No. 25-1189

# In the United States Court of Appeals
# for the Fourth Circuit

DONALD J. TRUMP, ET AL.,

*Defendants-Appellants,*

v.

NATL. ASSOC. OF DIVERSITY OFFICERS IN HIGHER EDU., ET AL.,
*Plaintiffs-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
District Court No. 1:25-cv-00333-ABA (Abelson, J.)

UNOPPOSED *AMICUS CURIAE* BRIEF OF AMERICAN CENTER FOR LAW
AND JUSTICE, SUPPORTING APPELLANTS

JAY ALAN SEKULOW
JORDAN SEKULOW*
STUART J. ROTH
BENJAMIN P. SISNEY
MATTHEW R. CLARK*
NATHAN J. MOELKER
LIAM R. HARRELL*
AMERICAN CENTER
   FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 546-8890
Fax: (202) 546-9309
Email: bsisney@aclj.org
*Counsel for Amicus Curiae*

*Not admitted in this jurisdiction.

**CORPORATE DISCLOSURE STATEMENT**

The American Center for Law and Justice ("ACLJ") submits this corporate disclosure statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29. The ACLJ is a non-profit legal corporation dedicated to the defense of constitutional liberties secured by law. The ACLJ has no parent corporation and issues no stock.

**Table of Contents**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES ................................................................... iv

INTEREST OF AMICUS ......................................................................1

INTRODUCTION ............................................................................2

ARGUMENT ...............................................................................4

    I.    This Court Should Stay the District Court's Injunction. Because Racial Discrimination is an Afront to the Constitution for Which the United States Government Has Authority to Deny Funding, There is No Likelihood of Success On the Merits. ...............................4

        A.    Racial Discrimination is a Fundamental Violation of Constitutional Norms. .....................................................5

        B.    Rationales for Racial Classification Never Satisfy the Standard of Strict Scrutiny..............................................................10

        C.    "Pure" Motives Cannot Justify Racial Discrimination. ...............12

        D.    The Executive Orders do not offend the First Amendment.........14

CONCLUSION ............................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
  570 U.S. 205 (2013).................................................................14

*Ark. Times LP v. Waldrip*,
  37 F.4th 1386 (8th Cir. 2022) (*en banc*)...................................3, 16, 17

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983).............................................................17-20

*Bolling v. Sharpe*,
  347 U.S. 497 (1954)..................................................................5

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)................................................................19

*Edmonson v. Leesville Concrete Co.*,
  500 U.S. 614 (1991)..................................................................7

*Fischer v. United States*,
  603 U.S. 480 (2024)..................................................................1

*Fisher v. Univ. of Texas*,
  570 U.S. 297 (2013)..............................................................7, 8, 9

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980)...............................................................6, 8

*Grutter v. Bollinger*,
  539 U.S. 306 (2003)................................................................12

*Hirabayashi* v. *United States*,
  320 U.S. 81 (1943)...................................................................5

iv

*Lamb's Chapel v. Center Moriches Sch. Dist.*,
    508 U.S. 384 (1993)......................................................................1

*Loving v. Virginia*,
    388 U.S. 1 (1967)........................................................................5

*McConnell v. FEC*,
    540 U.S. 93 (2003)......................................................................1

*Miller v. Johnson*,
    515 U.S. 900 (1995)............................................................ 10, 12

*Palmore v. Sidoti*,
    466 U.S. 429 (1984)....................................................................9

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007)........................................................ 4, 7, 10

*Plessy v. Ferguson*,
    163 U.S. 537 (1896)..................................................................5, 7

*Regan v. Taxation With Representation of Wash.*,
    461 U.S. 540 (1983)..................................................................15

*Republican National Committee v. Genser*,
    No. 24A408 (2024) ....................................................................1

*Rice v. Cayetano*,
    528 U.S. 495 (2000)....................................................................5

*Richmond v. J. A. Croson Co.*,
    488 U.S. 469 (1989)..................................................................11

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc. (FAIR)*,
    547 U.S. 47 (2006).............................................................. 16, 17

*Shaw v. Hunt*,
    517 U.S. 899 (1996)..................................................................11

*Shaw v. Reno,*
  509 U.S. 630 (1993) .................................................................................5, 10

*Shelley v. Kraemer,*
  334 U.S. 1 (1948) ...........................................................................................9

*Strauder v. West Virginia,*
  100 U.S. 303 (1879) .......................................................................................7

