**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

_____

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER
EDUCATION, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Maryland

_____

**BRIEF FOR APPELLANTS**

_____

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

MARK R. FREEMAN
DANIEL TENNY
JACK STARCHER
CATHERINE PADHI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ........................................................................2

STATEMENT OF THE ISSUES ............................................................................2

PERTINENT STATUTES AND REGULATIONS....................................................3

STATEMENT OF THE CASE................................................................................4

     A.    Background ........................................................................4

     B.    Prior Proceedings ........................................................5

SUMMARY OF ARGUMENT ................................................................................8

STANDARD OF REVIEW ...................................................................................11

ARGUMENT12

I.    Plaintiffs Have No Likelihood of Success on the Merits .....................12

     A.    Plaintiffs' challenge to the Termination Provision
            is unlikely to succeed .......................................................12

           1.    Plaintiffs' claims fail at the threshold..................................12

           2.    The Termination Provision is not
                  unconstitutionally vague .......................................................17

     B.    Plaintiffs' challenge to the Report Provision is
            unlikely to succeed..........................................................23

           1.    Plaintiffs' challenge fails at the threshold .........................24

2. The Report Provision complies with the Fifth and First Amendments..............................................29

C. Plaintiffs' challenge to the Certification Provision is unlikely to succeed ..........................................................33

1. Plaintiffs' challenge fails at the threshold ..........................34

2. The Certification Provision is not unconstitutional..........37

II. The Equitable Factors Favor the Government and Cannot Support the District Court's Expansive Injunction ...............................42

CONCLUSION .................................................................................................49

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                             **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed. Reserve*
*Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ................................................................ 16

*Association of Am. Physicians & Surgeons v. Clinton*,
997 F.2d 898 (D.C. Cir. 1993) .............................................................. 43

*Beck v. McDonald*,
848 F.3d 262 (4th Cir. 2017) ................................................. 13, 28, 35

*Boaz Hous. Auth. v. United States*,
994 F.3d 1359 (Fed. Cir. 2021) ........................................................... 16

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ............................................................................... 21

*Building & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .............................................................. 23

*Central Radio Co. v. City of Norfolk*,
811 F.3d 625 (4th Cir. 2016) ............................................................... 31

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................. 12, 16, 27

*Department of Educ. v. California*,
No. 24A910, 2025 WL 1008354 (U.S. Apr. 4, 2025) ........................ 16

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ............................................................................... 31

*Gill v. Whitford*,
585 U.S. 48 (2018) ................................................................................. 46

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................................... 18

*Guardians Ass'n v. Civil Serv. Comm'n of City of New York*,
463 U.S. 582 (1983) ............................................................................... 38

*Haaland v. Brackeen*,
   599 U.S. 255 (2023)...................................................................................47

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ......................................................................32

*Humanitarian Law Project v. U.S. Treasury Dep't*,
   578 F.3d 1133 (9th Cir. 2012) ...............................................................18, 19

*Laird v. Tatum*,
   408 U.S. 1 (1972) ..................................................................................16, 27

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...................................................................................47

*Maynard v. Cartwright*,
   486 U.S. 356 (1988)...................................................................................22

*MicroStrategy Inc. v. Motorola, Inc.*,
   245 F.3d 335 (4th Cir. 2001) ......................................................................11

*Myers v. United States*,
   272 U.S. 52 (1926).....................................................................................43

*National Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998)...........................................................................19, 20, 21

*National Park Hosp. Ass'n v. Department of the Interior*,
   538 U.S. 803 (2003)...................................................................................13

*Nken v. Holder*,
   556 U.S. 418 (2009)...............................................................................8, 42

*Northrop Grumman v. United States*,
   46 Fed. Cl. 622 (2000) ...............................................................................22

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998)...................................................................................13

*Reno v. Catholic Soc. Servs., Inc.*,
   509 U.S. 43 (1993).....................................................................................13

*Rice v. Paladin Enters., Inc.,*
128 F.3d 233 (4th Cir. 1997) ................................................. 30

*Sabri v. United States,*
541 U.S. 600 (2004) ........................................................... 21

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
591 U.S. 197 (2020) ....................................................... 43, 45

*Susan B. Anthony List v. Driehaus,*
573 U.S. 149 (2014) ........................................................... 26

*Texas v. United States,*
523 U.S. 296 (1998) ........................................................... 13

*Trump v. New York,*
592 U.S. 125 (2020) ........................................................... 13

*United States v. Moriello,*
980 F.3d 924 (4th Cir. 2020) ................................................. 21

*United States v. Texas,*
599 U.S. 670 (2023) ........................................................... 31

*United States ex rel. Purcell v. MWI Corp.,*
807 F.3d 281 (D.C. Cir. 2015) ............................................... 41

*United States ex rel. Wilson v. Kellogg Brown & Root,*
525 F.3d 370 (4th Cir. 2008) ................................................. 41

*Universal Health Servs., Inc. v. United States ex rel. Escobar,*
579 U.S. 176 (2016) ........................................................... 39

*Washington State Grange v. Washington State Republican Party,*
552 U.S. 442 (2008) ........................................................... 21

*Whole Woman's Health v. Jackson,*
595 U.S. 30 (2021) ............................................................ 25

*Wild Va. v. Council on Envtl. Quality,*
56 F.4th 281 (4th Cir. 2022) ................................................. 13

*Wills v. Pszczolkowski*,
     125 F.4th 534 (4th Cir. 2025) ......................................................... 18, 29


## U.S. Constitution:

Art. II:
     § 1, cl. 1................................................................................................ 43
     § 2, cl. 1................................................................................................ 43
     § 3 ......................................................................................................... 43


## Statutes:

Civil Rights Act of 1964,
     42 U.S.C. § 2000d-1 ............................................................................. 37

False Claims Act,
     31 U.S.C. § 3729(a) .............................................................................. 39

National Foundation on the Arts and Humanities Act,
     20 U.S.C. § 954(d)(1) ........................................................................... 20

Tucker Act,
     28 U.S.C. § 1491(a) .............................................................................. 16

28 U.S.C. § 1292(a)(1) ................................................................................. 2

28 U.S.C. § 1331 .......................................................................................... 2


## Regulatory Materials:

2 C.F.R. § 200.340(a)(4) ............................................................................ 22

Exec. Order No. 14,151,
     90 Fed. Reg. 8339 (Jan. 20, 2025)................................................... 4, 12

Exec. Order No. 14,173,
     90 Fed. Reg. 8633 (Jan. 21, 2025).......................................... 4, 5, 7, 24,
                                                                                                    30, 34, 35

## Other Authority:

Office of Legal Counsel, *Proposed Executive Order Entitled*
   *"Federal Regulation,"*
   5 Op. O.L.C. 59 (1981) ........................................................................................... 43

**INTRODUCTION**

The preliminary injunction at issue here inserts the district court between the President and the agencies he is constitutionally charged with supervising. It broadly enjoined three provisions of Executive Orders that merely directed federal officials to take lawful actions consistent with the President's priorities. The motions panel properly stayed the injunction pending appeal, and this Court should now vacate it.

Although numerous errors infected the district court's analysis, they reflect a common theme. The district court ignored the text of the Executive Orders, which directed federal agencies to carry out their lawful authorities consistent with the President's policy priorities and instead presumed that agencies would take unlawful actions in violation of both the statutes and regulations that govern agency conduct and the Executive Orders themselves.

