**No. 25-1189**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

───────────────

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER
EDUCATION, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

───────────────

On Appeal from the United States District Court
for the District of Maryland

───────────────

**JOINT APPENDIX**

───────────────

| | |
|---|---|
| ANANDA V. BURRA | YAAKOV M. ROTH |
| ALESHADYE GETACHEW | *Acting Assistant Attorney General* |
| AUDREY WIGGINS | |
| BROOKE MENSCHEL | ERIC D. McARTHUR |
| J. STERLING MOORE | *Deputy Assistant Attorney General* |
| ORLANDO ECONOMOS | |
| SKYE PERRYMAN | MARK R. FREEMAN |
| *Democracy Forward Foundation* | DANIEL TENNY |
| *P.O. Box 34553* | JACK STARCHER |
| *Washington, D.C. 20043* | CATHERINE PADHI |
| *(202) 448-9090* | *Attorneys, Appellate Staff* |
| | *Civil Division, Room 7712* |
| *Counsel for Plaintiffs* | *U.S. Department of Justice* |
| | *950 Pennsylvania Avenue NW* |
| | *Washington, DC 20530* |
| | *(202) 514-5091* |
| | |
| | *Counsel for Defendants* |

*(additional counsel listed on inside cover)*

NIYATI SHAH
NOAH BARON
ALIZEH AHMAD
   *Asian Americans Advancing Justice | AAJC*
   *1620 L Street NW, Suite 1050*
   *Washington, DC 20036*
   *(202) 296-2300*

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

Docket Sheet, No. 1:25-cv-333 (D. Md) ...........................................................JA1

Complaint for Declaratory and Injunctive Relief, Dkt. No. 1 (Feb. 3, 2025) .......................................................................................JA20

Memorandum Opinion (Granding Preliminary Injunction), Dkt. No. 44 (Feb. 21, 2025) ....................................................................JA65

Preliminary Injunction, Dkt. No. 45 (Feb. 21, 2025). ................................JA128

Defendants' Notice of Appeal, Dkt. No. 47 (Feb. 24, 2025) ....................JA131

Memorandum Opinion and Order Denyin Motion to Stay Injunction Pending Appeal, Dkt. No. 61 (Mar. 3, 2025) ...................................................................JA134

Memorandum Opinon (Granting Motion to Clarify), Dkt. No. 66 (Mar. 10, 2025) ......................................................................JA144

Clarified Preliminary Injunction, Dkt. No. 67 (Mar. 10, 2025) ................................................................JA152

CERTIFICATE OF SERVICE

APPEAL

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:25−cv−00333−ABA

National Association of Diversity Officers in Higher Education et al v. Trump et al
Assigned to: Judge Adam B Abelson
Related Case:  1:25−cv−00702−JRR
Case in other court:  Fourth Circuit Court of Appeals, 25−01189
Cause: 28:1346 U.S. Defendant

Date Filed: 02/03/2025
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**National Association of Diversity Officers in Higher Education**

represented by **Aleshadye Getachew**
Democracy Forward Foundation
PO BOX 34553
Washington, DC 20043
703−475−2639
Email: agetachew@democracyforward.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S Nugent**
Democracy Forward
P.O. Box 34553
Washington, DC 20043
202−862−1393
Email: vnugent@democracyforward.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alizeh Ahmad**
Asian Americans Advancing Justice –
AAJC
1620 L Street NW
Suite 1050
Washington, DC 20036
409−504−2117
Email: aahmad@advancingjustice−aajc.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ananda V. Burra**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
917−410−0832
Email: aburra@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
201−824−1347
Email: awiggins@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Menschel**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043

2024489090
Fax: 2027964426
Email: bmenschel@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: smoore@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Niyati Shah**
Asian Americans Advancing
Justice−AAJC
1620 L Street, NW
Ste 1050
Washington, DC 20036
202–815–1098
Email: nshah@advancingjustice−aajc.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Baron**
Asian Americans Advancing Justice AAJC
1620 L Street NW
Suite 1050
Washington, DC 20036
202–868–0396
Email: nbaron@advancingjustice−aajc.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Orlando Economos**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
2024489090
Fax: 2027964426
Email: oeconomos@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
254–722–5745
Email: sperryman@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Association of University Professors**    represented by    **Aleshadye Getachew**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S Nugent**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Alizeh Ahmad**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ananda V. Burra**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Menschel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Niyati Shah**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Baron**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Orlando Economos**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Restaurant Opportunities Centers United** | represented by | **Aleshadye Getachew** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S Nugent**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alizeh Ahmad**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ananda V. Burra**
(See above for address)

JA3

*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Menschel**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Niyati Shah**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Baron**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Orlando Economos**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Mayor and City Council of Baltimore, Maryland**     represented by   **Aleshadye Getachew**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victoria S Nugent**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alizeh Ahmad**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ananda V. Burra**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brooke Menschel**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**J. Sterling Moore**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Niyati Shah**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Noah Baron**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Orlando Economos**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye Lynn Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Donald J. Trump**                    represented by    **Pardis Gheibi**
DOJ–Civ
Civil Division, Federal Programs Branch
1100 L Street NW
Room 11526
Washington, DC 20005
202–305–3246
Email: pardis.gheibi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
DOJ–USAO
Civil Division
36 S. Charles Street
Suite 400
Baltimore, MD 21201
410–209–4800
Fax: 410–962–0717
Email: megan.micco@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
US Attorney's Office
District of MD
36 S Charles St
4th Fl
Baltimore, MD 21201
4102094862
Fax: 4109622310
Email: molissa.farber@usdoj.gov
*ATTORNEY TO BE NOTICED*

JA5

**Defendant**

**Dorothy Fink**        represented by   **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Health and Human Services**    represented by   **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Education**    represented by   **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Denise Carter**        represented by   **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Labor**    represented by   **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Vincent Micone**                    represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Interior**            represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Doug Burgum**                       represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Commerce**            represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**

JA7

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jeremy Pelter**               represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Agriculture**     represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gary Washington**         represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Energy**       represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ingrid Kolb**              represented by  **Pardis Gheibi**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Transportation**     represented by     **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sean Duffy**     represented by     **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Department of Justice**     represented by     **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**James McHenry**     represented by     **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA9

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**National Science Foundation**                 represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sethuraman Panchanathan**                 represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Office of Management and Budget**                 represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Matthew Vaeth**                 represented by  **Pardis Gheibi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Megan Lynn Micco**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Molissa Heather Farber**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/03/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405 receipt number AMDDC−11761094.), filed by Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons, # 17 Summons, # 18 Summons, # 19 Summons, # 20 Summons, # 21 Summons, # 22 Summons, # 23 Summons, # 24 Summons)(Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 2 | Local Rule 103.3 Disclosure Statement by National Association of Diversity Officers in Higher Education (Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 3 | Local Rule 103.3 Disclosure Statement by American Association of University Professors (Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 4 | Local Rule 103.3 Disclosure Statement by Restaurant Opportunities Centers United (Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 5 | Local Rule 103.3 Disclosure Statement by Mayor and City Council of Baltimore, Maryland (Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 6 | MOTION to Appear Pro Hac Vice for Alizeh Ahmad (Filing fee $100, receipt number AMDDC−11761123.) by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland(Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 7 | MOTION to Appear Pro Hac Vice for Audrey Wiggins (Filing fee $100, receipt number AMDDC−11761129.) by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland(Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 8 | MOTION to Appear Pro Hac Vice for Brooke Menschel (Filing fee $100, receipt number AMDDC−11761131.) by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland(Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 9 | MOTION to Appear Pro Hac Vice for J. Sterling Moore (Filing fee $100, receipt number AMDDC−11761132.) by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland(Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 10 | MOTION to Appear Pro Hac Vice for Noah Baron (Filing fee $100, receipt number AMDDC−11761133.) by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland(Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 11 | MOTION to Appear Pro Hac Vice for Niyati Shah (Filing fee $100, receipt number AMDDC−11761136.) by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland(Nugent, Victoria) (Entered: 02/03/2025) |
| 02/03/2025 | 12 | MOTION to Appear Pro Hac Vice for Skye Perryman (Filing fee $100, receipt number AMDDC−11761138.) by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland(Nugent, Victoria) (Entered: 02/03/2025) |

JA11

| | | |
|---|---|---|
| 02/03/2025 | 13 | NOTICE of Appearance by Victoria S Nugent on behalf of All Plaintiffs (Nugent, Victoria) (Entered: 02/03/2025) |
| 02/04/2025 | 14 | QC NOTICE: 1 Complaint,,, filed by Restaurant Opportunities Centers United, American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education was filed incorrectly.<br>**The following attachments or exhibits are missing – Summons for U.S. Attorney. To correct this problem, file Summons using the event Notice (Other) and link Summons to 1 . (ols, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 15 | NOTICE by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland re 1 Complaint,,, Summons for U.S. Attorney (Nugent, Victoria) (Entered: 02/04/2025) |
| 02/04/2025 | 16 | PAPERLESS ORDER granting 6 Motion to Appear Pro Hac Vice on behalf of Alizeh Ahmad. Directing attorney Alizeh Ahmad to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 17 | PAPERLESS ORDER granting 7 Motion to Appear Pro Hac Vice on behalf of Audrey Jordan Wiggins. Directing attorney Audrey Jordan Wiggins to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 18 | PAPERLESS ORDER granting 8 Motion to Appear Pro Hac Vice on behalf of Brooke Menschel. Directing attorney Brooke Menschel to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 19 | PAPERLESS ORDER granting 9 Motion to Appear Pro Hac Vice on behalf of J. Sterling Moore. Directing attorney J. Sterling Moore to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 20 | PAPERLESS ORDER granting 10 Motion to Appear Pro Hac Vice on behalf of Noah Baron. Directing attorney Noah Baron to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 21 | PAPERLESS ORDER granting 11 Motion to Appear Pro Hac Vice on behalf of Niyati Shah. Directing attorney Niyati Shah to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 22 | PAPERLESS ORDER granting 12 Motion to Appear Pro Hac Vice on behalf of Skye Lynn Perryman. Directing attorney Skye Lynn Perryman to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/04/2025 | 23 | Summons Issued 60 days as to Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington, and U.S. Attorney (ols, Deputy Clerk) (Entered: 02/04/2025) |

JA12

| 02/04/2025 | 24 | MOTION to Appear Pro Hac Vice for Orlando Economos (Filing fee $100, receipt number AMDDC−11763175.) by National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, Mayor and City Council of Baltimore, Maryland(Nugent, Victoria) (Entered: 02/04/2025) |
|---|---|---|
| 02/04/2025 | 25 | PAPERLESS ORDER granting 24 Motion to Appear Pro Hac Vice on behalf of Orlando Economos. Directing attorney Orlando Economos to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 2/4/2025. (mh4s, Deputy Clerk) (Entered: 02/04/2025) |
| 02/12/2025 | 26 | SUMMONS Returned Executed by Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United. All Defendants.(Nugent, Victoria) (Entered: 02/12/2025) |
| 02/13/2025 | 27 | MOTION for Temporary Restraining Order *and/or*, MOTION for Preliminary Injunction by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United (Attachments: # 1 Memorandum in Support of Motion for TRO and/or PI, # 2 Text of Proposed Order for TRO, # 3 Text of Proposed Order for PI, # 4 Exhibit Menschel Decl., # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18, # 23 Exhibit 19 (NADOHE Decl.), # 24 Exhibit 20 (AAUP Decl.), # 25 Exhibit 21 (ROC Decl.), # 26 Exhibit 22 (Baltimore Decl.))(Nugent, Victoria) (Entered: 02/13/2025) |
| 02/13/2025 | 28 | MOTION Seeking Swearing In of Aleshadye Getachew by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United(Nugent, Victoria) (Entered: 02/13/2025) |
| 02/14/2025 | 29 | MOTION Seeking Swearing In of Ananda Burra by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United(Nugent, Victoria) (Entered: 02/14/2025) |
| 02/14/2025 | 30 | PAPERLESS ORDER: The Court has scheduled a status teleconference at 12:00 P.M. today. Call−in information has been circulated to counsel. Public access line information will be available on the Court's calendar. Pursuant to Local Rule 506.1, court proceedings may not be photographed, video recorded, audio recorded, broadcast, televised, or otherwise transmitted. Signed by Judge Adam B Abelson on 2/14/2025. (sp6s, Chambers) (Entered: 02/14/2025) |
| 02/14/2025 | 31 | Telephone Status Conference held via WebEx on 2/14/2025 before Judge Adam B Abelson.(Court Reporter: Nadine Bachmann, Courtroom 5A) (cb5s, Deputy Clerk) (Entered: 02/14/2025) |
| 02/14/2025 | 32 | ORDER Scheduling a Hearing and Setting a Briefing Schedule for 27 Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction. Signed by Judge Adam B Abelson on 2/14/2025. (ols, Deputy Clerk) (Entered: 02/14/2025) |
| 02/14/2025 | 33 | NOTICE of Appearance by Molissa Heather Farber on behalf of All Defendants (Farber, Molissa) (Entered: 02/14/2025) |
| 02/14/2025 | 34 | NOTICE of Appearance by Pardis Gheibi on behalf of All Defendants (Gheibi, Pardis) (Entered: 02/14/2025) |
| 02/18/2025 | 35 | RESPONSE in Opposition re 27 MOTION for Temporary Restraining Order *and/or* MOTION for Preliminary Injunction filed by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, |

| | | |
|---|---|---|
| | | Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Gheibi, Pardis) (Entered: 02/18/2025) |
| 02/18/2025 | 36 | QC NOTICE: 35 Response in Opposition to Motion,, filed by Jeremy Pelter, Vincent Micone, Department of Transportation, National Science Foundation, Department of Agriculture, Gary Washington, Department of Education, Department of Justice, Sethuraman Panchanathan, Office of Management and Budget, Donald J. Trump, Doug Burgum, Department of Interior, Sean Duffy, Department of Commerce, Ingrid Kolb, Department of Energy, James McHenry, Dorothy Fink, Department of Labor, Department of Health and Human Services, Denise Carter, Matthew Vaeth was filed incorrectly.<br>**The following attachments or exhibits are missing − Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 35 .* (ols, Deputy Clerk) (Entered: 02/18/2025) |
| 02/18/2025 | 37 | NOTICE by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington re 35 Response in Opposition to Motion,, *Proposed Order* (Gheibi, Pardis) (Entered: 02/18/2025) |
| 02/18/2025 | 38 | NOTICE of Appearance by Megan Lynn Micco on behalf of All Defendants (Micco, Megan) (Entered: 02/18/2025) |
| 02/19/2025 | 39 | REPLY to Response to Motion re 27 MOTION for Temporary Restraining Order *and/or* MOTION for Preliminary Injunction filed by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United. (Attachments: # 1 Exhibit Menschel Supp. Decl., # 2 Exhibit AAUP Supp. Decl., # 3 Exhibit NADOHE Supp. Decl., # 4 Exhibit Baltimore Supp. Decl., # 5 Exhibit 23, # 6 Exhibit 24, # 7 Exhibit 25, # 8 Exhibit 26, # 9 Exhibit 27, # 10 Exhibit 28, # 11 Exhibit 29, # 12 Exhibit 30, # 13 Exhibit 31, # 14 Exhibit 32, # 15 Exhibit 33)(Nugent, Victoria) (Entered: 02/19/2025) |
| 02/19/2025 | 40 | NOTICE of Appearance by Aleshadye Getachew on behalf of American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United (Getachew, Aleshadye) (Entered: 02/19/2025) |
| 02/19/2025 | 41 | NOTICE of Appearance by Ananda V. Burra on behalf of American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United (Burra, Ananda) (Entered: 02/19/2025) |
| 02/19/2025 | 42 | Motion Hearing held on 2/19/2025 re 27 MOTION for Temporary Restraining Order *and/or* MOTION for Preliminary Injunction filed by Restaurant Opportunities Centers United, American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education before Judge Adam B Abelson.(Court Reporter: Nadine Bachman) (jh2s, Deputy Clerk) (Entered: 02/19/2025) |
| 02/21/2025 | 43 | NOTICE by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United re 27 MOTION for Temporary Restraining Order *and/or* MOTION for Preliminary Injunction *Notice of Correction and Supplemental Facts* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Burra, Ananda) (Entered: 02/21/2025) |
| 02/21/2025 | 44 | MEMORANDUM OPINION. Signed by Judge Adam B Abelson on 2/21/2025. (kns, Deputy Clerk) (Entered: 02/21/2025) |
| 02/21/2025 | 45 | ORDER granting in part and denying in part 27 Motion for Preliminary Injunction. Signed by Judge Adam B Abelson on 2/21/2025. (kns, Deputy Clerk) (Entered: 02/21/2025) |

| | | |
|---|---|---|
| 02/22/2025 | 46 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 02/19/2025, before Judge Abelson. Court Reporter N. Bachmann, Telephone number 410–962–4753 nadine_bachmann@mdd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 3/17/2025. Redacted Transcript Deadline set for 3/25/2025. Release of Transcript Restriction set for 5/23/2025.(ng, Court Reporter) (Entered: 02/22/2025) |
| 02/24/2025 | 47 | NOTICE OF APPEAL as to 44 Memorandum Opinion, 45 Order on Motion for TRO, Order on Motion for Preliminary Injunction by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington. (Gheibi, Pardis) (Entered: 02/24/2025) |
| 02/25/2025 | 48 | MOTION to Stay re 44 Memorandum Opinion, 45 Order on Motion for TRO, Order on Motion for Preliminary Injunction by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Gheibi, Pardis) (Entered: 02/25/2025) |
| 02/26/2025 | 49 | ORDER granting in part and denying in part the request to expedite briefing. Signed by Judge Adam B Abelson on 2/26/2025. (ols, Deputy Clerk) (Entered: 02/26/2025) |
| 02/27/2025 | 50 | MOTION for Other Relief *(clarify scope of preliminary injunction)* by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Attorney Declaration, # 4 Ex. A, # 5 Ex. B, # 6 Ex. C)(Burra, Ananda) (Entered: 02/27/2025) |
| 02/27/2025 | 51 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 47 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 02/27/2025) |
| 02/27/2025 | 52 | USCA Case Number 25–1189 for 47 Notice of Appeal, filed by Jeremy Pelter, Vincent Micone, Department of Transportation, National Science Foundation, Department of Agriculture, Gary Washington, Department of Education, Department of Justice, Sethuraman Panchanathan, Office of Management and Budget, Donald J. Trump, Doug Burgum, Department of Interior, Sean Duffy, Department of Commerce, Ingrid Kolb, Department of Energy, James McHenry, Dorothy Fink, Department of Labor, Department of Health and Human Services, Denise Carter, Matthew Vaeth – Case Manager – Cyndi Halupa.(slss, Deputy Clerk) (Entered: 02/27/2025) |
| 02/27/2025 | 53 | RESPONSE in Opposition re 48 MOTION to Stay re 44 Memorandum Opinion, 45 Order on Motion for TRO, Order on Motion for Preliminary Injunction filed by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United.(Burra, Ananda) (Entered: 02/27/2025) |
| 02/27/2025 | 54 | Joint MOTION Briefing Schedule re 50 MOTION for Other Relief *(clarify scope of preliminary injunction)* by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United(Burra, Ananda) (Entered: 02/27/2025) |

| | | |
|---|---|---|
| 02/28/2025 | 55 | QC NOTICE: 53 Response in Opposition to Motion, filed by Restaurant Opportunities Centers United, American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education was filed incorrectly. **The following attachments or exhibits are missing – Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 53 . (ols, Deputy Clerk) (Entered: 02/28/2025) |
| 02/28/2025 | 56 | QC NOTICE: 54 Motion for Miscellaneous Relief, filed by Restaurant Opportunities Centers United, American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education was filed incorrectly. **The following attachments or exhibits are missing – Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 54 . (ols, Deputy Clerk) (Entered: 02/28/2025) |
| 02/28/2025 | 57 | NOTICE by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United re 53 Response in Opposition to Motion, Proposed Order (Burra, Ananda) (Entered: 02/28/2025) |
| 02/28/2025 | 58 | NOTICE by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United re 54 Joint MOTION Briefing Schedule re 50 MOTION for Other Relief (clarify scope of preliminary injunction) Proposed Order (Burra, Ananda) (Entered: 02/28/2025) |
| 02/28/2025 | 59 | ORDER Setting Briefing Schedule for Plaintiffs' Motion to Clarify Preliminary Injunction Order. Signed by Judge Adam B Abelson on 2/28/2025. (ols, Deputy Clerk) (Entered: 02/28/2025) |
| 02/28/2025 | 60 | NOTICE by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United re 53 Response in Opposition to Motion, (supplemental authority) (Attachments: # 1 CASA v. Trump, (3d. Cir, 25−1153))(Burra, Ananda) (Entered: 02/28/2025) |
| 03/03/2025 | 61 | MEMORANDUM OPINION AND ORDER denying 48 Motion to Stay Injunction Pending Appeal. Signed by Judge Adam B Abelson on 3/3/2025. (kns, Deputy Clerk) (Entered: 03/03/2025) |
| 03/03/2025 | 62 | RESPONSE to Motion re 50 MOTION for Other Relief (clarify scope of preliminary injunction) filed by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington.(Gheibi, Pardis) (Entered: 03/03/2025) |
| 03/04/2025 | 63 | QC NOTICE: 62 Response to Motion,, filed by Jeremy Pelter, Vincent Micone, Department of Transportation, National Science Foundation, Department of Agriculture, Gary Washington, Department of Education, Department of Justice, Sethuraman Panchanathan, Office of Management and Budget, Donald J. Trump, Doug Burgum, Department of Interior, Sean Duffy, Department of Commerce, Ingrid Kolb, Department of Energy, James McHenry, Dorothy Fink, Department of Labor, Department of Health and Human Services, Denise Carter, Matthew Vaeth was filed incorrectly. **The following attachments or exhibits are missing – Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 62 . (ols, Deputy Clerk) (Entered: 03/04/2025) |
| 03/04/2025 | 64 | NOTICE by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and |

| | | |
|---|---|---|
| | | Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington re 62 Response to Motion,, *(Proposed Order)* (Gheibi, Pardis) (Entered: 03/04/2025) |
| 03/04/2025 | 65 | REPLY to Response to Motion re 50 MOTION for Other Relief *(clarify scope of preliminary injunction)* filed by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United.(Burra, Ananda) (Entered: 03/04/2025) |
| 03/10/2025 | 66 | MEMORANDUM OPINION. Signed by Judge Adam B Abelson on 3/10/2025. (ols, Deputy Clerk) (Entered: 03/10/2025) |
| 03/10/2025 | 67 | CLARIFIED PRELIMINARY INJUNCTION. Signed by Judge Adam B Abelson on 3/10/2025. (ols, Deputy Clerk) (Entered: 03/10/2025) |
| 03/13/2025 | 68 | Emergency MOTION for Other Relief *Status Conference Regarding Preliminary Injunction Compliance* by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United (Attachments: # 1 Text of Proposed Order, # 2 Ex. A – Rolling Stone Article, # 3 Ex. B – Plaintiffs' letter of 3.13.25, # 4 Ex. C – San Francisco HUD notice, # 5 Ex. D – Emails)(Burra, Ananda) (Entered: 03/13/2025) |
| 03/13/2025 | 69 | PAPERLESS ORDER: The Court will hold a telephonic status conference tomorrow, March 14, 2025 at 3:00 pm related to Plaintiffs' Emergency Motion for Status Conference Regarding Preliminary Injunction, ECF No. 68. The Court will send counsel an email with call–in details. A public access line will be made available on the court's public calendar. Signed by Judge Adam B. Abelson on 3/13/2025. (kb4s, Chambers) (Entered: 03/13/2025) |
| 03/14/2025 | 70 | NOTICE by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United *of Supplemental Facts* (Attachments: # 1 Affidavit Baltimore Decl., # 2 Exhibit A (HUD Email), # 3 Exhibit B (HUD Agreement))(Getachew, Aleshadye) (Entered: 03/14/2025) |
| 03/14/2025 | 71 | Telephonic Motion Hearing via Webex held on 3/14/2025 re 68 Emergency MOTION for Other Relief *Status Conference Regarding Preliminary Injunction Compliance* filed by Restaurant Opportunities Centers United, American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education before Judge Adam B Abelson.(Court Reporter: Kassandra McPherson) (jks, Deputy Clerk) (Entered: 03/14/2025) |
| 03/14/2025 | 72 | ORDER granting 68 Emergency Motion for Status Conference Regarding Preliminary Injunction Compliance to the extent that the Court held a status conference as requested and setting a briefing schedule and hearing; motion requesting a compliance plan due 3/17/2025; response due: 3/21/25; reply due: 3/25/2025; hearing scheduled for 3/28/2025 at 2:00 p.m. Signed by Judge Adam B Abelson on 3/14/2025. (kns, Deputy Clerk) (Entered: 03/17/2025) |
| 03/14/2025 | 73 | ORDER of USCA granting Motion for Stay Pending Appeal as to 47 Notice of Appeal,, filed by Jeremy Pelter, Vincent Micone, Department of Transportation, National Science Foundation, Department of Agriculture, Gary Washington, Department of Education, Department of Justice, Sethuraman Panchanathan, Office of Management and Budget, Donald J. Trump, Doug Burgum, Department of Interior, Sean Duffy, Department of Commerce, Ingrid Kolb, Department of Energy, James McHenry, Dorothy Fink, Department of Labor, Department of Health and Human Services, Denise Carter, Matthew Vaeth (kns, Deputy Clerk) (Entered: 03/17/2025) |
| 03/17/2025 | 74 | Consent MOTION to Vacate 72 Order on Motion for Other Relief, by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United (Attachments: # 1 Text of Proposed Order)(Burra, Ananda) (Entered: 03/17/2025) |