*Students for Fair Admissions, Inc. v. President & Fellows of Harv.*
  *Coll.*, 600 U.S. 181 (2023) ........................................ 1, 6, 8-10, 12, 13

*Trump v. Anderson,*
  601 U.S. 100 (2024) .......................................................................................1

*Trump v. United States*
   603 U.S. 593 (2024) .......................................................................................1

*Washington v. Davis,*
  426 U.S. 229 (1976) .......................................................................................8

*Winter v. NRDC, Inc.,*
  555 U.S. 7 (2008) ...........................................................................................4

*Wygant v. Jackson Bd. of Educ.,*
  476 U.S. 267 (1986) .....................................................................................11

*Yick Wo v. Hopkins,*
  118 U.S. 356 (1886) .......................................................................................8

## Constitutional Provisions

U.S. Const. amend. XIV ............................................................................5

## Other Authorities

Declaration of Independence (U.S. 1776). ................................................5

Cong. Globe, 39th Cong., 1st Sess. (1866)..................................................6

Executive Order 14,151, 90 FR 8339 .......................................................12

Executive Order 14,173, 90 FR 8633 .......................................................13

The American Center for Law and Justice ("ACLJ") is an organization dedicated to the defense of constitutional liberties secured by law. ACLJ attorneys have appeared often before the Supreme Court as counsel for parties, e.g., *Trump v. Anderson*, 601 U.S. 100 (2024) (unanimously holding that states have no power under the U.S. Constitution to enforce Section Three of the Fourteenth Amendment with respect to federal offices); *McConnell v. FEC*, 540 U.S. 93 (2003) (unanimously holding that minors enjoy the protection of the First Amendment); *Lamb's Chapel v. Center Moriches Sch. Dist.*, 508 U.S. 384 (1993) (unanimously holding that denying a church access to public school premises to show a film series on parenting violated the First Amendment); or as amici, e.g., *Republican National Committee v. Genser*, No. 24A408 (2024); *Trump v. United States*¸ 603 U.S. 593 (2024); *Fischer v. United States*, 603 U.S. 480 (2024); and *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181 (2023). The ACLJ has a fundamental interest in fighting racial discrimination and defending the constitutional principle of equal protection under the law for all people, as made in the *imago Dei*.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amicus curiae state that no counsel for any party authored this brief in whole or in part, and no entity or person, aside from amicus curiae, its members, and its counsel, made any monetary contribution toward the preparation or submission of this brief. All parties have consented to the filing of this amicus brief.

**INTRODUCTION**

Our nation was founded on the "self-evident" proposition that "all men are created equal." At the core of our Constitution and our law is the guarantee of equality and the prohibition of all forms of racial discrimination. Prohibiting racial discrimination among those who receive federal funding is neither novel nor suspect, but, rather, is a well-established practice. Racial discrimination should not be tolerated under any disguise, including the guise of Diversity, Equity, and Inclusion ("DEI") programs.

At the heart of this case are two executive orders seeking to dismantle systemic racial discrimination within federal grant and contract processes. These orders represent a recommitment to the constitutional principle that government must treat citizens as individuals, not as racial archetypes. The Supreme Court has repeatedly and unequivocally rejected the notion that racial discrimination can be remedied through more racial discrimination. In landmark decisions, particularly *Students for Fair Admissions v. Harvard*, the Supreme Court has made crystal clear that racial classifications—whether packaged as "affirmative action," "equity," or "diversity"—are fundamentally incompatible with the Equal Protection Clause of the Fourteenth Amendment or with the system of civil rights law. All individuals possess inherent dignity that transcends racial categorization. Racial discrimination is always unacceptable, even when done for purportedly benign reasons, or for the

ostensible benefit of those of differing races.

The executive orders in question do not restrict speech or attack ideological diversity. Instead, they simply require federal contractors to certify that they are not engaging in illegal racial discrimination. This is not a limitation of viewpoint, but a necessary prohibition of unlawful conduct. Contractors remain free to advocate for any DEI principles they choose—they are simply prohibited from implementing those principles through racially discriminatory practices, a practice already made illegal under federal law. In *Bob Jones University v. United States*, the Supreme Court has already specifically addressed whether entities it determines engage in racially discriminatory conduct can be denied a generally available federal benefits program and answered that question with a resounding yes. Other courts have upheld statutes requiring contractors to agree not to engage in national origin discrimination. *See Ark. Times LP v. Waldrip*, 37 F.4th 1386 (8th Cir. 2022) (*en banc*). Racial discrimination on the public dime cannot be justified by religious doctrine, institutional tradition, or purportedly benevolent intentions. In fact, the government has not only the right but the constitutional obligation to withhold benefits from entities that engage in racial discrimination.