These errors caused the district court to erroneously conclude that plaintiffs had presented a live case or controversy and were likely to succeed on the merits. They also infected the court's assessment of the harms, causing the court to downplay the importance of vindicating the President's lawful directives to the Executive Branch and to foresee harms

that no plausible understanding of the Executive Orders would create. To top it all off, the court improperly extended its injunction beyond the plaintiffs in this case, and even beyond the defendants in this case to the entire Executive Branch.

This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, Dkt. No. 1, JA26, but jurisdiction is contested, *see infra* pp. 12-17, 24-29, 34-37. The district court granted plaintiffs' motion for a preliminary injunction on February 21, 2025. Dkt. No. 45, JA128. The government timely appealed on February 24, 2025. Dkt. No. 48, JA131. The district court issued an order purporting to clarify the scope of the injunction on March 10, 2025. Dkt. No. 67, JA152. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

The issues presented in this appeal are:

1.     Whether the district court erroneously concluded that plaintiffs could establish jurisdiction and a likelihood of success on the merits for their challenge to three provisions of Executive Orders:

a. The Termination Provision, which instructs federal agencies to terminate, to the extent consistent with law, contracts inconsistent with certain presidential priorities;

b. The Report Provision, which directs the Attorney General to submit a report regarding enforcement strategies to deter certain unlawful conduct on which the President wished to focus; and

c. The Certification Provision, which directs federal agencies to require contractors to certify compliance with federal law in certain respects and to acknowledge that such compliance is material to the federal government's payment decisions.

2.      Whether the district court erred in applying the remaining preliminary injunction factors and in crafting an injunction that applied beyond plaintiffs and defendants to the entire Executive Branch.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Background

On January 20, 2025, the President issued Executive Order 14,151, 90 Fed. Reg. 8339, entitled *Ending Radical and Wasteful Government DEI Programs and Preferencin*g (EO 14,151), to eliminate "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," in the government. EO 14,151 § 1. As relevant here, EO 14,151 includes a Termination Provision, which directs "[e]ach agency, department, or commission head" to "terminate, *to the maximum extent allowed by law,* ... 'equity-related' grants or contracts." *Id.* § 2(b)(i) (emphasis added).

On January 21, 2025, the President issued Executive Order 14,173, 90 Fed. Reg. 8633, entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (EO 14,173), to "enforc[e] our civil-rights laws" by "ending illegal preferences and discrimination." EO 14,173 § 1. As relevant here, EO 14,173 includes a Certification Provision instructing each agency head to "include in every contract or grant award" a requirement that the recipient "certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B).

That certification is material to the government's payment decisions. *Id.* § 3(b)(iv)(A).

Executive Order 14,173 also includes a Report Provision, which directs the Attorney General, in consultation with federal agencies, to write a report identifying "[t]he most egregious and discriminatory DEI practitioners" and outlining a plan of action to "deter DEI programs or principles … that constitute illegal discrimination or preferences," including through "[l]itigation," "[p]otential regulatory action and sub-regulatory guidance," and "[o]ther strategies." EO 14,173 § 4(b). EO 14,173 made clear, however, that it did not restrict recipients "from engaging in First Amendment-protected speech." *Id.* § 7(b).

## B.    Prior Proceedings

1. Plaintiffs—the Mayor and City Council of Baltimore, Maryland, as well as three associations—challenge, as relevant here, (1) the Certification and Report Provisions as infringing the First Amendment's Free Speech Clause; and (2) the Termination and Report Provisions as void for vagueness under the Fifth Amendment's Due Process Clause. The district court granted a universal preliminary injunction, Dkt. No. 45, JA128.

The district court determined that plaintiffs were likely to succeed in showing that the Termination Provision was unconstitutionally vague because the Order did not provide sufficient notice about the "equity-related" contracts to which it applies. JA102-108. The court enjoined the government from terminating or changing the terms of any awards, contracts, or obligations on the basis of the Termination Provision.

In the district court's view, the Report Provision's directive to the Attorney General to write a report to the President regarding an "appropriate and effective civil rights policy" was likely unconstitutionally vague because it did not sufficiently specify which DEI programs would fall within the scope of the directive. JA117-119. The court also concluded that the directive was likely an unlawful content- and viewpoint-based restriction on protected speech because it "disfavored" DEI views and programs. JA113-117.

The district court provided relief from the Report Provision, which it labeled the "Enforcement Threat Provision," by prohibiting defendants from bringing any enforcement action "pursuant to" that provision. JA130. The court stated, however, that it would not enjoin the provision "to the extent it is merely a directive from the President to the Attorney General"

to create a plan "to deter DEI programs or principles … that constitute illegal discrimination or preferences.'" JA114 n.13 (quoting EO 14,173 § 4(b)(iii) (alteration in original)).

The district court also concluded that the Certification Provision, which requires certifying that DEI programs comply with federal law, likely chilled speech in violation of the First Amendment. The court enjoined defendants from requiring any certification or other representation pursuant to the Certification Provision.

2. The government filed a timely notice of appeal, Dkt No. 47, JA131, and moved for a stay in district court the next day, Dkt No. 48. The district court denied the government's stay motion, largely for the reasons given in its decision granting the preliminary injunction. Dkt No. 61, JA134.

The government then sought a stay in this Court. While that motion was pending, the district court purported to "clarify" that the injunction bound *all* federal agencies and officers, regardless of whether they were defendants before the court. Dkt. No. 67, JA152. This Court granted the government's motion and accordingly stayed the preliminary injunction in its entirety. Order 1-2. The Court unanimously concluded that the government had satisfied the demanding standard for obtaining a stay

pending appeal under *Nken v. Holder*, 556 U.S. 418, 426 (2009). Order 2. All three members of the motions panel noted in concurring opinions that plaintiffs were challenging provisions on their face rather than in connection with any particular set facts. *See* Order 4-5 n.2 (Diaz, C.J., concurring) (noting lack of clarity about how order would be applied); Order 7 (Harris, J., concurring) (noting distinction between facial challenge and enforcement of orders); Order 9 (Rushing, J., concurring) (noting that "this case does not challenge any particular agency action implementing the Executive Orders"). As Judge Rushing noted in her concurrence, that aspect of plaintiffs' challenges raises "serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it." Order 9 (Rushing, J., concurring).

## SUMMARY OF ARGUMENT

I. The district court's preliminary injunction was premised on a misunderstanding of the three Executive Order provisions at issue that caused multiple errors relating both to jurisdiction and the merits.

A. The Termination Provision directs federal agencies, to the extent consistent with law, to terminate equity-related grants or contracts. The district court's jurisdictional and merits analysis of this provision was

driven by its erroneous view that private parties were required to assess what was meant by "equity-related." The provision is a directive within the Executive Branch and relates only to contracting decisions over which federal agencies have discretion. Plaintiffs thus have no reason to curtail their activities to attempt to conform to the definition—the alleged chilling that ostensibly gave rise to standing—and the provision gives rise to no vagueness concerns of the sort that would apply if the government were regulating primary conduct of private parties. These errors make plain that the injunction as to this provision cannot stand.

B. The Report Provision directs the Attorney General to prepare a report with recommendations for enforcement measures to encourage the private sector to end discriminatory practices, including unlawful diversity, equity, and inclusion initiatives. There is plainly no basis for standing to challenge a provision contemplating the drafting of an internal Executive Branch report, nor is there any basis to challenge it on the merits. The district court essentially acknowledged as much when it said that it would not enjoin the provision insofar as it directs the Attorney General to create a plan. The court could issue a preliminary injunction only by suggesting that, in addition to what the provision expressly states, the

Executive Order also created some imprecise enforcement threat that chilled speech and was unconstitutionally vague. Because there appears to be no dispute that the provision's actual text provides no basis for an injunction, the preliminary injunction should be vacated as to this provision as well.