| | | |
|---|---|---|
| 03/17/2025 | <u>75</u> | ORDER granting <u>74</u> Consent Motion to Vacate; vacating without prejudice <u>72</u> scheduling order. Signed by Judge Adam B Abelson on 3/17/2025. (jf3s, Deputy Clerk) (Entered: 03/17/2025) |
| 03/18/2025 | <u>76</u> | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 03/14/2025, before Judge Adam B. Abelson. Court Reporter Kassandra L. McPherson, Telephone number (410) 962–4544; Kassandra_McPherson@mdd.uscourts.gov. Total number of pages filed: 21. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025.(km10, Court Reporter) (Entered: 03/18/2025) |
| 03/21/2025 | <u>77</u> | MOTION to Vacate <u>45</u> Order on Motion for TRO, Order on Motion for Preliminary Injunction, <u>67</u> Preliminary Injunction by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United (Attachments: # <u>1</u> Text of Proposed Order)(Burra, Ananda) (Entered: 03/21/2025) |
| 04/01/2025 | <u>78</u> | RESPONSE in Opposition re <u>77</u> MOTION to Vacate <u>45</u> Order on Motion for TRO, Order on Motion for Preliminary Injunction, <u>67</u> Preliminary Injunction filed by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C)(Gheibi, Pardis) (Entered: 04/01/2025) |
| 04/01/2025 | 79 | QC NOTICE: <u>78</u> Response in Opposition to Motion,,, filed by Jeremy Pelter, Vincent Micone, Department of Transportation, National Science Foundation, Department of Agriculture, Gary Washington, Department of Education, Department of Justice, Sethuraman Panchanathan, Office of Management and Budget, Donald J. Trump, Doug Burgum, Department of Interior, Sean Duffy, Department of Commerce, Ingrid Kolb, Department of Energy, James McHenry, Dorothy Fink, Department of Labor, Department of Health and Human Services, Denise Carter, Matthew Vaeth was filed incorrectly. *\*The following attachments or exhibits are missing – Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to <u>78</u> .* (ols, Deputy Clerk) (Entered: 04/01/2025) |
| 04/01/2025 | <u>80</u> | NOTICE by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington re <u>78</u> Response in Opposition to Motion,,, (Gheibi, Pardis) (Entered: 04/01/2025) |
| 04/02/2025 | <u>81</u> | REPLY to Response to Motion re <u>77</u> MOTION to Vacate <u>45</u> Order on Motion for TRO, Order on Motion for Preliminary Injunction, <u>67</u> Preliminary Injunction filed by American Association of University Professors, Mayor and City Council of Baltimore, Maryland, National Association of Diversity Officers in Higher Education, Restaurant Opportunities Centers United.(Moore, J.) (Entered: 04/02/2025) |
| 04/03/2025 | <u>82</u> | MOTION for Extension of Time to File Answer by Doug Burgum, Denise Carter, Department of Agriculture, Department of Commerce, Department of Education, Department of Energy, Department of Health and Human Services, Department of Interior, Department of Justice, Department of Labor, Department of Transportation, Sean Duffy, Dorothy Fink, Ingrid Kolb, James McHenry, Vincent Micone, National Science Foundation, Office of Management and Budget, Sethuraman Panchanathan, Jeremy Pelter, Donald J. Trump, Matthew Vaeth, Gary Washington (Attachments: # <u>1</u> Text of Proposed Order)(Gheibi, Pardis) (Entered: 04/03/2025) |

| 04/04/2025 | 83 | ORDER Setting an Oral Argument on Plaintiffs' Motion to Vacate the Preliminary Injunction Order. Signed by Judge Adam B Abelson on 4/4/2025. (ols, Deputy Clerk) (Entered: 04/04/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| National Association of Diversity Officers in Higher Education; | |
| American Association of University Professors; | |
| Restaurant Opportunities Centers United; | |
| Mayor and City Council of Baltimore, Maryland; | Civil Action No. _____ |
|             Plaintiffs, | |
| v. | |
| Donald J. Trump, in his official capacity as President of the United States; | |
| Department of Health and Human Services; Dorothy Fink, in her official capacity as Acting Secretary of Health and Human Services; | |
| Department of Education; Denise Carter, in her official capacity as Acting Secretary of Education; | |
| Department of Labor; Vincent Micone, in his official capacity as Acting Secretary of Labor; | |
| Department of Interior; Doug Burgum, in his official capacity as Secretary of the Interior; | |
| Department of Commerce; Jeremy Pelter, in his official capacity as Acting Secretary of Commerce; | |
| Department of Agriculture; Gary Washington, in his official capacity as Acting Secretary of Agriculture; | |
| Department of Energy; Ingrid Kolb, in her official capacity as Acting Secretary of Energy; | |

Department of Transportation; Sean Duffy, in his
official capacity as Secretary of Transportation;

Department of Justice; James McHenry, in his
official capacity as Acting Attorney General;

National Science Foundation; Sethuraman
Panchanathan, in his official capacity as Director
of the National Science Foundation;

Office of Management and Budget; Matthew
Vaeth, in his official capacity as Acting Director of
the Office of Management and Budget,

        Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

"*If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.*"
*West Virginia Board of Education v. Barnett*, 319 U.S. 624 (1943).

To protect their rights under the United States Constitution, Plaintiffs National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, and the Mayor and City Council of Baltimore, Maryland bring this action on their own behalf and on behalf of their members against Defendants President Donald J. Trump and the other Defendants identified below.

## INTRODUCTION

1.      In the United States, there is no king. The President can exercise only those powers the Constitution grants to the executive, and only in ways that do not violate the rights the Constitution grants to the American people. In his crusade to erase diversity, equity, inclusion, and accessibility from our country, President Trump cannot usurp Congress's exclusive power of the purse, nor can he silence those who disagree with him by threatening them with the loss of federal funds and other enforcement actions.

2.      On January 20, 2025, the President signed Executive Order 14151 titled, "*Ending Radical Government DEI Programs and Preferencing*" (the "J20 Order"). The order directed the Attorney General and the Director of the Office of Management and Budget ("OMB") to engage in sweeping efforts to remove "DEI," "DEIA," and "environmental justice" programs and professionals from executive branch agencies. J20 Order § 2(a). The terms "DEI," "DEIA," and "environmental justice" are undefined. That order also required each federal agency to

1

"terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within sixty days. *Id.* § 2(b)(i). The term "equity-related" is undefined.

3.       The next day, the President signed Executive Order 14173 titled, "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*," (the "J21 Order"). The J21 Order seeks to suppress free speech on diversity, equity, and inclusion ("DEI"), or diversity, equity, inclusion, and accessibility ("DEIA") principles.

4.       The J21 Order threatens civil investigations and loss of funding "to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise)." J21 Order § 3(b)(iv), 4(b)(iii). Again, the President failed to define any material terms, including "DEI," "illegal DEI," "DEI programs or principles," or "illegal discrimination or preferences."

5.       Ordinary citizens bear the brunt. Plaintiffs and their members receive federal funds to support educators, academics, students, workers, and communities across the country. As federal agencies make arbitrary decisions about whether grants are "equity-related," Plaintiffs are left in limbo. Some have received notifications to cease all work on federally funded programs with connections to DEIA.

6.       The OMB added to Plaintiffs' fear when it ordered a nationwide freeze on all federal financial assistance, only to rescind that order two days later. Yet the White House Press Secretary persisted: "This is NOT a rescission of the federal funding freeze."[1] And even after a court enjoined enforcement of the freeze, the Department of Justice continued to press that the court order does not "enjoi[n] the President's Executive Orders, which are plainly lawful and unchallenged in this case."[2]

---

[1] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:40 PM ET), https://x.com/PressSec/status/1884672871944901034.
[2] Notice of Compliance with Court's TRO, at 2, *New York. v. Trump*, 1:25-cv-39 (D.R.I. Feb. 3, 2025), ECF No. 51.

7.      Because of the vagueness of President Trump's two executive orders, Plaintiffs are left to wonder whether, and for how long, they can rely on the federal funding that Congress appropriated using its exclusive power of the purse.

8.      As part of the mandate to "deter DEI," the J21 Order attempts to bypass the standard processes for amending government contracts and grant awards, and instructs each agency to include "in every contract or grant award," a term that the contractor or grantee "certify that it does not operate any programs *promoting DEI*" that would violate federal antidiscrimination laws. *Id.* § 3(b)(iv)(B) (emphasis added). Another provision instructs that compliance is "material to the government's payment decisions for purposes of" the False Claims Act ("FCA")," *id.* 3(b)(iv)(A), a clear threat of civil enforcement.

9.      President Trump's history and explicit call to dismantle anything connected to DEIA presses the question of which "programs promoting DEI" President Trump views as "illegal." If lawful DEI programs are suddenly deemed unlawful by presidential fiat, Plaintiffs must either risk prosecution for making a false claim, or censor promotion of their values. Our Constitution does not tolerate that result.

10.      Moreover, the J21 Order directs the Attorney General to deter voluntary DEI programs or principles in the private sector, even for those who do not receive federal grants or contracts. The Attorney General must provide a "plan [with] specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences." *Id.* 4(b)(iii). As a part of this plan, each agency must "identify up to nine potential civil compliance investigations" in various sectors including "institutions of higher education with endowments over 1 billion dollars." *Id.*

11. Any potential target of a civil compliance investigation, like some of the largest institutional members of Plaintiff National Association of Diversity Officers in Higher Education, is left with an untenable choice: continue to promote their lawful diversity, equity, inclusion, and accessibility programs, or suppress their own speech by ending programs or policies that the President may consider "illegal DEI."

12. The J21 Order is designed to, and does, chill free speech on matters of substantial political import, solely because the President disagrees with that speech. The President has made clear—during both his campaign and his previous administration—that his goal is to punish those who recognize or choose to speak out about this country's history on issues of enslavement, racial exclusion, health disparities, gender inequality, treatment of individuals with disabilities, and discrimination. President Trump wishes to see the end of all diversity, equity, inclusion, and accessibility programs of any kind whatsoever.

13. The J21 Order's chilling effect is amplified by its vagueness. The undefined terms leave  potential targets with no anchor as to what speech or which actions the order encompasses. They also give executive branch officials like the Attorney General carte blanche authority to implement the order discriminatorily. The order thus commits the twin evils of chilling speech beyond the scope of what may be legally regulated, and granting unfettered discretion to executive branch officials who will implement the President's orders.

14. The President can have his own views about these matters. He can try to make his views into policy. But he cannot seize Congress's power of the purse. He cannot deny due process to millions of Americans. And he cannot abridge or disrupt the free speech of those who disagree. Those are the constitutional and legal transgressions of the J20 and J21 Orders. To remedy these harms, and to defend core Constitutional rights, Plaintiffs bring this suit.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter because the claims arise under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because the Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

16.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, under Title 28, Sections 2201 and 2202 of the United States Code, and under the All Writs Act.

17.     Venue lies in this District because Plaintiff Mayor and City Council of Baltimore, Maryland resides in this judicial district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity. 28 U.S.C. § 1391(e)(1).

## PARTIES

### A. Plaintiffs

18.     Plaintiff **National Association of Diversity Officers in Higher Education** ("NADOHE") is the nation's leading association for chief diversity officers and professionals with over 2,200 members. NADOHE's members include diversity, equity, inclusion, and accessibility professionals who work at institutions of higher education, as well as institutions of higher education themselves. Many of NADOHE's institutional members receive grants from the federal government and/or hold federal contracts, and several institutional members have endowments exceeding $1 billion. Some of NADOHE's institutional members offer educational programming or degrees or certificates in diversity, equity, and inclusion leadership and similar subject matters.

19.     Plaintiff the **American Association of University Professors** ("AAUP") is a membership association and labor union of faculty and academic professionals with chapters at colleges and universities throughout the country. Many AAUP members are employees of institutions of higher learning with endowments exceeding $1 billion. AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of academic workers, and ensuring higher education's contribution to the common good.

20.     Plaintiff **Restaurant Opportunities Centers United** ("ROC United") is a national membership organization of thousands of restaurant workers across the United States. Its mission is to improve restaurant workers' lives by building worker power and uniting workers of various backgrounds around shared goals and values, including racial and gender equity. ROC United receives grants from the federal government.

21.     Plaintiff **Mayor and City Council of Baltimore, Maryland** ("Baltimore") is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles. Baltimore is the largest city in Maryland and the thirtieth largest city in the United States.

## B. Defendants

22.     Defendant **Donald J. Trump** ("President Trump") is the President of the United States.  He issued the J20 and J21 Orders (the "Executive Orders"). He is sued in his official capacity.

23.     Defendant **Department of Health and Human Services** ("HHS") oversees the U.S. Public Health Services, the Centers for Disease Control and Prevention ("CDC"), the Centers for Medicare & Medicaid Services, the Food and Drug Administration ("FDA"), and the

6

National Institutes of Health ("NIH"). NIH is itself the umbrella organization for an institute

with an express focus on equity in health care: the National Institute on Minority Health and

Health Disparities. HHS is directed to implement the Executive Orders in various ways, which

HHS has proceeded to do. HHS provides grant funding to one or more Plaintiffs.

24.    Defendant **Dorothy Fink** is the Acting Secretary of Health and Human Services.

She is sued in her official capacity. On information and belief, Acting Secretary Fink and the

department she leads have begun implementing the Executive Orders.

25.    Defendant **Department of Education** ("Education Department") is directed to

implement the Executive Orders in various ways, which the Education Department has

proceeded to do. The Education Department provides grant funding to one or more Plaintiffs.

26.    Defendant **Denise Carter** is the Acting Secretary of Education. She is sued in her

official capacity. On information and belief, Acting Secretary Carter and the department she

leads have begun implementing the Executive Orders.

27.    Defendant **Department of Labor** ("DOL") is directed to implement the

Executive Orders in various ways, which DOL has proceeded to do. DOL provides grant funding

to one or more Plaintiffs.

28.    Defendant **Vincent Micone** is the Acting Secretary of Labor. He is sued in his

official capacity. On information and belief, Acting Secretary Micone and the department he

leads have begun implementing the Executive Orders.

29.    Defendant **Department of Interior** ("DOI") is directed to implement the

Executive Orders in various ways, which DOI has proceeded to do. DOI provides grant funding

to one or more Plaintiffs.

30.     Defendant **Douglas Burgum** is the Secretary of the Interior. He is sued in his official capacity. On information and belief, Secretary Burgum and the department he leads have begun implementing the Executive Orders.

31.     Defendant **Department of Commerce** ("Commerce") is directed to implement the Executive Orders in various ways, which Commerce has proceeded to do. Commerce provides grant funding to one or more Plaintiffs.

32.     Defendant **Jeremy Pelter** is the Acting Secretary of Commerce. He is sued in his official capacity. On information and belief, Acting Secretary Pelter and the department he leads have begun implementing the Executive Orders.

33.     Defendant **Department of Agriculture** ("USDA") is directed to implement the Executive Orders in various ways, which USDA has proceeded to do. USDA provides grant funding to one or more Plaintiffs.

34.     Defendant **Gary Washington** is the Acting Secretary of the USDA. He is sued in his official capacity. On information and belief, Acting Secretary Washington and the department he leads have begun implementing the Executive Orders.

35.     Defendant **Department of Energy** ("Energy") is directed to implement the Executive Orders in various ways, which Energy has proceeded to do. Energy provides grant funding to one or more Plaintiffs.

36.     Defendant **Ingrid Kolb** is the Acting Secretary of Energy. She is sued in her official capacity. On information and belief, Acting Secretary Kolb and the department she leads have begun implementing the Executive Orders.

37.    Defendant **Department of Transportation** ("DOT") is directed to implement the Executive Orders in various ways, which DOT has proceeded to do. DOT provides grant funding to one or more Plaintiffs.

38.    Defendant **Sean Duffy** is the Secretary of Transportation. He is sued in his official capacity. On information and belief, Secretary Duffy and the department he leads have begun implementing the Executive Orders.

39.    Defendant **Department of Justice** ("DOJ") is directed to implement the Executive Orders in various ways, which DOJ has proceeded to do. DOJ provides grant funding to one or more Plaintiffs.

40.    Defendant **James McHenry** is the Acting Attorney General. He is sued in his official capacity. On information and belief, Acting Attorney General McHenry and the department he leads have begun implementing the Executive Orders.

41.    Defendant **National Science Foundation** ("NSF") is directed to implement the Executive Orders in various ways, which NSF has proceeded to do. NSF provides grant funding to one or more Plaintiffs.

42.    Defendant **Sethuraman Panchanathan** is the Director of NSF. He is sued in his official capacity. On information and belief, Director Panchanathan and the department he leads have begun implementing the Executive Orders.

43.    Defendant **Office of Management and Budget** ("OMB") is directed to implement the Executive Orders in various ways, which OMB has proceeded to do.

44.    Defendant **Matthew Vaeth** is the Acting OMB Director. He is sued in his official capacity. On information and belief, Acting Director Vaeth and the office he leads have begun implementing the Executive Orders.

## LEGAL BACKGROUND

45.    The First Amendment provides all Americans with essential freedoms, including the freedom of speech, the right to assemble, and the right to petition the government for a redress of grievances. James Madison recognized: "the people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments; and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable."[3]

46.    The First Amendment protects the freedom of expression of all Americans, no matter their point of view. The government may not censor, discriminate, or apply rules inconsistently based on viewpoint. The Constitution protects the right of scholars, teachers, and researchers to think, speak, and teach without governmental interference. The "essentiality of freedom in the community of American universities is almost self-evident" and educators play a "vital role in a democracy." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

47.    And freedom of speech is not just for academics, scholars, and educators.  It protects Americans working wage and shift jobs in communities across the nation. The law requires us all to "do equal right to the poor and to the rich." 28 U.S.C. § 453.

48.    Throughout our nation's history, courts have consistently prevented various state actors, including executive branch officials, from trampling the protections afforded by the First Amendment. *See, e.g.*, *Int'l Dev. v. All. for Open Soc'y*, 570 U.S. 205 (2013) (Roberts, J.) (striking down requirement that nonprofits express opposition to disfavored policies before receiving federal funds); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (finding the government cannot force students to recite the pledge of allegiance).

---

[3] 1 *Annals of Cong.* 434 (1789).

49.    Indeed, nothing in the Constitution's text, or in more than two centuries of judicial decisions interpreting the Constitution, confers on the President or the executive branch any power to dictate government spending or to place conditions on the spending power, especially conditions that are themselves constitutionally suspect. Any power to impose lawful conditions rests solely with Congress. *See* U.S. Const. art. I, § 1, 8.

50.    Finally, the Constitution protects people from being deprived of their rights without due process. U.S. Const. amend. V. A federal enactment, like an executive order, is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In other words, the Constitution demands clarity and consistency.

## FACTUAL ALLEGATIONS

### A.  Diversity, Equity, Inclusion, and Accessibility Principles Are Critical to Plaintiffs.

51.    Diversity, equity, inclusion, and accessibility principles seek to promote the fair treatment and full participation of all people, particularly groups who have historically been underrepresented or subject to discrimination on the basis of identity or disability. While DEIA is a relatively new acronym, the work it refers to—ensuring that all have equal opportunity—is not.

52.    Principles of diversity, equity, inclusion, and accessibility are foundational to the nation's promise of equality for all and equal justice under the law and are deeply embedded in Plaintiffs' missions, programs, and work in service of students, research and academic inquiry, restaurant workers, and everyday citizens.

*Diversity, Equity, Inclusion, and Accessibility Are Essential in Higher Education.*

53.     In higher education, DEIA principles and initiatives contribute to ensuring an inclusive, supportive environment for all students and staff, enhancing academic freedom, and promoting academic exploration, all of which drive innovation well beyond academic settings.

54.     Plaintiff NADOHE's core values include excellence, diversity, equity, inclusivity, and scholarship. NADOHE pursues its mission by, among other things, offering its members resources that support professional development, informal career counseling, and other support that aids diversity professionals in ensuring the competent delivery of critical activities within an institution.

55.     On campuses, the impactful initiatives spearheaded by diversity professionals include strategies designed to provide access, support, and resources to a diverse student body, including low-income students, first-generation students, students from historically underrepresented racial identities and marginalized groups, veterans, women, and persons with disabilities, and to ensure that the institution is recruiting from a diverse applicant pool as it makes hiring and other personnel decisions.

56.     In recent years, some states have enacted legislation restricting use of public funds to support DEIA in higher education. As a result, NADOHE's mission has become even more important as students, faculty, and staff, particularly from underrepresented backgrounds, increasingly feel isolated and unsupported on campuses.

57.     NADOHE's members include Chief Diversity Officers at institutions of higher education who serve as principal administrators with duties including leading, facilitating, and evaluating diversity, equity, inclusion, and accessibility efforts for the institution, and supporting

core functions including curriculum, recruitment, retention, and success of students, faculty, and staff.

58.    In addition, Chief Diversity Officers are responsible for strategic planning and accountability for outcomes and nondiscrimination, which may include serving as the institution's designated Equal Employment Opportunity coordinators, Americans with Disabilities Act coordinators, and Title IX coordinators, along with ensuring that diversity, equity, inclusion, and accessibility efforts are consistent with applicable laws.

59.    NADOHE established Standards of Professional Practice for Chief Diversity Officers in higher education to inform its work and support its members. These standards of practice are based on empirically validated research that demonstrates the pursuit of inclusive excellence is essential to the strength of our institutions and the realization of an equitable society. NADOHE also jointly publishes the peer-reviewed *Journal of Diversity in Higher Education* to make available multidisciplinary research on evidence-based practices for the pursuit of inclusive excellence.

60.    Plaintiff AAUP is dedicated to protecting and advancing academic freedom, which is indispensable to the advancement of research and academic inquiry to further the search for truth and free expression. It was founded by John Dewey and other preeminent scholars to defend the ability of scholars, researchers, and educators to teach, write, and research without political and economic retaliation based on their viewpoints.

61.    AAUP has long advocated for diversity in higher education, including a diverse faculty and student body. For AAUP, diversity is tied to academic freedom and shared governance, and it believes that broad representation of faculty members—in terms of gender, race, and ethnicity—is essential to fulfill the promise of academic freedom, to deepen existing disciplinary

approaches, and to open new disciplinary paths, including the study of inequality and discrimination.

62.    One of AAUP's core beliefs is that diversity results in better knowledge production, which is critical to expanding areas of inquiry and exposing, correcting, and filling gaps in our understanding.  In a 2024 statement, AAUP reaffirmed this belief, noting that faculty diversity is important to move towards ensuring inclusion and equality in higher education.

63.    AAUP's membership includes a large number of academic professionals whose work focuses on topics related to diversity, including faculty that teach courses focused on specific racial or ethnic identities (e.g., Black studies, Latino studies, Asian studies, etc.), faculty whose teaching focuses on a range of gender or sexual orientation identities, and faculty whose teaching focuses on environmental justice and other subject matter targeted by the Executive Orders. Furthermore, some AAUP members teach students participating in graduate programs that focus on diversity, equity, and inclusion specifically.

64.    AAUP's membership also includes a large number of faculty members whose research focuses on equity-related topics, including many who rely on federal grants to support their work. This is particularly true at medical schools, where AAUP represents a significant number of members who focus on medical and other scientific research related to whether and how race and ethnicity affect health outcomes.

***Diversity, Equity, Inclusion, and Accessibility are Essential for Working Americans.***

65.    In addition to our nation's higher education institutions, workplaces with blue collar, shift workers promote the principles of DEIA too.

66.    Plaintiff ROC United envisions a society that treats restaurant workers with dignity and respect, including prioritizing racial and gender equity and increasing the standard of living for all working-class people.

67.    ROC United is deeply invested in ensuring the principles of diversity, equity, inclusion, and accessibility are realized across the restaurant industry. ROC United partners with restaurant workers to overcome the obstacles racism and sexism place in their way.

68.    Launched in 2007, ROC United's Culinary Hospitality Opportunities for Workers (CHOW) workforce development program directly addresses the racial segregation that is deeply embedded in the restaurant industry. ROC United's students, who are overwhelmingly people of color and women, build their confidence as leaders in the industry and gain access to the livable-wage jobs historically held by white men in the industry.

69.    By building career pathways so that people of color, women, and young restaurant workers can achieve livable-wage employment, ROC United significantly improves quality-of-life outcomes for CHOW graduates, their families, and their communities.

70.    In addition, ROC United provides sexual harassment training to protect and empower women who make up most of the restaurant workforce.

***Diversity, Equity, Inclusion, and Accessibility Are Critical to Community Life.***

71.    Since 1729, the City of Baltimore has been a crossroads of peoples and ideas. It has gained prominence in myriad ways including fostering the arts, sparking innovation in medicine, and pushing the vanguard of civil rights.

72.    Plaintiff Baltimore is a city of nearly 600,000 Americans of all backgrounds. According to the 2020 Census, 60 percent of Baltimore's population is Black, 27 percent is

White, 8 percent is Hispanic or Latino, and 2.5 percent is Asian. Five percent of the city was identified by the Census as two or more races.

73.     The diversity of the city is its strength, and Baltimore has made significant efforts to embrace people from all backgrounds to strengthen itself economically and socially. The city has an Office of Equity and Civil Rights devoted to "activities to eliminate inequity, inequality, and discrimination," and works to advance "equity and [uphold] the federal and local civil rights laws, the local living and prevailing wage laws ensuring access and equal opportunities for persons with disabilities, and providing oversight of local law enforcement."[4]

74.     Baltimore's Warm Welcome program—an initiative that provides free diversity, equity, inclusion, and accessibility training to Baltimore businesses—has enhanced the city's tourism industry through the participation of over one hundred businesses, and garnered attention from national tourism publications. Baltimore is committed to building a more equitable city for families to thrive.