The government's interest in preventing racial discrimination is not just legal—it is compelling and of the highest constitutional order. Whether in education, employment, or public contracting, racial distinctions are inherently suspect and

subject to the most rigorous judicial scrutiny. The Supreme Court has consistently held that ameliorating societal discrimination through race-based preferences is not a constitutionally acceptable strategy, and it should not be tolerated here either. True equality is not racial categorization but recognizing the unique worth of each person.

## ARGUMENT

I.     **This Court Should Stay the District Court's Injunction**. **Because Racial Discrimination is an Afront to the Constitution for Which the United States Government Has Authority to Deny Funding**, **There is No Likelihood of Success On the Merits.**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). Here, the crucial first part of the inquiry into the propriety of an injunction, likelihood of success on the merits, should lead this Court to stay the District Court's injunction. Prohibiting racial discrimination among those who receive federal funding is not novel or suspect, but is well-recognized as an implementation of the government's compelling interest to ensure that no invidious discrimination is tolerated. "The way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion of Roberts, C.J.).

No matter the label, racial discrimination violates fundamental principles of our republic, and the government has a compelling interest of the highest order in

preventing that illegal conduct. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Rice* v. *Cayetano*, 528 U.S. 495, 517 (2000) (quoting *Hirabayashi* v. *United States*, 320 U.S. 81, 100 (1943)).

### A. Racial Discrimination is a Fundamental Violation of Constitutional Norms.

Racial discrimination is at the very core of the Constitution's protections. "[I]n view of the Constitution, in the eye of the law, there is in this country no superior, dominant, ruling class of citizens. There is no caste here. Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting). This commitment harkens back to the Nation's very founding, affirming that "all men are created equal." THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

Although often far from living up to this standard, the American people redoubled their commitment to that goal with the passage of the Fourteenth Amendment. Its Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, §1. Courts are to treat distinctions between citizens based on their race or ethnic origin as suspect, *see, e.g., Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), and the Equal Protection Clause "demands that racial classifications . . . be subjected to the

most rigid scrutiny," *Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see also Shaw v. Reno*, 509 U.S. 630, 643 (1993) ("*Shaw I*") (racial distinctions "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility").

The Supreme Court has just made clear that racial affirmative action—done in the name of "diversity"—is itself race-based discrimination and unconstitutional. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230-31 (2023). Constitutional analysis begins from the fundamental proposition that "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect." *Fullilove v. Klutznick*, 448 U.S. 448, 523 (1980) (Stewart, J., dissenting). The Supreme Court has emphasized "the inherent folly . . . of trying to derive equality from inequality[.]" *Students for Fair Admissions, Inc.*, 600 U.S. at 203. Racial discrimination is inherently improper, regardless of motive.

To its proponents, the Equal Protection Clause represented a "foundation[al] principle"— "the absolute equality of all citizens of the United States politically and civilly before their own laws." Cong. Globe, 39th Cong., 1st Sess., 431 (1866) (statement of Rep. Bingham). The use of racial discrimination of whatever kind, for whatever alleged reason, is inherently incompatible with the inherent, equal dignity of all persons. "What is this," the Supreme Court said, "but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether

6

colored or white, shall stand equal before the laws of the States?" *Strauder v. West Virginia*, 100 U.S. 303, 307-309 (1879).

When educational institutions forbid the differential treatment of individuals on the basis of racial labels, they properly set themselves against insidious discrimination. But when such institutions, or institutions of any kind, undertake to treat people differentially on the basis of racial labels, they run afoul of the norm of color-blindness embraced by the Equal Protection Clause of the Fourteenth Amendment and laws against race discrimination, such as Title VI of the Civil Rights Act of 1964. "[E]very time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all." *Fisher v. Univ. of Texas*, 570 U.S. 297, 316 (2013) (Thomas, J., concurring) (internal quotation marks and citation omitted). The Supreme Court has made very clear that "[r]acial discrimination [is] invidious in all contexts," *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991). The government has every right, and even a fundamental responsibility, to refuse to tolerate it wherever it rears its head.