C. The Certification Provision directs agencies to require grantees to certify that their DEI programs comply with federal antidiscrimination laws and that this condition is material to the federal government's payment decisions. Once again, there can be no serious dispute that the provision, properly understood, provides no basis for an injunction. But once again, the district court misconstrued the provision. The court concluded that grantees would need to certify compliance not with the antidiscrimination laws themselves but with some unspecified construction of them that the Executive Branch might devise. Nothing in the Executive Order supports that approach, and the preliminary injunction was thus mistaken as to this provision too.

II. Many of the same errors infected the district court's assessment of the equities. The district court largely ignored the degree to which it was intruding on the President's authority to provide guidance to agencies in

carrying out their responsibilities and focused on hypothetical harms that might arise from Executive Orders that the President has not issued.

Compounding its errors, the court extended its injunction beyond the plaintiffs in this case—and then purported to "clarify" that its order also extended beyond the defendants in this case to the entire Executive Branch. Even if the injunction were not subject to vacatur in its entirety, at a minimum it should be narrowed to what is necessary to resolve a case or controversy between the parties to this case.

## STANDARD OF REVIEW

This Court "review[s] the grant or denial of a preliminary injunction for abuse of discretion, recognizing that preliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quotation marks omitted).

# ARGUMENT

## I. Plaintiffs Have No Likelihood of Success on the Merits.

### A. Plaintiffs' challenge to the Termination Provision is unlikely to succeed.

The Termination Provision directs agencies to "terminate, to the maximum extent allowed by law, all ... 'equity-related' grants or contracts." EO 14,151 § 2(b)(i). To the extent the district court identified uncertainty in the way this provision would be applied, it only highlighted the threshold standing and ripeness problems with plaintiffs' arguments. And on the merits, it is by definition lawful to terminate grants or contracts "to the maximum extent allowed by law," and likewise lawful for the President to direct federal agencies to exercise any authority they may have to terminate grants that do not align with the President's priorities.

#### 1. Plaintiffs' claims fail at the threshold.

To demonstrate standing, a plaintiff must allege an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks omitted). To satisfy that standard, the injury in question cannot be "conjectural or hypothetical"; it must be "concrete in both a qualitative and temporal

sense." *Beck v. McDonald*, 848 F.3d 262, 270-71 (4th Cir. 2017) (quotation marks omitted). A supposed future injury that is "too speculative" and might never occur does not satisfy that standard. *Id.* at 274.

The related doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 807 (2003) (quotation marks omitted). A claim is unripe for judicial review if it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *Wild Va. v. Council on Envtl. Quality*, 56 F.4th 281, 294 (4th Cir. 2022) (quotation marks omitted). The Supreme Court has repeatedly held that challenges to intra-governmental directives are not ripe because such a directive, by itself, "does not affect [anyone's] primary conduct." *National Park*, 538 U.S. at 810; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58-61 (1993). It is, moreover, "too speculative whether the problem [plaintiffs] presen[t] will ever need solving." *Texas*, 523 U.S. at 302.

As members of the stay panel recognized, plaintiffs' challenge here presents standing and ripeness problems. Plaintiffs identify two potential concrete harms: the termination of government contracts and the chilling of First Amendment activity. Neither provides a basis for judicial review now.

For the first alleged harm—the termination of government contracts—to the extent that plaintiffs contend that the termination of a particular contract is unlawful, they could challenge it in a concrete factual scenario in the appropriate forum. And for any contracts that have already been terminated, it is unclear why an injunction against the continued operation of the Termination Provision—as opposed to relief related to the particular contract itself—would redress any injury, and there is likewise no basis for proceeding with plaintiffs' abstract claim here instead of a concrete claim raised in the context of a particular contract termination.

As for hypothetical future terminations of contracts, it is speculative that plaintiffs will suffer from additional contract terminations. Indeed, plaintiffs argued below only that they or their members "have grants that *may* be subject to the Termination Provision." Plaintiffs' Reply in Support of Motion for Temporary Restraining Order or Preliminary Injunction, Dkt. No. 39, at 12-13 (emphasis added); *see also id.* (arguing that associational

14

plaintiff has standing because "many" of its members "have active federal grants that either include 'equity' in the title or proposal, or are *arguably related to such concepts*") (emphasis added); *id.* at 13 (one associational plaintiff "provide[d] details about four members who receive federal grants that *may* be canceled pursuant to the Termination Provision") (emphasis added); *id.* ("many" of its members "fear that their federal grants may be terminated" or "that they must cease certain activities" (quotation marks omitted)).

The district court acknowledged the absence of any concrete information about the underlying grants or the government's implementation of the provision but concluded that the absence of those facts was irrelevant because "much of the [standing] analysis [for the Termination Provision] revolves around Plaintiffs' reasonable fears and chilling of speech, rather than the specifics of the grants." JA83.[1] But plaintiffs fare no better under that theory.

_____

[1] The district court's indifference to the specific terms or factual circumstances of any grant that may be terminated serves only to highlight another threshold problem with plaintiffs' challenge to the Termination Provision. Plaintiffs profess a concern that their grants and contracts may be unlawfully terminated as a result of the Executive Order, but claims

*Continued on next page.*

Plaintiffs cannot demonstrate Article III standing "simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part." *Clapper*, 568 U.S. at 419; *see Laird v. Tatum*, 408 U.S. 1, 11 (1972) (plaintiff alleging chilling effect lacks standing where government policy is not "regulatory, proscriptive, or compulsory in nature"). The Termination Provision merely directs Executive Branch officials to terminate certain contracts; it does not regulate plaintiffs or their members

---

arising from such terminations generally must be brought under the Tucker Act in the Court of Federal Claims. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a); *see Department of Educ. v. California*, No. 24A910, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (per curiam) ("[T]he Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States.'" (citation omitted)). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation marks omitted). And the Tucker Act's preclusive effect extends to some claims founded on grants. To the extent that the government has implemented its grant programs by "employ[ing] contracts to set the terms of and receive commitments from recipients," then the proper recourse for asserted violations of those grant terms is likely a "suit in the Claims Court for damages relating to an alleged breach." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

at all, much less subject them to a threat of enforcement if they engage in particular protected activity. The possibility that a government contract will be terminated because the government no longer wishes to fund the kinds of activities described in the Provision does not give rise to any cognizable chilling effect, unlike the threat of criminal enforcement or other punishment for private conduct.

## 2. The Termination Provision is not unconstitutionally vague.

Even apart from the dispositive threshold bars, the district court erred in concluding that plaintiffs were likely to succeed in challenging the Termination Provision under the Fifth Amendment. Treating the President's policy directive as it would a criminal statute, the district court concluded that plaintiffs were likely to succeed in showing the Termination Provision is void for vagueness. That holding rested on multiple fundamental errors.