**B.  President Trump's 2025 Anti-DEIA Executive Orders.**

75.     Within 48 hours of taking office, President Trump issued executive orders seeking to eliminate any trace of diversity, equity, inclusion, and accessibility from our nation, and to punish those who support and promote the principles of diversity, equity, inclusion, and accessibility. Those executive orders included the J20 Order and the J21 Order.

76.     As soon as the executive orders were announced, the White House Press Secretary noted: "President Trump campaigned on ending the scourge of DEI from our federal

---

[4] *Office of Equity and Civil Rights*, City of Baltimore, https://civilrights.baltimorecity.gov/ (last visited Feb. 3, 2025).

government and returning America to a merit based society . . . . Promises made, promises kept."[5]

77.    The J20 Order directs government officials to eliminate "DEI," "DEIA," and "environmental justice" from the federal government, including by shuttering all "DEI," "DEIA," and "environmental justice" offices, positions, and functions. J20 Order § 2(b)(i).

78.    It also directs "each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM . . . [to] terminate, to the maximum extent allowed by law, all . . . 'equity related' grants or contracts" within 60 days. *Id.*

79.    Also, within 60 days, agencies must provide the OMB Director with lists of federal contractors who have provided DEIA training to the government and federal grantees who received funding "to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities." *Id.* § 2(b)(ii).

80.    The J20 Order does not define "equity-related," does not explain what it means to advance "DEI, DEIA, or 'environmental justice' programs, services, or activities," or even what it means by "DEI," "DEIA," or "environmental justice." *Id.* § 2.

81.    The same day the executive order was issued, Defendants began targeting individuals within the federal government who are perceived to support diversity, inclusion, equity, and accessibility.

82.    That day, the Acting OPM Director issued a memo instructing all agencies to close all offices "focusing exclusively on DEIA initiatives and programs," without even evaluating the legality of those initiatives and programs and suggested agencies threaten

---

[5] Zoë Richards & Caroline Kenny *Trump orders all federal diversity, equity and inclusion employees placed on paid leave starting Wednesday*, NBC News (Jan. 22, 2025, 10:50 AM). https://www.nbcnews.com/politics/white-house/trump-orders-federal-diversity-equity-inclusion-employees-placed-paid-rcna188679.

employees with "adverse consequences" if they failed to report changes intended "to obscure the connection to "DEIA or similar ideologies . . . ." OPM did not explain what "ideologies" might be "similar" to DEIA.

83.    The J21 Order states President Trump's intent to end "illegal preferences and discrimination," referring to "illegal DEI and DEIA policies," and, under the guise of promoting "equal opportunity," rescinds orders and policies that have been critical in mitigating the harmful effects of centuries of discrimination in the United States. J21 Order § 1, 3.

84.    The J21 Order targets those in the private sector—including corporations, large nonprofits, medical entities, and institutions of higher education—that have allegedly "adopted and actively use[d] dangerous, demeaning, and immoral race- and sex- based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." J21 Order § 1.

85.    The J21 Order instructs agency heads to "include in every contract or grant award" a "term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B) (the "Certification Requirement"). The order does not lay out a timeline for implementing these instructions, thus they must be presumed to take effect immediately. Nor does the order define what it means to "promot[e] DEI" or the types of "programs promoting DEI" that would violate "applicable Federal anti-discrimination laws."

86.    A certification, found to be materially false, may result in treble damages, penalties, and potentially attorneys' fees under the FCA. *See Id.* § 3(b)(iv)(A); 31 U.S.C. §§ 3729(a) & 3730(d). Penalties currently range as high as $27,894 per violation, *see* 28 C.F.R.

§ 85.5, and FCA cases often involve many violations. *See U.S. ex rel. Kozak v. Chabad-Lubavitch Inc.*, No. 2:10-CV-01056-MCE, 2015 WL 2235389, at *7 (E.D. Cal. May 11, 2015).

87.     Moreover, the J21 Order promises swift enforcement to "deter" those in the private sector from engaging in "Illegal DEI Discrimination and Preferences." *Id.* § 4(b). Within 120 days, it calls on the Attorney General and other administration officials to issue a "strategic enforcement plan" that identifies "the most egregious and discriminatory DEI practitioners in each sector of concern," and recommends litigation "that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest." *Id.* 4(b)(ii) and (v). To aid the Attorney General, each agency is required to "identify up to nine potential civil compliance investigations of" certain types of organizations, including "institutions of higher education with endowments over 1 billion dollars." *Id.* 4(b)(iii).

88.     The J21 Order makes no effort to consider the specifics of a particular program, declaring instead that "DEI programs or principles (whether specifically denominated 'DEI' or otherwise) . . . constitute illegal discrimination or preferences." *Id.*

89.     On information and belief, there are over 120 institutions of higher education with endowments over $1 billion in the United States. The order offers no criteria for which of these institutions should be served up for investigations, nor does it explain what they can do to stay off the target list. In other words, none of the approximately 120 institutions of higher education that could be subject to civil compliance investigations know what, if any, action they can take to avoid being named on the Attorney General's target list.

90.     The J21 Order does not define "DEI" or "illegal DEI and DEIA programs" at all, nor does it recognize that the question of a program's legality is a fact-intensive exercise left to

courts and other adjudicatory bodies that are well-equipped to apply the facts to existing antidiscrimination laws.

91.    To Defendants, DEIA is an ideology that they do not define but nonetheless want to crush, whether it manifests itself through lawful speech and actions or through actual violations of law. Ultimately, the President's position on DEIA was made clearest by his Deputy Chief of Staff Stephen Miller when he stated: "[a]ll DEI must be abolished nationwide."[6]

**C. President Trump's Crusade to Eliminate All DEIA Is Not New.**

92.    During the years leading up to these Executive Orders, President Trump has repeatedly and publicly made his disdain for DEIA initiatives clear—though what he imagines "DEIA" to be is inconsistent.

93.    Indeed, at the end of his last term, President Trump attempted (unsuccessfully) to silence those who promote diversity, equity, inclusion, and accessibility by banning what he decreed to be "divisive concepts" in Executive Order 13950.[7]

94.    To identify and eliminate these "divisive concepts," agencies were instructed to review diversity and inclusion training materials to identify banned ideas including by searching for terms like "intersectionality," "unconscious bias," and "systemic racism," among others. Off. of Mgmt. & Budget, Exec. Off. of the President, M-20-37, Ending Employee Trainings that Use Divisive Propaganda to Undermine the Principle of Fair and Equal Treatment for All (Sept. 28, 2020).

---

[6] Stephen Miller (@StephenM), X (January 12, 2025, 9:36 AM ET), https://x.com/StephenM/status/1878450912621994410.

[7] Executive Order 13950 was challenged, and the Northern District of California issued a preliminary injunction on the basis of the First and Fifth Amendment claims brought by individuals and organizations who received federal funds. *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) (enjoining sections of Executive Order 13950 pertaining to federal contractors and grantees).

95.     President Trump defended his crusade, claiming the government was "paying people hundreds of thousands of dollars to teach very bad ideas and frankly, very sick ideas" like "teaching people to hate our country."[8]

96.     President Trump's allies—now members of his administration—have echoed his call to abolish DEIA.

97.     Shortly before he joined President Trump's campaign, then-Senator J.D. Vance introduced the Dismantle DEI Act to eliminate DEIA programs in the federal government and prevent the awarding of federal contracts and grants to entities that employ DEIA practices.

98.     Then-Senator Vance stated: "The DEI agenda is a destructive ideology that breeds hatred and racial division," and "Americans' tax dollars should not be co-opted to spread this radical and divisive ideology—this bill would ensure they are not."[9]

99.     Elon Musk, head of President Trump's Department of Government Efficiency ("DOGE") said: "DEI is just another word for racism. Shame on anyone who uses it."[10] Musk criticized the NSF, calling the increase in NSF grants with DEIA components "insane."[11]

100.     An administration insider familiar with President Trump's plans for DOGE said, "[a]nything having to do with DEI will be gone," and that "[e]veryone is committed to working together and rooting it out."[12]

---

[8] ABC News (@ABC), X (Sept. 29, 2020, 10:06 PM ET), https://x.com/ABC/status/1311125196829609984.
[9] Press Release, *JD Vance and Michael Cloud introduce bill to eliminate DEI programs in federal government*, Office of Rep. Michael Cloud, Jun. 12, 2024, https://cloud.house.gov/posts/jd-vance-and-michael-cloud-introduce-bill-to-eliminate-dei-programs-in-federal-government.
[10] Elon Musk (@elonmusk), X (Jan. 3, 2025, 4:05 PM ET), https://x.com/elonmusk/status/1742653436393406618.
[11] Elon Musk (@elonmusk), X (Dec. 3, 2024, 11:30 AM ET), https://x.com/elonmusk/status/1863984151705120806.
[12]  Rene Marsh & Pamela Brown, *DOGE vs. DEI: Republicans' Promise to Purge Government Diversity Initiatives Could be Wide-ranging, and Hard to Pull Off*, CNN, Dec. 19, 2024, https://www.cnn.com/2024/12/19/politics/doge-government-diversity-initatives/index.html

101.    On January 29, 2025, President Trump finally said the quiet part out loud.
Although the J21 Order does not define "illegal DEI" or the "equity" principles that the OMB is
directed to target and to "terminate," eight days later President Trump signed Executive Order
14190, titled "*Ending Radical Indoctrination in K-12 Schooling*," that sheds some light on his
intent.  Executive Order 14190 defines "discriminatory equity ideology" as holding beliefs that
are almost identical to the so-called "divisive concepts" list in Executive Order 13950—the same
executive order that was already enjoined because it violated the First Amendment.

**D. The Implementation of the Executive Orders Confirms Their Unlawful Reach.**

102.    Executive branch agencies are already implementing the Executive Orders,
making liberal use of the unfettered discretion granted and often using the same vague and
vitriolic language that gives the Executive Orders their chilling effect.

103.    On January 21, 2025, the Acting Director of the U.S. Office of Personnel
Management ("OPM") issued OPM's "Initial Guidance Regarding DEIA Executive Orders."
Memorandum from Acting Director of OPM Charles Ezell to Heads and Acting Heads of
Departments and Agencies (Jan. 21, 2025) (the "OPM Memo"). The OPM Memo told agencies
how to notify employees about the closure of DEI offices, and how to intimidate employees into
informing the agency of purported attempts to evade the OPM Memo's terms.

104.    Citing the J20 Order, the OPM Memo instructed agencies to ask all employees, by
the end of January 22, 2025, "if they know of any efforts to disguise these programs by using
coded or imprecise language." OPM Memo, at 1.

105.    OPM shared template emails for agency heads to use in carrying out OPM's
instructions. These templates assert that DEIA programs "divided Americans by race, wasted
taxpayer dollars, and resulted in shameful discrimination" and warned that OPM was "aware of

efforts by some in government to disguise these programs by using coded or imprecise language." OPM Memo, App'x 1. Employees were instructed to expose any "change in any contract description or personnel position description since November 5, 2024 to obscure the connection between the contract and DEIA or similar ideologies," and that "all facts and circumstances" must be reported to "DEIAtruth@opm.gov within 10 days." *Id.* OPM's template email did not explain what kind of "ideologies" might be "similar" to DEIA. OPM further warned that "failure to report this information within 10 days may result in adverse consequences." *Id.* It did not delineate the "adverse consequences" that might be in store for employees who fail to expose their colleagues who engage with DEIA or "similar ideologies."

106.    Some federal agencies have sent versions of OPM's template email to their employees.[13] On information and belief, these letters included the language characterizing "DEIA offices" and "DEIA-related" contracts. They also included the language threatening "adverse consequences" to employees who failed to report the required information.

107.    On information and belief, DOL, the National Aeronautics and Space Administration ("NASA"), NIH, the United States Agency for International Development ("USAID"), the Defense Intelligence Agency ("DIA"), and the Internal Revenue Service (IRS) have already started relying on one or both of the Executive Orders, or the OPM Memo, to instruct federal grantees to cease activities related to DEIA.

108.    Citing the Executive Orders, the NSF informed grantees that they must cease "all non-compliant grant and award activities."[14] Specifically, this includes "conferences, trainings, workshops, considerations for staffing and participant selection, and any other grant activity that

---

[13] *See* Kayla Epstein & Brajesh Upadhyay, *US Government Workers Told to Report DEI Efforts or Face 'Consequences,'* BBC, (Jan. 23, 2025), https://www.bbc.com/news/articles/c78wn5qg3nyo.
[14] U.S. Nat'l Sci. Found., *Message to the NSF Principal Investigator Community*, https://new.nsf.gov/executive-orders (Feb. 3, 2025).

uses or promotes the use of diversity, equity, inclusion, and accessibility (DEIA) principles and frameworks or violates federal anti-discrimination laws."[15]

109.    On information and belief, the CDC has relied on the J20 Order to instruct grant recipients to terminate programs, personnel, activities, or contracts promoting DEI that are supported with funds from grants the agency administers.

110.    On information and belief, the DIA issued a memorandum on January 28, 2025, indicating that in order to "implement the [J20] Executive Order[] . . . DIA will pause all activities and events related to Agency Special Emphasis Programs effective immediately." The memorandum also paused "Special Observances" including Martin Luther King Jr. Day, Black History Month, Women's History Month, and Holocaust Remembrance Day.

111.    On information and belief, the IRS removed all mentions of "equity" and "inclusion" from its Internal Revenue Manual, regardless of context, and without any assessment of legality. One deleted section mentioned the potential "inequity" of holding on to a taxpayer's money and described the "inclusion" of a taxpayer identification number on a form.

112.    On January 27, 2025, the Acting OMB Director issued a memorandum to the heads of executive departments and agencies declaring that "the use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars." M-25-13 "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" (the "OMB Freeze Memo").

113.    The OMB Freeze Memo instructed that, effective at 5:00 PM on January 28, 2025, all federal agencies must "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be

---

[15] *Id.*

implicated by the executive orders, including, but not limited to, financial assistance for foreign

aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."

114.    On January 28, 2025, a district court ordered an administrative stay prohibiting

OMB from "implementing [the OMB Freeze Memo] with respect to disbursement of Federal

funds under all open awards" until February 3, 2025.[16]

115.    Around 12:30pm ET on January 29, 2025, the Acting OMB Director issued a

memo announcing that the OMB Freeze Memo "is rescinded."  Jan. 29, 2025 Memo, "Rescission

of M-25-13," M-25-14.

116.    "This is NOT a rescission of the federal funding freeze," announced White House

Press Secretary Karoline Leavitt, about an hour later.[17] Instead, the Press Secretary claimed, it

was "simply a rescission of the OMB memo," intended to "end any confusion created by the

court's injunction."[18] She asserted that the "President's EO's [*sic*] on federal funding remain in

full force and effect, and will be rigorously implemented."[19]

117.    Consistent with the Press Secretary's announcement, in a separate action

challenging the OMB Freeze Memo and its implementation, the Department of Justice pressed

that the court's temporary restraining order does not "enjoi[n] the President's Executive Orders,

which are plainly lawful and unchallenged in this case."[20]

---

[16] Order, *Nat'l Council of Nonprofits, et al. v. Off. of Mgmt. & Budget*, No. 1:25-cv-00239-LLA (D.D.C. Jan. 28, 2025), ECF No. 13 (ordering administrative stay of OMB's federal financial assistance freeze).
[17] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:40 PM ET), https://x.com/PressSec/status/1884672871944901034.
[18] *Id.*
[19] *Id.*
[20] Notice of Compliance with Court's TRO, at 2, *New York. v. Trump,* 1:25-cv-39 (D.R.I. Feb. 3, 2025), ECF No. 51.

**E. Plaintiffs Rely on Federal Support to Advance their Critical Work and Missions.**

118.     Plaintiffs, or their members and constituents, receive federal funds, either as grantees or contractors. Their federal grants and contracts currently require compliance with federal antidiscrimination laws.

119.     NADOHE has hundreds of active institutional members, including public and private colleges and universities. These institutional members receive federal grants and contracts from several different federal agencies, and plan to seek more federal grants and contracts in the future.

120.     Those grants include active and ongoing grants awarded by several agencies and sub-agencies including but not limited to the Education Department, Interior, Commerce, Energy, Transportation, USDA, NSF, HHS, and DOJ.

121.     The grants cover a wide variety of projects ranging from advancing STEM education, to pursuing more equitable health outcomes for underserved communities, to reducing disparities in juvenile justice, to improving public transit for communities, to promoting the development of clean energy technology, and many more.

122.     Likewise, academic professionals who are members of AAUP receive federal grants from agencies across the federal government, including NIH, NSF, NEA, and HHS, among many others. Many of these grants fund the salaries of medical school faculty, graduate students, and other researchers who focus on health equity. Others focus on the impact of climate change and other environmental risks on diverse communities.

123.     ROC United similarly has been awarded federal grants. For example, in 2023, ROC United received a grant from the Fostering Access, Rights and Equity ("FARE") grant program within DOL's Women's Bureau. Public Law No. 259 of June 5, 1920, 29 U.S.C. § 11-

16, which established the Women's Bureau within DOL, provides the statutory authority for this grant. Congress gave the Women's Bureau the "authority to formulate standards and policies which shall promote the welfare of wage-earning women, improve their working conditions, increase their efficiency, and advance their opportunities for profitable employment." 29 U.S.C. § 13.

124.    Established in 2021, the FARE grant program was designed to help women workers learn about and access their employment rights and benefits. Starting in 2023, the FARE grant program began focusing on addressing gender-based violence and harassment in the workplace.

125.    The FARE grant program has allowed ROC United to expand several of its sexual harassment training initiatives. It has also enabled ROC United to establish a referral network to connect survivors with support services, such as the EEOC and local equivalents, the Office of Human Rights, and the Occupational Safety and Health Administration ("OSHA").

126.    Without this grant, ROC United would not have been able to expand or support its efforts to end gender-based violence and sexual harassment in the restaurant industry.

127.    ROC United also has a grant award from OSHA under the Susan Harwood Training Grant Program, which it uses to provide heat-safety training to over 600 workers in the restaurant industry, including youth, those who are hard to reach, and limited English proficiency workers.

128.    Baltimore is both a contractor and grantee of the federal government. Federal funding supports a range of services and programs for which Baltimore is accountable, including public safety, housing, the environment, the local economy, infrastructure, and accessibility for

rural, low-income, elderly, and disabled populations. Baltimore relies on federal funds to serve the needs of its residents, including food, infrastructure, energy, and weather resilience.

129.    Baltimore receives $250 million in federal funds under the Justice40 Initiative intended to benefit disadvantaged communities. The programs were developed, in part, pursuant to Executive Order 14008, which President Trump rescinded on January 20, 2025, by Executive Order 14148, "*Initial Rescissions of Harmful Executive Orders and Actions*." By design, many of the Justice40 grants provide targeted support for historically underserved groups. As such, many of Baltimore's grants touch on themes of equity and inclusion.

130.    Baltimore receives $500,000 from Energy through the Weatherization Assistance Program to improve the energy efficiency of homes in Baltimore.  The Secretary of Energy is authorized to administer this grant program "for the purpose of providing financial assistance with regard to projects designed to provide for the weatherization of dwelling units, particularly those where elderly or handicapped low-income persons reside, occupied by low-income families." 42 U.S.C. § 6863(a).

131.    These are only a few examples of the federal support on which Plaintiffs rely to provide economic stability, entrepreneurial opportunity, and environmental health.

**F.  Absent Court Intervention, the EOs and Their Implementation Will Cause Irreparable Harm to Plaintiffs.**

132.    The Executive Orders, which broadly characterize DEIA efforts as "illegal and immoral discrimination programs," directly undermine the missions and needs of Plaintiffs and their communities.

133.    The sixty-day mandate for "terminat[ing] … all … 'equity-related' grants or contracts" under the J20 Order is not a running clock leading up to the termination. Rather, sixty

days is a deadline by which the terminations must occur; grant and contract terminations may occur any day up to and including the 60th day after the issuance of the J20 Order.

134.    Many of NADOHE's institutional members have active federal grants that include the term "equity" in the title, the grant proposal submitted for funding, or in other public-facing documentation. Further, many of NADOHE's institutional members have federal grants that include other terms arguably related to the concept of "equity," including terms such as "diversity," "inclusion," "accessibility," and "belonging."

135.    The Executive Orders' vagueness threatens NADOHE's members with termination of federal grants. DOL has already relied on both Executive Orders to instruct at least one of NADOHE's institutional members that receives federal funding to cease certain activities connected to DEIA.

136.    If such terminations occur, NADOHE fears that the result will be eradication of critical support for students, staff, and faculty, and research on campuses of higher education.

137.    The J21 Order likewise harms NADOHE. Within 120 days, the Attorney General must provide a report that identifies "up to nine" targets from each agency for civil compliance investigations, all designed to "deter DEI." Again the 120 days provision is a deadline and the report could be produced any day between now and May 21, 2025.

138.    NADOHE's institutional members with endowments greater than $1 billion and those institutions' diversity officers are under threat from the J21 Order's requirement for agencies to identify targets for civil compliance investigations. They cannot wait to be named to prevent the injuries an investigation would cause. Those NADOHE members have a responsibility to their trustees and students to avoid the fiscal and reputational harms that would flow from any such investigation.

139.    However, because the J21 Order fails to define material terms, NADOHE's institutional members who fit the parameters of the potential target list are left with only fear to guide their determinations of what activities, programs, and principles will render them a target. The only way NADOHE's relevant institutional members can ensure they are *not* on the civil compliance investigation list would be to end *all* DEIA programs and cease voicing support for any DEIA principles, or similar principles, that could even possibly concern this administration. More simply, the only sure way to avoid unwarranted harm is for Plaintiff NADOHE's relevant institutional members to censor their own speech.

140.    Likewise, the J21 Order leaves NADOHE's members who are Chief Diversity Officers to guess whether and which of their duties might put their institutions in the crosshairs of an investigation. In accordance with NADOHE's Standards of Professional Practice, NADOHE's members who are Chief Diversity Officers "have ethical, legal, and practical obligations to frame their work from comprehensive definitions of equity, diversity, and inclusion."[21] Further, the standards call for them to be "committed to drawing from existing scholarship and using evidence-based practices to provide intellectual leadership in advancing equity, diversity, and inclusion." The J21 Order suggests that these and all other DEIA principles and activities are "illegal."

141.    Many of AAUP's members have active federal grants with "equity" in the title, description, request for grant proposals, or other public facing documentation. Still other AAUP members have active federal grants that address topics related to equity, including diversity, anti-racism, inclusion, accessibility, and belonging.

---

[21] NADOHE, Standard of Professional Practice for Chief Diversity Officers in Higher Education 2.0 (March 2020), https://nadohe.memberclicks.net/assets/2020SPPI/__NADOHE%20SPP2.0_200131_FinalFormatted.pdf.

142.    Many of AAUP's members fear that their federal grants may be terminated because of the vagueness of the Executive Orders. On information and belief, AAUP members have already been told that they must cease certain activities that are arguably related to DEIA.

143.    AAUP is concerned that terminating federal funding for its members will undermine academic excellence and make academic institutions less inclusive and equitable.

144.    Similarly, for those AAUP members whose teaching or research focuses on topics related to diversity or equity, there is concern that their work—whether teaching or research— might endanger their own institutions and lead to adverse employment consequences.

145.    ROC United relies on federal grant support, including the FARE and Harwood grants, to realize its vision of a society that treats restaurant workers with dignity and respect, including prioritizing racial and gender equity.

146.    ROC United received e-mail notices from DOL's Women's Bureau and OSHA to "cease all activities related to [DEI] or [DEIA] under their federal awards, consistent with the requirements of" the Executive Orders. The notices did not define what constitutes DEI or DEIA.

147.    In addition, OSHA instructed grant recipients to: "effective immediately! Cease collecting and reporting trainees DEI information."

148.    The notices explained that DOL "is reviewing all active federal awards and will take appropriate action, including terminating the award, consistent with the requirements of" the Executive Orders. The notices have no timelines or standards for such a review.

149.    When it received these notices, ROC United stopped all work funded by the FARE grant and the Harwood Grant. ROC United is experiencing significant disruption to its operations as it considers whether it can continue its programs and under what parameters.

150.    For example, ROC United has several scheduled upcoming training programs connected to the FARE and Harwood grants. Due to the Executive Orders, ROC United is in limbo: it must either seek other sources of funding and remove any reference to the two grants, or it will have to cancel the trainings altogether. As a last resort, it will operate at a deficit to continue to fulfill its mission until its funds are depleted.

151.    And Baltimore, accountable for a wide range of services supported by federal funding that could be considered "equity-related," faces a quandary. The uncertainty of federal funding leaves the city wondering whether it needs to start reallocating resources—and likely reduce support for other programs—just to sustain its critical municipal functions.

152.    Finally, the J21 Order's Certification Requirement chills Plaintiffs' and their members' speech. The Certification Requirement does not delineate which "programs promoting DEI" President Trump purports to prohibit. Without clarity, Plaintiffs and their members fear they may have to abandon their lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds that support their valuable programs.

153.    Further chilling, the Certification Requirement includes no timetable for its implementation. Plaintiffs and their members cannot know whether the agencies overseeing their grant programs feel authorized to insert the required certifications into active grants that Plaintiffs and their members have already been awarded.

## LEGAL CLAIMS

### COUNT ONE:
### ULTRA VIRES (SPENDING CLAUSE)
### REGARDING SECTION 2 OF THE J20 ORDER

154.    The preceding allegations are incorporated herein as if repeated fully.

155.    Plaintiffs state this cause of action against all Defendants.

156.    The Constitution vests spending powers exclusively in the hands of Congress. *See* U.S. Const. art. I, § 1, 8.

157.    "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952).