To the Constitution of the United States, there is but one race: the human race. "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy*, 163 U.S. at 559 (Harlan, J., dissenting). "To be forced to live under a state-mandated racial label is inconsistent with the dignity of individuals in our society." *Parents Involved in Cmty. Sch.*, 551 U.S. at 797 (Kennedy, J., concurring

in part and concurring in the judgment). The "central purpose" of the Equal Protection Clause is to prohibit "official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976); *see also e.g., Students for Fair Admissions, Inc.*, 600 U.S. at 206. (the "core purpose" of the Equal Protection Clause is "doing away with all governmentally imposed discrimination based on race" (internal quotation marks and alterations omitted)).

The guarantees of equal protection "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). That entities may profess a benign motive for this exercise does not change the fact that "the very attempt to define with precision a beneficiary's qualifying racial characteristics is repugnant to our constitutional ideals." *Fullilove*, 448 U.S. at 534 n.5 (Stevens, J., dissenting). In fact, "[t]he worst forms of racial discrimination in this Nation have always been accompanied by straight-faced representations that discrimination helped minorities." *Fisher*, 570 U.S. at 328 (Thomas, J., concurring). Racial labelling of whatever kind, for whatever reason is inconsistent with the Fourteenth Amendment and Titles VI and VII of the Civil Rights Act of 1964. "The time cannot come too soon when no governmental decision will be based upon immutable characteristics of pigmentation or origin." *Fullilove*, 448 U.S. at 516 (Powell, J., concurring).

Human beings cannot be pigeonholed into racial boxes, and it is offensive to insist that they can or must be so labeled. "Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc.*, 600 U.S. at 206. The Supreme Court has recently had cause to reiterate the impermissibility and unlawfulness of racial classifications of all kinds, regardless of motive. "Harvard and UNC now forthrightly state that they racially discriminate when it comes to admitting students, arguing that such discrimination is consistent with this Court's precedents." *Id.* at 261. (Thomas, J., concurring). In particular, affirmative action was purportedly justified based on interests in promoting DEI.

The Supreme Court thoroughly rejected the argument: "discrimination on the basis of race—often packaged as 'affirmative action' or 'equity' programs—[is] based on the benighted notion 'that it is possible to tell when discrimination helps, rather than hurts, racial minorities.'" *Id.* (Thomas, J., concurring) (quoting *Fisher*, 570 U.S. at 328 (Thomas, J., concurring)). This reasoning is an affront to the "core purpose" of the Equal Protection Clause: "do[ing] away with all governmentally imposed discrimination based on race." *Palmore v. Sidoti*, 466 U.S. 429, 432 (1984). The "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities." *Shelley v. Kraemer*, 334 U.S. 1, 22 (1948).

> The solution to our Nation's racial problems thus cannot come from policies grounded in affirmative action or some other conception of equity. Racialism simply cannot be undone by different or more

9

racialism. Instead, the solution announced in the second founding is incorporated in our Constitution: that we are all equal, and should be treated equally before the law without regard to our race. Only that promise can allow us to look past our differing skin colors and identities and see each other for what we truly are: individuals with unique thoughts, perspectives, and goals, but with equal dignity and equal rights under the law.

*Students for Fair Admissions, Inc.*, 600 U.S. at 277 (Thomas, J., concurring).

The Supreme Court made clear that racial discrimination is never acceptable, even on grounds like diversity. "We have time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *Id.* at 220. (quoting *Shaw I*, 509 U.S. at 647). The Supreme Court has repeatedly explained that the protections of the Equal Protection clause extend to all persons alike and require that all people be treated equally. *See Parents Involved in Cmty. Sch.*, 551 U.S. at 730 (2007) (plurality opinion of Roberts, C.J.) (citing *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

## B. Rationales for Racial Classification Never Satisfy the Standard of Strict Scrutiny

Part of the supposed justification for DEI is the undoubted history of past discrimination in this country. The Supreme Court rejected this alleged justification for current race-based decisions, explaining that it has "repeatedly held that ameliorating societal discrimination does not constitute a compelling interest that

justifies race-based state action." *Students for Fair Admissions, Inc.*, 600 U.S. at 226-27. This was not novel. The Supreme Court had previously held that "[a] generalized assertion of past discrimination," *Shaw v. Hunt*, 517 U.S. 899, 909 (1996), is insufficient to justify current racial discrimination, as "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Id.* at 909-910. In *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 477 (1989), the Supreme Court held that a city government contracting program that provided unique benefits to minorities violated the Equal Protection clause. Permitting "past societal discrimination" to "serve as the basis for rigid racial preferences would be to open the door to competing claims for 'remedial relief 'for every disadvantaged group." *Id.* at 505. "[S]uch a result would be contrary to both the letter and spirit of a constitutional provision whose central command is equality." *Id.* at 506.