1. At a basic level, a presidential policy directive to federal officers is not subject to constitutional vagueness standards. Those standards derive from the Fifth Amendment's Due Process Clause, which requires that restrictions on private conduct be sufficiently clear to give a person of

"ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The doctrine thus serves to ensure notice and prohibit arbitrary enforcement of the requirements with which the public must comply. *Id*. But none of these concerns arise if the President gives his subordinates an unclear directive, and that is true whether the directive is made in a phone call or in an Executive Order. *Cf. Wills v. Pszczolkowski*, 125 F.4th 534, 539 (4th Cir. 2025) (observing that while the Supreme Court has "evaluated and invalidated statutes for unconstitutional vagueness," it "has not extended those holdings beyond the statutory context"). The Termination Provision is not a law, and it does not prohibit private conduct—it is instead an instruction that articulates the President's policy priorities to subordinate officers in the Executive Branch.

The district court based its contrary suggestion on a single out-of-circuit case involving an Executive Order that directly prohibited private transactions, as opposed to directing agencies to exercise their lawful authorities. *See Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1140, 1145-47 (9th Cir. 2012). Its reliance on that case was misplaced. Even apart from the fact that the Ninth Circuit upheld the Executive Order

at issue there against a vagueness challenge, the case exemplifies that vagueness doctrine applies to laws that regulate private conduct. The Ninth Circuit confronted an executive order freezing assets of certain terrorist organizations and authorizing the Secretary of Treasury to designate other groups that provided material support to those organizations as terrorists themselves. *See id.* at 1137-38. The executive order therefore had direct, substantial consequences both for the designated organizations and for private parties—like the plaintiff—that provided support to lawful activities of designated organizations. Those facts are a far cry from those presented here, and the Ninth Circuit's decision provides no support for applying vagueness doctrine to policy directives within the Executive Branch.

2. Even apart from the intragovernmental nature of the Termination Provision, the Supreme Court has squarely held that there is no constitutional guarantee of clarity in grant or contract criteria, even if these criteria are set by statute. In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Court rejected a vagueness challenge to the National Foundation on the Arts and Humanities Act, which provides that grants shall be awarded according to "artistic excellence and artistic merit ...,

taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1). The Court recognized that these standards were "undeniably opaque," such that they would raise "substantial vagueness concerns" in the context of a "criminal statute or regulatory scheme." 524 U.S. at 588.

In the context of competitive grants, however, the Court explained that this imprecision raised no such concerns. That is because "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Finley*, 524 U.S. at 589. The challenged statute "merely add[ed] some imprecise considerations to an already subjective selection process," and neither these considerations nor the underlying selection process "impermissibly infringe[d] on First or Fifth Amendment rights." *Id.* at 590. A contrary conclusion would render unconstitutional "all Government programs awarding scholarships and grants on the basis of subjective criteria such as 'excellence,'" which the Supreme Court declined to do. *Id.* at 589 (citation omitted).

The district court's conclusion that the term "equity-related" was unconstitutionally vague replicates the analysis that the Supreme Court rejected in *Finley*. A directive to terminate "equity-related" grants creates

no greater constitutional problem than a directive to terminate grants that are not "excellent"—and that is so even if, "as a practical matter," putative grantees "may conform ... to what they believe to be the decisionmaking criteria in order to acquire funding." *Finley*, 524 U.S. at 589.

3. The district court's errors in these respects are particularly pronounced given the facial nature of plaintiffs' challenge. "Facial challenges are disfavored for several reasons," including that they "often rest on speculation" and "consequen[tly] ... raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). And given its scope, "[f]acial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'" *Finley*, 524 U.S. at 580 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

As a general rule, a vagueness claim under the Fifth Amendment "must be examined in light of the facts of the case at hand," not on an abstract, facial basis. *United States v. Moriello*, 980 F.3d 924 (4th Cir. 2020). That is because "[o]bjections to vagueness under the Due Process Clause

rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Here, plaintiffs' claims cannot be examined in light of any relevant facts because they are not challenging any particular grant decision.

4. Finally, the district court's analysis fundamentally misunderstands the Termination Provision's role in agency decisionmaking. Without the Executive Order, federal agencies would still have discretion to determine how to exercise their lawful authority to terminate grants or contracts. That authority is often broad and may be exercised based on policy preferences rather than any concrete standard. *See, e.g.,* 2 C.F.R. § 200.340(a)(4) (authority to terminate award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"); *Northrop Grumman v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad."). That breadth has never been thought to create a vagueness problem, as private parties have no obligation to ascertain, or comply with, any standard that might affect the agency's own contracting decisions.

It makes no sense that guidance to agencies on how to exercise that broad discretion somehow *creates* a vagueness problem. As exemplified by the district court's decision here, that approach would allow for searching judicial review of all presidential policy directives and effectively prohibit the President from directing executive officials unless he can do so with the same degree of specificity required of a criminal statute.

Of course, to the extent a counterparty believes that a particular termination is unlawful, it could raise that concern in an appropriate forum. But no such claim has been brought in this action, which sought instead to pretermit entirely the review of certain grants. Nor could such a claim be directed at the Termination Provision, which directs termination only as "allowed by law." As the D.C. Circuit has recognized in analyzing an analogous Executive Order, a directive to agencies cannot be unlawful when "the Executive Order itself instructs the agency to follow the law." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

**B.      Plaintiffs' challenge to the Report Provision is unlikely to succeed.**

The next challenged provision directs the Attorney General to submit a report to "inform and advise" the President "so that [the] Administration

may formulate appropriate and effective civil-rights policy." EO 14,173 § 4(b). That report shall "contai[n] recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI." *Id.* Among other things, the report shall identify "steps or measures to deter DEI programs or principles … that constitute illegal discrimination or preferences," and identify "potential civil compliance investigations" of large corporations, associations, foundations, and institutions of higher education. EO 14,173 § 4(b)(iii). The provision requiring a report regarding a strategy for enforcing existing law threatens no cognizable injury to plaintiffs and is plainly lawful in any event.

### 1. Plaintiffs' challenge fails at the threshold.

The district court purported to deny in part plaintiffs' request to enjoin the Report Provision "to the extent it is merely a directive from the President to the Attorney General to identify '[a] plan of specific steps or measures to deter DEI programs or principles … that constitute illegal discrimination or preferences.'" JA114 n.13 (alterations in original) (quoting EO 14,173 § 4(b)(iii)). That denial makes sense; it is hard to see how plaintiffs would have standing to challenge the drafting of a report. But

24

that is all the Report Provision does, and the district court should therefore have dismissed this claim on standing grounds.

The district court nevertheless went on to enjoin the government from initiating hypothetical future enforcement actions against plaintiffs "based on" the Report Provision, JA118, on the theory plaintiffs had shown that the threat of enforcement "objectively and reasonably chilled" their protected First Amendment speech, JA87. That holding was erroneous for numerous reasons.

As the Supreme Court recently emphasized, there is no "unqualified right to pre-enforcement review," even for claims raising fundamental constitutional rights. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49-50 (2021). Instead, many statutory and constitutional rights "are as a practical matter asserted typically as defenses," not in "pre-enforcement cases." *Id.* Thus, pre-enforcement review is the exception, not the rule, and is available only under limited circumstances not present here. To establish standing to bring a pre-enforcement claim, petitioners must show, both that their "intended future conduct" is "'arguably proscribed'" by the orders and that there is a "credible threat" of enforcement under the

orders. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-62 (2014).

Plaintiffs cannot satisfy either of those requirements.