158.    The J20 Order purports to direct subordinate executive branch officials to unilaterally "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts." J20 Order § 2(b)(i).

159.    The Constitution gives neither the President nor his subordinate executive branch officials authority to unilaterally terminate "'equity-related' grants and contracts" without express statutory authority.

160.    Though the J20 Order purports to limit terminations "to the maximum extent allowed by law," President Trump and his subordinate agencies have already acted contrary to that limitation.

161.    A general statement about nominal adherence to the law does not suffice to evade judicial review.

162.    Accordingly, the J20 Order was issued without legal authority and is *ultra vires*.

## COUNT TWO:
## FIFTH AMENDMENT DUE PROCESS (VAGUENESS)
## REGARDING SECTION 2 OF THE J20 ORDER

163.    The preceding allegations are incorporated herein as if repeated fully.

164.    Plaintiffs state this cause of action against all Defendants.

165.    Under the Fifth Amendment to the United States Constitution, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

166.    The J20 Order "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

167.    The J20 Order does not define key terms, including "DEI," "DEIA," "equity" or "equity-related" and fails to satisfy the constitutional minimum.

168.    Plaintiffs are left to guess whether their federal grants or contracts will be terminated within the sixty-day period proscribed by the J20 Order.

169.    Furthermore, the J20 Order lends itself to subjective interpretation and discriminatory enforcement. Each agency head is authorized to exercise unfettered discretion to determine whether a federal grant is "equity-related."

170.    Accordingly, the J20 Order is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

## COUNT THREE:
## FIFTH AMENDMENT DUE PROCESS (VAGUENESS)
## REGARDING SECTION 4 OF THE J21 ORDER

171.    The preceding allegations are incorporated herein as if repeated fully.

172.    Plaintiffs NADOHE and AAUP state this cause of action against all Defendants.

173.    The J21 Order "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

174.    The J21 Order fails to define material terms that determine whether Plaintiffs NADOHE, particularly its members at institutions with endowments over $1 billion, and AAUP, will be subject to civil investigation, civil enforcement, claw back of funding, or other enforcement actions by the federal government.

175.    The J21 Order does not define the term "illegal DEIA and DEIA policies" in Section 1; "illegal private-sector DEI preferences, mandates, policies, programs, and activities" in Section 2; nor "illegal DEI discrimination and preferences" in Section 4.

176.    The lack of definitions necessarily requires people of common intelligence to guess as to what is prohibited. Given the vagueness of the material terms, the Attorney General and each agency head charged with identifying the "up to nine" investigation targets are "encourage[d]" to engage in "discriminatory enforcement."

177.    The J21 Order provides no rubric or clear criteria for how the "up to nine" entities will be selected by each agency, nor does the order define "DEI programs or principles" or "illegal discrimination or preferences." Without any definitive criteria or information, any of the over 130 colleges and universities in the United States with endowments over $1 billion, including NADOHE's institutional members, are potentially in the crosshairs of the order.

178.    Plaintiff NADOHE's members, including "institutions of higher education with endowments over 1 billion dollars," are at risk of being identified for "civil compliance investigations" to "deter [their] DEI programs or principles (whether specifically denominated 'DEI' or otherwise)." J21 Order § 4(b)(iii).

179.    Many of AAUP's members, along with NADOHE's institutional members and the diversity professionals they employ, use equity-centered principles and policies in their work.

180.     Plaintiffs NADOHE and AAUP and their members cannot determine what is prohibited and what is permissible under the J21 Order, especially given admissions by the President and his representatives about their desire to end *all* DEI programs and principles.

181.     The enforcement of the J21 Order, and related executive orders, by the executive agencies further demonstrates its vagueness and arbitrary enforcement.

182.     Accordingly, the J21 Order is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

**COUNT FOUR:**
**FIRST AMENDMENT (FREE SPEECH CLAUSE)**
**REGARDING SECTION 4 OF THE J21 ORDER**

183.     The preceding allegations are incorporated herein as if repeated fully.

184.     Plaintiffs NADOHE and AAUP state this cause of action against all Defendants.

185.     The J21 Order violates the Free Speech Clause of the First Amendment because Section 4(b)(iii)'s threat of "civil compliance investigations" impermissibly restricts the exercise of NADOHE's and AAUP's constitutionally protected speech based on its content and viewpoint.

186.     For example, the J21 Order penalizes the protected speech of NADOHE's institutional members with endowments over $1 billion by threatening to bring enforcement actions against them to "deter" "DEI programs or principles." J21 Order § 4(b)(iii).

187.     The President makes threats of civil investigation and undefined "deterrence" against anyone who expresses support for what he imprecisely defines as "illegal DEI."

188.     Indeed, merely being listed for a civil compliance investigation carries its own consequences for institutions of higher education, including the costs of conducting investigations, the potential costs of litigation, and the need to redirect dedicated resources from

other purposes to engage with the civil compliance investigation. Those harms are separate and apart from the reputational harm that besets an institution of higher education identified for a civil compliance investigation, including the risk of loss of student applicants, donors, and prestige that will likely result from such an investigation.

189.    The freedom of speech of individual Chief Diversity Officers and other academic faculty at such institutions is likewise impinged due to the threats of investigation of their institutions.

190.    A general statement about nominal adherence to the law does not suffice to evade judicial review.

191.    These First Amendment violations have injured and continue to injure Plaintiffs NADOHE, AAUP, and their members.

192.    Accordingly, the J21 Order violates the First Amendment.

**COUNT FIVE:**
**FIRST AMENDMENT (FREE SPEECH CLAUSE)**
**REGARDING SECTION 3 OF THE J21 ORDER**

193.    The preceding allegations are incorporated herein as if repeated fully.

194.    Plaintiffs state this cause of action against all Defendants.

195.    The J21 Order violates the Free Speech Clause of the First Amendment because it impermissibly restricts Plaintiffs constitutionally protected speech based on its content and viewpoint, and because it fails to define what "programs promoting DEI" are or why such programs might violate anti-discrimination laws.

196.    Section 3(b)(iv)(B) requires federal contractors and grantees to "certify that they do not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

197.    This Certification Provision—contained in an executive order characterizing DEIA as "illegal" and "violat[ions of] the text and spirit of our longstanding Federal civil-rights laws, *id.* § 1—is designed to chill federal contractors' and grantees' speech related to diversity, equity, inclusion, and accessibility. Through this provision, President Trump brandishes the threat of FCA enforcement to quiet federal contractors' and grantees' dissenting views.

198.    The President does not define any of the key terms of these prohibitions. It is not clear what "so-called 'diversity, equity, and inclusion' (DEI)" means, *see* J21 Order, § 1; nor does it provide any guidance on how such programs or initiatives can be considered to "violate the text and spirit of our longstanding Federal civil-rights laws." *Id.*

199.    As a result, Plaintiffs are chilled from expressing or participating in anything that might draw the ire of the President or his administration when it comes to DEI.

200.    A general statement about nominal adherence to the law does not suffice to evade judicial review, particularly in the face of real-world facts as detailed elsewhere in this Complaint that the President is attempting to ban *all* DEI, legal or otherwise.

201.    Accordingly, the J21 Order violates the First Amendment.

**COUNT SIX:**
**VIOLATION OF SEPARATION OF POWERS**
**REGARDING SECTION THREE OF THE J21 ORDER**

202.    The preceding allegations are incorporated herein as if repeated fully.

203.    The J21 Order violates the separation of powers enshrined in the Constitution.

204.    The President and the executive branch have no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch.

205.    The Constitution vests spending powers exclusively in the hands of Congress. *See* U.S. Const. art. I, § 1, 8.

206.    The J21 Order purports to impose a condition on the receipt of federal funds by requiring recipients of contracts or grants to certify that they "do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." J21 Order § 3(b)(iv)(B).

207.    While the Certification Requirement claims to limit itself to "programs promoting DEI" that violate "any applicable Federal anti-discrimination laws," those limitations are undefined and conflict with the rest of the order. *Id.*

208.    A general statement about nominal adherence to the law does not suffice to evade judicial review.

209.    No delegation of Congress's power under the Spending Clause is constitutionally permitted, nor did Congress delegate any spending power to the President with respect to the particular federal programs and funds at issue here.

210.    Accordingly, the J21 Order is unconstitutional because it violates the constitutional separation of powers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

    a.    Enter a declaratory judgment that Executive Order 14151 is unlawful and unconstitutional;

    b.    Enter a declaratory judgment that Executive Order 14173 is unlawful and unconstitutional;

    c.    Enter a preliminary and permanent injunction enjoining Defendants other than the President from enforcing Executive Order 14151;

d.  Enter a preliminary and permanent injunction enjoining Defendants other than the

President from enforcing Executive Order 14173;

e.  Award Plaintiffs reasonable costs and attorney's fees; and

f.  Issue such other relief as the Court deems proper.

The Plaintiffs request a trial by jury on all issues so triable.

February 3, 2025

Niyati Shah*
Noah Baron*
Alizeh Ahmad*
**Asian Americans Advancing Justice |
AAJC**
1620 L Street NW, Suite 1050,
Washington, DC 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

Respectfully submitted,

/s/ Victoria S. Nugent
Victoria S. Nugent (Bar No. 15039)
Aleshadye Getachew⁺
Ananda V. Burra⁺
Audrey Wiggins*
Brooke Menschel*
J. Sterling Moore*
Orlando Economos*
Skye Perryman*
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
vnugent@democracyforward.org
agetachew@democracyforward.org
aburra@democracyforward.org
awiggins@democracyforward.org
bmenschel@democracyforward.org
smoore@democracyforward.org
oeconomos@democracyforward.org
sperryman@democracyforward.org
* motion to appear *pro hac vice*
forthcoming
⁺admission pending

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| National Association of Diversity Officers in Higher Education, et al. (See Attached.) | Donald J. Trump, in his official capacity as President of the United States, et al. (See Attached.) |

**(b)** County of Residence of First Listed Plaintiff ___District of Columbia___
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached for full list of attorneys and attorney information.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:    Plaintiffs challenge two of President Trump's Executive Orders pertaining to diversity and equity under Separation of Powers, the First Amendment, and the Fifth Amendment, among other claims.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____     DOCKET NUMBER _____

DATE   February 3, 2025

SIGNATURE OF ATTORNEY OF RECORD   /s/ Victoria S. Nugent

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JA62

**Addendum to Civil Cover Sheet: Complete List of Parties**

## I(a): COMPLETE LIST OF PLAINTIFFS

**A complete list of Plaintiffs is as follows:**

National Association of Diversity Officers in Higher Education

American Association of University Professors

Restaurant Opportunities Center United

Mayor and City Council of Baltimore, Maryland

## I(c): COMPLETE LIST OF ATTORNEYS FOR PLAINTIFFS

**A complete list of Attorneys for Plaintiffs is as follows:**

Victoria S. Nugent
Audrey Wiggins
J. Sterling Moore
Orlando Economos
Brooke Menschel
Aleshadye Getachew
Ananda Burra
Skye Perryman

Democracy Forward Foundation
P.O. Box 34553,
Washington, D.C. 20043
(202) 448-9090

Niyati Shah
Noah Baron
Alizeh Ahmad

Asian Americans Advancing Justice
1620 L St NW #1050,
Washington, DC 20036
(202) 296-2300

## I: COMPLETE LIST OF DEFENDANTS

**A complete list of Defendants is as follows:**

Donald J. Trump, in his official capacity as President of the United States

Department of Health and Human Services

Dorothy Fink, in her official capacity as Acting Secretary of Health and Human Services

Department of Education

Denise Carter, in her official capacity as Acting Secretary of Education

Department of Labor

Vincent Micone, in his official capacity as Acting Secretary of Labor

Department of Interior

Doug Burgum, in his official capacity as Secretary of the Interior

Department of Commerce

Jeremy Pelter, in his official capacity as Acting Secretary of Commerce

Department of Agriculture

Gary Washington, in his official capacity as Acting Secretary of Agriculture

Department of Energy

Ingrid Kolb, in her official capacity as Acting Secretary of Energy

Department of Transportation

Sean Duffy, in his official capacity as Secretary of Transportation

Department of Justice

James McHenry, in his official capacity as Acting Attorney General

National Science Foundation

Sethuraman Panchanathan, in his official capacity as Director of the National Science Foundation

Office of Management and Budget

Matthew Vaeth, in his official capacity as Acting Director of the Office of Management and Budget

JA64

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION OF
DIVERSITY OFFICERS IN HIGHER
EDUCATION, *et al.*,

     *Plaintiffs*,

  v.

DONALD J. TRUMP, *et al.*,

     *Defendants*

Case No. 1:25-cv-00333-ABA

## MEMORANDUM OPINION

Among the executive orders the President issued on the first two days of the administration were orders that (1) directed all executive agencies to "terminate . . . 'equity-related' grants or contracts" (the "Termination Provision"), (2) directed all executive agencies to "include in every contract or grant award" a certification, enforceable through the False Claims Act, that the contractor and grantee "does not operate any programs *promoting DEI* that violate any applicable Federal anti-discrimination laws" (the "Certification Provision"), and (3) directing the Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]" (the "Enforcement Threat Provision") (collectively, the "Challenged Provisions").[1]

---

[1] Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339, 8339 (Jan. 29,

The term "DEI," of course, is shorthand for "diversity, equity, and inclusion." And ensuring equity, diversity, and inclusion has long been a goal, and at least in some contexts arguably a requirement, of federal anti-discrimination law. But the administration has declared "DEI" to be henceforth "illegal," has announced it will be terminating all "'equity-related' grants or contracts"—whatever the administration might decide that means—and has made "practitioners" of what the government considers "DEI" the targets of a "strategic enforcement plan." J20 Order § 2; J21 Order § 4. But the Challenged Orders do not define any of the operative terms, such as "DEI," "equity-related," "promoting DEI," "illegal DEI," "illegal DEI and DEIA[2] policies," or "illegal discrimination or preferences," J20 Order §§ 1-2; J21 Order §§ 1-4—let alone identify the types of programs or policies the administration considers "illegal."

According to a recent case, "approximately 20% of the nation's labor force works for a federal contractor." *Kentucky v. Biden*, 57 F.4th 545, 548 (6th Cir. 2023). The Termination Provision leaves those contractors and their employees, plus any other recipients of federal grants, with no idea whether the administration will deem their contracts or grants, or work they are doing, or speech they are engaged in, to be "equity-related." And the J21 Order leaves the private sector at a loss for whether the administration will deem a particular policy, program, discussion, announcement, etc. to be among the "preferences, mandates, policies, programs, and activities" the

---

2025) ("J20 Order"); Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633, 8634-35 (Jan. 31, 2025) ("J21 Order") (collectively, the "Orders" or "Challenged Orders") (emphasis added).

[2] The J20 defines this phrase as "diversity, equity, inclusion, and accessibility." J20 Order § 2(a).

administration now deems "illegal." J21 Order §§ 2, 4(b)(iii). Plaintiffs, who have easily established their standing to bring this case and irreparable harm, have shown they are likely to prove the Termination and Enforcement Threat Provisions are unconstitutionally vague on their face.

But it is not just the vagueness of the Challenged Provisions that renders them unconstitutional. There is a label for government action that seeks to "deter . . . principles," J21 Order § 4(b)(iii), that the government disagrees with: "restrict[ion]" of "expression because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And the most "blatant" and "egregious form of content discrimination" is viewpoint discrimination. *Id.* at 168-69. The Certification and Enforcement Threat Provisions squarely, unconstitutionally, "abridge[] the freedom of speech." U.S. Const. amend. I.

A "President's duties are of 'unrivaled gravity and breadth.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Trump v. Vance*, 591 U.S. 786, 800 (2020)). And the Constitution "vest[s] the President with 'supervisory and policy responsibilities of utmost discretion and sensitivity.'" *Id.* (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982)). But "a President does not 'stand exempt from the general provisions of the constitution.'" *Id.* at 612 (quoting *United States v. Burr,* 25 F. Cas. 30, 34 (No. 14,692d) (C.C.D. Va. 1807)). The preliminary injunction factors weigh in favor of issuing a preliminary injunction against the Termination Provision, the Certification Provision, and part of the Enforcement Threat Provision.

I.    BACKGROUND

A.    The Challenged Executive Orders

As noted above, President Trump issued the two executive orders at issue on January 20 and 21, 2025. *See* J20 Order; J21 Order. The J20 Order focuses on activities and programs within the federal government, including "Equity Action Plans" that were required of executive agencies during President Biden's administration. *See* J20 Order §§ 1-2 (citing Exec. Order No. 13,985, 86 Fed. Reg. 7009 (Jan. 25, 2021)). The J21 Order focuses on "ending illegal preferences and discrimination," both within the federal government and in the private sector. J21 Order §§ 1-4.

Plaintiffs do not contend that the two Challenged Orders are unconstitutional in their entirety; Plaintiffs challenge one specific provision of the J20 Order and two specific provisions of the J21 Order, detailed below. Other aspects of the Challenged Orders, such as a direction to assess the operational impact and cost of President Biden's DEI, DEIA, and "environmental justice" programs and policies, J20 Order § 2(b)(iii), and ordering the Director of the Office of Management and Budget (OMB) to "[e]xcise references to DEI and DEIA principles" from federal acquisition and contracting procedures, J21 Order § 3(c)(ii), are not at issue here. Each order also contains a severability clause, stating that if any provision of the order is held to be invalid, "the remainder of this order . . . shall not be effected." J20 Order § 3; J21 Order § 6.

1.    Termination Provision

The first provision that Plaintiffs challenge is Section 2(b)(i) of the J20 Order, the Termination Provision. That provision provides, in pertinent part, as follows:

> Each agency, department, or commission head, in
> consultation with the Attorney General, the Director of OMB,
> and the Director of OPM, as appropriate, shall take the
> following actions within sixty days of this order: (i) terminate,
> to the maximum extent allowed by law, all . . . "equity-related"
> grants or contracts.

J20 Order § 2(b)(i). That provision is in the context of Section 2 of the J20 Order, which

directs the OMB director, "assisted by the Attorney General and the Director of the

Office of Personnel Management," to "coordinate the termination of all discriminatory

programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility'

(DEIA) mandates, policies, programs, preferences, and activities in the Federal

Government, under whatever name they appear." J20 Order § 2(a).

    Plaintiffs bring two discrete claims against the Termination Provision. First,

Plaintiffs contend the provision violates the Spending Clause of the United States

Constitution. ECF No. 1 ¶¶ 154-62 ("Count One") (citing U.S. Const. art. I, §§ 1, 8). They

assert that neither the President nor executive branch officials have authority under the

Constitution to unilaterally terminate "'equity-related' grants and contracts," absent

express statutory authority. *Id.* ¶ 159. Second, Plaintiffs argue that the provision is

unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause. *Id.*

¶¶ 163-70 ("Count Two"). Plaintiffs further note that key terms—including "DEI,"

"DEIA," "equity," and "equity-related"—are undefined in the order. *Id.* ¶ 167. As a result,

Plaintiffs contend, they are "left to guess" not only "whether their federal grants or

contracts will be terminated," but also how to conform their policies, programs, and

speech to the vague, undefined, and unspecified directive that "equity-related" grants

will be terminated. *Id.* ¶¶ 168.

## 2.    Certification Provision

The next provision Plaintiffs challenge is Section 3(b)(iv) of the J21 Order, the

Certification Provision. That provision provides as follows:

> (iv) The head of each agency shall include in every contract or
> grant award:
>
>> (A) A term requiring the contractual counterparty or grant
>> recipient to agree that its compliance in all respects with
>> all applicable Federal anti-discrimination laws is material
>> to the government's payment decisions for purposes of
>> section 3729(b)(4) of title 31, United States Code; and
>>
>> (B) A term requiring such counterparty or recipient to
>> certify that it does not operate any programs promoting
>> DEI that violate any applicable Federal anti-
>> discrimination laws.

J21 Order § 3(b).

The reference to 31 U.S.C. § 3729(b)(4) refers to the False Claims Act. Under the

False Claims Act, a person who, for example, "knowingly makes, uses, or causes to be

made or used, a false record or statement material to an obligation to pay or transmit

money or property to the Government" is "liable to the United States Government for a

civil penalty . . . plus 3 times the amount of damages which the Government sustains

because of the act of that person." 31 U.S.C. § 3729(a)(1)(G). That means the

Certification Provision is attempting to use the False Claims Act to enforce the

government's notion of what it means to "promot[e] DEI" in a way that "violate[s] any

applicable Federal anti-discrimination laws."

Plaintiffs bring two distinct claims against the Certification Provision.

First, Plaintiffs allege the Certification Provision violates the Free Speech Clause

of the First Amendment. ECF No. 1 ¶¶ 193-201 ("Count Five"). They argue the provision

"impermissibly restricts Plaintiffs['] constitutionally protected speech based on its content and viewpoint." *Id.* ¶ 195. They also claim that the provision fails to define the terms including "programs promoting DEI" and fails to explain "why such programs might violate anti-discrimination laws." *Id.* Specifically, they argue that "Plaintiffs are chilled from expressing or participating in anything that might draw the ire of the President or his administration when it comes to DEI" and that "[t]hrough this provision, President Trump brandishes the threat of [False Claims Act] enforcement to quiet federal contractors' and grantees' dissenting views." *Id.* ¶¶ 197, 199.

Second, Plaintiffs contend the Certification Provision violates separation of powers principles. *Id.* ¶¶ 202-10 ("Count Six"). Plaintiffs contend the executive branch has "no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch." *Id.* ¶ 204. Plaintiffs contend Congress cannot delegate its power under the Spending Clause and, in any event, did not "delegate any spending power to the President with respect to the particular federal programs and funds at issue here." *Id.* ¶ 209.

### 3.    Enforcement Threat Provision

The third and final provision Plaintiffs challenge is Section 4(b)(iii) of the J21 Order, the Enforcement Threat Provision. That provision directs the Attorney General as follows:

> (b) To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to

> encourage the private sector to end illegal discrimination and preferences, including DEI. The report shall contain a proposed strategic enforcement plan identifying
>
> . . .
>
> (iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated "DEI" or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars[.]

J21 Order § 4. That provision is followed by a directive that the Attorney General's "proposed strategic enforcement plan" also identify "[o]ther strategies to encourage the private sector to end illegal DEI discrimination and preferences and comply with all Federal civil-rights laws." *Id.* § 4(b)(iv).

Plaintiffs the National Association of Diversity Officers in Higher Education ("NADOHE") and the American Association of University Professors ("AAUP") bring two claims against the Enforcement Threat Provision. First, Plaintiffs allege the Enforcement Threat Provision is unconstitutionally vague. ECF No. 1 ¶¶ 171-82 ("Count Three"). That claim is based on the alleged inherent vagueness of terms such as "illegal DEI discrimination and preferences," J21 Order § 4(b)(iv), or "[p]romoting 'diversity,'" *id.* § 3(b)(ii), or "illegal DEI and DEIA policies," *id.* § 1, or what types of "DEI programs or principles" the new administration considers "illegal" and is seeking to "deter," *id.* § 4(b)(iii).

And second, Plaintiffs allege the Enforcement Threat Provision violates the Free Speech Clause of the First Amendment. ECF No. 1 ¶¶ 183-92 ("Count Four"). They contend the threat of "civil compliance investigations," J21 Order, § 4(b)(iii), "impermissibly restricts the exercise of NADOHE's and AAUP's constitutionally protected speech based on its content and viewpoint." ECF No. 1 ¶ 185. Plaintiffs note that the provision specifically states that it seeks to "deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise)" and that the threat of private sector enforcement actions in furtherance of that deterrence constitutes content- and viewpoint-discriminatory restriction of speech, including that of some of NADOHE's institutional members. *Id.* ¶¶ 185-86.

### 4.    Implementation of the J20 and J21 Executive Orders

Since the issuance of the Orders, several steps have been taken by the executive branch to implement, among other portions of the Orders, the Challenged Provisions.

On January 22, 2025, a day after the J21 Order was issued, the White House released a fact sheet titled "President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI." ECF No. 27-19 at 3.[3] The fact sheet calls the J21 Order "the most important federal civil rights measure in decades," and states that the J21 Order "expands individual opportunity by terminating radical DEI preferencing in federal contracting and directing federal agencies to relentlessly combat private sector discrimination." *Id.* It describes the J21 Order as terminating DEI discrimination "in federal contracting and spending." *Id.* The fact sheet describes the Certification

---

[3] For clarity and consistency, the Court has cited to the ECF document numbers and pagination. Thus, when the ECF pagination and the parties' pagination differ, the Court's citation is to the ECF page number.

Provision to "require[] simple and unmistakable affirmation that contractors will not engage in illegal discrimination, including illegal DEI," and the Enforcement Threat Provision to "direct[] all departments and agencies to take strong action to end private sector DEI discrimination, including civil compliance investigations." *Id.* The fact sheet ends by reiterating the goal of a "colorblind and competence-based workplace," and blaming DEI for "intergroup hostility and authoritarianism" as well as for amplifying "prejudicial hostility" and exacerbating "interpersonal conflict." *Id.* at 4.

Also on January 22, 2025, the Department of Labor ("DOL") distributed a memorandum directing grantees to "cease all award activities related to [DEI or DEIA] under their federal awards." ECF No. 27-11 at 3; *accord* ECF No. 27-10 at 2. On January 28, 2025, Under Secretary of Defense Steven J. Morani issued a memorandum to the Department of Defense, instructing contracting officers to "cancel or amend solicitations and terminate or partially terminate existing contracts . . . and contract-like instruments . . . that contain diversity, equity, and inclusion (DEI) and diversity, equity, inclusion, and accessibility (DEIA) requirements." ECF No. 27-15 at 2.