In *Croson*, the majority held that Richmond had failed to demonstrate a compelling interest supporting its program. Were Richmond correct in its "claim that [an interest in combating] past societal discrimination alone" is compelling, it "would open the door to competing claims [from different groups and create] a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs." *Id.* at 505-06 (emphasis added); *see also Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274-76 (1986) (rejecting racial classifications in a school district's teacher layoff policy when offered as a means of providing minority role models for

its minority students and as a means of alleviating past societal discrimination).

### C. "Pure" Motives Cannot Justify Racial Discrimination.

The Supreme Court has made very clear that neither diversity, *Students for Fair Admissions, Inc.*, 600 U.S. at 214 (Harvard's goal of "better educating its students through diversity" is "not sufficiently coherent for purposes of strict scrutiny."), equity, *id.* at 261 (Thomas, J., concurring) (emphasizing that illegal "discrimination on the basis of race" is still illegal if "packaged as 'affirmative action' or 'equity' programs[.]"), nor inclusion, *id.* at 220 ("The point of respondents' admissions programs is that there is an inherent benefit in race qua race—in race for race's sake."), can justify racial discrimination. Instead, the Equal Protection Clause's "central mandate is racial neutrality in governmental decisionmaking," *Miller*, 515 U.S. at 904; *Students for Fair Admissions, Inc.*, 600 U.S. at 258. (Thomas, J., concurring) ("[I]t has long been apparent that 'diversity [was] merely the current rationale of convenience' to support racially discriminatory admissions programs." (quoting *Grutter v. Bollinger*, 539 U.S. 306, 393 (2003) (Kennedy, J., dissenting)).

Accordingly, the President issued two Executive Orders. On January 20, 2025, the President issued Executive Order 14,151, 90 FR 8339, entitled Ending Radical and Wasteful Government DEI Program and Preferencing (J20). J20 sought to eliminate "illegal and immoral discrimination programs, going by the name

'diversity, equity, and inclusion' (DEI)," in the Government. J20 § 1. As is relevant here, J20 includes a Termination Provision, which directs that within 60 days of its issuance, "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM . . . terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts." *Id.* § 2(b)(i) (emphasis added).

On January 21, 2025, the President issued Executive Order 14,173, 90 FR 8633, entitled Ending Illegal Discrimination and Restoring Merit-Based Opportunity (J21). J21 sought to "enforce[e] our civil-rights laws" by "ending illegal preferences and discrimination." J21 § 1. As is relevant here, J21 includes a Certification Requirement, which provides that "[t]he head of each agency shall include in every contract or grant award … [a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B). J21 made clear, however, that it did not restrict recipients "from engaging in First Amendment-protected speech." *Id.* § 7(b). In directing implementation of this new policy initiative, the Executive has expressly confined its actions to the extent permitted by federal law. Racial discrimination of whatever kind is flatly prohibited by law and the Constitution. "Outright racial balancing is patently unconstitutional." *Students for Fair Admissions, Inc.*, 600 U.S. at 223 (brackets and quotations omitted). These

orders merely enforce and apply, and are consistent with, the law.

### D. The Executive Orders do not offend the First Amendment.

Viewpoint discrimination must never be taken lightly. But these orders are expressly, on their face, no act of viewpoint discrimination at all, but a prohibition of already illegal racial discrimination, that is, illegal conduct on the part of government contractors. The orders make very clear the target of their prohibition; discrimination on the basis of race. Grantees and contractors must certify that they do not "operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws," J21 Order § 3(iv)(B). In other words, they must certify that they do not engage in racial discrimination. The alternative "viewpoint," racial discrimination, is not a viewpoint under First Amendment protection, but illegal *conduct*. This law requires a certification from contractors that they are not engaging *in conduct* that is already illegal under existing antidiscrimination laws. They are not required to certify any agreement with any definition of DEI or stop supporting DEI, they must simply stop unlawful conduct.