Whatever "chill" plaintiffs claim from the Report Provision is not reasonable because plaintiffs have not claimed that any protected speech is "arguably proscribed" by the provision. At the threshold, the Report Provision does not itself "proscribe" anything; it merely directs agencies to enforce preexisting prohibitions against discrimination. Even assuming that the Report Provision itself "proscribed" conduct in a way capable of chilling speech, plaintiffs' theory of chill is founded on fears that, notwithstanding what the Report Provision *says*, unspecified government actors will, at some point in the future, apply or implement the provision in a way that is unlawful or overbroad. Plaintiffs cannot claim to be "objectively and reasonably chilled" based on a theory that the government will ignore what the Report Provision says and bring enforcement actions targeting lawful conduct. *See Susan B. Anthony*, 573 U.S. at 162 (pre-enforcement review only available where plaintiffs' "future conduct" is "'arguably proscribed'" by the challenged government action). For the same reasons, plaintiffs cannot demonstrate a "credible threat" of

enforcement by assuming the government will misunderstand or misapply the law.

Indeed, the Supreme Court has long rejected the idea that alleged chilling effects resulting from executive orders establishes an injury-in-fact sufficient to confer standing to bring a pre-enforcement challenge. In *Laird*, for example, the plaintiffs alleged a "chilling effect" based on their allegations that the government "was engaged in certain [investigative and data-gathering] activities" and that "armed with the fruits of those activities, the agency might in the future take some … action detrimental to" them. 408 U.S. at 11. *Laird* held that such "speculative apprehensiveness" was insufficient to establish Article III standing. *Id.* at 13. Similarly, *Clapper* held that the plaintiffs claiming to be chilled by governmental investigative efforts pursuant to a surveillance statute lacked Article III standing, in part because it was "speculative whether the Government w[ould] imminently target" them—much less do so in reliance on the challenged statute, given that "[t]he Government has numerous other methods of conducting surveillance." 568 U.S. at 411-13; *see id.* at 417-18. Plaintiffs likewise offer only speculation that the

government might take any action against them pursuant to the Executive Orders.

The layers of supposition inherent in plaintiffs' theory of injury raise several other standing and ripeness problems. At every turn, plaintiffs' allegations turn on the kind of "conjectural or hypothetical" assumptions that are "too speculative" to support Article III standing. *Beck*, 848 F.3d at 270-71 (quotation marks omitted). Without knowing how the government will interpret or apply federal antidiscrimination laws in the future, it is impossible for the parties or the courts to assess whether any particular interpretation of those laws is correct. And without knowing what underlying conduct will form the basis of any future enforcement action, it is impossible to assess whether that conduct would in fact violate federal law.

Furthermore, to the extent it is unclear whether a particular program violates federal antidiscrimination law, any lack of clarity is not attributable to the Executive Order and would not be remedied by its invalidation. Plaintiffs are free to defend against any hypothetical future enforcement action by maintaining that their conduct is lawful or by advancing any applicable constitutional defense. But there is no live case or

controversy involving any such potential enforcement action now. And none of these issues is remotely ripe for judicial review, let alone a basis for preemptively enjoining the government from enforcing antidiscrimination laws.

### 2. The Report Provision complies with the Fifth and First Amendments

Even if plaintiffs' claims were justiciable, the district court erred in holding that the Report Provision likely violates the Constitution. The district court's analysis of plaintiffs' constitutional claims was premised on its rebranding of the provision as the "Enforcement Threat Provision" and then treating it as if it required private parties to comply with "undefined standards." JA114.

That reading has no basis in the Executive Order. Regardless of "what the government now considers 'illegal' DEI," JA116, all plaintiffs must do is comply with federal law itself—longstanding federal statutes that are not challenged here on vagueness grounds or any other. The district court's vagueness holding thus suffers from all of the same defects that infected the court's analysis of the Termination Provision. *See supra* pp. 17-23; *Pszczolkowski*, 125 F.4th at 539. The President's enforcement priorities

need not conform to the same standards that would apply to a statute that regulates primary conduct, and the statutes that do regulate primary conduct are not at issue here.

The district court's First Amendment analysis is equally groundless. *See* JA113-117. The court fundamentally misconstrued the Report Provision as "threaten[ing] to initiate enforcement actions against plaintiffs for engaging in protected speech." JA113-114. As an initial matter, the Report Provision expressly states that it does not restrict recipients "from engaging in First Amendment-protected speech." EO 14,173 § 7(b). And the Report Provision otherwise merely describes priorities in enforcement of federal law that will be reflected in the report and then, potentially, in subsequent enforcement actions under antidiscrimination statutes. Even in those enforcement actions, the order directs the Attorney General to take steps to deter only "*illegal* discrimination," and plaintiffs have no First Amendment right to engage in illegal *conduct*. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 243-44 (4th Cir. 1997).

To the extent the district court presumed that enforcement actions would be motivated by something other than the unlawful conduct targeted by the antidiscrimination laws and referenced in the Executive

Order, it was engaging in unfounded speculation and effectively prejudging a selective enforcement claim that would be difficult to prove. *See Central Radio Co. v. City of Norfolk*, 811 F.3d 625, 634-35 (4th Cir. 2016) (discussing demanding standard for selective-enforcement claims). At a minimum, no such claim could be premised on an Executive Order that merely compels the submission of a report regarding how to target a particular category of unlawful action. *Cf. Franklin v. Massachusetts*, 505 U.S. 788, 798 (1992) (explaining that "report to the President [that] carries no direct consequences" for parties is "not final and therefore not subject to review" under the Administrative Procedure Act).

To the extent the district court suggested that focusing enforcement resources on a particular category of unlawful conduct under the antidiscrimination laws amounts to viewpoint discrimination, it was again badly mistaken. If the President announced, for example, that religious discrimination against a particular group was prevalent and was fracturing our society, and directed federal agencies to focus on curtailing such discrimination, there would be no plausible claim of viewpoint discrimination. *See United States v. Texas*, 599 U.S. 670, 678 (2023) ("Under Article II, the Executive Branch possesses authority to decide 'how to

prioritize and how aggressively to pursue legal actions against defendants who violate the law." (citation omitted)). That self-evident proposition cannot be reconciled with the district court's view that targeting illegal DEI programs "without, for example, a similar restriction on *anti*-DEI principles that may also be in violation of existing federal anti-discrimination laws" constitutes "textbook viewpoint-based discrimination." JA114. The fundamental flaw in the district court's reasoning is that discrimination is unlawful conduct, not protected speech, and the President can determine which forms of unlawful discrimination to prioritize.

The errors in the district court's analysis are highlighted by its reliance on this Court's decision in *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021), which held that a "purely theoretical savings clause" that "would undermine" the substantive provisions of an Executive Order does not "immunize [the Executive Order] from scrutiny." *Id.* at 325. Here the reference to "illegal" programs is neither theoretical nor a savings clause; it is the heart of the provision, which relates to how federal agencies will use enforcement authority to combat unlawful practices. The Executive Order is thus entirely meaningful if construed as drafted, and there is no basis for ascribing any atextual meaning to it.

At its core, the district court's approach would kneecap the Executive's enforcement authority. Even directives to target only illegal conduct could be preemptively halted by speculating that the government may also impermissibly target legal, protected conduct, or that the government might prioritize some unlawful conduct that it particularly disfavors. All of that is unprecedented and untenable. The district court's injunction impermissibly interferes with the President's Article II authority to set enforcement priorities by enjoining the President from ordering enforcement priorities and directing subordinates to pursue certain goals, all under the guise of protecting First Amendment rights. There is no basis for the district court's unprecedented injunction prohibiting the government from enforcing existing civil rights laws against a particular category of unlawful discrimination.