On January 29, 2025, the Centers for Disease Control and Prevention ("CDC") sent a letter to grant recipients that states that grantees "must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting 'diversity, equity, and inclusion' (DEI) at every level and activity, regardless of [their] location or the citizenship of employees or contractors, that are supported with funds from this award." ECF No. 27-13 at 2. The letter goes on to say that "[a]ny vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.*

On February 5, 2025, Attorney General Pamela Bondi issued a memorandum for all Department of Justice ("DOJ") employees with the subject line "ELIMINATING INTERNAL DISCRIMINATORY PRACTICES." ECF No. 27-14 at 2. The memorandum states, in relevant part, that pursuant to the directives in the J21 Order, each component of DOJ must submit a report to the Office of the Attorney General by March 15, 2025: "[c]onfirming the termination, to the maximum extent allowed by law, of . . . all 'equity-related' grants or contracts"; "[i]dentifying federal contractors . . . and grantees who have provided DEI training or DEI training materials to agency or department employees since January 20, 2021"; and "[i]dentifying federal grantees who received federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." *Id*. at 3. In preparing these reports, the memorandum advises that DOJ components "shall pay particular attention to ending references to DEI or DEIA in . . . training and programs, including references to 'unconscious bias,' 'cultural sensitivity,' [and] 'inclusive leadership.'" *Id*. at 3-4.

Also on February 5, 2025, the Attorney General issued a separate memorandum to all DOJ employees with the subject line "ENDING ILLEGAL DEI AND DEIA DISCRIMINATION AND PREFERENCES." ECF No. 27-21 at 2. The memorandum states, in relevant part, that pursuant to the directives in the J21 Order, the DOJ Civil Rights Division "will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds." *Id*. The memorandum requires the Civil Rights Division and the Office of Legal Policy to jointly submit a report to the Associate Attorney General by March 1, 2025 with "recommendations for enforcing federal civil-rights laws and taking other appropriate measures to encourage the private

sector to end illegal discrimination and preferences, including policies related to DEI and DEIA." *Id.* The memorandum states that the joint report should address, among other things, a "plan including specific steps to deter the use of DEI and DEIA programs or principles that constitute illegal discrimination or preferences," as well as "[o]ther strategies to end illegal DEI and DEIA discrimination and preferences and to comply with all federal civil-rights laws." *Id.* at 3.

On February 7, 2025, a Bluesky post stated that a "non-government business that contracts with the federal government" received a notice demanding that the contractor certify that it "does not operate any programs promoting Diversity, Equity, and Inclusion that violate any applicable Federal anti-discrimination laws." ECF No. 27-20 at 2. On February 10, 2025, according to an announcement from the so-called Department of Government Efficiency, the Department of Education terminated "29 training grants for diversity, equity and inclusion that total $101 million." ECF No. 27-17 at 3. One of the canceled grants was using funding to train teachers to "help students understand / interrogate the complex histories involved in oppression, and help students recognize areas of privilege and power on an individual and collective basis." *Id.*

Also on February 7, 2025, the Occupational Safety and Health Administration ("OSHA") removed a list of publications from its website, including publications such as "A Road Map for Healthcare Facilities (Workplace Violence)," "Improve Tracking of Workplace Injuries and Illnesses Fact Sheet," "Guidelines for Nursing Homes: Ergonomics for the Prevention of Musculoskeletal Disorders," and "OSHA Best Practices for Hospital-Based First Receivers." ECF No. 39-14 at 2. OSHA further advised

its staff that "[i]f [they] have wallet cards that include language, or can be interpreted [*sic*], on DEIA or gender ideology, please dispose of them as well." *Id.*

On February 11, 2025, Brendan Carr, Chairman of the Federal Communications Commission ("FCC"), sent a letter to the CEO of Comcast Corporation regarding "Comcast and NBCUniversal's Promotion of DEI." ECF No. 39-7 at 1. Carr wrote in the letter that he was "concerned that Comcast and NBCUniversal may be promoting invidious forms of DEI in a manner that does not comply with FCC regulations." *Id.* As examples, Carr pointed to Comcast stating on its website that promoting DEI is "a core value of [their] business," as well as having a "DEI infrastructure." *Id.* Carr noted that "[d]espite the emergence of DEI initiatives in recent years, these forms of discrimination have long been condemned by America's civil rights laws." *Id.* Carr broadly stated that the FCC's goal is to "ensure that every entity the FCC regulates complies with the civil rights protections enshrined in the Communications Act and the agency's EEO rules, including by shutting down any programs that promote invidious forms of DEI discrimination." *Id.* at 2.

Around February 12, 2025, the National Endowment for the Arts ("NEA") released new rules requiring grant applicants to agree not to "operate any programs promoting 'diversity, equity, and inclusion' (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with [the J21 Order]." ECF No. 39-8 at 11. The rules go on to state that "[t]he United States has the right to seek judicial or administrative enforcement of this assurance." *Id.* at 12.

## B.    Plaintiffs

This action has been brought by four plaintiffs that contend their rights are violated by various aspects of the Orders: NADOHE, AAUP, Restaurant Opportunities

Centers United ("ROC United"), and the Mayor and City Council of Baltimore, Maryland ("Baltimore").

NADOHE is an "association for chief diversity officers and professionals with over 2,200 members," including "diversity, equity, inclusion, and accessibility professionals who work at institutions of higher education, as well as institutions of higher education themselves." ECF No. 1 ¶ 18. Many of NADOHE's members receive grants and contracts from the federal government; some offer education programs and degrees "in diversity, equity, and inclusion leadership and similar subject matters"; and some of NADOHE's members are institutions of higher education that have endowments exceeding $1 billion (a threshold invoked in the Enforcement Threat Provision). *Id.*

AAUP "is a membership association and labor union of faculty and academic professionals." *Id.* ¶ 19. "Many AAUP members are employees of institutions of higher learning" and "AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of academic workers, and ensuring higher education's contribution to the common good." *Id.*

ROC United "is a national membership organization of thousands of restaurant workers across the United States." *Id.* ¶ 20. The mission of ROC United, which receives grants from the federal government, "is to improve restaurant workers' lives by building worker power and uniting workers of various backgrounds around shared goals and values, including racial and gender equity." *Id.*

Baltimore "is a municipal corporation" organized under the Maryland Constitution and "the largest city in Maryland and the thirtieth largest city in the United

States." *Id.* ¶ 21. As explained below, Baltimore "is both a contractor and grantee of the federal government." *Id.* ¶ 128.

### C.    Procedural History

On February 3, 2025, Plaintiffs filed this lawsuit against President Trump, the Attorney General, and various other agencies and agency heads, sued in their official capacities. ECF No. 1 ¶¶ 22-44. Plaintiffs claim that certain provisions in the Orders violate the Spending Clause of Article I of the U.S. Constitution, *id.* ¶¶ 154-62, the Fifth Amendment, *id.* ¶¶ 163-82, the First Amendment, *id.* ¶¶ 183-201, and separation of powers, *id.* ¶¶ 202-10. Plaintiffs seek declaratory and injunctive relief. *Id.* at 41-42. Specifically, Counts One and Two allege that the Termination Provision in the J20 Order violates the Spending Clause and the Fifth Amendment. *Id.* ¶¶ 154-70. Counts Three and Four allege that the Enforcement Threat Provision of the J21 Order violates the Fifth Amendment and the First Amendment. *Id.* ¶¶ 171-92. And Counts Five and Six allege that the Certification Provision of the J21 Order violates the First Amendment and the separation of powers. *Id.* ¶¶ 193-210.

On February 13, 2025, Plaintiffs filed a motion for a temporary restraining order and/or preliminary injunction. ECF No. 27. The government opposed the motion. ECF No. 35. Plaintiffs filed a reply. ECF No. 39. The Court held a hearing on Plaintiffs' motion on February 19, 2025.

## II.    PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent relief; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543

(4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs must demonstrate all four factors to obtain relief. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). And a preliminary injunction, being an "extraordinary remedy," may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)).

## III.   LIKELIHOOD OF SUCCESS ON THE MERITS

### A.   Standing/Ripeness

#### 1.   Standing

Before addressing Plaintiffs' allegations, the Court must determine whether Plaintiffs have shown sufficient likelihood that they have standing under Article III of the Constitution to bring this action, that is, that Plaintiffs have "a 'personal stake' in the dispute." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

#### a)   *Legal standards*

"[T]he doctrine of standing identifies disputes appropriate for judicial resolution." *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)). A plaintiff establishes standing to bring a case by establishing three elements:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the

> injury and the conduct complained of. Third, it must be likely,
> as opposed to merely speculative, that the injury will be
> redressed by a favorable decision.

*Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (cleaned up, quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin'" in that "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Food & Drug Admin.*, 602 U.S. at 380-81 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). Thus, "the two key questions in most standing disputes are injury in fact and causation." *Id.* at 381. The Supreme Court has also stated that standing is "usually easy to establish" where "Government regulations . . . require or forbid some action by the plaintiff" because plaintiffs in such circumstances "almost invariably satisfy both the injury in fact and causation requirements." *Id.* at 382.

When plaintiffs "seek declaratory and injunctive relief, they must establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). When plaintiffs allege fear of *future* injury, they can show "a sufficiently imminent injury in fact if plaintiffs allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 288 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). A credible threat of future enforcement exists "so long as the threat is not 'imaginary or wholly speculative,' 'chimerical,' or 'wholly conjectural.'" *Id.* (internal citations omitted) (quoting *Babbitt*, 442 U.S. at 302; *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); and *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)).

For First Amendment claims, however, standing requirements "are somewhat relaxed." *Cooksey*, 721 F.3d at 235.

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Id.* (quoting *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956, (1984)). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact," which is "commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression.'" *Id.* (alteration in original) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). Thus, "to demonstrate injury in fact, it is sufficient to show that one's First Amendment activities have been chilled" as long as the chilling effect is objectively reasonable and not subjective or speculative. *Id.* (quoting *Benham*, 635 F.3d at 135).

When an organization is alleging harm, it may establish standing based on its own injury or based on its members' injuries, the latter of which is called representational or associational standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To establish representational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). An organization need only "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

### *b)   Defendants' arguments as to standing*

In discussing standing, Defendants raise their arguments generally rather than through the lens of each of the three Challenged Provisions.

First, contrary to Defendants' argument, Plaintiffs have adequately identified, albeit anonymously, specific affected members who would individually have standing. This argument goes to whether NADOHE and AAUP have representational standing. Defendants do not suggest that such a means of identification is improper, and instead argue that "without knowing the . . . specific features of the grants or contracts at issue . . . Defendants and the Court cannot evaluate whether such contracts or grants have features allowing them to be terminated consistent with the law." ECF No. 35 at 10 n.1. For the reasons stated below, the Court disagrees, as much of the analysis revolves around Plaintiffs' reasonable fears and chilling of speech, rather than the specifics of the grants. Defendants do not challenge the other two prongs of the representational standing test.[4]

---

[4] NADOHE has also adequately shown standing on its own behalf because the government action at issue "directly affected and interfered with [its] core business activities." *Food & Drug Admin.*, 602 U.S. at 395; *see also* ECF No. 27-23 ¶¶ 9, 26, 39-

Second, Defendants contend that ROC and Baltimore fail to identify an injury-in-fact because they do not identify imminent disruption to any particular contract and instead merely speculate that they may see reductions based on future agency actions. ECF No. 35 at 11. As discussed below, these Plaintiffs have alleged sufficient actual or imminent injury for standing purposes for all relevant provisions.

Third, Defendants argue that Plaintiffs have failed to allege injury that is "fairly traceable to the challenged action." *Brown*, 600 U.S. at 561 (quoting *Lujan*, 504 U.S. at 560). Defendants assert that the Orders did not terminate any particular grant or program, but merely provided policy directives to federal agencies. They claim that "[a]ny alleged future harm necessarily depends on future action by federal agencies that plaintiffs have not adequately alleged has occurred and impacted them." ECF No. 35 at 11 (citing *Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) and *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020)). Below, the Court will discuss how each Plaintiff has adequately shown cognizable injuries-in-fact that are traceable to the three Challenged Provisions.

### c)    *The Termination Provision*

Each Plaintiff has shown at least one adequately imminent and concrete injury-in-fact in connection with the Termination Provision. As stated above, that provision instructs "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" to "terminate, to the

---

42, 44-46, ECF No. 39-3 ¶ 8 (discussing the threats to NADOHE's core missions and its continued existence). But given the representational standing, the Court need not further address NADOHE's individual standing.

maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts" within
60 days. J20 Order § 2(b)(i).

NADOHE asserts that Individual Member A, "who provides services to a
university as a consultant, has had contracts terminated by the university client because
the J20 Order threatens the termination of the grant funding from the National Science
Foundation ["NSF"] that funded Individual Member A's contract." ECF No. 27-23 ¶ 33.
NADOHE further alleges that this same member has "lost her salary and any
discretionary funds when all of her contracts 'c[a]me to an abrupt halt and contracting
for future work . . . evaporated.'" ECF No. 39-3 ¶ 6 (alteration in original). NADOHE
also alleges that Institutional Member A, "in light of the J20 Order, cancelled a
conference on alternate models of education at [Historically Black Colleges and
Universities] because the program was funded in part by a grant from the Department
of Labor" and that panel participants "had been barred from participation by their own
organizations on account of the J20 Order." ECF No. 27-23 ¶ 22.

AAUP has a member who is a professor at a Virginia university with an NSF grant
regarding "Gender Equity in STEM [Science, Technology, Engineering and
Mathematics] Academic Professions" "to research potential disparities affecting women
in science." ECF No. 39-2 ¶ 4. After requesting travel accommodations to a conference
as a part of their grant work, "the professor received an email on February 6, 2025, from
their Program Officer with NSF notifying them that the NSF employee 'cannot make the
determination' regarding the travel until it is determined that 'the activity is aligned
with the administration's executive orders.'" *Id.* Another AAUP member who is a
professor at the University of Texas at Austin stated that "on January 29, 2025, the
university's Office of Sponsored Projects received an e-mail 'stop work order'" regarding

a National Academy of Sciences ("NAS") subaward. *Id.* ¶ 6. The member's project at
issue was "focused on equity of access to crucial services and goods." *Id.* The email
provided that NAS "is hereby issuing University of Texas at Austin this notice of
Termination for Convenience effective as of the date of this letter for all work associated
with the above referenced Subaward" because "NAS has determined to take certain
actions with respect to federally funded contracts following the issuance of the" J20 and
J21 Orders. *Id.* A third AAUP member is a professor at the University of Connecticut
and "works on a project to broaden diversity" in the STEM workforce that is funded by
NSF. *Id.* ¶ 7. "On January 31, 2025, this member received an email from the Principal
Investigator—the faculty member in charge—of that project 'to pause project activities
until we receive further guidance from NSF . . . .'" *Id.*

On January 22, 2025, ROC United "received e-mail notices from DOL's Women's
Bureau and OSHA to 'cease all activities related to "diversity, equity, and inclusion"
(DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) under their federal
awards, consistent with the requirements of . . .' the J20 Order and a related anti-DEIA
order signed by President Trump on January 21, 2025." ECF No. 27-25 ¶ 26. "In
addition, OSHA instructed ROC United to: 'effective immediately! Cease collecting and
reporting trainees DEI information,'" *id.* ¶ 29, which caused ROC United to stop work
on projects funded by two federal grants. *Id.* ¶¶ 30-31.

Baltimore received a January 29, 2025 letter from the U.S. Department of Health
and Human Services that demanded that Baltimore "immediately terminate" all
activities "promoting 'diversity, equity, and inclusion'" "that are supported with funds
from [a CDC] award" in light of the Orders. ECF No. 27-13 at 2. Baltimore also received
an email on February 14, 2025 "from AmeriCorps informing [it] that three of [its]

AmeriCorps grants had been flagged for review" because they contained words like "Diversity," "Equity," "Equity Action Plan," and "DEI" as well as "Environmental Justice" and "Climate Change." ECF No. 39-4 ¶¶ 4-8. The email asserted that by February 19, 2025, Baltimore must either "(1) Certify that the awards, using proscribed language, 'compl[y] with all administration Executive Orders and do[] not include any activities that promote DEI activities'; (2) Stop providing noncompliant services . . . ; or (3) Forgo this AmeriCorps funding altogether." *Id.* ¶ 11.

These are all concrete actual injuries suffered by Plaintiffs and their members. Moreover, the injuries are directly traceable to the Orders. It is also likely that Plaintiffs' injuries will be redressed by a favorable decision. Therefore, all four Plaintiffs have standing to challenge the Termination Clause.

### d) *The Certification and Enforcement Threat Provisions*

The Court will address the Certification and Enforcement Threat Provisions together as they both implicate First Amendment concerns and are therefore subject to the more lenient standing standard under which each Plaintiff must merely "show that one's First Amendment activities have been" objectively and reasonably chilled. *Cooksey*, 721 F.3d at 235 (quoting *Benham*, 635 F.3d at 135).

All four Plaintiffs have met the lower bar to establish injury-in-fact for the Certification Provision, as have NADOHE and AAUP regarding the Enforcement Threat Provision (as they are the only Plaintiffs challenging that provision, *see* ECF No. 1 ¶¶ 172, 184).

NADOHE asserts that its Institutional Members B through G have been forced to stop certain "curricular programs or requirements" because they fear "adverse

consequences from federal agencies" in light of the Certification Provision. ECF No. 27-23 ¶ 29. Similarly, Institutional Member H of NADOHE fears the dictates of the Enforcement Threat Provision because it is an institution of higher education with an endowment over $1 billion and is concerned that its protected speech will be penalized and fears it "may be targeted for investigation but lack[s] clarity about how to avoid the financial, reputational, and organizational costs of such an investigation." *Id.* ¶ 31.

Likewise, AAUP and its members fear that their activities, including appointing standing committees such as "the Committee on Historically Black Institutions and Scholars of Color" and "the Committee on Gender and Sexuality in the Academic Profession," run afoul of the directives in the Executive Orders. ECF No. 27-24 ¶ 28. AAUP's members also "fear they may have to limit how they choose to participate in DEIA programs in order to meet the certification requirements and to avoid facing penalties under the FCA [False Claims Act] or be unable to sign the certification requirement and lose their funding altogether." *Id.* ¶ 31. AAUP further asserts that several members "work at institutions of higher education with endowments exceeding 1 billion dollars" "whose teaching or research focuses on topics related to diversity or equity" and who "fear that their work . . . might endanger their own institutions and lead to adverse employment consequences" under the Enforcement Threat Provision. *Id.* ¶ 40.

As stated above, Baltimore received emails on February 14, 2025 from AmeriCorps providing that Baltimore was required to certify by February 19, 2025 either that three grants complied with the Orders, to stop providing noncompliant services and initiate an amendment to the award, or to forgo funding. ECF No. 39-4 ¶¶ 4-8, 11; ECF No. 39-10 at 2. Baltimore asserts that it "fears it may have to abandon its

lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds that support the City's valuable programs." ECF No. 27-26 ¶ 35; *see also id.* ¶¶ 37-42 (listing specific activities Baltimore fears fall under the Orders).

ROC United asserts that it "ha[s] no way of doing [its] work and living out [its] mission without speaking about ending occupational segregation and building career ladders for workers who have historically been denied opportunities," and "fear [it] may have to stop addressing racial and gender equity to avoid financial and other penalties by the federal government. Or if [it] decline[s] to certify, [it] risk[s] losing all federal funding." ECF No. 27-25 ¶¶ 38, 40.

Plaintiffs have adequately shown that they are injured by these provisions because they reasonably expect that they will be forced to either restrict their legal activities and expression that are arguably related to DEI, or forgo federal funding altogether.

The causation and redressability requirements are also met. In all cases, these objectively reasonable fears arise from the vague language in the Orders, and can be redressed by a favorable decision. *See Food & Drug Admin.*, 602 U.S. at 382 (providing that "standing is usually easy to establish" where "Government regulations . . . require or forbid some action by the plaintiff" because the plaintiffs in such circumstances "almost invariably satisfy both the injury in fact and causation requirements"). Enjoining Defendants from imposing the Certification and Enforcement Threat Provisions will prevent the chilling effects that flow from those provisions.

## 2.    Ripeness

Like standing, as a threshold matter, Plaintiffs must also establish that their claims are ripe. *Wild Va. v. Council on Envtl. Quality*, 56 F.4th 281, 293 (4th Cir. 2022).

"While standing involves 'the question . . . of *who* may sue,' ripeness involves '*when* they [may] sue.'" *Id.* (alterations in original) (quoting *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019)). In reviewing ripeness, courts consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (quoting *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018)). "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative'" while "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* (quoting *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013)).

Defendants argue a lack of ripeness as to all claims generally, rather than in connection with the First and Fifth Amendment claims separately. Ripeness in connection with the Fifth Amendment claims is discussed below in section III.C.2. As with standing, "ripeness requirements are also relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 240. "First Amendment rights . . . are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill." *Id.* (omission in original) (quoting *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995)). Standing and ripeness are "viewed through the same lens" in this context and are "inextricably linked." *Id.*

Defendants' arguments focus on the contention that because Plaintiffs do not know whether their contracts or grants will be terminated or, if so, on what basis, that

Plaintiffs' claims are unripe and purely speculative. Defendants assert that Plaintiffs' claims

> are contingent upon several layers of future actions that are not only hypothetical but also contradictory: Plaintiffs' claims assume that agencies will not only take actions that will directly impact Plaintiffs but will do so both in service of the [Orders'] directive to deprioritize DEI *and* in violation of the [Orders'] directive to stay within the confines of the law.

ECF No. 35 at 13. However, as discussed above with respect to standing, regarding their First Amendment claims Plaintiffs have adequately shown that their speech has been and will continue to be chilled in light of the Challenged Orders based both on actions currently being taken by Defendants and based on Plaintiffs' reasonable fears. The First Amendment claims are fit for judicial decision and Plaintiffs have convinced the Court that significant hardship would occur without a decision. Thus, Plaintiffs' First Amendment Claims are ripe.

### B.  Plaintiff's Claims and the Relevant Legal Standards

As explained above, Plaintiffs assert that the Challenged Provisions violate the First Amendment (free speech), the Fifth Amendment (due process vagueness), and separation of powers (including the spending clause of the Constitution, art. I, § 1, 8). As explained below, Plaintiffs have established entitlement to a preliminary injunction on their First and Fifth Amendment claims. The Court need not and does not reach whether Plaintiffs have also shown a likelihood of success on the merits on their separation of powers claims. This section III.B describes the applicable legal standards. The Court applies these standards to Plaintiffs' claims in subsequent sections.

## 1.    First Amendment Claims (Counts 4 & 5)

As noted above, Counts 4 and 5 of Plaintiffs' complaints arise under the First Amendment. In Count 4, Plaintiffs allege that by purporting to "deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise)," and threatening to bring enforcement against perceived violators of the undefined standards, the Enforcement Threat Provision is a content-based and viewpoint-discriminatory restriction on protected speech that has the effect of "penaliz[ing] the protected speech of NADOHE's institutional members," ECF No. 1 ¶ 186, and otherwise infringing upon Plaintiffs' free-speech rights protected by the First Amendment, *id.* ¶¶ 189, 191. As for Count 5, which addresses the Certification Provision, Plaintiffs distill their First Amendment claim as follows:

> This Certification Provision—contained in an executive order characterizing DEIA as "illegal" and "violat[ions of] the text and spirit of our longstanding Federal civil-rights laws, *id.* § 1—is designed to chill federal contractors' and grantees' speech related to diversity, equity, inclusion, and accessibility. Through this provision, President Trump brandishes the threat of FCA enforcement to quiet federal contractors' and grantees' dissenting views.

ECF No. 1 ¶ 197.

Plaintiffs contend the chilling effect of those executive order provisions is exacerbated by the vagueness of the orders' key terms. *See, e.g.*, ECF No. ¶ 198 ("The President does not define any of the key terms of these prohibitions. It is not clear what 'so-called "diversity, equity, and inclusion" (DEI)' means, *see* J21 Order, § 1; nor does it provide any guidance on how such programs or initiatives can be considered to 'violate the text and spirit of our longstanding Federal civil-rights laws.' *Id.*"); *id.* ¶ 199 ("As a

result, Plaintiffs are chilled from expressing or participating in anything that might draw the ire of the President or his administration when it comes to DEI.").

For the reasons discussed later in this opinion, the Court concludes that Plaintiffs have shown a likelihood of success on the merits of Counts 4 and 5. This section describes the basic legal framework applicable to Plaintiffs' First Amendment claim. The Enforcement Threat Provision targets private persons, companies and organizations unrelated to whether they are government contractors or grantees, and thus the Court begins with an overview of the framework for claims asserting facial challenges against content-based and viewpoint-discriminatory restrictions on protected speech. The Termination Provision and Certification Provision target government contractors and grantees; the Court addresses the First Amendment standards to those contexts below.[5]

### a)    Content and viewpoint discrimination

The First Amendment prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., amend. I. "The First Amendment generally prevents government from proscribing speech, . . . or even expressive conduct, . . . because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 309-311 (1940), and *Texas v. Johnson*, 491 U.S. 397, 412, 414 (1989)). In other words, "a government . . . 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed v.*

---

[5] None of the Plaintiffs or their members are government employees, and the relief Plaintiffs seek does not extend to government employees. Different standards may pertain to claims brought by government employees. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

*Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

   "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citing *R.A.V.*, 505 U.S. at 395; *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118 (1991)). "Deciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). The "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011)). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163-64. Moreover, "it is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" *Id.* at 169 (quoting *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 530, 537 (1980)).