Plaintiffs possess no First Amendment right to violate federal antidiscrimination laws in the first place. Moreover, First Amendment concerns arise in the context of "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-215 (2013). But conditions themselves are not per se

14

illegitimate.  In *Regan v. Taxation With Representation of Washington*, the Supreme

Court upheld a requirement that nonprofit organizations seeking tax-exempt status

under 26 U.S.C. §501(c)(3) not engage in substantial efforts to influence legislation.

461 U.S. 540, 546 (1983) (dismissing "the notion that First Amendment rights are

somehow not fully realized unless they are subsidized by the State" (internal

quotation marks omitted)). The tax-exempt status, the Supreme Court explained,

"ha[d] much the same effect as a cash grant to the organization." *Id.* at 544. The

corporation challenged the statute arguing, among other things, that "Congress'

decision not to subsidize its lobbying violate[d] the First Amendment [because] the

prohibition against substantial lobbying by § 501(c)(3) organizations impose[d] an

'unconstitutional condition' on the receipt of tax-deductible contributions." *Id.* at

545 (citation omitted) (bracketed alterations supplied).

The Court discussed the nature of tax exemptions and tax deductions and

concluded that tax exemptions are a form of subsidy.  And by limiting that benefit,

§501(c)(3) status, to organizations that did not attempt to influence legislation,

Congress had merely "chose[n] not to subsidize lobbying." *Id.* at 544. Likewise,

there is no requirement that the government subsidize illegal racial discrimination.

On the contrary, it is illegal and should be treated as such. As the Eighth Circuit

sitting *en banc* explained when addressing a statutory requirement that government

contractors not discriminate against Israel: "A factual disclosure of this kind, aimed

at verifying compliance with unexpressive conduct-based regulations, is not the kind of compelled speech prohibited by the First Amendment." *Ark. Times LP v. Waldrip*, 37 F.4th 1386, 1394 (8th Cir. 2022) (*en banc*); *id.* ("Although it requires contractors to agree to a contract provision they would otherwise not include, it does not require them to publicly endorse or disseminate a message. Instead, the certification targets the noncommunicative aspect of the contractors' conduct—unexpressive commercial choices.").

The Court below reasoned that the Executive Order requires "federal contractors and grantees to confirm under threat of perjury and False Claims Act liability that they do not operate any programs promoting DEI that the government might contend violate federal anti-discrimination laws. J21 Order § 3(b)(iv)." Mot. Stay Add. 48. This straw-man reasoning sets aside what the President's Executive Order actually says. It instead requires grantees to certify that they not "operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws," J21 Order § 3(iv)(B). This is a crucial distinction. Grantees are in no way required to certify agreement with the federal government's definition or even that they are complying with that definition. Instead, they are simply required to certify that they are not violating *discrimination laws themselves*. The meaning remains tied to federal law. The Certification Requirement does not limit plaintiffs' protected speech by compelling or restricting their speech: they remain free to espouse any

16

viewpoint they want, including advocating for whatever DEI activities they prefer. But what they cannot do is *engage* in pernicious racially discriminatory *conduct*.

This issue is not novel. In *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. (FAIR)*, 547 U.S. 47 (2006), law schools banned military recruiters from their campuses and in response, Congress conditioned federal grant money on allowing military recruiters on campus. *Id.* at 52. The Supreme Court held that the law schools' refusal to allow military recruiters did not implicate the First Amendment because such a refusal was "not inherently expressive." *Id.* at 66. The Court made clear that only the schools' *non-expressive* conduct was unprotected. *Id.* at 60. The law schools were still free to express their views in other ways, such as through posting signs and organizing student protests. In other words, the law "regulates conduct, not speech. It affects what law schools must do--afford equal access to military recruiters--not what they may or may not say." *Id.* Likewise, Arkansas' contractor requirement did not prohibit any speech, "[i]t only prohibits economic decisions that discriminate against Israel. Because those commercial decisions are invisible to observers unless explained, they are not inherently expressive and do not implicate the First Amendment." *Waldrip*, 37 F.4th at 1394.

This distinction between conduct and expression is particularly crucial when addressing racial discrimination. The Supreme Court has already specifically addressed whether entities that engage in racial discrimination may be denied the

17

benefits of a generally available program, and answered that question with a resounding yes. The Court held that "schools that prescribe and enforce racially discriminatory admissions standards on the basis of religious doctrine" can properly and constitutionally be denied tax exemption. *Bob Jones Univ. v. United States*, 461 U.S. 574, 577 (1983). The IRS denied tax exemption to all schools which engaged in racial discrimination at any level of education, based on the "national policy to discourage racial discrimination in education." *Id.* at 579. The Supreme Court upheld this policy, even as applied to religious schools that racially discriminated based on religious belief: "there can no longer be any doubt that racial discrimination in education violates deeply and widely accepted views of elementary justice." *Id.* at 592.