### C.     Plaintiffs' challenge to the Certification Provision is unlikely to succeed.

The final challenged provision provides that "[t]he head of each agency shall include in every contract or grant award": (1) a "term requiring the [contractor or] recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-

discrimination laws," and (2) a "term requiring the [contractor or] recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act]." EO 14,173 § 3(b)(iv)(A)-(B). The district court erred in holding that plaintiffs were likely to succeed in their First Amendment challenge to that provision.

### 1. Plaintiffs' challenge fails at the threshold.

The district court erred in holding that plaintiffs adequately alleged that the Certification Provision injured them by chilling their protected speech. In the court's view, plaintiffs had standing to challenge the Certification Provision because they "fear 'adverse consequences from federal agencies' in light of" that provision. JA87-88. Plaintiffs alleged that as a result of this alleged "fear," certain unidentified members of the plaintiff associations "have been forced to stop certain [also unidentified] 'curricular programs or requirements.'" *Id.* But the Certification Provision only directs agencies to require that grant recipients certify that any of their DEI programs comply with federal law. Plaintiffs do not allege that they wish to engage in DEI programs that are unlawful, which would be the only conduct that could plausibly be chilled. And plaintiffs do not—and

34

cannot—claim that they have any right to engage in programs or activities that violate federal antidiscrimination law.

To the extent plaintiffs' programs do not violate federal law, they are not implicated by the Certification Provision. Just like their theory of injury from the Report Provision, plaintiffs cannot overcome this fact by positing that undefined federal officials may misapply or misinterpret federal law in unspecified ways at some point in the future. Any such theory of injury would be too "conjectural," "hypothetical," and "speculative" to support Article III standing. *Beck*, 848 F.3d at 271 (quotation marks omitted).

The district court identified only one specific mechanism of enforcement that could plausibly support the kind of imminent, "credible threat" of enforcement of the Certification Provision necessary to create a cognizable "chilling effect" injury, but this reasoning rested on a fundamental misunderstanding of applicable law. The Certification Provision directs agencies to include in contracts a "term requiring the [contractor or] recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of [the False Claims Act]." EO 14,173 § 3(b)(iv)(A). This term announces that the government considers

compliance to be a material condition on payment—and requires the funding recipient to acknowledge as much. The district court asserted that this provision requires contractors and grantees to "guess whether they are in compliance with the administration's as-yet-unpromulgated guidance on what constitutes ... 'illegal ... DEI,' [and] threaten [them] with False Claims Act liability if they miss the mark." JA118-119 (second alteration in original) (citation omitted). But that is not what the Certification Provision says. Rather, parties are asked to certify only that they are in compliance with the anti-discrimination laws, not with the federal government's interpretation of them. As discussed below, good-faith errors on this subject would not give rise to False Claims Act liability. *See infra* p. 41.

The district court's theory of standing was thus premised on an untenable reading of the Certification Provision. And although plaintiffs experience some direct effects from the Certification Provision (unlike the other two provisions in this lawsuit, which operate entirely within the Executive Branch), they have advanced no argument that they would be injured by the provision as properly construed. Plaintiffs have not asserted that they object to certifying that their DEI programs are lawful or to certifying that they are aware that the government regards compliance

with antidiscrimination laws to be material to its grant decisions. But even if the requirement to provide such certifications were thought to give rise to some sort of technical injury, as we now explain, the district court's merits analysis repeated many of the same errors as its standing analysis such that plaintiffs' claims plainly fail on the merits as well.

### 2. The Certification Provision is not unconstitutional.

On the merits, there is nothing remotely unlawful about requiring recipients of federal contracts or grants to affirm that any DEI programs they operate comply with the antidiscrimination laws and to acknowledge that the government considers compliance with such laws material to its payment decisions.

Like the other provisions at issue in this case, these measures impose no new requirements on primary conduct. Rather, they simply require recipients to certify their compliance with existing legal obligations under the "applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which applies to all recipients of federal assistance, 42 U.S.C. § 2000d-1—rules that are already binding independent of any certification

requirements. The Executive Order merely instructs agencies to require a certification that these obligations are being honored.

That is not novel. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 629 (1983) (Marshall, J., dissenting) (citing regulations from Departments of Agriculture, Commerce, Defense, Education, Energy, Health and Human Services, Housing and Urban Development, Interior, Justice, Labor, State, Transportation, and Treasury). These "assurances" of compliance are "given in consideration of" federal aid, "and the federal government extends assistance in reliance on the assurance of compliance"—but the obligations of Title VI apply regardless of any certification. *Id.* The requirement here is no different: Although recipients must certify specifically that any DEI programs they run comply with federal antidiscrimination law, this certification "does not place upon a

38

recipient any unanticipated burdens because any recipient must anticipate having to comply with the law." *Id.*

While the certification requirement thus imposes only minimal administrative burdens on funding recipients, it serves the government's interest in enforcing compliance with long-established civil rights protections. One enforcement mechanism available to the government, and contemplated by the Order, is the False Claims Act. As relevant here, the Act imposes civil liability on persons who "knowingly mak[e] … false statement[s] material to a false or fraudulent claim." 31 U.S.C. § 3729(a). The Executive Order's certification requirement announces, and requires the funding recipient to acknowledge, that the government considers compliance to be a material condition on payment. Such an express certification is not required to establish False Claims Act liability, but it can serve as evidence of materiality and the claimant's knowledge thereof. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194-95 (2016) (explaining that the "Government's decision to expressly identify a provision as a condition of payment is relevant," though "not automatically dispositive," evidence of materiality).

Like its standing analysis, the district court's merits analysis of plaintiffs' First Amendment challenge to the Certification Provision was premised entirely on its conclusion that the Executive Order means something very different from what it says. *See supra* 34-37. The court stated, without reference to any text, that "the express language of the Certification Provision demands that federal contractors and grantees essentially certify that there is no 'DEI' (whatever the executive branch decides that means) in *any* aspect of their functioning." JA109. And building on this assertion, the court determined that "[t]he Certification Provision states that not only are government contractors ... in a position to have to guess whether they are in compliance with the administration's as-yet-unpromulgated guidance on what constitutes … 'illegal … DEI,' they are nevertheless being threatened with False Claims Act liability if they miss the mark." JA118-119.

These assertions are irreconcilable with the Order's text, which does not purport to adopt any new construction of antidiscrimination law, let alone threaten liability for failure to divine this new interpretation. Once more, federal antidiscrimination law already applies and already governs the conduct of government contractors among others. The Certification

Provision merely directs agencies to expressly remind counterparties about those obligations and their materiality to the government's payment decisions. None of this implicates the First Amendment.

Moreover, as explained above, the district court appeared to misconstrue the False Claims Act to allow liability based on a good faith misunderstanding of the law that turns out to be incorrect. In the district court's view, contractors and grantees must guess the government's interpretation of antidiscrimination law and conform their speech to that interpretation, lest they risk all federal funding or liability under the False Claims Act. But it has long been established that the False Claims Act "does not reach an innocent, good-faith mistake about the meaning of an applicable rule," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015); *see also United States ex rel. Wilson v. Kellogg Brown & Root*, 525 F.3d 370, 377 (4th Cir. 2008) (same). That provides ample protection against the sort of unfair liability the district court worried about.

As discussed, the Executive Order does not require a certification that conforms with some particular interpretation of federal law yet to be

announced by the government. Rather, like other longstanding certification requirements, it simply requires entities to acknowledge their existing obligations under already "applicable Federal anti-discrimination laws" and to recognize that they may face liability if they make a knowingly false statement in this respect. That is neither novel nor unconstitutional.