Whether a government action is "content based" does not (at least generally) turn on motivation. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)); *see also Turner,* 512 U.S. at 642 (holding that although "a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary").

One form of "content-based" speech regulation is "[g]overnment discrimination among viewpoints." *Reed*, 576 U.S. at 168 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Viewpoint discrimination means "the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829). Both content-based and viewpoint-based regulation are subject to strict scrutiny. *Boos v. Barry*, 485 U.S. 312, 320 (1988); *Rosenberger*, 515 U.S. at 829. But the most "blatant" and "egregious form of content discrimination" is viewpoint discrimination. *Reed*, 576 U.S. at 168-69 (quoting *Rosenberger*, 515 U.S. at 829); *see also id.* at 174 (Alito, J., concurring) ("Content-based laws merit [strict scrutiny] protection because they present, albeit sometimes in a subtler form, the same dangers as laws that regulate speech based on viewpoint."). Similarly, where legislation or executive action regulates speech depending on the "identity of the speaker," such "[s]peech restrictions" are subject to strict scrutiny because they "are all too often simply a means to control content." *Id.* at 170 (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010)); *see also id.* ("'[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference")

(quoting *Turner*, 512 U.S. at 658); *Rosenberger*, 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

Finding a statute "viewpoint discriminatory" is "all but dispositive" in a First Amendment challenge, at least outside the context of government employees or contractors (which is discussed below). *Sorrell*, 564 U.S. at 571. "The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Id.* at 578-79.

A content-based restriction on speech is subject to strict scrutiny, meaning such restrictions are "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "[R]egulations that are *unrelated* to the content of speech are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner,* 512 U.S. at 642 (emphasis added).

### b)    *Federal grantees and contractors*

A number of the organizational Plaintiffs' members are government contractors and grantees. As discussed above, the Certification Provision applies to "Federal contractors and subcontractors." J21 Order, § 3(b)(iii). And although the Enforcement Threat Provision applies to the entire "private sector," that includes government contractors and grantees. Plaintiffs have asserted facial First Amendment challenges to both the Certification Provision (Count 5) and Enforcement Threat Provision (Count 4). In addition, with respect to the Termination Provision, although Plaintiffs have not asserted a standalone First Amendment claim, their Fifth

Amendment due process claim (Count 2) turns in part on the applicability of the First Amendment to recipients of "equity-related" grants or contracts. That is because the applicable void-for-vagueness standard depends in part on whether "a vague statute abuts upon sensitive areas of basic First Amendment Freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up); *see also, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) ("[W]hen a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.") (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)); *Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring) ("[A] 'stringent vagueness test' should apply to at least some civil laws—those abridging basic First Amendment freedoms."). Thus, the question whether Plaintiffs have shown a likelihood of success on Count Five—and to some extent Count Four—implicates the law applicable to whether, and to what extent, the government may lawfully restrict speech by government contractors and grantees.

The First Amendment does restrain, in certain ways, the government's right to restrict government contractors' and grantees' free speech rights. This context sits at the intersection of several strands of First Amendment doctrine. And thus, as this case proceeds, the applicability of particular aspects of the doctrine may differ depending on which particular claims, which subsets of Plaintiffs or their members, and which Challenged Provisions, are at issue. But at this preliminary stage, when the question presented is whether Plaintiffs have shown a likelihood that they will succeed on the merits of their First Amendment claims, the following principles are salient.

"[W]hen individuals enter into government employment or contracts, they accept certain restrictions on their freedom as part of the deal." *Fulton v. City of Philadelphia*,

*Pennsylvania*, 593 U.S. 522, 535 (2021). "The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Board of Cnty. Com'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) ("*Wabaunsee County*"). "And, absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all." *Id.* In other words, "the First Amendment does not create property or tenure rights, and does not guarantee absolute freedom of speech." *Id.* at 675.

But government contractors, and government grantees, retain First Amendment rights in two important, and relevant, ways.

First, when the government funds a program or activity, although the government may "define the limits of the government spending program"—*i.e.*, "specify the activities Congress wants to subsidize"—the First Amendment prohibits the government from "seek[ing] to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013) ("*AID*"). In *AID*, the Supreme Court held that Congress's policy requirement in the Leadership Act, which required organizations that receive funding under the Act to have a policy expressly opposing prostitution, "demand[ed] that funding recipients adopt—as their own—the Government's view on an issue of public concern," thereby affecting "protected conduct outside the scope of the federally funded program." *Id.* at 217-18 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). The "line" between "conditions that define the limits of the government spending program" and "conditions that seek to leverage funding to regulate speech outside the contours of the program itself" is not always "clear" because "the definition of a particular program can

always be manipulated to subsume the challenged condition." *Id.* at 215-16. Thus, although the government may "cho[ose] to fund one activity to the exclusion of another," at least so long as in doing so it is not "discriminat[ing] on the basis of viewpoint," *Rust*, 500 U.S. at 193, and "a legislature's [or, presumably, executive's] decision not to subsidize the exercise of a fundamental right does not infringe that right," *Regan v. Taxation with Representation of Wash*, 461 U.S. 540, 549 (1983), attempts to limit the scope of a grant or contract can also be subject to First Amendment scrutiny, "lest the First Amendment be reduced to a simple semantic exercise." *AID*, 570 U.S. at 215 (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)).

Second, the government may not terminate government contracts "*because of* the[] [contractors' or grantees'] speech on matters of public concern." *Wabaunsee County*, 518 U.S. at 675. After all, under the "unconstitutional conditions" doctrine, "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Id.* at 674 (quoting *Perry v. Sindermann,* 408 U.S. 593, 597 (1972)).

At least with respect to a government contractor, to prevail on a claim that the government has unconstitutionally infringed its free speech rights, it "must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination." *Id.* at 675. "If the [contractor] discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Id.* "And even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong." *Id.* That is because government contractors' "First Amendment rights depend on the 'balance between the interests of

the [contractor], in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its [contractors]." *Id.* at 676 (quoting *Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cnty.,* 391 U.S. 563, 568 (1968)); *see also id.* at 677-78 (explaining that "*Mt. Healthy* [*City Bd. of Ed. v. Doyle,* 429 U.S. 274 (1977)] assures the government's ability to terminate contracts so long as it does not do so in retaliation for protected First Amendment activity. *Pickering* requires a fact-sensitive and deferential weighing of the government's legitimate interests."). In short, the government does not have "*carte blanche* to terminate independent contractors for exercising First Amendment rights." *Id.* at 679.[6]

## 2.    Fifth Amendment Vagueness Claims (Counts 2 & 3)

The Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108; *see also Williams*, 553

---

[6] For purposes of preliminary injunctive relief, for the reasons explained below, Plaintiffs have shown a likelihood of success on the merits of their First Amendment claims as to contractors and grantees—the latter in part because of application of the test set forth in *AID,* 570 U.S. at 206). The Court need not and does not decide whether (or to what extent) the *Pickering* burden-shifting and balancing components of the *Wabaunsee County* analysis apply to government grantees, as opposed to contractors.

U.S. at 304 (describing vagueness doctrine as "an outgrowth . . . of the Due Process Clause of the Fifth Amendment.").

There are "at least two connected but discrete" due process concerns that underlie the void for vagueness doctrine. *Fox Television*, 567 U.S. at 253.

First, due process requires that parties "know what is required of them so they may act accordingly." *Id.*; *see also Grayned*, 408 U.S. at 108 ("Vague laws may trap the innocent by not providing fair warning."). "Perhaps the most basic of due process's customary protections is the demand of fair notice." *Sessions v. Dimaya*, 584 U.S. 148, 177 (2018) (Gorsuch, J., concurring). "[V]oid for vagueness doctrine, at least properly conceived, serves as a faithful expression of ancient due process and separation of powers principles the framers recognized as vital to ordered liberty under our Constitution." *Id.* at 176. "Without an assurance that the laws supply fair notice, so much else of the Constitution risks becoming only a 'parchment barrier' against arbitrary power." *Id.* at 181 (citing The Federalist No. 48, p. 308 (C. Rossiter ed. 1961) (J. Madison)).

Second, clear guidance ensures that "those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253 (citing *Grayned*, 408 U.S. at 108-09). The void-for-vagueness doctrine also is a "corollary" of separation-of-powers principles; "[i]f the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, it would substitute the judicial for the legislative department." *Sessions*, 584 U.S. at 156 (cleaned up) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)).

The vagueness doctrine analysis is not uniform across all case types. "[T]he degree of vagueness that the Constitution [allows] depends in part on the nature of the

enactment." *Id.* at 156 (quoting *Hoffman Estates*, 455 U.S. at 498). For example, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 156 (quoting *Hoffman Estates*, 455 U.S. at 498-99). By comparison, when the government awards "selective subsidies," there is some tolerance for vagueness because "the consequences of imprecision are not constitutionally severe." *See Nat'l Endowmt. for the Arts v. Finley*, 524 U.S. 569, 589 (1998). But the requirement to avoid vagueness is particularly high when a law "threatens to inhibit the exercise of constitutionally protected rights." *Hoffman Estates*, 455 U.S. at 499. "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* Indeed, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963); *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (explaining that "vagueness" of "content-based regulation of speech" raises "special First Amendment concerns because of [their] obvious chilling effect on free speech").

### C.    Termination Provision

#### 1.    Fifth Amendment vagueness claim

Plaintiffs have shown a likelihood of success on their claim that the Termination Provision is void for vagueness under the Fifth Amendment for two main reasons. First, the vagueness of the term "'equity-related' grants or contracts" invites arbitrary and discriminatory enforcement. Second, the vagueness of the term offers insufficient notice

to current grantees about whether and how they can adapt their conduct to avoid termination of their grants or contracts.[7]

### a)    *Potential for arbitrary enforcement*

One of the primary rationales of the void-for-vagueness doctrine is the importance of preventing "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [those enforcing the law] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-09 (footnote omitted). Such vague laws "to some extent, substitute the judicial for the legislative department of government." *Kolender*, 461 U.S. at 358 n.7 (internal quotation marks omitted). "Nor is the worry only that vague laws risk allowing judges to assume legislative power." *Sessions*, 584 U.S. at 182 (Gorsuch, J., concurring). "Vague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's [or, as here, executive order's] contours through their enforcement decisions." *Id.* (citing *Grayned*, 408 U.S. at 108-09).

Here, the very real possibility of arbitrary and discriminatory enforcement—both between and within executive agencies—is rooted in the vagueness of the term "'equity-related' grants or contracts."

---

[7] Although many vagueness challenges take place within the statutory context, the same principles apply in the consideration of executive orders. *See, e.g.*, *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146-47 (9th Cir. 2012) (relying upon principles and case law relied upon in statutory vagueness cases to analyze the vagueness of an executive order).

First, the term "equity" itself is broad. Although much of the J20 Order relates to DEI and DEIA, "equity" is a concept that transcends issues of diversity, inclusion, and accessibility. It also extends beyond areas addressed by anti-discrimination efforts and civil rights laws. *Cf.* J20 Order § 1 (stating that a purpose of the Order is to address "illegal and immoral discrimination programs"). Is "equity" limited to one part of the acronym "DEI" or "DEIA"? Is it meant as an umbrella term or synonym for some or all of the concepts encompassed by those acronyms? Given the J21 Order's rejection of at least one executive order that offers a definition for the term "equity," should agency leaders assume that the applicable definition is something materially different from that one? *See* J20 Order § 1 (citing Executive Order 13985, 86 Fed. Reg. 7009, Jan. 25, 2021). Does the meaning of "equity" extend beyond DEI/DEIA?

To say the least, the lack of clarity on these and other questions makes unavoidable that agency decisionmakers will "shap[e] a vague [order's] contours though their enforcement decisions." *Sessions*, 584 U.S. at 182 (Gorsuch, J., concurring). The meaning of the word "equity" is unclear to a degree that risks arbitrary and discriminatory enforcement, particularly absent any definitions or other guidance to clarify the meaning of the term.

Even more so, the modifier "related" adds an impermissible layer of vagueness. It is wholly unclear how strong or how tenuous a grant or contract must "relate[]" to the topic of "equity" to be subject to termination. In one of Plaintiffs' exhibits, it appears that the only basis for "clarification" about "whether . . . [the] program is using Federal funds to promote or provide services out of compliance of the recent Executive Orders" is the fact that a narrative associated with the grant award includes the terms

"diversity," "equity," "equity action plan,"[8] and "DEI."[9] ECF No. 39-10 at 1. This evidence suggests that at least one executive agency appears to be, at minimum, considering that a program *might* be "equity-related" simply because the word "equity" appears in a grant narrative. Plaintiffs have amply established a likelihood that they will succeed in proving that the Termination Provision invites arbitrary and discriminatory enforcement over billions of dollars in government funding.

### b)  *Notice*

Another key rationale for the void-for-vagueness doctrine is the principle that "[v]ague laws may trap the innocent by not providing fair warning." *Grayned*, 408 U.S. at 108. "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108-09.

Here, the vagueness of the Termination Provision leaves current grant recipients and contractual counterparts unsure about what activities are prohibited under the J20

---

[8] As the J20 Order notes, the previous administration had directed agencies to create and periodically update "Equity Action Plans." J20 Order § 1 ("[p]ursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted 'Equity Action Plans'"); *see also* Executive Order 14091, 88 Fed. Reg. 10825, Feb. 22, 2023 (directing agency heads to create and maintain Equity Action Plans). It is therefore likely that some grants and contracts include one or multiple references to the term "equity action plan" in relation to agency activities at the time, whether or not the grants themselves could fairly be considered "equity-related."

[9] The email in this exhibit did not explicitly indicate that the inquiry was tied to a grant termination decision. *See* ECF No. 39-10 at 1-2. However, one of the three options offered in the email is for the recipient to "relinquish [their] award." *Id.* at 2. The other two options are to (1) self-certify that the grant activities are consistent with the executive orders "and do[] not include any activities that promote DEI activities," or (2) "stop providing [] services [non-compliant with the executive orders] . . . immediately." *Id.* at 1-2.

Order. Specifically, these individuals and organizations have no reasonable way to know what, if anything, they can do to bring their grants into compliance such that they are not considered "equity-related."

The possibilities are almost endless, and many are pernicious. If an elementary school receives Department of Education funding for technology access, and a teacher uses a computer to teach the history of Jim Crow laws, does that risk the grant being deemed "equity-related" and the school being stripped of funding? If a road-construction grant is used to fill potholes in a low-income neighborhood instead of a wealthy neighborhood, does that render it "equity-related"? If a university grant helps fund the salary of a staff person who then helps teach college students about sexual harassment and the language of consent, would the funding for that person's salary be stripped as "equity-related"? If a business with a grant from the Small Business Administration conducts a recruiting session at a historically Black college or university, could the business be stripped of the grant on that basis?

It appears from the record that at least one federal agency is giving grantees some time to "[s]top providing [non-compliant] services in your program/project immediately." ECF No. 39-10 at 2. It is unknown whether other agencies will offer an opportunity to adapt grant or contract activities at all, or whether the agencies will unilaterally assess whether to terminate the grant or contract without giving the grantee or contractor the opportunity to revise its program. But with the mandatory deadline to terminate these grants and contracts just weeks away, *see* J20 Order § 2(b) (stating that grants and contracts must be terminated "within sixty days of this order"), the time is also ticking for grantees and contractors to take action to preserve their grants and contracts, should they have such an option and should they choose to do so. The

Termination Provision fails to provide current grantees with notice about "what is prohibited, so that [they] may act accordingly." *Grayned*, 408 U.S. at 108. Thus, Plaintiffs have also demonstrated a likelihood of success on their Fifth Amendment vagueness claim based on a lack of notice.[10]

### 2.    Plaintiffs may facially challenge the Termination Provision for vagueness

Defendants' primary argument as to Plaintiffs' vagueness challenge to the Termination Provision is that the claim is "categorically unripe" because "a facial vagueness challenge cannot arise under the Due Process Clause." ECF No. 35 at 5 (citing *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002)). Defendants maintain that to bring a facial challenge, Plaintiffs must show that the Termination Provision cannot give notice to *any* person to whom it applies. *See* ECF 35 at 3-4.

The barrier to a facial challenge for vagueness, however, is not as absolute as the government contends. Plaintiffs may bring their vagueness claim notwithstanding the possibility that a very narrow subset of grantees could be on notice that their grants are subject to termination pursuant to the J20 Order. The Supreme Court in *Johnson v. United States* clarified that "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is *some conduct* that clearly falls within the provision's grasp." 576 U.S. 591, 602 (2015) (second emphasis added); *see also Kolbe v.*

---

[10] Defendants have also argued that Plaintiffs have not shown a likelihood of success on the merits of their Fifth Amendment claim as to the Termination Provision because it is not "clear" whether Plaintiffs have a "property interest" sufficient to give rise to due process protections at all. ECF No. 35 at 22-23. But as Plaintiffs explain, that is not the law. *See* ECF No. 39 at 6; *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77 (1972) (collecting cases).

*Hogan*, 849 F.3d 114, 148 n.19 (2017) (en banc) (acknowledging this language from *Johnson* and rejecting appellees' argument that appellant must show that "no set of circumstances exists" under which the law would be valid to bring a facial challenge) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Here, the possibility that some small number of grants could "clearly fall[] within the provision's grasp," *Johnson*, 576 U.S. at 602, does not preclude a facial challenge to the vagueness of this provision. That is, perhaps a "person of ordinary intelligence" could understand that a theoretical "All About Equity Grant" with a stated mission of "fostering equity in all activities" may be considered an "'equity-related' grant" subject to the Termination Provision. *Cf. Grayned*, 408 U.S. at 109 ("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"). But the existence of an obvious application does not preclude a facial vagueness challenge. Just as the mere possibility that a grocer could charge a thousand dollars for a pound of sugar does not preclude a facial challenge to a law barring charging an "unjust or unreasonable rate" for necessaries, *Johnson*, 576 U.S. at 602-03 (citing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921)), the mere possibility that some government grants might fit squarely within the definition of "equity-related" does not forestall the Court's review of the otherwise broad and vague term as it applies to government grants and contracts generally.[11]

---

[11] Because Plaintiffs have shown a likelihood of success on the merits with respect to Count Two, their void-for-vagueness challenge to the Termination Provision, the Court need not decide whether Plaintiffs have *also* shown a likelihood of success on the merits on Count One, their Spending Clause claim as to the Termination Provision. The Court does not decide one way or the other whether Plaintiffs are likely to succeed on the merits of Count One.

### D. Certification Provision

 Section III.B.1.b above describes the First Amendment standards as they apply to federal contractors and grantees. Applying those standards to the Certification Provision, § 3(b)(iv) of the J21 Order, Plaintiffs are likely to succeed on their claim that it violates the First Amendment because on its face it constitutes a content-based restriction on the speech rights of federal contractors and grantees, and further because such restriction expands to all of those contractors' and grantees work, whether funded by the government or not. J21 Order § 3(b)(iv)(B) (requiring certification that any "counterparty or recipient" certify that "it does not operate *any* programs promoting DEI that violate any applicable Federal anti-discrimination laws") (emphasis added); *id.* § 3(b)(iv)(A) (requiring certification by every "contractual counterparty or grant recipient" of materiality with respect to "its compliance *in all respects* with all applicable Federal anti-discrimination laws") (emphasis added).

The language of the Certification Provision makes clear that the sole purpose of the provision, regardless of the individualized implementation by executive agencies, is for federal contractors and grantees to confirm under threat of perjury and False Claims Act liability that they do not operate any programs promoting DEI that the government might contend violate federal anti-discrimination laws. J21 Order § 3(b)(iv). This is precisely a "condition[] that seek[s] to leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214-15. There is no language in the Certification Provision that restricts the certification to be specifically about the use of DEI using federal funding received by the government; the express language of the Certification Provision demands that federal contractors and grantees essentially certify that there is no "DEI" (whatever the executive branch decides that means) in *any* aspect

of their functioning, regardless of whether the DEI-related activities occur outside the scope of the federal funding.

The executive branch's ongoing implementation of the Certification Provision confirms that the plain language of the Executive Order means what it says. The White House's fact sheet released on January 22, 2025 states that the Certification Provision "requires simple and unmistakable affirmation that contractors will not engage in illegal discrimination, including illegal DEI." ECF No. 27-19 at 3. On February 7, 2025, a federal contractor received a notice demanding that it certify that it "does not operate any programs promoting Diversity, Equity, and Inclusion that violate any applicable Federal anti-discrimination laws." ECF No. 27-20 at 2. On February 12, 2025, the NEA released language for compliance requiring grant applicants to agree not to "operate any programs promoting [DEI] that violate any applicable Federal anti-discrimination laws, in accordance with the [J21 Order]." ECF No. 39-8 at 11. These examples all point to the conclusion that the clear purpose, and clear effect, of the Certification Provision is to restrict speech related to topics such as equity, inclusion, and diversity that also falls outside the scope of the federal funding.

Defendants' main response is that "Plaintiffs have no First Amendment right to violate federal antidiscrimination laws in the first place" and that if Plaintiffs do not wish to sign such a certification, "they may forgo contracting with the Government or receiving federal funds." ECF No. 35 at 16-17. Indeed, when the Court asked the government during the hearing a series of questions regarding hypothetical implementation of DEI by federal contractors and grantees, the government refused to even attempt to clarify what the Certification Provision means, or whether these hypothetical scenarios are legal. The government merely reiterated that promoting DEI

can be unlawful and that there is uncertainty about whether programs or policies that are sometimes referred to as "DEI" are lawful after the Supreme Court's decision in *Students for Fair Admission*. And the government did not dispute that the Certification Provision is being applied to current federal grantees and contractors that have already received and relied on federal funding, not just future federal grantees and contractors.

Because even the government does not know what constitutes DEI-related speech that violates federal anti-discrimination laws, Plaintiffs have easily shown a likelihood that they will prevail in proving that the Certification Provision operates as a content-based prior restraint on their speech, and likely will also prevail in showing that the Certification operates as a facially viewpoint-discriminatory order as well. The speech-chilling effect of the Certification Provision is particularly obvious given the vagueness of the J20 and J21 orders, as discussed in sections III.C and III.E.2. Plaintiffs, their members, and other federal contractors and grantees have shown they are unable to know which of their DEI programs (if any) violate federal anti-discrimination laws, and are highly likely to chill their own speech—to self-censor, and reasonably so—because of the Certification Provision. Indeed, the Certification Provision was likely designed to induce, and certainly has been shown to have the effect of inducing, federal contractors and grantees to apply an overinclusive definition of illegal DEI to avoid risking liability. This is exactly what *AID* prohibits—the government leveraging its funding to restrict federal contractors and grantees from otherwise exercising their First Amendment rights outside the scope of the federal funding.

Defendants lastly make the argument that the Certification Provision is merely a "directive" from the President, and that agencies need not include such certification provisions "verbatim" but rather "in substance." ECF No. 35 at 18. That argument is

incompatible with the plain text of the Certification Provision, and the evidentiary record of how agencies are already implementing it. There is no language in the Certification Provision suggesting that agencies have discretion in deciding how narrow or broad the scope of the Certification Provision should be, or suggesting that agencies should restrict the certification to only apply to the use of federal funds. The express language of the Certification Provisions requires federal contractors and grantees to agree (or at the very least, prepare to agree) to not operate any programs promoting DEI that they might guess the government might contend violate anti-discrimination laws.

Defendants separately argue that "the Certification Provision falls within the Executive's authority to fund its policy priorities." ECF No. 35 at 17 (citing *Rust*, 500 U.S. at 193). This is wholly unresponsive because, as the Supreme Court has held in both *Rust* and *AID*, the Executive's authority to fund its policy priorities is still subject to the First Amendment, particularly where it seeks to encroach on protected speech made *outside* the scope of the federal funding, as the Certification Provision does.

Finally, in addition to showing that Defendants have violated the holding in *AID*, Plaintiffs have also shown a likelihood of success on the merits in showing that the Certification Provision unconstitutionally restricts, and retaliates against, contractors' and grantees' free speech rights even within the scope of the pertinent programs. As discussed above, although the government may "cho[ose] to fund one activity to the exclusion of another," *Rust*, 500 U.S. at 193, and may "define the limits of the government spending program," *AID*, 570 U.S. at 214, it may not punish government contractors or grantees "*because of* their speech on matters of public concern." *Wabaunsee County*, 518 U.S. at 675. And whether attempts to do so violate the First Amendment then turn on a "balance between the interests of the [contractor], in

48

JA112

commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its [contractors]." *Id.* at 676. Plaintiffs have shown a likelihood of success on this aspect of their First Amendment claim with respect to the Certification Provision as well. Plaintiffs have clearly shown that, if they refuse to comply with the Certification Provision and are unable to receive federal funding directly as a result for noncompliance, their First Amendment protected speech is "a substantial or motivating factor in the termination." *Id.* at 675.

Therefore, Plaintiffs have shown a likelihood of success on the merits as to Count Five of the complaint.[12]

### E.    Enforcement Threat Provision

The final challenged provision is the Enforcement Threat Provision, which directs the Attorney General to, among other things, take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]." J21 Order § 4(b)(iii).