The statutory analysis in *Bob Jones University* regarding the law governing taxation and the IRS is beyond the scope of this case.[2] But what is crucial here is the Court's rejection of the argument for a First Amendment right to engage in racially discriminatory *conduct*. The Supreme Court applied strict scrutiny and held that the denial of benefits based on the conduct of racial discrimination met that high

---

[2] In fact, Justice Powell concurred in *Bob Jones* and then-Justice Rehnquist dissented, but both agreed fully with the Court's First Amendment analysis, making that aspect of the decision unanimous: *Bob Jones Univ.*, 461 U.S. at 606 (Powell, J., concurring) ("I join the Court's judgment, along with Part III of its opinion holding that the denial of tax exemptions to petitioners does not violate the First Amendment."); *Id.* at 622 n. 3 (Rehnquist, J., dissenting) ("I agree with the Court that such a requirement would not infringe on petitioners' First Amendment rights.").

standard: "the Government has a fundamental, overriding interest in eradicating racial discrimination in education -- discrimination that prevailed, with official approval, for the first 165 years of this Nation's constitutional history. That governmental interest substantially outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs." *Id.* at 604. There is a compelling interest of the highest order in prohibiting racial discrimination, and there is no less restrictive alternative "available to achieve the governmental interest." *Id. Bob Jones University* does not give the imprimatur to denying benefits based on religious beliefs or expression; it instead highlights the uniquely overwhelming interest in eradicating discriminatory conduct. If anything, the Executive Orders here, limited to illegal discrimination, are narrower and accordingly more justifiable than the exclusion in *Bob Jones University*, which concerned a broader policy of ending discrimination.

The Supreme Court has regularly emphasized that the prevention of racial discrimination is a compelling government interest. *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) ("The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."); *Bob Jones Univ.*, 461 U.S. at 604 ("[T]he Government has a fundamental, overriding interest in eradicating racial discrimination in

education."). The key import of cases like *Bob Jones University* is that when the government takes action to prevent racially discriminatory conduct, it is not thereby targeting viewpoints. The government possesses a compelling interest of the highest order in eradicating racial discriminatory conduct, one of the rare interests that satisfies even strict scrutiny under the Free Exercise Clause and which requires denying a government benefit. That interest is at stake here, and racial discrimination cannot be justified by even the sincerest beliefs. "Whatever may be the rationale for such private schools' policies, and however sincere the rationale may be, racial discrimination in education is contrary to public policy." *Bob Jones Univ.*, 461 U.S. at 595. So is the conduct the orders in question seek to cut off from government funds.

## CONCLUSION

For the foregoing reasons, *Amicus Curiae* the American Center for Law and Justice respectfully asks this Court to grant the Appellants' Motion for Stay Pending Appeal.

Respectfully Submitted,

JAY ALAN SEKULOW
  *Counsel of Record*
JORDAN SEKULOW*
STUART J. ROTH

*/s/ Benjamin P. Sisney*
BENJAMIN P. SISNEY

MATTHEW R. CLARK*
NATHAN J. MOELKER
LIAM R. HARRELL
AMERICAN CENTER
  FOR LAW & JUSTICE
201 Maryland Ave., NE
Washington, DC 20002
Phone: (202) 546-8890
Fax: (202) 546-9309
Email: bsisney@aclj.org
*Counsel for Amicus Curiae*

*Not admitted in this jurisdiction

# CERTIFICATE OF COMPLIANCE

## with type volume limit, typeface Requirements and type-style requirements

This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(b) because it contains 4,722 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f).

**This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft word for office 365 in 14-point Times New Roman font.**

**Date:** March 11, 2025

/s/ Benjamin P. Sisney
BENJAMIN P. SISNEY
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2025, I electronically filed a copy of the foregoing *Amicus Curiae* Brief using the ECF System which will send notification of that filing to all counsel of record in this litigation.

**Date:** <u>March 11, 2025</u>                    <u>*/s/ Benjamin P. Sisney*   </u>
                                        BENJAMIN P. SISNEY
                                        *Counsel for Amicus Curiae*