## II. The Equitable Factors Favor the Government and Cannot Support the District Court's Expansive Injunction.

1. The district court erred in concluding that the equitable factors—irreparable harm, the balance of harms, and the public interest—weigh in favor of preliminary relief. The court's injunction indefinitely restrains the government from carrying out lawful and important policies with respect to funding, contracting, and enforcement of civil rights law. Such an injunction irreparably injures both the government and the public, whose interests "merge" in this context. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And these injuries are not outweighed by the purported benefits of relieving plaintiffs' "fears" about the President's announcement of enforcement priorities that are inconsistent with their own policy preferences.

"Under our Constitution, the 'executive power'—all of it—is vested in a President," who must "take Care that the laws be faithfully executed." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.* at 203-04. To that end the President may, for example, "require the opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices." U.S. Const. art. II, § 2, cl. 1; *see also Association of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes."). The President also has authority, "as head of the Executive Branch, to 'supervise and guide' executive officers in 'their construction of the statutes under which they act.'" Office of Legal Counsel, *Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 60 (1981) (quoting *Myers v. United States*, 272 U.S. 52, 135 (1926)).

The extraordinary injunction in this case interferes with these core executive functions and prevents the President from directing and controlling executive officers in their exercise of lawful authority. The Termination Provision simply guides agencies' exercise of pre-existing authority to terminate grants or contracts and enjoining it inhibits agencies from exercising their authority in a way that furthers the President's priorities. The injunction against the Report Provision similarly intrudes on the President's superintendence of the Executive Branch by frustrating the President's ability to direct executive officials in their enforcement and prioritization of existing federal law. Finally, the injunction against the Certification Provision hamstrings the President's ability to "take care that the laws be faithfully executed" by preventing agencies from requiring recipients of federal funds to certify compliance with existing federal laws.

At every turn, the injunction thus inflicts irreparable constitutional harm by eroding the President's control over subordinates and frustrates the public's interest in having the elected President effectuate policy priorities through lawful direction of the executive branch. As the Supreme Court has emphasized, under the "constitutional strategy" chosen by the Framers, individual executive officials' authority "remains subject to the

ongoing supervision and control of the elected President." *Seila*, 591 U.S. at 224. The district court's assertion of authority to parse and analyze the way the President provides that supervision and direction is unprecedented and unlawfully usurps the President's Article II authority.

By contrast, the district court's conclusions regarding the harm to plaintiffs were premised on a fundamental misreading of the Executive Orders. Enforcement of the Executive Orders, which instruct the government to take actions consistent with federal law, is plainly in the public interest. And plaintiffs have no cognizable interest in receiving or retaining funds in violation of the antidiscrimination laws or in avoiding investigation for illegal practices.

2. The district court's analytical errors in granting preliminary relief are compounded by its refusal to recognize any limitations on the scope of its equitable powers. Indeed, while the government's stay motion was pending in this Court, the district court "clarified" that its injunction "applies to and binds Defendants other than the President, as well as all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions," regardless of whether they were named as a defendant in this suit. JA154. The district court thus

read its injunction to bar nondefendants from taking actions against nonplaintiffs, making it unprecedentedly overbroad. The court has therefore dropped any pretense of resolving a discrete case or controversy and made plain its intention to oversee broad swaths of federal action and funding by replacing the President's directions to federal agencies with the court's own judgments. Its sweeping injunction cannot be reconciled with basic Article III principles or the separation of powers and must therefore be vacated.

Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alteration omitted). By extending its ruling beyond the parties properly before it—especially to *defendants* not before it—the court entered an injunction bearing little relationship to any concrete case or controversy. Courts are empowered to resolve disputes between specific parties, not to supervise the entire federal government for the purported benefit of any potential plaintiff. But the injunction here is untethered to any concrete agency action challenged by plaintiffs; it instead assumes a sweeping mandate to interfere with core executive functions and frustrate the

President's ability to direct his subordinates. Article III permits no such injunction.

It is unclear why the court even bothered to mention the defendants in an injunction that "applies to and binds Defendants … as well as all other federal executive branch agencies," JA154. The court was explicit that it was overseeing the entire Executive Branch. Unsurprisingly, this action defies binding precedent. In *Lujan v. Defenders of Wildlife*, for instance, the Supreme Court observed that an injury attributable to certain federal agencies was not redressable because these particular agencies were not parties to the case. 504 U.S. 555, 568 (1992) (plurality opinion); *see also Haaland v. Brackeen*, 599 U.S. 255, 293 (2023) (reaffirming this principle and stating that an injunctive or declaratory judgment entered against a nonparty is not "legally enforceable" and "is little more than an advisory opinion"). That conclusion followed from the unremarkable proposition that the district court "could accord relief only against" the actual defendant. *Lujan*, 504 U.S. at 568. As for the other agencies, "[t]hey were not parties to the suit, and there is no reason they should be obliged to honor an incidental legal determination the suit produced" with respect to the defendant agency. *Id.* at 569.

The district court's assertion that its injunction binds the entire Executive Branch was not merely an isolated overstep—it is the clearest manifestation of its improper intrusion into the affairs of the Executive Branch. As discussed above, the district court strayed beyond the text of the Executive Orders and beyond any concrete case or controversy to insert itself between the President and the agencies he is constitutionally charged with supervising.

The court's injunction thus must be vacated in its entirety. But at an absolute minimum, it should be vacated to the extent that it purports to extend beyond the parties to this case.

**CONCLUSION**

For the foregoing reasons, the preliminary injunction should be vacated.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
*s/ Jack Starcher*
JACK STARCHER
CATHERINE PADHI
*Attorneys, Appellate Staff*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*
*john.e.starcher@usdoj.gov*

APRIL 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,153 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Jack Starcher*
Jack Starcher

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2025, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals by using the appellate CM/ECF system.


*s/ Jack Starcher*

Jack Starcher

# ADDENDUM

# TABLE OF CONTENTS

Executive Order 14,151, Ending Radical and Wasteful Government
      DEI Programs and Preferencing, 90 Fed. Reg 8339 ............................ A1

Executive Order 14,173, Ending Illegal Discrimination and Restoring
      Merit-Based Opportunity, 90 Fed. Reg 8633 ........................................ A4

**Executive Order 14,151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg 8339**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose and Policy. The Biden Administration forced illegal and immoral discrimination programs, going by the name "diversity, equity, and inclusion" (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military. This was a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."

Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted "Equity Action Plans" to detail the ways that they have furthered DEIs infiltration of the Federal Government. The public release of these plans demonstrated immense public waste and shameful discrimination. That ends today. Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great.

Sec. 2. Implementation. (a) The Director of the Office of Management and Budget (OMB), assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), shall coordinate the termination of all discriminatory programs, including illegal DEI and "diversity, equity, inclusion, and accessibility" (DEIA) mandates, policies, programs, preferences and activities in the Federal Government, under whatever name they appear. To carry out this directive, the Director of OPM, with the assistance of the Attorney General as requested, shall review and revise, as appropriate, all existing Federal employment practices, union contracts, and training policies or programs to comply with this order. Federal employment practices, including Federal employee performance reviews, shall reward individual initiative, skills, performance, and hard work and shall not under any circumstances consider DEI or DEIA factors, goals, policies, mandates, or requirements.