### 1.    First Amendment Free Speech Claim (Count Four)

Plaintiffs are likely to succeed on their claim that the Enforcement Threat Provision, § 4(b)(iii) of the J21 Order, violates the First Amendment, because it

---

[12] Because Plaintiffs have shown a likelihood of success on the merits with respect to Count Five, their First Amendment challenge to the Certification Provision, the Court need not decide whether Plaintiffs have *also* shown a likelihood of success on the merits on Count Six, their separation-of-powers claim as to the Certification Provision. The Court does not decide one way or the other whether Plaintiffs are likely to succeed on the merits of Count Six.

threatens to initiate *enforcement actions* against Plaintiffs (in the form of civil

compliance investigations) for engaging in protected speech. *See Moody v. NetChoice*,

603 U.S. 707, 743-44 (2024) (holding that, for a facial First Amendment challenge,

plaintiffs must show that the law at issue "prohibits a substantial amount of protected

speech relative to its plainly legitimate sweep") (quoting *United States v. Hansen*, 599

U.S. 762, 770 (2023).[13]

     The Enforcement Threat Provision applies broadly to the private sector;

therefore, unlike with the other provisions, the analysis is based on pure private speech

regulated by the First Amendment as opposed to the speech of federal contractors or

grantees. *See* § III.B, *supra*. Plaintiffs have shown a likelihood of success on the merits

of their claim that the Enforcement Threat Provision, which threatens to bring

enforcement against perceived violators of undefined standards, is, on its face, an

unlawful viewpoint-based restriction on protected speech. The Enforcement Threat

Provision *expressly* focuses on "deter[ring] DEI programs or principles that constitute

illegal discrimination or preferences" and "encourag[ing] the private sector to end illegal

discrimination and preferences, including DEI," without, for example, a similar

restriction on *anti*-DEI principles that may also be in violation of existing federal anti-

discrimination laws. J21 Order § 4(b). That is textbook viewpoint-based discrimination.

The government's threat of enforcement is not just targeted towards enforcement of

---

[13] The Court does not reach this same conclusion with respect to the investigative
portion of the Enforcement Threat Provision to the extent it is merely a directive from
the President to the Attorney General to identify "[a] plan of specific steps or measures
to deter DEI programs or principles . . . that constitute illegal discrimination or
preferences." J21 Order § 4(b)(iii). The Court denies Plaintiffs' request to enjoin that
aspect of the Enforcement Threat Provision.

federal law. Rather, the provision expressly targets, and threatens, the expression of views supportive of equity, diversity and inclusion—a "particular view[] taken by speakers." *Rosenberger*, 515 U.S. at 829.

The government's conduct and subsequent communications pursuant to the J21 Order confirm this to be the case. The White House's fact sheet released a day after the J21 Order was issued claims, for example, that "radical DEI has dangerously tainted many of our critical businesses and influential institutions." ECF No. 27-19 at 4. It further states that "many corporations use DEI . . . ignoring the fact that DEI's foundational rhetoric and ideas foster intergroup hostility and authoritarianism," and that "DEI creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict." *Id*. Similarly, in the Attorney General's February 5, 2025 memorandum to internal DOJ employees regarding the interpretation of the J21 Order as to its directives to remove references to DEI or DEIA within the executive branch, she specifically states that the DOJ components should pay particular attention to ending references to DEI or DEIA "including references to 'unconscious bias,' 'cultural sensitivity,' [and] 'inclusive leadership[.]'" ECF No. 27-14 at 3-4.

The White House and Attorney General have made clear, through their ongoing implementation of various aspects of the J21 Order, that viewpoints and speech considered to be in favor of or supportive of DEI or DEIA are viewpoints the government wishes to punish and, apparently, attempt to extinguish. And, as the Supreme Court has made clear time and time again, the government cannot rely on the "threat of invoking legal sanctions and other means of coercion" to suppress disfavored speech. *Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963); *Nat'l Rifle Assoc. of America v. Vullo*, 602 U.S. 175, 189 (2024).

Plaintiffs have also shown a likelihood of success that, regardless of the viewpoint discrimination baked into the Enforcement Threat Provision, it is also a *content*-based restriction on protected speech that would not pass the high bar of strict scrutiny. As explained above, a content-based restriction on protected speech is presumptively unconstitutional and will only be justified if the government's restriction is narrowly tailored to serve a compelling interest. *See* § III.B, *supra*. Like in *Reed*, here the speech being regulated is determined "based on the message [the] speaker conveys," 576 U.S. at 163, *i.e.*, whether the speech promotes principles of inclusion, equity, and diversity. That is clear based on the face of the J21 Order, and hammered home by the egregiously content-based actions taken by various agencies pursuant to the J21 Order.

Defendants' only real attempt at a defense on the merits is to point to language in the Enforcement Threat Provision that the "strategic enforcement plan" to combat "DEI" in the "private sector" and "deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences" is limited to "*illegal* discrimination or preferences." J21 Order, § 4(b)(iii) (emphasis added). In other words, Defendants contend that all they are threatening is to target non-compliance with existing federal anti-discrimination law, and that the Enforcement Threat Provision "does not target a First Amendment right to begin with" because "Plaintiffs have no First Amendment right to engage in 'illegal discrimination.'" ECF No. 35 at 19. But, as explained above, *see* § III.E.1, *supra*, the J21 Order offers no guidance or notice of what the government now considers "illegal" DEI. And more importantly, the Fourth Circuit has already held, in *HIAS, Inc. v. Trump*, that a "purely theoretical savings clause" like this one, "with no method or standard for invoking it," and where application of it "would undermine" the substantive provisions of the

Executive Orders, does not "immunize [the Executive Order] from scrutiny." 985 F.3d 309, 325 (4th Cir. 2021).

Defendants further argue that "Plaintiffs' allegation of 'chilled' speech is wholly subjective because it relies on the unfavored presumption that the Government will execute the [Orders'] directive in bad faith and ignore its own declaration to only target illegal conduct." ECF No. 35 at 19. Defendants cite to *Ali v. Hogan* to support this proposition, but that case held that the plaintiff "does not allege an intention to engage in any activity that could be construed to fall within the purview of the Executive Order," and so the plaintiff there was unable to allege a credible fear of chilled speech. 496 F. Supp. 3d 917, 930 (D. Md. 2020), *aff'd as modified*, 26 F.4th 587 (4th Cir. 2022). Here, not only have Plaintiffs shown many ways in which they have historically engaged in protected speech on diversity-related topics that the executive branch has now suggested is unlawful. Defendants also still do not respond to the baseline contention that the Enforcement Threat Provision is *facially* unconstitutional as a viewpoint- and content-based restriction on speech. Plaintiffs have shown they face "a 'credible threat' that the policy will be enforced against them." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).

Therefore, Plaintiffs have shown a likelihood of success on the merits as to Count IV of the complaint.

### 2.    Due Process Vagueness Claim (Count 3)

Plaintiffs have also shown a likelihood of success on the merits of their facial due process vagueness challenge to the Enforcement Threat Provision.

Defendants have rescinded swaths of existing executive branch guidance on what the executive branch considers the federal civil rights laws to require, prohibit, or allow.

*See* J21 Order §§ 2, 3 (ordering executive agencies to terminate all "discriminatory and illegal" guidance and regulations and revoking four executive orders). Yet neither the J20 nor the J21 Order gives guidance on what the new administration considers to constitute "illegal DEI discrimination and preferences," *id.* § 4(b)(iv), or "[p]romoting 'diversity,'" *id.* § 3(b)(ii), or "illegal DEI and DEIA policies," *id.* § 1, or what types of "DEI programs or principles" the new administration considers "illegal" and is seeking to "deter," *id.* § 4(b)(iii). The due process clause of the Fifth Amendment requires that "prohibitions" on conduct be "clearly defined." *Grayned*, 408 U.S. at 108. That is especially the case where "the law interferes with the right of free speech." *Hoffman Estates*, 455 U.S. at 499. As explained above, Plaintiffs have shown a likelihood of success on the merits of both of their First Amendment Claims: Count Five as to the Certification Provision and Count Four as to the Enforcement Threat Provision. Accordingly, the "more stringent vagueness test," *id.*, applies in this context.

"Vague laws invite arbitrary power." *Sessions*, 584 U.S. at 175 (Gorsuch, J., concurring). And Plaintiffs here have shown substantial evidence of the risks of such arbitrariness here. By threatening the "private sector" with enforcement actions, J21 Order § 4, based on those vague, undefined standards, the Enforcement Threat Provision is facially unconstitutional under the due process clause of the Fifth Amendment.

The harm to constitutionally protected notice interests caused by the newly announced "prohibitions," *Grayned*, 408 U.S. at 108, is further exacerbated by the interaction between the Enforcement Threat Provision and the Certification Provision. The Certification Provision states that not only are government contractors (and grantees, insofar as they are required to aver to such certifications too) in a position to

have to guess whether they are in compliance with the administration's as-yet-unpromulgated guidance on what constitutes, for example, "illegal . . . DEI," J21 Order § 4(b)(iii), they are nevertheless being threatened with False Claims Act liability if they miss the mark. Such escalation of consequences dramatically raises the stakes, and by extension dramatically expands the degree of injury to interests protected by the Fifth Amendment. *See Sessions*, 584 U.S. at 184 (Gorsuch, J., concurring) ("[T]oday's civil laws regularly impose penalties far more severe than those found in many criminal statutes.").

Plaintiffs have shown a likelihood of success on the merits of Count 3.

## IV.    IRREPARABLE HARM

Each Plaintiff alleges that failure to enjoin the conduct at issue will cause irreparable harm. A plaintiff seeking a preliminary injunction "must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief," in other words "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 21. "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Irreparable means the injury "cannot be fully rectified by the final judgment after trial." *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

A "prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)). Relatedly,

where a plaintiff has shown a strong likelihood of success on a constitutional claim, irreparable harm has been established. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, Plaintiffs allege four types of irreparable harm from the challenged Executive Order provisions: threat of loss of funds, uncertainty regarding future operations, loss of reputation, and chilled speech. The Court agrees that Plaintiffs have adequately shown a sufficient likelihood of irreparable harm.

First, as stated above, Plaintiffs have adequately shown a likelihood of success on their constitutional claims, and thus irreparable injury. *Mills*, 571 F.3d at 1312; *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."). This is also why Defendants' contention that regulatory uncertainty is not irreparable harm is incorrect: here the uncertainty is sufficient to likely *create* constitutional violations such as chilled protected speech, which provides the requisite irreparable harm. Defendants assert that because the Orders only prohibit "illegal" conduct, Plaintiffs' claims of chilled speech are objectively unreasonable because they assume Defendants will enforce the Executive Orders against constitutional conduct and in bad faith. But as discussed above, the problem is not that Plaintiffs assume Defendants will enforce the Orders in bad faith, but rather that the Challenged Provisions strip Plaintiffs of the ability to know what the government might now consider lawful or unlawful. There have been 60 years of statutes, regulations, and case law developed since the Civil Rights Act of 1964. The Challenged Provisions strip away much of the prior executive branch guidance, and then

threaten the loss or condition the receipt of federal funds, and also threaten civil enforcement actions—some backed by the possibility of treble damages—for violations. And in so doing, they threaten to punish prior expressions of protected speech, and chill future expressions of protected speech.

Second, while Defendants allege that Plaintiffs' economic injuries are not irreparable, they acknowledge that economic injuries severe enough to threaten Plaintiffs' existence, if shown, are irreparable. ECF No. 35 at 26 (asserting that "[a]ny such financial loss must 'threaten[] the very existence of the [Plaintiffs'] business[es].'") (quoting *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986)). Plaintiffs have shown that the Challenged Provisions threaten the livelihoods of numerous of Plaintiffs' members and NADOHE's existence. ECF No. 27-23 ¶¶ 26, 44-46 (NADOHE declaration that the Challenged Provisions "will lead to the eradication of critical support for students, staff, and faculty on campuses of higher education; the elimination of many of [their] members' jobs; and will ultimately threaten NADOHE's existence" and expecting severe loss of members and revenue based on past experiences); ECF No. 27-24 ¶ 21-25 (AAUP detailing its members' expected losses); ECF No. 27-25 ¶¶ 35 (ROC United asserting that because of the Challenged Provisions, it "will operate at a deficit to continue to fulfill its mission until its funds are depleted"); ECF No. 27-26 ¶ 30 (Baltimore asserting that the uncertainty arising from the Orders will "likely reduce support for other programs or shutter some altogether—just to sustain certain critical municipal functions").

Similarly, while economic damages are often ultimately recoverable in litigation, and thus not irreparable harm, if those damages are *not* recoverable, they can amount to irreparable injury. *Mountain Valley Pipeline*, 915 F.3d at 218. In light of Defendants'

sovereign immunity, monetary recovery in this case is likely to be precluded. *See Mayor & City Council of Balt. v. Azar*, 392 F. Supp. 3d 602, 618 (D. Md. 2019) (providing that "[s]hould Baltimore City lose Title X funding . . . the lost funds could not be recovered should it ultimately succeed with this litigation, because HHS enjoys sovereign immunity that precludes monetary recovery") (citing *Mountain Valley Pipeline*, 915 F.3d at 217-18). Thus, the Court concludes that Plaintiffs have adequately established the necessary irreparable harm.

## V.    BALANCE OF THE EQUITIES AND PUBLIC INTEREST

The final two factors are the balance of the equities and the public interest. The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). To balance the equities, the Court considers "the relative harms to the applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)).

Plaintiffs contend that injunctive relief is necessary to prevent further harm and that "[d]elayed remedy would be akin to 'shut[ting] the stable door after the horse has bolted.'" ECF No. 27-1 at 33-34 (quoting *Juliana v. United States*, 947 F.3d 1159, 1181 (9th Cir. 2020) (Staton, J., dissenting)). Plaintiffs also assert that "[s]wift elimination of infringement on free speech rights is decidedly in the public interest." *Id.* at 34 (citing *Nat'l Pub. Radio, Inc. v. Klavans*, 560 F. Supp. 3d 916, 929 (D. Md. 2021)).

On the other hand, Defendants assert that, because Plaintiffs' First Amendment claims fail on the merits, an injunction is not in the public interest. ECF No. 35 at 28.

58

Defendants also argue that "there is no question that eradicating discrimination is in the interest of the public," *id.* (citing *Students for Fair Admissions*, 600 U.S. at 206), and that they will be injured because an injunction "would effectively disable almost a dozen federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities." *Id.* 28-29 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).

As discussed above, Plaintiffs have made a strong showing that they are likely to succeed on the merits of the facial challenges to the Termination Provision, the Certification Provision, and, in part, the Enforcement Threat Provision. And Plaintiffs have also made a strong showing that they, their members, and similarly situated government contractors, grantees, and members of the private sector are suffering substantial current and imminent irreparable harm. As Plaintiffs put it, "[e]fforts to foster inclusion have been widespread and uncontroversially legal for decades." ECF No. 39 at 9. Plaintiffs' irreparable harms include widespread chilling of unquestionably protected speech, chilling that is unquestionably attributable to the Challenged Provisions.

The government contends that even if Plaintiffs have shown a likelihood of success on the merits, and even if Plaintiffs are suffering irreparable harm, the government's interest in immediately imposing a new, not-yet-promulgated interpretation of what it considers "eradicating discrimination," ECF No. 35 at 28, outweighs the merits of Plaintiffs' claims and the irreparable harm they are suffering. The government is free to promulgate regulations, take litigating positions, propose legislation, or any number of other steps, so long as they are consistent with statutes and the Constitution. The core problem here is that, as explained above, Plaintiffs have

shown that the specific Challenged Provisions infringe on core constitutional

protections, and that the status quo must be maintained while Plaintiffs and the

government litigate the claims asserted in this case. The balance of equities tips strongly

in Plaintiffs' favor.

## VI.   SCOPE OF PRELIMINARY INJUNCTION

Having determined that Plaintiffs are entitled to a preliminary injunction, the

Court must determine its proper scope. "District courts have broad discretion to craft

remedies based on the circumstances of a case, but likewise must ensure that 'a

preliminary injunction is no more burdensome to the defendant than necessary to

provide complete relief to the plaintiffs.'" *HIAS*, 985 F.3d at 326 (quoting *Roe v. Dep't of

Def.*, 947 F.3d 207, 231 (4th Cir. 2020)).

For the reasons explained above, Plaintiffs have amply shown they are entitled to

a preliminary injunction that protects them, and their members, from the substantial,

irreparable harms they have shown are being caused by the Challenged Provisions and

Defendants' conduct pursuant to those provisions. The question remains whether the

preliminary injunction should also apply to non-parties. This is sometimes referred to as

presenting whether the injunction should be "nationwide," but that is a misnomer; here,

Plaintiffs themselves are national organizations, and so the injunction would be

"nationwide" in any event. The relevant question is whether, in light of the claims and

Plaintiffs' showing of likelihood of success on the merits, including similarly situated

non-parties within the scope of an injunction would be appropriate.

Here, Plaintiffs have made that showing. "A district court may issue a nationwide

injunction so long as the court 'mold[s] its decree to meet the exigencies of the

particular case.'" *HIAS*, 985 F.3d at 326 (alteration in original) (quoting *Trump v. Int'l*

*Refugee Assistance Project*, 582 U.S. 571, 580 (2017)). An injunction that extends to non-parties may be particularly "appropriate" where, as here, "the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *Id.* (quoting *Roe*, 947 F.3d at 231). Moreover, "[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293-94 (1976) (citations and internal quotation marks omitted). "[W]here a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff.")).

In *HIAS*, the Fourth Circuit affirmed an injunction that extended to non-parties similarly situated to the plaintiffs in that case where "[t]he refugee resettlement program by its nature impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country," and where "[e]njoining the Order and Notice only as to the plaintiff resettlement agencies would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect." 985 F.3d at 326-27. Analogous circumstances apply here, where, as explained above, the Termination and Enforcement Threat Provisions are unconstitutionally vague as to *all* contractors and grantees who are subject to them, and the Certification and Enforcement Threat Provisions are content- and viewpoint-based restrictions that chill speech as to anyone the government might conceivably choose to accuse of engaging in speech about "equity" or "diversity" or "DEI," or the other topics

the J20 and J21 Orders cite—or as the Attorney General cites, for example, "unconscious bias," "cultural sensitivity" or "inclusive leadership." ECF No. 27-14 at 3-4.

As noted above, for prudential and separation-of-powers reasons, the Court will not enjoin the Attorney General from preparing the report pursuant to the J21 Order, or engaging in investigation. But otherwise, Plaintiffs have shown they are entitled to an injunction as to the Termination, Certification and Enforcement Threat Provisions, whether as applied to Plaintiffs or to others.

## VII.    BOND

Defendants have requested that "any injunctive relief accompany a bond under [Federal Rule of Civil Procedure] 65(c)." ECF No. 35 at 32. Defendants have not proposed a precise amount for bond, but note that "preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed." *Id.* Plaintiffs oppose this request, because the bond amount Defendants seem to forecast they would request would be an enormous financial barrier and "Defendants point to no example of a court ordering a bond in analogous circumstances." ECF No. 39 at 17.

Federal Rule of Civil Procedure 65(c) states, in relevant part: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Although the rule is "mandatory and unambiguous," *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999), the Fourth Circuit has acknowledged that "where the circumstances warrant it, the court may fix the amount of the bond accordingly" and noting that "[i]n some circumstances, a nominal bond may suffice." *Id.* at 421 n.3 (cleaned up); *see also Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district

court retains the discretion to set the bond amount as it sees fit *or waive* the security requirement.") (emphasis added).

In addition, courts in other circuits have frequently waived the bond requirement in cases where a fundamental constitutional right is at stake. *See, e.g.*, *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1186 (N.D. Fla. 2022) (waiving the bond requirement under Rule 65(c) because the "unlawful impact on Plaintiffs' First Amendment rights weighs against requiring a bond"); *Thomas v. Andino*, 613 F. Supp. 926, 956 (D.S.C. 2020) (waiving bond in a voting rights case); *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (noting that courts have held that security is not necessary where the effect would deny plaintiffs the right to judicial review of administrative action) (citing cases).

Here, because the Plaintiffs seek to protect their First and Fifth Amendment rights, and because a bond of the size Defendants appear to seek would essentially forestall Plaintiffs' access to judicial review, the Court will set a nominal bond of zero dollars under Rule 65(c).

## VIII.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is granted in part and denied in part. Their motion for a temporary restraining order is denied as moot. A separate preliminary injunction order follows.

Date:  February 21, 2025                    _____/s/_____
                                            Adam B. Abelson
                                            United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION, *et al.*, | |
|     *Plaintiffs*, | |
|   v. | Case No. 1:25-cv-00333-ABA |
| DONALD J. TRUMP, *et al.*, | |
|     *Defendants* | |

## PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, and upon consideration of the Motion for a Temporary Restraining Order and/or Preliminary Injunction filed by Plaintiffs National Association of Diversity Officers in Higher Education, the American Association of University Professors, Restaurant Opportunities Centers United, and the Mayor and City Council of Baltimore, Maryland (ECF No. 27) (the "Motion"), Defendants' memorandum in opposition to the Motion (ECF No. 35), Plaintiffs' reply brief (ECF No. 39), and the exhibits to those submissions, and having held a hearing on the Motion on February 19, 2025, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED as follows:

    1.    The Motion is GRANTED IN PART and DENIED IN PART.

    2.    This Order addresses the following provisions in Exec. Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) (the "J20 Order"), and Exec. Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based*

*Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025)

("J21 Order"):

> J20 Order § 2(b)(i) (in part) (the "**Termination Provision**"):
>
>> Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:
>>
>>> (i) terminate, to the maximum extent allowed by law, . . . all . . . "equity-related" grants or contracts[.]
>
> J21 Order § 3(b)(iv) (the "**Certification Provision**"):
>
>> The head of each agency shall include in every contract or grant award:
>>
>>> (A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and
>>>
>>> (B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.
>
> J21 Order § 4(b)(iii) (the "**Enforcement Threat Provision**"):
>
>> To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and

2

JA129

preferences, including DEI. The report shall contain a proposed strategic enforcement plan identifying

> . . . (iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars.

3.      Defendants other than the President, and other persons who are in active concert or participation with Defendants (the "Enjoined Parties"), shall not:

     a.      pause, freeze, impede, block, cancel, or terminate any awards, contracts or obligations ("Current Obligations"), or change the terms of any Current Obligation, on the basis of the Termination Provision;

     b.      require any grantee or contractor to make any "certification" or other representation pursuant to the Certification Provision; or

     c.      bring any False Claims Act enforcement action, or other enforcement action, pursuant to the Enforcement Threat Provision, including but not limited to any False Claims Act enforcement action premised on any certification made pursuant to the Certification Provision.

Date:  February 21, 2025                    _____/s/_____
                                            Adam B. Abelson
                                            United States District Judge

3

JA130

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

National Association of Diversity Officers in
Higher Education, et al.,

     Plaintiffs,

     v.

Donald J. Trump, in his official capacity as
President of the United States, et al.,

     Defendants.

Case No. 25-cv-333 (ABA)

### DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the Fourth Circuit from this Court's Memorandum Opinion and Order. *See* ECF Nos. 44 & 45.

Respectfully submitted,

ERIC HAMILTON
Deputy Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Pardis Gheibi*
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

JA131

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.

*/s/ Pardis Gheibi*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION OF
DIVERSITY OFFICERS IN HIGHER
EDUCATION, *et al.*,

     *Plaintiffs*,

  v.

DONALD J. TRUMP, *et al.*,

     *Defendants*

Case No. 25-cv-0333-ABA

## MEMORANDUM OPINION AND ORDER DENYING
## MOTION TO STAY INJUNCTION PENDING APPEAL

The First Amendment prohibits the government from making any law "abridging the freedom of speech." U.S. Const., amdt. I. The government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). Such "[c]ontent-based laws" are "presumptively unconstitutional." *Id.* And although "speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter," *id.* at 169, the most "egregious form of content discrimination" is "[g]overnment discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Id.* at 168 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

As the Court explained in its February 21 opinion granting (in part) Plaintiffs' motion for a preliminary injunction, the specific executive order provisions at issue in this case run afoul of these protections, and do so on their face, meaning the provisions

themselves, among other things, expressly "draw[] distinctions based on the message a speaker conveys." *Id.* at 163; *see* ECF No. 44 at 45–48 (Certification Provision), 49–53 (Enforcement Threat Provision), *see also id.* at 42–43 (holding, with respect to the Termination Provision, that Plaintiffs have demonstrated a likelihood of success based on their Fifth Amendment vagueness claim). They punish, or threaten to punish, individuals and institutions based on the content of their speech, and in doing so they specifically target viewpoints the government seems to disfavor. ECF No. 44 at 45–53. The provisions target not only purely private persons who have no nexus to federal funding, but also "seek to leverage funding to regulate speech" of individuals and institutions that happen to contract with (or receive grants from) the federal government, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013), and they terminate benefits or threaten punishment "because of [individuals'] speech on matters of public concern," *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996) (emphasis omitted), which constitute independent First Amendment violations. ECF No. 44 at 47–49. The specific provisions at issue also likely violate the due process clause of the Fifth Amendment. *Id.* at 38–43, 53–55. After all, the First and Fifth Amendment analyses in this case merge in several ways, because laws that "interfere[] with the right of free speech or of association" must pass a "stringent vagueness test," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982), for such a law to give citizens sufficient notice of "what is prohibited, so that [they] may act accordingly," and for such a law to provide sufficiently "explicit standards" to avoid "arbitrary and discriminatory enforcement." *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

Because Plaintiffs in this case have shown a strong likelihood of success on the merits with respect to at least their free speech and vagueness claims, and have shown that permitting the government to implement the challenged provisions would cause substantial irreparable harm, the Court issued a preliminary injunction, prohibiting the implementation of the three challenged provisions, other than with regard to certain investigation-related portions of the Enforcement Threat provision. ECF No. 45 (preliminary injunction); ECF No. 44 (memorandum opinion). Defendants have appealed the injunction, ECF No. 47, and now seek to stay the preliminary injunction while the appeal proceeds. ECF No. 48 ("Motion to Stay").