(b) Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM,

as appropriate, shall take the following actions within sixty days of this order:

(i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

(ii) provide the Director of the OMB with a list of all:

(A) agency or department DEI, DEIA, or "environmental justice" positions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether these positions, committees, programs, services, activities, budgets, and expenditures have been misleadingly relabeled in an attempt to preserve their pre-November 4, 2024 function;

(B) Federal contractors who have provided DEI training or DEI training materials to agency or department employees; and

(C) Federal grantees who received Federal funding to provide or advance DEI, DEIA, or "environmental justice" programs, services, or activities since January 20, 2021.

(iii) direct the deputy agency or department head to:

(A) assess the operational impact (e.g., the number of new DEI hires) and cost of the prior administration's DEI, DEIA, and "environmental justice" programs and policies; and

(B) recommend actions, such as Congressional notifications under 28 U.S.C. 530D, to align agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including set-asides), grants, consent orders, and

litigating positions with the policy of equal dignity and respect identified in section 1 of this order. The agency or department head and the Director of OMB shall jointly ensure that the deputy agency or department head has the authority and resources needed to carry out this directive.

(c) To inform and advise the President, so that he may formulate appropriate and effective civil-rights policies for the Executive Branch, the Assistant to the President for Domestic Policy shall convene a monthly meeting attended by the Director of OMB, the Director of OPM, and each deputy agency or department head to:

(i) hear reports on the prevalence and the economic and social costs of DEI, DEIA, and "environmental justice" in agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including setasides), grants, consent orders, and litigating positions;

(ii) discuss any barriers to measures to comply with this order; and

(iii) monitor and track agency and department progress and identify potential areas for additional Presidential or legislative action to advance the policy of equal dignity and respect.

Sec. 3. Severability. If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected.

Sec. 4. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

January 20, 2025.


## Executive Order 14,173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg 8633


By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1 . *Purpose.* Longstanding Federal civil-rights laws protect individual Americans from discrimination based on race, color, religion, sex, or national origin. These civil-rights protections serve as a bedrock supporting equality of opportunity for all Americans. As President, I have a solemn duty to ensure that these laws are enforced for the benefit of all Americans.

Yet today, roughly 60 years after the passage of the Civil Rights Act of 1964, critical and influential institutions of American society, including the Federal Government, major corporations, financial institutions, the medical industry, large commercial airlines, law enforcement agencies, and institutions of higher education have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) that can violate the civil-rights laws of this Nation.

Illegal DEI and DEIA policies not only violate the text and spirit of our longstanding Federal civil-rights laws, they also undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system. Hardworking Americans who deserve a shot at the American Dream

should not be stigmatized, demeaned, or shut out of opportunities because of their race or sex.

These illegal DEI and DEIA policies also threaten the safety of American men, women, and children across the Nation by diminishing the importance of individual merit, aptitude, hard work, and determination when selecting people for jobs and services in key sectors of American society, including all levels of government, and the medical, aviation, and law-enforcement communities. Yet in case after tragic case, the American people have witnessed first-hand the disastrous consequences of illegal, pernicious discrimination that has prioritized how people were born instead of what they were capable of doing.

The Federal Government is charged with enforcing our civil-rights laws. The purpose of this order is to ensure that it does so by ending illegal preferences and discrimination.

Sec. 2 . *Policy.* It is the policy of the United States to protect the civil rights of all Americans and to promote individual initiative, excellence, and hard work. I therefore order all executive departments and agencies (agencies) to terminate all discriminatory and illegal preferences, mandates, policies, programs, activities, guidance, regulations, enforcement actions, consent orders, and requirements. I further order all agencies to enforce our longstanding civil-rights laws and to combat illegal private-sector DEI preferences, mandates, policies, programs, and activities.

Sec. 3 . *Terminating Illegal Discrimination in the Federal Government.* (a) The following executive actions are hereby revoked:

\*\*\*

(b) The Federal contracting process shall be streamlined to enhance speed and efficiency, reduce costs, and require Federal contractors and subcontractors to comply with our civil-rights laws. Accordingly:

(i) Executive Order 11246 of September 24, 1965 (Equal Employment Opportunity), is hereby revoked. For 90 days from the date of this order, Federal contractors may continue to comply with the regulatory scheme in effect on January 20, 2025.

(ii) The Office of Federal Contract Compliance Programs within the Department of Labor shall immediately cease:

(A) Promoting "diversity";

(B) Holding Federal contractors and subcontractors responsible for taking "affirmative action"; and

(C) Allowing or encouraging Federal contractors and subcontractors to engage in workforce balancing based on race, color, sex, sexual preference, religion, or national origin.

(iii) In accordance with Executive Order 13279 of December 12, 2002 (Equal Protection of the Laws for Faith-Based and Community Organizations), the employment, procurement, and contracting practices of Federal contractors and subcontractors shall not consider race, color, sex, sexual preference, religion, or national origin in ways that violate the Nation's civil rights laws.

(iv) The head of each agency shall include in every contract or grant award:

(A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and

(B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

(c) The Director of the Office of Management and Budget (OMB), with the assistance of the Attorney General as requested, shall:

(i) Review and revise, as appropriate, all Government-wide processes, directives, and guidance;

(ii) Excise references to DEI and DEIA principles, under whatever name they may appear, from Federal acquisition, contracting, grants, and financial assistance procedures to streamline those procedures, improve speed and efficiency, lower costs, and comply with civil-rights laws; and

(iii) Terminate all "diversity," "equity," "equitable decision-making," "equitable deployment of financial and technical assistance,"

"advancing equity," and like mandates, requirements, programs, or activities, as appropriate.

Sec. 4 . *Encouraging the Private Sector to End Illegal DEI Discrimination and Preferences.* (a) The heads of all agencies, with the assistance of the Attorney General, shall take all appropriate action with respect to the operations of their agencies to advance in the private sector the policy of individual initiative, excellence, and hard work identified in section 2 of this order.

(b) To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI. The report shall contain a proposed strategic enforcement plan identifying:

(i) Key sectors of concern within each agency's jurisdiction;

(ii) The most egregious and discriminatory DEI practitioners in each sector of concern;

(iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated "DEI" or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars;

(iv) Other strategies to encourage the private sector to end illegal DEI discrimination and preferences and comply with all Federal civil-rights laws;

(v) Litigation that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest; and

(vi) Potential regulatory action and sub-regulatory guidance.

Sec. 5 . *Other Actions.* Within 120 days of this order, the Attorney General and the Secretary of Education shall jointly issue guidance to all State and local educational agencies that receive Federal funds, as well as all institutions of higher education that receive Federal grants or participate in the Federal student loan assistance program under Title IV of the Higher Education Act, 20 U.S.C. 1070 *et seq.,* regarding the measures and practices required to comply with *Students for Fair Admissions, Inc.* v. *President and Fellows of Harvard College,* 600 U.S. 181 (2023).

Sec. 6 . *Severability.* If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 7 . *Scope.* (a) This order does not apply to lawful Federal or private-sector employment and contracting preferences for veterans of the U.S. armed forces or persons protected by the Randolph-Sheppard Act, 20 U.S.C. 107 *et seq.*

(b) This order does not prevent State or local governments, Federal contractors, or Federally-funded State and local educational agencies or institutions of higher education from engaging in First Amendment-protected speech.

(c) This order does not prohibit persons teaching at a Federally funded institution of higher education as part of a larger course of academic instruction from advocating for, endorsing, or promoting the unlawful employment or contracting practices prohibited by this order.

Sec. 8 . *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department, agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to and does not create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE, January 21, 2025.