Because the motion-to-stay standard is, in critical respects, the inverse of the preliminary-injunction standard, the Court has largely already explained why a stay would be inappropriate. For those reasons, and the additional reasons explained below, the Court will deny Defendants' Motion to Stay. The full factual background and procedural history of this case is outlined in detail in the memorandum opinion. *See* ECF No. 44.

## I.    DISCUSSION

### A.    Legal Standard

A preliminary injunction is not stayed after an appeal is taken "[u]nless the court orders otherwise." Fed. R. Civ. P. 62(c); *see also* Fed. R. App. 8(a)(1) ("A party must ordinarily move first in the district court for . . . an order suspending . . . an injunction while an appeal is pending."). There are four factors relevant to the issuance of a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties

interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors are "the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The party seeking a stay carries the burden of demonstrating that these factors justify a stay. *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) ("[T]he burden is on the Government as applicant to show, among other things, a likelihood of success . . . and that the equities favor a stay.").

As noted, the standard for a stay pending appeal is similar to the standard for a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."); *see also Nken*, 556 U.S. at 434 ("There is substantial overlap between these [factors governing issuance of a stay pending appeal] and the factors governing preliminary injunctions.").

### B. Analysis

Defendants argue these factors weigh in favor of a stay in this case. They contend they have demonstrated a likelihood of success on the merits, as outlined in their Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction. ECF No. 48-1 at 3 (citing ECF No. 35 at 5–22). They also assert that Plaintiffs' harms are "purely speculative," but the injunction "threatens irreparable injuries" to the government and "improperly impedes" agencies from "implementing the President's stated priority of enforcing the antidiscrimination laws." *Id.* (citing *Maryland v. King*, 567 U.S. 1301, 1013 (2012)). Defendants alternatively argue that if the Court keeps the injunction in place, it should "stay the nationwide

application of the injunction," *i.e.*, limit the application to Plaintiffs and their members.[1] *Id.* at 4 (citing *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024)).

Plaintiffs, in turn, argue that just as a preliminary injunction is warranted for the reasons the Court explained in its February 21 memorandum opinion, the same reasons counsel denial of a stay pending appeal, and further emphasize that there are no changed circumstances since entry of the preliminary injunction that would justify the "extraordinary remedy" of a stay pending appeal. ECF No. 53 at 3–5 (quoting *Nken*, 556 U.S. at 428). As for Defendants' alternative argument about the application of the injunction to non-parties, Plaintiffs contend that the relevant factors, including squarely applicable caselaw from the Fourth Circuit, support the injunction as entered. *Id.* at 9 (citing *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021); *see also* ECF No. 60 ("Plaintiffs' Notice of Supplemental Authority") (citing *CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902 (4th Cir. 2025)).

Applying the *Nken* standards for a motion to stay pending appeal, the Court concludes that all the factors militate against a stay, and against narrowing the preliminary injunction to Plaintiffs and their members. Defendants have not established a strong likelihood of success on the merits. Indeed, because Defendants point only to their opposition brief as support for this first factor, the Court has already considered— and rejected—the argument that Defendants are likely to succeed on the merits. *See* ECF No. 44 at 15–55 (Section III, "Likelihood of Success on the Merits"). That leaves the

---

[1] As the Court noted in its memorandum opinion, the term "nationwide" is a misnomer and "[t]he relevant question is whether, in light of the claims and Plaintiffs' showing of likelihood of success on the merits, including similarly situated non-parties within the scope of an injunction would be appropriate." *See* ECF No. 44 at 60.

5

JA138

government's argument that the preliminary injunction should be stayed because it harms "intra-executive policy implementation by enjoining the President's policy directives to federal agencies" and improperly impedes federal agencies from enforcing antidiscrimination laws. ECF No. 48-1 at 3. As the Court explained in its memorandum opinion granting the preliminary injunction, the executive branch is obviously entitled to have policy goals and to pursue them. But in pursuing those goals it must comply with the Constitution, including, as relevant here, the Free Speech Clause of the First Amendment, and the Due Process Clause of the Fifth Amendment. *See* ECF No. 44 at 3, 48.

And although the aforementioned factors are the "most critical," *Nken*, 556 U.S. at 434, the remaining factors (balance of the harms and the public interest) also weigh against a stay in this case. As the Court has explained, although the case is presently in its preliminary stages, several of the challenged provisions clearly, on their face, violate First Amendment free speech protections. ECF No. 44 at 59 (noting that "chilling of unquestionably protected speech" is a serious harm attributable to the challenged provisions). And when balancing the harms, the chilling of the exercise of fundamental First Amendment rights weighs strongly in favor of the preliminary injunction, and against a stay pending appeal. The recognized harm of chilled speech is precisely why, for instance, there are relaxed standing and ripeness requirements in First Amendment cases. *See, e.g.*, *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (explaining that standing requirements are "somewhat relaxed" in First Amendment cases). Likewise, Plaintiffs have shown a likelihood of success on the merits based on the unconstitutional vagueness of the challenged provisions. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("[T]he loss of constitutional freedoms, 'for even minimal periods

of time, unquestionably constitutes irreparable injury.'") (citation omitted). Defendants
have offered no new evidence or arguments that justify a reassessment of the balance of
the harms or the public interest considerations in this case.

Finally, Defendants argue that even if a stay pending appeal is not justified, the
Court should stay the injunction insofar as it bars application of the enjoined provisions
to parties other than Plaintiffs and their members. ECF No. 48-1 at 4 (citing *Gill v.
Whitford*, 585 U.S. 48, 66 (2018); *Lewis v. Casey*, 518 U.S. 343, 360 (1996); *Califano v.
Yamasaki*, 442 U.S. 682, 702 (1979); *Trump v. Hawaii*, 585 U.S. 667, 717 (2018)
(Thomas, J., concurring); and *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 927 (2024)
(Gorsuch, J., concurring)). Plaintiffs specifically explain why *Labrador* is inapposite,
and further argue that, "as this Court rightly concluded, this case is on all fours with the
Fourth Circuit's decision in *HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021)." ECF
No. 53 at 9.

As the Court previously explained in identifying the appropriate contours of a
preliminary injunction, an injunction that extends to non-parties may be particularly
"appropriate" where, as here, "the government relies on a 'categorical policy,' and when
the facts would not require different relief for others similarly situated to the plaintiffs."
*HIAS*, 985 F.3d at 326 (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020)).
And here, because Plaintiffs have shown a likelihood of proving a "constitutional
violation," the Court is "required to tailor the scope of the remedy to fit the nature and
extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976)
(citations and internal quotation marks omitted); *see also, e.g.*, *Trump v. Int'l Refugee
Assistance Project*, 582 U.S. 571, 582 (2017) (affirming preliminary injunction insofar as
it applied to parties "similarly situated" to the plaintiffs, including any "foreign nationals

who have a credible claim of a bona fide relationship with a person or entity in the United States," and only holding that the injunction was overly broad insofar as it also applied to "foreign nationals abroad who have no connection to the United States at all").

The government's cited cases do not counsel otherwise. *Gill*, for example, was a gerrymandering case; there, whether a particular plaintiff was harmed by a particular gerrymander, or could prove a constitutional violation, was "district specific." 585 U.S. at 66; *see also id.* at 67 ("Here, the plaintiffs' partisan gerrymandering claims turn on allegations that their votes have been diluted. That harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district. Remedying the individual voter's harm, therefore, does not necessarily require restructuring all of the State's legislative districts. It requires revising only such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be."). In *Lewis*, which related to incarcerated persons' access to legal research materials and related support, the reason the Supreme Court held that the plaintiffs there were not entitled to "systemwide relief" was because plaintiffs had only proven "actual injury on the part of only one named plaintiff," specifically tied to whether he was entitled to "special services that [he] would have needed, in light of his illiteracy, to avoid dismissal of his case." 518 U.S. at 358–60. In *Califano*, the question was the propriety of certification under Rule 23 of a "nationwide class," and there the Supreme Court held that it was, under the circumstances presented in that case. 442 U.S. at 702–03.

As to the concurring opinions the government cites from *Labrador v. Poe* and *Trump v. Hawaii*, neither compels narrowing the preliminary injunction here. As for Justice Gorsuch's opinion concurring in the grant of a stay in *Labrador*, the principal deficiency of the underlying injunction that Justice Gorsuch identified was the fact that it extended to every aspect of the Idaho statute at issue, "even though no party before the court" had challenged most aspects or applications of the statute. 144 S. Ct. at 921–22 (Gorsuch, J., concurring). Justice Gorsuch's *Labrador* concurrence advises lower courts to consider a number of factors in deciding whether an injunction is justified in a given case, and in shaping the appropriate contours of such injunctions. *See, e.g.*, *id.* at 927–28. In addition, in a concurring opinion in *Trump v. Hawaii*, Justice Thomas expressed a general skepticism of district courts' authority to enter so-called "universal" injunctions at all. 585 U.S. at 713 (Thomas, J., concurring). The Court has carefully considered those factors and recognizes that preliminary injunctions generally encompass, and should encompass, only parties to a given litigation. But, as the Court has explained, the specific provisions included within the scope of the injunction have the effect of infringing on core constitutional protections, including freedom of speech and the right to notice and avoidance of arbitrary enforcement under the Fifth Amendment. *See, e.g.*, ECF No. 44 at 59. The need to encompass nonparties within the scope of this Court's injunction in this case arises from the facial constitutional deficiencies in the enjoined provisions themselves. The only way to effectively prevent these constitutional violations and mitigate their irreparable harm is to include non-parties within the scope of the preliminary injunction.

Finally, the Fourth Circuit's decision last week in *CASA, Inc. v. Trump* further supports denial of a stay. In that case, the Fourth Circuit, applying the "traditional

factors laid out in *Nken v. Holder*," denied a motion seeking a partial stay of a preliminary injunction pending appeal. *CASA*, 2025 WL 654902, at *1. The Fourth Circuit also noted that "[n]otwithstanding . . . reservations" expressed in "separate writings by Supreme Court Justices," the Supreme Court has "allowed most universal injunctions to remain in effect during the course of litigation." *Id.* The *CASA* court specifically observed that the executive action challenged there was a "categorical policy" as to which the "facts would not require different relief for others similarly situated," and that an injunction limited to the parties "would be unworkable in practice and thus fail to provide complete reliefs to the plaintiffs." *Id.* (citations omitted). As explained above, those considerations apply with equal force here.

The executive branch must, of course, comply with the Constitution, including the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment. The Court's preliminary injunction is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," and has been "mold[ed] . . . to meet the exigencies of the particular case." *HIAS*, 985 F.3d at 326 (quoting *Roe*, 947 F.3d at 231).

## II.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Stay Injunction Pending Appeal, ECF No. 48, is DENIED.

Date:  March 3, 2025                    _____/s/_____

                                        Adam B. Abelson
                                        United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION OF
DIVERSITY OFFICERS IN HIGHER
EDUCATION, *et al.*,

      *Plaintiffs*,

  v.

DONALD J. TRUMP, *et al.*,

      *Defendants*

Case No. 25-cv-0333-ABA

## MEMORANDUM OPINION

The Court entered a Preliminary Injunction on February 21, 2025. ECF No. 45. The Preliminary Injunction described the "Enjoined Parties" as "Defendants other than the President, and other persons who are in active concert or participation with Defendants." *Id.* ¶ 3. Defendants, as identified in Plaintiffs' complaint, are President Trump in his official capacity, the Office of Management and Budget, the Departments of Justice, Health and Human Services, Education, Labor, Interior, Commerce, Agriculture, Energy, and Transportation along with the heads of those agencies (in their official capacities), and the National Science Foundation.

Plaintiffs have filed a motion seeking "clarification" on whether the "Enjoined Parties" include federal executive agencies, departments, and commissions (and their subdivisions, agents, and officers) that are not named as defendants in this case. ECF No. 50-1 ("Clarification Motion") at 3. Defendants oppose the motion and argue that (1) the Court lacks jurisdiction to consider the Clarification Motion because Defendants have filed a notice of appeal; and (2) Plaintiffs' interpretation, or requested clarification, of the Preliminary Injunction is inconsistent with Federal Rule of Civil Procedure 65(d),

1

JA144

Article III of the U.S. Constitution, and traditional principles of equity and the principles underlying preliminary injunctive relief. *See* ECF No. 62.

For the reasons set forth below, the Court will grant the Clarification Motion. The Court clarifies, pursuant to Federal Rule of Civil Procedure 65(d)(2)(B), as follows and as set forth in the accompanying Clarified Preliminary Injunction (March 10, 2025) at paragraph 3:

> The Preliminary Injunction applies to and binds Defendants other than the President, as well as all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions directed pursuant to the J20 and J21 Orders (collectively, the "Enjoined Parties").

## I.    JURISDICTION

Generally, the timely filing of a notice of appeal transfers jurisdiction to the court of appeals and "divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982); *Doe v. Pub. Citizen*, 749 F.3d 246, 258 (4th Cir. 2014). An exception to this general rule is when the district court "take[s] action that aids the appellate process." *Pub. Citizen*, 749 F.3d at 258 (citing *Grand Jury Proceedings Under Seal v. United States*, 947 F.2d 1188, 1190 (4th Cir. 1991)). Under this exception, a district court may modify an injunction to clarify it in order to "reliev[e] [the appellate court] from considering the substance of an issue begotten merely from imprecise wording in the injunction." *Lytle v. Griffith*, 240 F.3d 404, 407 n.2 (4th Cir. 2001).

In *Lytle*, while an appeal was pending, the district court replaced a reference to "the Commonwealth" to specify who was covered by the injunction (there, the Governor of the Commonwealth of Virginia, and the Norfolk Commonwealth Attorney). *Id.*

Similarly, in *Dixon v. Edwards*, the Fourth Circuit held that, while an appeal was pending, the district court could modify an injunction barring an individual from "officiat[ing] at religious services on or near the grounds" of a church by revising the order to specify that the individual was "permitted to conduct religious services at least 300 feet distant from the perimeter" of the church. 290 F.3d 699, 709 & n.14 (4th Cir. 2001).

Here, Plaintiffs do not request a substantive amendment to the Preliminary Injunction, but rather a clarification regarding which agencies are encompassed among "Enjoined Parties." The requested clarification is comparable to the modified orders in *Lytle* and *Dixon*. Further, as explained below, the Court's Memorandum Opinion that accompanied the Preliminary Injunction cited actions by agencies that were not named as defendants to explain the rationale for the Preliminary Injunction, and thus clarification is further justified, and serves to "aid[] the appellate process," *Pub. Citizen*, 749 F.3d at 258, "in light of a potential inconsistency between the language of the Preliminary Injunction and that of the accompanying Memorandum Opinion." *See Am. Coll. of Obstetricians and Gynecologists ex rel. Council of Univ. Chairs of Obstetrics & Gynecology v. U.S. Food & Drug Admin.*, No. 20-cv-1320-TDC, 2020 WL 8167535, at *1 (D. Md. Aug. 19, 2020). Therefore, this Court may rule on the Clarification Motion and clarify the terms of the Preliminary Injunction.[1]

---

[1] Because the clarified preliminary injunction replaces the "in active concert or participation" language from the February 21, 2025 order with clearer wording consistent with the Court's February 21, 2025 memorandum opinion, the Court need not reach the issues raised by the parties as to what would render a non-named federal executive agency "in active concert or participation" with a named Defendant.

3

## II.    CLARIFICATION

Plaintiffs' complaint challenges as facially unconstitutional three executive order provisions, set forth in the Preliminary Injunction and referred to therein as the Termination Provision, Certification Provision, and Enforcement Threat Provision. ECF No. 45 ¶ 2. As the Court explained in its February 21 Memorandum Opinion, those provisions run afoul of the free speech protections of the First Amendment, and the due process protections of the Fifth Amendment, and do so on their face. ECF No. 44 at 38-55.

Defendants acknowledge that the President was a named defendant in this case; that the Challenged Provisions were directives to all executive agencies, departments, and commissions; and that the Court has held that those directives are unconstitutional on their face. ECF No. 62 at 3. Nonetheless, Defendants argue that the Court should only preliminarily enjoin the actions of the specific departments, agencies and commissions that Plaintiffs named as *additional* defendants. *Id.* at 14. They argue that including other departments, agencies and commissions that are under the President's direction, and were in fact directed by the Challenged Provisions, is inconsistent with Article III's standing requirement because it would bind "nonparties who would [otherwise] not be bound by the judgment." *Id.* at 13 (citing *Haaland v. Brackeen*, 599 U.S. 255, 293 (2023)). Defendants similarly argue that this kind of injunction is inconsistent with traditional principles of equity and preliminary injunctive relief. *Id.*

The Court has previously explained why this is the proper scope of an injunction given the claims, the nature of the challenged provisions, and the ways in which Plaintiffs have shown a likelihood that the provisions are facially unconstitutional. *See*

ECF No. 44 at 60-62; ECF No. 61 at 10. To reiterate and further explain, there are three principal reasons.

First, Plaintiffs have shown a likelihood of success on the merits that the Termination and Certification Provisions, and the Enforcement Threat Provision in part, on their face constitute unlawful content-based and viewpoint-discriminatory restrictions on speech in violation of the First Amendment, and on their face also run afoul of due process because of their vagueness. ECF No. 44 at 38-55; *see also* ECF No. 61 at 1-2 (order denying stay pending appeal). In particular, the Court held that Plaintiffs have shown a likelihood of success on the merits as follows:

- The Termination Provision, as to which Plaintiffs brought facial challenges under the Spending Clause (Count 1) and the Fifth Amendment (Count 2), "invites arbitrary and discriminatory enforcement" and "offers insufficient notice to current grantees about whether and how they can adapt their conduct to avoid termination of their grants or contracts," and in so doing facially violates the "'more stringent vagueness test'" that applies when a law "'interferes with the right of free speech or of association.'" ECF No. 44 at 38-39 (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)).

- The Certification Provision, as to which Plaintiffs brought facial challenges under the First Amendment (Count 5) and separation of powers (Count 6), "operates as a facially viewpoint-discriminatory order," "constitutes a content-based restriction on the speech rights of federal contractors and grantees . . . because such restriction expands to all of those contractors' and grantees work, whether funded by the government or not," and also "unconstitutionally

5

JA148

restricts, and retaliates against, contractors' and grantees' free speech rights even within the scope of the pertinent programs." *Id.* at 45 & 47-48.

- The Enforcement Threat Provision, as to which Plaintiffs brought facial challenges under the First Amendment (Count 4) and Fifth Amendment (Count 3), violates the First Amendment because it "threatens . . . enforcement actions" using "a content-based restriction on protected speech that would not pass the high bar of strict scrutiny" and further constitutes an "unlawful viewpoint-based restriction on protected speech." *Id.* at 50, 52. And it violates the Fifth Amendment because, among other things, while "rescind[ing] swaths of existing executive branch guidance on what the executive branch considers the federal civil rights laws to require, prohibit, or allow," it gives no "guidance on what the new administration considers to constitute 'illegal DEI discrimination and preferences,' J21 Order § 4(b)(iv), or '[p]romoting diversity,' *id.* § 3(b)(ii), or 'illegal DEI and DEIA policies,' *id.* § 1, or what types of 'DEI programs or principles' the new administration considers 'illegal' and is seeking to 'deter,' *id.* § 4(b)(iii)." *Id.* at 53-54.

Each of those ways in which Plaintiffs have shown that the Challenged Provisions are unconstitutional are deficiencies with those provisions on their face. Any executive agency, department or commission acting pursuant to the Challenged Provisions would be acting pursuant to an order that Plaintiffs have shown a strong likelihood of success in establishing is unconstitutional on its face.

<u>Second</u>, the Termination and Certification Provisions are directives the President issued to *all* executive agencies, departments and commissions, J20 Order § 2(a)(i); J21 Order § 3(b)(iv), and the Enforcement Threat Provision was an express directive by the

6

President to the Department of Justice. J21 Order § 4(b)(iii). Defendants named in Plaintiffs' complaint include the President in his official capacity. ECF No. 1 ¶ 22. The Preliminary Injunction—both original and as clarified—is tailored to the executive branch agencies, departments and commissions that were directed, and have acted or may act, pursuant to the President's directives in the Challenged Provisions of the J20 and J21 Orders. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 513-14 (2010) (holding that the President is responsible and accountable for executive agencies that are executing the laws); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203-204 (2020) (same).

Third, enjoining only the agencies that Plaintiffs specifically named, and ignoring the fact that the President (who issued the Challenged Provisions) is a named defendant, would fail to provide complete relief to Plaintiffs and their members themselves because, among other things, they are at risk of their speech being chilled by many non-named federal executive agencies, as Plaintiffs explain. ECF No. 65 at 13. Artificially limiting the preliminary injunction in the way Defendants propose also would make the termination status of a federal grant, or the requirement to certify compliance by a federal contractor, turn on which federal executive agency the grantee or contractor relies on for current or future federal funding—even though the agencies would be acting pursuant to the exact same Challenged Provisions—thereby "causing 'inequitable treatment' in an area in which uniformity is needed." *CASA, Inc. v. Maribel*, No. 25-1153, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025) (quoting *Roe v. Dep't. of Defense*, 947 F.3d 207, 231-32 (4th Cir. 2020) and *HIAS, Inc. v. Trump*, 985 F.3d 309, 326-27 (4th Cir. 2021)).

7

JA150

**III.    CONCLUSION**

For these reasons and those previously articulated, the Court will issue a separate

order clarifying that the Preliminary Injunction, consistent with the Court's reasoning in

the February 21, 2025 Memorandum Opinion, applies as follows:

> The Preliminary Injunction applies to and binds Defendants
> other than the President, as well as all other federal executive
> branch agencies, departments, and commissions, and their
> heads, officers, agents, and subdivisions directed pursuant to
> the J20 and J21 Orders (collectively, the "Enjoined Parties").

Date:  March 10, 2025                  _____/s/_____

                                       Adam B. Abelson
                                       United States District Judge

JA151

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION OF
DIVERSITY OFFICERS IN HIGHER
EDUCATION, *et al.*,

     *Plaintiffs*,

  v.

DONALD J. TRUMP, *et al.*,

     *Defendants*

Case No. 1:25-cv-00333-ABA

### CLARIFIED PRELIMINARY INJUNCTION (March 10, 2025)[1]

Pursuant to Federal Rule of Civil Procedure 65, and upon consideration of the Motion for a Temporary Restraining Order and/or Preliminary Injunction filed by Plaintiffs National Association of Diversity Officers in Higher Education, the American Association of University Professors, Restaurant Opportunities Centers United, and the Mayor and City Council of Baltimore, Maryland (ECF No. 27) (the "Preliminary Injunction Motion"), Defendants' memorandum in opposition (ECF No. 35),[2] Plaintiffs' reply brief (ECF No. 39), and the exhibits to those submissions; having held a hearing on the Preliminary Injunction Motion on February 19, 2025; having also considered

---

[1] For the reasons set forth in the accompanying Memorandum Opinion, the Court is issuing this order to clarify the scope of the preliminary injunction issued on February 21, 2025 (ECF No. 45). The only clarified *operative* language appears in the definition of Enjoined Parties in paragraph 3.

[2] The Defendants named in this action are the Office of Management and Budget, the Departments of Justice, Health and Human Services, Education, Labor, Interior, Commerce, Agriculture, Energy, and Transportation along with the heads of those agencies (in their official capacities), the National Science Foundation, and President Trump in his official capacity.

1

Plaintiffs' Motion to Clarify Preliminary Injunction Order (ECF No. 50) ("Clarification

Motion"), Defendants' response (ECF No. 62) and Plaintiffs' reply (ECF No. 65); and for

the reasons set forth in the Court's Memorandum Opinion that accompanied the

original Preliminary Injunction (ECF No. 44), and the additional reasons set forth in the

Memorandum Opinion that accompanies this clarified Preliminary Injunction, it is

hereby ORDERED as follows:

    1.    The Preliminary Injunction Motion is GRANTED IN PART and DENIED

IN PART, and the Clarification Motion is GRANTED.

    2.    This Order addresses the following provisions in Exec. Order 14151,

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive

Order of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) (the "J20 Order"), and

Exec. Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based*

*Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025)

("J21 Order"):

J20 Order § 2(b)(i) (in part) (the "**Termination Provision**"):

> Each agency, department, or commission head, in
> consultation with the Attorney General, the Director of OMB,
> and the Director of OPM, as appropriate, shall take the
> following actions within sixty days of this order:
>
> > (i) terminate, to the maximum extent allowed by law, . . .
> > all . . . "equity-related" grants or contracts[.]

J21 Order § 3(b)(iv) (the "**Certification Provision**"):

> The head of each agency shall include in every contract or
> grant award:
>
> > (A) A term requiring the contractual counterparty or grant
> > recipient to agree that its compliance in all respects with

all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and

(B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

J21 Order § 4(b)(iii) (the "**Enforcement Threat Provision**"):

To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI. The report shall contain a proposed strategic enforcement plan identifying

. . . (iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars.

3.      The Preliminary Injunction applies to and binds Defendants other than the President, as well as all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions directed pursuant to the J20 and J21 Orders (collectively, the "Enjoined Parties").

4.    The Enjoined Parties shall not:

a.    pause, freeze, impede, block, cancel, or terminate any awards, contracts or obligations ("Current Obligations"), or change the terms of any Current Obligation, on the basis of the Termination Provision;

b.    require any grantee or contractor to make any "certification" or other representation pursuant to the Certification Provision; or

c.    bring any False Claims Act enforcement action, or other enforcement action, pursuant to the Enforcement Threat Provision, including but not limited to any False Claims Act enforcement action premised on any certification made pursuant to the Certification Provision.

Date:  March 10, 2025

_____
        */s/*

Adam B. Abelson
United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2025, I electronically filed the foregoing record excerpts with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Jack Starcher
Counsel for Defendants- Appellants