No. 25-1189

IN THE

# United States Court of Appeals for the Fourth Circuit

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS
IN HIGHER EDUCATION, ET AL.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Maryland
Case No. 25-cv-333

**SUPPLEMENTAL APPENDIX**

Niyati Shah
Noah Baron
Alizeh Ahmad
ASIAN AMERICANS ADVANCING JUSTICE
  | AAJC
1620 L Street NW, Suite 1050
Washington, D.C. 20036
(202) 296-2300

Aleshadye Getachew
Cynthia Liao
J. Sterling Moore
Audrey Wiggins
Brooke Menschel
Skye Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
agetachew@democracyforward.org

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Page

Exhibits to Motion for Temporary Restraining Order and/or Motion for Preliminary Injunction, Dkt. No. 27

    Ex. 6, Training and Employment Notice, Jan. 22, 2025, Dkt. No. 27-10 ......................................................................................SA1

    Ex. 9, Letter from HHS to "Recipient," Jan. 29, 2025, Dkt. No. 27-13 ......................................................................................SA4

    Ex. 13, Rebecca Carballo & Juan Perez Jr., *DOGE announces $881 million in cuts for Education Contract*, Politico, Feb. 10, 2025, Dkt. No. 27-17 ......................................................SA6

    Ex. 15, White House Fact Sheet, *Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI*, Jan. 22, 2025, Dkt. No. 27-19 ......................................................SA13

    Ex. 19, Decl. of Paulette Granberry Russell, President and Chief Executive Officer of the National Association of Diversity Officers in Higher Education, Feb. 12, 2025, Dkt. No. 27-23 .......SA18

    Ex. 20, Decl. of Todd Wolfson, Feb. 12, 2025, Dkt. No. 27-24 ..............SA33

    Ex. 22, Decl. of Faith Leach, Dkt. No. 27-26 ..........................................SA46

Exhibits to Reply to Response to Motion for Temporary Restraining Order and/or Motion for Preliminary Injunction, Dkt. No. 39

    Ex. 20, Suppl. Decl. of Todd Wolfson, Feb. 18, 2025, Dkt. No. 39-2 ......SA56

    Ex. 21, Suppl. Decl. of Paulette Granberry Russell, President and Chief Executive Officer of the National Association of Diversity Officers in Higher Education, Feb. 18, 2025, Dkt. No. 39-3 ......................................................................................SA60

    Ex. 22, Suppl. Decl. of Faith Leach, Feb. 18, 2025, Dkt. No. 39-4 .........SA64

    Ex. 23, Carolyn Y. Johnson, et al., *Here Are the Words Putting Science in the Crosshairs of Trump's Orders*, Wash. Post, Feb. 4, 2025, Dkt. No. 39-5 ......................................................SA66

i

Ex. 25, Letter from Brendan Carr, FCC Chairman, to Brian
     Roberts, CEO, Comcast Corp., Feb. 11, 2025, Dkt. No. 39-7 .......SA69

Ex. 26, National Endowment for the Arts, *Legal Requirements and
     Assurance of Compliance*, downloaded Feb. 17, 2025, Dkt.
     No. 39-8 ...................................................................................SA72

Memorandum Opinion and Order Denying Motion to Vacate, May 1,
     2025, Dkt. No. 90 .....................................................................SA86

# Exhibit 6

| **TRAINING AND EMPLOYMENT NOTICE** | **NO.** 21-24 |
| --- | --- |
| | **DATE** January 22, 2025 |

**TO:**     STATE WORKFORCE AGENCIES
STATE WORKFORCE LIAISONS
STATE WORKFORCE DEVELOPMENT BOARDS AND STAFF
LOCAL WORKFORCE DEVELOPMENT BOARDS AND STAFF
AMERICAN JOB CENTER DIRECTORS
ETA COMPETITIVE GRANTEES
COMMUNITY COLLEGES AND TRIBAL COLLEGES
STATE APPRENTICESHIP AGENCIES
JOB CORPS CENTER DIRECTORS

**FROM:**   MICHELLE PACZYNSKI /s/
Acting Deputy Assistant Secretary

**SUBJECT:**   Immediate Implementation of Executive Orders "Ending Radical and Wasteful Government DEI Programs and Preferencing" and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity"

1. **Purpose.** To notify all Employment and Training Administration (ETA) recipients about changes ETA is making to federal financial assistance awards to prohibit activities described in President Trump's Executive Orders (EOs) titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025.

2. **Action Requested.** Effective immediately, all recipients of federal financial assistance awards are directed to cease all activities related to "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) under their federal awards, consistent with the requirements of the EOs titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," issued on January 21, 2025. Additional guidance will be provided.

3. **Summary and Background.**

   a. Summary – This notice shares recent EO requirements to eliminate DEI activities that constitute illegal discrimination or preferences.

   b. Background – President Trump has issued several EOs, which are available at https://www.whitehouse.gov/presidential-actions/, including the EOs titled, "Ending Radical and Wasteful Government DEI Programs and Preferencing," issued on January 20, 2025, and "Ending Illegal Discrimination and Restoring Merit-Based Opportunity,"

issued on January 21, 2025. All federal agencies are taking steps to implement these EOs, and promptly notifying all federal awardees. ETA, like all federal agencies, will provide further guidance on specific programs and activities within those programs.

4. **Ceasing DEIA activities.** All awardees must immediately cease all award activities related to DEI or DEIA. All other award activities should continue.

   ETA will issue further guidance on specific activities that are allowable and unallowable.

5. **Inquiries.** Please direct inquiries to the appropriate Regional Office.

6. **References.**
   - Executive Order, "Ending Radical and Wasteful Government DEI Programs and Preferencing," January 20, 2025, available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/.
   - Executive Order, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," January 21, 2025, available at https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/.

7. **Attachments.** N/A

# Exhibit 9



U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30329-4027

January 29, 2025

Dear Recipient:

This Centers for Disease Control and Prevention (CDC) award is funded in whole or in part with United States Government funds.

To implement Executive Orders entitled *Ending Radical and Wasteful Government DEI Programs and Preferencing* and *Initial Rescissions of Harmful Executive Orders and Action,* you must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting "diversity, equity, and inclusion" (DEI) at every level and activity, regardless of your location or the citizenship of employees or contractors, that are supported with funds from this award. Any vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government under this award are immediately, completely, and permanently terminated.

No additional costs must be incurred that would be used to support any DEI programs, personnel, or activities.

If you are a global recipient and have previously received this notification regarding DEI activities, please follow those instructions accordingly.

**SA5**

# Exhibit 13





**EDUCATION**

# DOGE announces $881 million in cuts for Education Department contracts

About 170 contracts for the Institute of Education Sciences were targeted.



The Education Department also terminated 29 training grants for diversity, equity and inclusion that total $101 million, according to an announcement from the Department of Government Efficiency. | Kayla Bartkowski/Getty Images

By **REBECCA CARBALLO** and **JUAN PEREZ JR.**
02/10/2025 09:04 PM EST
Updated: 02/10/2025 09:56 PM EST

**SA7**



Education Department funds for diversity programs and research initiatives will dry up, according to a series of announcements Monday night about the agency's future.

The department terminated 89 contracts, worth $881 million, according to an X post from the Department of Government Efficiency, but DOGE did not say which contracts were ended. In a separate post, DOGE said the department also terminated 29 training grants for diversity, equity and inclusion that total $101 million. One of the grants sought to train teachers to "help students understand / interrogate the complex histories involved in oppression, and help students recognize areas of privilege and power on an individual and collective basis," according to the post.

Advertisement

The Trump administration is halting about 170 contracts for the Education Department's Institute of Education Sciences, according to two people familiar with the decisions.

**SA8**

The cuts comes as the president is expected to issue an executive order this month to wind down the department, and Education Secretary nominee Linda McMahon gets ready to testify before Congress on Thursday.

The American Institutes for Research, a nonprofit organization that conducts behavioral and social science research, confirmed it received multiple notices of terminations on Monday for several IES contracts. IES is a nonpartisan research arm of the department that studies special education and student learning outcomes, among other topics.

Want more POLITICO? Download our mobile app to save stories, get notifications and more. In iOS or Android.

"The money that has been invested in research, data, and evaluations that are nearing completion is now getting the taxpayers no return on their investment," Dana Tofig, an AIR spokesperson, said in a statement Monday. "If the point of this exercise is to make sure taxpayer dollars are not wasted and are used well, the evaluation and data work that has been terminated is exactly the work that determines which programs are effective uses of federal dollars, and which are not."

**SA9**

DOGE announces $881 million in cuts for Education Department contracts - POLITICO

The department and DOGE did not immediately respond to requests for comment.

**FILED UNDER:** RESEARCH, DEPARTMENT OF EDUCATION, DOGE

## Playbook

The unofficial guide to official Washington, every morning and weekday afternoons.

**EMAIL**

Your Email

**EMPLOYER**

Employer

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

Advertisement

AD

Advertisement

AD

**SA10**

SPONSORED CONTENT



**Costco's Best-Kept Secret For Eye Bags Is Flying Off...**

wrinkles.pro



**Windows Users Didn't Know This Simple Trick T...**

Removing ads is the first step in having a faster, safer and...

Safe Tech Tips



**Top Experts Say This Drugstore Wrinkle Crea...**

seniorskinsolutions.com



**Study support that helps you really learn and feel...**

Dive deep into your most complex college courses. Lear...

Chegg

**More than 7 million sold!**

Laura Geller Beauty



**If You Have Moles Or Skin Tags, Do This Immediately**

Do This Immediately If You Have Moles Or Skin Tags (It's Genius!)

Skin Remedies

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

**SA11**

DOGE announces $881 million in cuts for Education Department contracts - POLITICO

Feedback

Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

© 2025 POLITICO LLC

**SA12**

# Exhibit 15

2/11/25, 2:42 PM    Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI – The White House

Case 1:25-cv-00333-ABA    Document 27-19    Filed 02/13/25    Page 2 of 5



# TRUMP PROTECTS CIVIL RIGHTS AND MERIT-BASED OPPORTUNITY BY ENDING ILLEGAL DEI

January 22, 2025

USCA4 Appeal: 25-1189     Doc: 46     Filed: 05/08/2025     Pg: 18 of 103

2/11/25, 2:42 PM                    Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI – The White House
Case 1:25-cv-00333-ABA     Document 27-19     Filed 02/13/25     Page 3 of 5

**PROTECTING CIVIL RIGHTS AND EXPANDING INDIVIDUAL OPPORTUNITY**:

Today, President Donald J. Trump signed an historic Executive Order that protects the civil rights of all Americans and expands individual opportunity by terminating radical DEI preferencing in federal contracting and directing federal agencies to relentlessly combat private sector discrimination. It enforces long-standing federal statutes and faithfully advances the Constitution's promise of colorblind equality before the law. This comprehensive order is the most important federal civil rights measure in decades:

- It terminates "diversity, equity, and inclusion" (DEI) discrimination in the federal workforce, and in federal contracting and spending.
  - Federal hiring, promotions, and performance reviews will reward individual initiative, skills, performance, and hard work and not, under any circumstances, DEI-related factors, goals, policies, mandates, or requirements.

- The order requires OMB to streamline the federal contracting process to enhance speed and efficiency, reduce costs, and require Federal contractors and subcontractors to comply with our civil rights laws.
  - It revokes Executive Order 11246 contracting criteria mandating affirmative action
  - It bars the Office of Federal Contract Compliance Programs from pushing contractors to balance their workforce based on race, sex, gender identity, sexual preference, or religion.
  - It requires simple and unmistakable affirmation that contractors will not engage in illegal discrimination, including illegal DEI.

- It directs all departments and agencies to take strong action to end private sector DEI discrimination, including civil compliance investigations.

- It mandates the Attorney General and the Secretary of Education issue joint guidance regarding the measures and practices required to comply

**SA15**

USCA4 Appeal: 25-1189    Doc: 46    Filed: 05/08/2025    Pg: 19 of 103

2/11/25, 2:42 PM                Fact Sheet: President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI – The White House
Case 1:25-cv-00333-ABA    Document 27-19    Filed 02/13/25    Page 4 of 5

with the Supreme Court's decision in *Students for Fair Admissions v. Harvard*.

**RESTORING THE VALUES OF INDIVIDUAL DIGNITY, HARD WORK, AND EXCELLENCE**: Individual dignity, hard work, and excellence are fundamental to American greatness. This Executive Order reaffirms these values by ending the Biden-Harris Administration's anti-constitutional and deeply demeaning "equity" mandates, terminating DEI, and protecting civil rights:

- Reversing the progress made in the decades since the Civil Rights Act of 1964 toward a colorblind and competence-based workplace, radical DEI has dangerously tainted many of our critical businesses and influential institutions, including the federal government.

- In the private sector, many corporations and universities use DEI as an excuse for biased and unlawful employment practices and illegal admissions preferences, ignoring the fact that DEI's foundational rhetoric and ideas foster intergroup hostility and authoritarianism.
    - Billions of dollars are spent annually on DEI, but rather than reducing bias and promoting inclusion, DEI creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict.

**PRESIDENT TRUMP PROMISED AND DELIVERED**: President Trump promised to terminate DEI in the federal government, protect equal opportunity, and force schools to end discriminatory admissions policies, and he delivered. Every man and woman should have the opportunity to go as far as their hard work, individual initiative, and competence can take them. In America, excellence, grit, and determination is our strength.

News

SA16

Case 1:25-cv-00333-ABA      Document 27-19      Filed 02/13/25      Page 5 of 5

Administration

Issues

Contact

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

**SA17**

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

National Association of Diversity Officers in
Higher Education, et al.,

    Plaintiffs,

  v.

               Civil Action No. 1:25-cv-333-ABA

Donald J. Trump, in his official capacity as
President of the United States, et al.,

    Defendants.

---

### DECLARATION OF PRESIDENT AND CHIEF EXECUTIVE OFFICER OF THE NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION

  I, Paulette Granberry Russell, hereby attest:

*Background*

 1. I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

 2. I am the current President and Chief Executive Officer of the National Association of Diversity Officers in Higher Education ("NADOHE").

 3. Prior to my role with NADOHE, I served for twenty-two years as a senior diversity officer at a large, research-intensive public university. The work I performed in that role is representative of the work that many of NADOHE's individual diversity officer members perform in their own roles.

 4. NADOHE is the nation's leading association for chief diversity officers and professionals in postsecondary education, with over 2,200 members, as of the date of this Declaration. NADOHE's members include diversity, equity, inclusion, and accessibility

**SA19**

Declaration. NADOHE's members include diversity, equity, inclusion, and accessibility professionals who work at institutions of higher education, as well as institutions of higher education themselves, both public and private.

5.     NADOHE counts among its institutional members several institutions of higher education with endowments exceeding $1 billion in assets.

6.     NADOHE was incorporated in 2006, but the foundation for the organization was laid in 2003 after several chief diversity officers met and concluded there was a need to create a national forum to discuss professional standards and guide the nascent diversity profession.

7.     The organization serves as the leading voice for current and aspiring diversity leaders in higher education. NADOHE strives to equip diversity professionals and institutions of higher education with the necessary tools to be successful in their roles and to advance equity, inclusion, and the value of belonging within their campus communities, using evidence-based practices.  Through embracing the value of inclusive excellence, NADOHE's members seek to enhance academic freedom and exploration.

8.     NADOHE is a not-for-profit 501(c)(3) organization based in Washington, D.C.

*Diversity, Equity, Inclusion, and Scholarship*

9.     NADOHE's core values include excellence, diversity, equity, inclusivity, and scholarship. NADOHE pursues its mission by, among other things, offering its members resources that support professional development, informal career counseling, and other support that aids diversity professionals in ensuring the competent delivery of critical activities within an institution.

10.     Diversity professionals and diversity offices in higher education have wide ranging duties, which may include leading diversity, equity, inclusion efforts for the institution,

with Disabilities Act coordinators and Title IX coordinators, and ensuring that diversity, equity, and inclusion efforts are consistent with applicable antidiscrimination laws.

11.    The initiatives our members are responsible for at their respective institutions include strategies designed to provide access, support, and resources to a diverse student body, including low-income students, first-generation students, students from historically underrepresented groups, international students, veterans, women, and persons with disabilities; and to ensure that the institution is recruiting from a diverse applicant pool as it makes nondiscriminatory hiring and other personnel decisions. For example, NADOHE's individual professional members typically lead or influence outreach, recruitment, and admission programs, including pre-college programs that introduce students from diverse backgrounds to the college experience. "Diverse backgrounds" is a broad umbrella term and includes nontraditional students, such as veterans and students with families. NADOHE members also ensure that the needs of students with disabilities are accommodated in accordance with the institution's policies and the law. Diversity professionals are expected to understand the varied levels of preparation of admitted students, identify barriers to student retention and graduation, and monitor outcomes. They also examine policies and practices to ensure that academic and social support programs, including career services, address the different lived experiences of students that may impact students' abilities to achieve their career and workforce goals (such as, identifying supports for students who have aged out of foster care and have no home to return to during college breaks or after graduation).

12.    Typically, NADOHE members also monitor hiring and promotion efforts to assure compliance with institutional hiring and progression policies and state and federal nondiscrimination laws. Because campus culture and climate can also impact student and

3

**SA21**

employee retention, diversity professionals monitor, respond to, and design interventions necessary to address incidents involving bias, discrimination, or harassment of students and employees, and often conduct trainings that may be required or recommended to comply with federal and state laws prohibiting harassment and discrimination. NADOHE members also design, promote, and implement inclusive education and professional development programs to foster student and employee success and engagement. NADOHE members understand that this work is valuable not only because it advances inclusive excellence, but also because it establishes campus cultures that protect against violations of antidiscrimination laws.

13.    NADOHE established the *Standards of Professional Practice for Chief Diversity Officers in Higher Education* to inform its work and support its members. These standards of practice are based on empirically validated research that demonstrate that the pursuit of inclusive excellence is essential to the strength of our educational institutions and the realization of an equitable society. NADOHE's *Standards of Professional Practice* provide, for example, that Chief Diversity Officers "have ethical, legal, and practical obligations to frame their work from comprehensive definitions of equity, diversity, and inclusion." Further, the *Standards* call for them to be "committed to drawing from existing scholarship and using evidence-based practices to provide intellectual leadership in advancing equity, diversity, and inclusion."

14.    NADOHE also jointly publishes the peer-reviewed *Journal of Diversity in Higher Education* to make available multidisciplinary research on evidence-based practices for the pursuit of inclusive excellence.

15.    NADOHE's mission has become particularly important in recent years as backlash against DEI on higher education campuses, due in part to some state legislative measures, has caused many students, faculty, and staff from diverse and underrepresented

**SA22**

backgrounds to feel unsupported. Now, more than ever, it is critical for NADOHE to support its members in their critical work of fostering inclusive academic environments.

*Importance of Federal Grants and Contracts*

16.     Many of NADOHE's institutional members have active federal grants and contracts from several different federal agencies and sub-agencies, including the Department of Interior, Department of Commerce, Department of Energy, Department of Transportation, Department of Agriculture, Department of Education, Department of Justice, Department of Health and Human Services, and National Science Foundation. NADOHE's members plan to seek more federal grants and contracts in the future.

17.     The grants cover a wide variety of projects ranging from advancing education in science, technology, engineering, and mathematics (STEM), to pursuing more equitable health outcomes for underserved communities, to reducing disparities in juvenile justice, to improving public transit for communities, to promoting the development of clean energy technology, and many more.

18.     Without the grants they receive, many of NADOHE's institutional members would have to shut down the programs funded by those grants.

*Consequences of President Trump's Executive Order 14151 (Section 2)*

19.     I understand that President Trump's Executive Order 14151 titled, "*Ending Radical Government DEI Programs and Preferencing*" that he signed on January 20, 2025 (the "J20 Order") requires all federal agencies to terminate all "equity-related grants or contracts" to the maximum extent allowable by law within sixty days of the date President Trump signed the J20 Order.

SA23

20.     The vague language in the J20 Order's description of prohibited activities will leave many of our institutional members guessing as to which activities are prohibited under the J20 Order. Specifically, the term "equity-related," which is not defined, could mean a multitude of activities, some of which the J20 Order may not have intended to capture.

21.     Many of our member institutions have federal grants that include the term "equity" in the title of the grant, the grant proposal submitted for the grant, or in other public-facing documentation related to the grant.

22.     One of NADOHE's institutional members, Institutional Member A, in light of the J20 Order, cancelled a conference on alternate models of education at HBCUs because the program was funded in part by a grant from the Department of Labor. The institutional member was informed by the panel participants for the conference that they had been barred from participation by their own organizations on account of the J20 Order. Citing a lack of funding and a lack of participation, the institution cancelled the conference.

23.     Further, many of our member institutions have federal grants that include other terms arguably related to the concept of "equity," including terms such as "diversity," "inclusion," "belonging," "access," "accessibility," and "success."

24.     Given the ambiguity in the J20 Order, our member institutions, including Institutional Member A, fear that those grant funds will be terminated, and are already taking steps to mitigate harms that might flow from the termination of those funds.

25.     Those grants that may be terminated include grants from the following federal agencies: the Departments of Interior, Commerce, Energy, Transportation, Agriculture, Education, Health and Human Services, and Justice; and the National Science Foundation.

SA24

26.    If the grants that may be impacted by the J20 Order are terminated, NADOHE

fears the J20 Order will lead to the eradication of critical support for students, staff, and faculty

on campuses of higher education; the elimination of many of our members' jobs; and will

ultimately threaten NADOHE's existence.

*Consequences of President Trump's Executive Order 14173 (Section 3)*

27.    I also understand that President Trump's Executive Order 14173 titled, "*Ending*

*Illegal Discrimination and Restoring Merit-Based Opportunity*," that he signed on January 21,

2025 (the "J21 Order") provides that all federal grants and contracts must include terms requiring

the recipient or contractor "to certify that [they] do[] not operate any programs promoting DEI

that violate any applicable Federal anti-discrimination laws" and to acknowledge that

compliance is "material to the government's payment decisions for purposes of" the False

Claims Act ("FCA")."

28.    Because the Executive Order does not define key terms, NADOHE's institutional

members are left with a difficult choice: risk civil enforcement for violation of the FCA by

certifying that they do not operate any DEI programs without knowing what that means; lose

funding by failing to certify; or else censor themselves and cancel programs to avoid drawing the

ire of the President and the Department of Justice.

29.    For example, at least six of NADOHE's current institutional members,

Institutional Members B-G, are subject to a recently issued university system-wide

announcement that, in accordance with Section 3 of the J21 Order, any curricular programs or

requirements that relate to the prohibited topics listed in the J21 Order might prevent the

certification now required of federal contractors and grantees. Citing the J21 Order, the

announcement explained that even with a compliance certification made in good faith by an

institution, such curricular and program requirements might still be deemed noncompliant and

7

**SA25**

trigger adverse consequences from federal agencies. The announcement further explained that the risk of jeopardizing significant sources of critical federal research funding for the system's institutions was too great to defer action, and that, as a result, all such programs and requirements mandating completion of courses related to diversity, equity, and inclusion would be suspended immediately. These institutional members have yet to submit renewals of their memberships, and, given this announcement, I have reason to believe that they will decide not to continue as dues-paying members of NADOHE. Even if these institutional members cease to be NADOHE members, many other current institutional members of NADOHE who already renewed their NADOHE memberships are contending with the same fears of loss of critical federal research funding.

*Consequences of President Trump's Executive Order 14173 (Section 4)*

30.     I further understand that the J21 Order requires all agencies to transmit a report to the Attorney General within sixty days of the signing of the Order and to "identify up to nine potential civil compliance investigations of" certain types of organizations, including "institutions of higher education with endowments over 1 billion dollars" in order to "deter DEI."

31.     NADOHE's institutional members with endowments greater than $1 billion, including Institutional Member H, are subject to inclusion in the reports that agencies must produce under the J21 order. Since the J21 Order fails to define material terms, NADOHE's institutional members that fit the parameters of the potential target list fear they may be targeted for investigation but lack clarity about how to avoid the financial, reputational, and organizational costs of such an investigation. As a result of the President's directive and mission to "deter" institutions with endowments over $1 billion from promoting or condoning "DEI programs or principles," those members' protected speech is penalized and chilled. Moreover,

simply being named for investigation under the J21 Order would carry consequences including the costs of investigations and litigation, and the need to redirect dedicated resources from other purposes to engage with the civil compliance investigation, even if the investigation ultimately establishes no legal violation by the investigation target. Finally, those harms are compounded by the reputational harm that an institution of higher education identified for a civil compliance investigation would inevitably suffer, such as the loss of student applicants, donors, and prestige that will likely result from such an investigation.

### *Harms to NADOHE's Individual Members and to NADOHE Itself*

32.    NADOHE is also concerned for its individual diversity professional members, given the February 5, 2025, memorandum from Attorney General Bondi that calls for proposals for criminal investigations in implementing the J21 Order. That memorandum raises the possibility that NADOHE's individual diversity professional members may be targeted for criminal prosecution if they continue to carry out their jobs consistent with their professional obligations and values, even though they conduct themselves in a way that they in good faith believe is lawful and fully consistent with antidiscrimination laws – and, indeed, believe are part of carrying out their compliance roles.

33.    NADOHE's individual diversity professional members have suffered and will continue to suffer both direct and downstream effects of these threats. Individual Member A, who provides services to a university as a consultant, has had contracts terminated by the university client because the J20 Order threatens the termination of the grant funding from the National Science Foundation that funded Individual Member A's contract. Over 50% of Individual Member A's business is based on National Science Foundation grants that are at risk of termination under the J20 Order.

SA27

34.    NADOHE's individual members fear that as institutions of higher education seek to escape the crosshairs of criminal and civil compliance investigations, or as the institutions seek to comply with the J21 Order's certification requirement, the jobs held by those diversity professionals will be terminated or resources allocated to their work and departments will be diminished and reallocated. Our members' fears are not unfounded. Prior efforts to dismantle DEI initiatives at colleges and universities—such as state-level legislation and the Supreme Court's ruling in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023)—have already had a negative impact on our members. They reasonably expect the effect of this renewed effort under the J20 and J21 Orders to have similar negative impacts.

35.    Already, our individual members have suffered threats to their employment status and careers. In states where anti-DEI legislation has been introduced and passed or tabled, our members have faced severe professional and personal consequences, including, for some, lost jobs, reorganized offices, transfer into other departments, and health consequences, such as stress related illnesses. The J20 and J21 Orders exacerbate these harms, compounding a problem that already exists for NADOHE members in some jurisdictions with the more broadly sweeping threat of federal legal consequences for both those individuals and the institutions they serve. When institutions are forced to decide between, on the one hand, risking investigations and potential violations of grant and contract requirements by continuing to employ and support the work of individual diversity officers and, on the other, dropping those programs, the individual diversity officers that are responsible for these programs are caught in the middle.

36.    For example, in Florida and Texas, where diversity offices at public institutions of higher education were outlawed, various NADOHE members initially understood as a result of

**SA28**

guidance from their institutions or university systems that necessary adjustments needed to be made to bring their offices and programs into compliance with the provisions of the legislation, and that there might be changes in titles, or programs and activities; however, they were led to believe that they would remain employed. Despite these initial assurances from institutions in Florida and Texas, I am aware of members in those states who lost their jobs, felt isolated, and suffered repeated attacks to their personal and professional reputations, including vicious and clearly intended attacks to impugn the reputation of highly skilled and educated professionals.

37.     In the case of at least one of our individual members, her photo was included in published stories by anti-diversity activists with what appeared to be the professional headshots of three diversity administrators marked with the word "FIRED" in enlarged red font. In that individual's case, it was not represented to her that the passage of the legislation would result in the elimination of her role and office.

38.     Moreover, these injuries to NADOHE's members raise harms for NADOHE itself. NADOHE's members are the heart of our organization.

39.     In response to the J20 and J21 Orders, NADOHE has reallocated resources away from its planned, mission-driven work to respond to its members' needs concerning the uncertainty created by the J20 and J21 Orders.

40.     Because of the J20 and J21 Orders, I am spending over 50% of my time focused on the J20 and J21 Orders, including responding to media and directing the work of staff to respond to requests for information related to the orders. That work includes quickly developing webinars that address the current events and strategies for our members to respond to the impact on their departments and their institutions overall.  These efforts have required redirecting my

11

**SA29**

time from the day-to-day operations of the association and from supporting planning for NADOHE's usual programmatic work.

41.    Our communications team has been redirected to field media requests, develop talking points, develop FAQs regarding our efforts, and, along with our association management team, monitor our membership data, respond to requests for information, and provide support to our board and members related to the impact of the orders.

42.    But for the J20 and J21 Orders, my time and NADOHE resources would have been spent pursuing our previously planned programmatic goals.

43.    Over the last 16 months, NADOHE has been closely tracking the impact of the "anti-DEI" state legislation on our membership count. Our organization's membership has declined in states where anti-DEI bills have been introduced, passed, or tabled.

44.    Some NADOHE members have stopped attending events and publicly participating in the organization due to the backlash from state-level anti-DEI laws. Other members have decided they could no longer be members of the organization because of their state's anti-DEI legislation and/or the chilling effect of being associated with DEI efforts in those states. Due to the J20 and J21 Orders, and based on conversations with NADOHE members, NADOHE expects that more of our current members will determine they cannot or should not renew their membership or that they cannot or should not attend our conferences and events. I also expect that, due to the J20 and J21 Orders, NADOHE will lose opportunities to recruit prospective members who would otherwise have been interested in joining our association.

45.    NADOHE's annual conference and membership dues are our largest sources of revenue. We have experienced a near total loss of members and revenues from public colleges and universities in Florida and Texas, where anti-DEI legislation has been enacted, and

**SA30**

significant or noticeable losses in other states where such bills have been introduced or tabled, and we do not anticipate growth in membership in those states, particularly among state-funded colleges and universities. We have had to increase our dues and implement an aggressive and strategic membership drive targeting states and institutions for the first time in the existence of the organization to replace this lost revenue.

46.      Due to the J21 Order's vague and ambiguous language regarding both the certification requirement and the potential investigations, NADOHE has had to address questions about the viability of the future of the organization—how do we survive and continue our mission to advocate for inclusive campus communities locally, regionally, and nationally when our members are unsure whether their work is proscribed?  How can our members continue to practice their profession without clarity as to which types of programs and policies will subject their institutions' federal contracts to termination? How do we as an organization highlight exemplars of practice in higher education, now that we have to concern ourselves with how such exemplars may become targets for derision or adverse employment actions? I worry that the J21 Order will cause irreparable harm to our members and our organization, and my worries reflect those that NADOHE's members have also shared with me.

47.      In the wake of the J20 and J21 Orders, I personally have experienced personal insults, verbal attacks, and received threatening communications based on NADOHE's professional mission, with messages similar in tone to the J21 Order's mischaracterization of diversity, equity, and inclusion efforts as "dangerous," "demeaning," "immoral," "corrosive" and "pernicious" pretexts for an "identity-based spoils system" that undermines "traditional American values."  NADOHE members have expressed concerns that they may be similarly

13

**SA31**

targeted for threats and personal attacks. NADOHE has had to hire increased security for its events, as a result.

48.    I understand that the J20 Order directed federal agencies to terminate, to the maximum extent allowable by law, all "'Chief Diversity Officer' positions" and "all DEI....offices and positions" within the federal government. I fear that, in combination, the J20 Order and the J21 Order, if implemented, will result in the elimination of those offices at many higher education institutions and that the J20 and J21 Orders represent an existential threat to the profession of NADOHE's individual members – and therefore to the continued viability and existence of NADOHE itself.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated: February 12, 2025

Paulette Granberry Russell, J.D.

14

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

National Association of Diversity Officers in
Higher Education, et al.,

                    Plaintiffs,

        v.

                                                    Civil Action No. 1:25-cv-333-ABA

Donald J. Trump, in his official capacity as
President of the United States, et al.,

                    Defendants.

---

## DECLARATION OF TODD WOLFSON

I, Todd Wolfson, declare as follows:

### *Background*

1.      I am over eighteen years old, of sound mind, and fully competent to make this

declaration. I also have personal knowledge of the factual statements contained herein.

2.      I have a Ph.D. in Anthropology and Social and Cultural Foundations of Education

from the University of Pennsylvania.

3.      I am the President of the American Association of University Professors

("AAUP"). I was elected to this role in October 2024. I have held various leadership roles in the

Rutgers chapter of AAUP, AAUP-AFT, including as its President and Vice President.

4.      AAUP is a membership association and labor union of faculty and academic

professionals with chapters at colleges and universities throughout the country.

5.    Many AAUP members are employees of institutions of higher learning with endowments exceeding $1 billion.

6.    AAUP is a 501(c)(6) organization headquartered in Washington, D.C.

7.    The mission of AAUP is to advance academic freedom and shared governance, define fundamental professional values and standards for higher education, promote the economic security of academic workers, and ensure higher education's contribution to the common good.

8.    AAUP was founded by John Dewey and other preeminent scholars in 1915 to defend the ability of scholars, researchers, and educators to teach, write, and research without political and economic retaliation based on their viewpoints.

9.    Over one century later, AAUP finds itself revisiting several of the core issues that prompted its founding.

### Diversity, Equity, Inclusion, and Accessibility

10.    AAUP has long advocated for diversity in higher education, including a diverse student body and faculty.

11.    For AAUP, diversity is tied to academic freedom and shared governance, and it believes that broad representation of faculty members—in terms of gender, race, and ethnicity—is essential to fulfill the promise of academic freedom, to deepen existing disciplinary approaches, and to open new disciplinary paths, including the study of inequality and discrimination.

12.    One of AAUP's core beliefs is that diversity results in better knowledge production, which is critical to expanding areas of inquiry and exposing, correcting, and filling gaps in our understanding.

SA35

13.    AAUP's members include several academic professionals whose work focuses on topics related to diversity, including faculty that teach courses focused on specific racial or ethnic identities (e.g., Black studies, Latino studies, Asian studies, etc.), faculty whose teaching focuses on a range of gender or sexual orientation identities, and faculty whose teaching focuses on environmental justice and other subject matter targeted by the President's anti-DEIA executive orders. Furthermore, some AAUP members teach students participating in graduate programs that focus on diversity, equity, and inclusion specifically.

### *Importance of Federal Grants and Contracts*

14.    AAUP's membership includes faculty members whose research focuses on equity-related topics, including many who rely on federal grants to support their work. This is particularly true at medical schools, where AAUP represents a significant number of members who focus on medical and other scientific research related to whether and how race and ethnicity affect health outcomes. For example, Rutgers New Jersey Medical School faculty, including AAUP members, received a National Science Foundation grant to study environmental and cultural influences on substance abuse issues in Black and Latinx Youth.

15.    Likewise, academic professionals who are members of AAUP receive federal grants from agencies across the federal government, including the National Institutes of Health, the National Science Foundation, National Endowment for the Arts, and Department of Health and Human Services, among many others. Many of these grants fund the salaries of medical school faculty, graduate students, and other researchers who focus on health equity. Others focus on the impact of climate change and other environmental risks on diverse communities.

16.    Many of AAUP's members have active federal grants with "equity" in the title, description, request for grant proposals, or other public facing documentation. Still other AAUP

members have active federal grants that address topics related to equity, including diversity, anti-racism, inclusion, accessibility, and belonging. And AAUP members have active federal grants unrelated to diversity, equity, and inclusion, but are separately involved in diversity, equity, and inclusion-related activities outside of the scope of their work pursuant to federal grants.

17.    One NSF grant that several AAUP members receive is the "Historically Black Colleges and Universities – Excellence in Research (HBCU-EiR)" program, which was founded in 2018. This program was founded in response to a report from the Senate Committee on Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies, and prior and continuing efforts by NSF to strengthen research capacity at Historically Black Colleges and Universities.

18.    Another AAUP member won an NSF grant called the "ADVANCE: Organizational Change for Gender Equity in STEM Academic Professions" program, which contributes to the NSF's goal of a more diverse and capable science and engineering workforce. The program's website expresses that when policies do not aim to reduce implicit bias in employment-related decisions in the academy, it both perpetuates underrepresentation of marginalized populations in STEM academia and reduces inclusivity.

***Consequences of President Trump's Executive Order 14151 (Section 2)***

19.    I understand that President Trump's Executive Order 14151 titled, "Ending Radical Government DEI Programs and Preferencing" (the "J20 Order") requires all federal agencies to terminate all "equity-related grants or contracts" to the maximum extent allowable by law within sixty days.

20.    This J20 Order does not define "equity-related grants or contracts," nor does it describe the reasons for eliminating such grants or contracts.

21.     Several AAUP members and/or the institutions for which they work have grants and/or contracts from federal entities, including but not limited to:

a.  Rutgers-New Brunswick

1.  One federal grantee, a professor, supports postdoctoral students and trains them to teach research through the NIH's Institutional Research and Academic Career Development Award (IRACDA). Some IRACDA-funded programs allow the postdoctoral fellows to shadow faculty at schools with underrepresented populations and to teach the students at those schools. The IRACDA website has been disabled. This professor is concerned that they will imminently lose one of their postdoctoral fellows, whose work on female reproductive health is funded by the grant. In short, they will lose both research staff and the funding they bring.

b.  University of Cincinnati

i.  A science professor at the University of Cincinnati has had one NSF grant paused and expects it to be terminated entirely. The grant was for broadening diversity in the STEM workforce via mentoring and provision of professional development opportunities to undergraduate science, technology, engineering, and math (STEM) majors at the University of Cincinnati.

c.  Northern Michigan University (NMU)

SA38

   i. NMU gets funding for the McNair Scholars Program, which provides funding to low-income students from marginalized populations; specifically, the funding helps students pay their rent and get paid research internships. A science professor at NMU mentors these students and helps recipients get paid internships, including by interning for this professor. Without the McNair Scholars Program, this professor risks losing the labor they expected from hiring these students, whom she mentors, as interns.

d. University of Rhode Island

   i. A science professor at the University of Rhode Island states that 70% of their work is based on contracted research. They have received grants that the J21 Order could implicate. For example, the professor is a grantee of NSF BIO LEAPS, a program supporting diversity, equity, and inclusion in the biological sciences. The website has been archived. Specifically, the professor participated in the Inclusive Leadership Program under BIO LEAPS.

   ii. This professor has pending proposals for federal funding, including but not limited to:

      1. Three proposals before the National Oceanic and Atmospheric Administration (NOAA) for research on offshore wind.

      2. Two proposals pending before the NSF program Confronting Hazards, Impacts, and Risks for a Resilient Planet (CHIRRP) on coastal resilience in underrepresented communities.

iii.   This professor received an email from NOAA instructing them to

remove their pronouns from emails.

22.    Many of AAUP's members fear that their federal grants may be terminated

because of the President's J20 Order. Indeed, AAUP members have already been told that they

must cease certain activities that are arguably related to diversity, equity, inclusion, and

accessibility ("DEIA").

23.    Faculty members affiliated with AAUP are concerned about their job security and

ability to provide for their families, as well as that of the graduate students and postgrad fellows

they work closely with because they may have to terminate them because of losses in federal

grant funding.

24.    AAUP is concerned that terminating federal funding for its members will

undermine academic excellence and make academic institutions less inclusive and equitable.

25.    Similarly, for those AAUP members whose teaching or research focuses on topics

related to diversity or equity, they fear that their work—whether teaching or research—might

endanger their own institutions and lead to adverse employment consequences.

### *Consequences of President Trump's Executive Order 14173 (Section 3)*

26.    I also understand that President Trump's Executive Order 14173 titled, "Ending

Illegal Discrimination and Restoring Merit-Based Opportunity," (the "J21 Order") provides that

all federal grant recipients and contractors must "certify that [they] do[] not operate any

programs promoting DEI that violate any applicable Federal anti-discrimination laws," and that

compliance is "material to the government's payment decisions for purposes of" the False

Claims Act ("FCA")."

27.    The J21 Order does not define what it means to "promot[e] DEI" nor does it identify, or describe, which "programs promoting DEI" may violate existing antidiscrimination laws.

28.    AAUP and its members affirmatively promote DEI principles and programs in several ways, all of which they, in good faith, believe to be lawful. However, AAUP and its members remain unclear whether their activities "promot[e] DEI" within the meaning of the J21 Order and whether the J21 Order, nonetheless, would deem those activities unlawful. For example, AAUP appoints standing committees on topics relevant to higher education, including the Committee on Historically Black Institutions and Scholars of Color and the Committee on Gender and Sexuality in the Academic Profession.

29.    Many of AAUP's members receive federal grants to do work that is inextricable from, focuses on, or simply mentions concepts or terms related to diversity, equity, and inclusion.

30.    Many of AAUP's members have degrees, publications, and recognition as experts in areas of study that Executive Order 14173 might implicate. For example, I received the Scholar Activist Award from the National Communications Association's Critical and Cultural Studies Division. That award was based on my research on the digital divide and co-authored "Poverty, Literacy, and Social Transformation: An Interdisciplinary Exploration of the Digital Divide."

31.    Because of the vague language of the J21 Order, AAUP's members fear they may have to limit how they choose to participate in DEIA programs in order to meet the certification requirements and to avoid facing penalties under the FCA or be unable to sign the certification requirement and lose their funding altogether.

9

SA41

*Consequences of President Trump's Executive Order 14173 (Section 4)*

32.    I further understand that the J21 Order requires all agencies to transmit a report within sixty days to the Attorney General and to "identify up to nine potential civil compliance investigations of" certain types of organizations, including "institutions of higher education with endowments over 1 billion dollars" in order to "deter DEI."

33.    None of the key terms in the J21 Order are defined including "DEI," "illegal DEI," "DEI programs or principles," or "illegal discrimination or preferences."

34.    The J21 Order does not define what constitutes compliance or noncompliance.

35.    AAUP and its members remain unsure as to the potential scope of the terms "DEI", "illegal DEI", "DEI programs or principles", or "illegal discrimination or preferences."

36.    The Administration's actions since the issuance of the J21 Order have not provided additional clarity to AAUP and its members; rather, those actions have only heightened anxiety.

37.    On February 5, 2025, Attorney General Pamela Bondi sent a memorandum to all Department of Justice employees detailing the agency's enforcement priorities under Executive Order 14173.

38.    The memorandum requires the Department of Justice's Civil Rights Division and Office of Legal Policy to submit a report by March 1, 2025, to Attorney General Bondi recommending how to enforce Executive Order 14173 against diversity, equity and inclusion measures in the private sector, including but not limited to "proposals for criminal investigations . . ."

39.    The memorandum also states without explanation that "the Department of Justice will work with the Department of Education to issue directions, and the Civil Rights Division will pursue action, regarding the measures and practices required to comply with" *Students for*

*Fair Admissions v. Harvard*. The memorandum does not explain what those "measures and practices" may be.

40.    Several AAUP members work at institutions of higher education with endowments exceeding 1 billion dollars. As discussed above, those AAUP members whose teaching or research focuses on topics related to diversity or equity, fear that their work—whether teaching or research—might endanger their own institutions and lead to adverse employment consequences.

41.    For example, to avoid potentially limitless civil and criminal penalties from this Administration, these large endowment institutions may choose to discipline, terminate, or otherwise silence AAUP members who center the principles of DEIA in their work, or even more broadly in their personal lives.

42.    Moreover, nothing in the J21 Order prevents the Attorney General, the Administration, or members of the public from targeting individual faculty members at these large endowment universities once the target list of purported DEI offenders is made known. The looming March 1, 2025 deadline in the Attorney General's memorandum has only added to the distress that AAUP members are experiencing as a result of the J21 Order.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

Executed on February 12, 2025

By: _Todd Wolfson_
    Todd Wolfson (Feb 12, 2025 11:46 EST)
    _____
    Todd Wolfson

# Wolfson Declaration (AAUP) Signed Adobe

**Final Audit Report**             2025-02-12

| | |
|---|---|
| Created: | 2025-02-12 |
| By: | Alizeh Ahmad (aahmad@advancingjustice-aajc.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAmmGbS-mcm4wDeI7gpIXSi9R0IzFQTliA |

## "Wolfson Declaration (AAUP) Signed Adobe" History

📄 Document created by Alizeh Ahmad (aahmad@advancingjustice-aajc.org)
     2025-02-12 - 3:33:44 PM GMT

📧 Document emailed to wolfsont@gmail.com for signature
     2025-02-12 - 3:35:25 PM GMT

📄 Email viewed by wolfsont@gmail.com
     2025-02-12 - 4:46:02 PM GMT

✏️ Signer wolfsont@gmail.com entered name at signing as Todd Wolfson
     2025-02-12 - 4:46:51 PM GMT

✏️ Document e-signed by Todd Wolfson (wolfsont@gmail.com)
     Signature Date: 2025-02-12 - 4:46:53 PM GMT - Time Source: server

✅ Agreement completed.
     2025-02-12 - 4:46:53 PM GMT



ASIAN AMERICANS ADVANCING JUSTICE AAJC | Powered by Adobe Acrobat Sign

# EXHIBIT 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| National Association of Diversity Officers in Higher Education, et. al., | |
| Plaintiffs, | Civil Action No. 1:25-cv-333-ABA |
| v. | |
| Donald J. Trump, in his official capacity as President of the United States, | |
| Defendant. | |

## <u>DECLARATION OF FAITH LEACH</u>

I, Faith Leach, declare as follows:

### <u>*Background*</u>

1.  I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2.  I am the Chief Administrative Officer of the City of Baltimore. I have served in this role since March 2023.

3.  In my role, I manage the day-to-day government operations across the entire City enterprise, ensuring the effective, efficient, and equitable delivery of City services.

4.  The City of Baltimore is a municipal corporation organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles.

5.  Baltimore is the largest city in Maryland and the thirtieth largest city in the United States.

**SA47**

6. Baltimore is a city of nearly 600,000 people of all backgrounds. According to the 2020 Census, 60 percent of Baltimore's population is Black, 27 percent is White, 8 percent is Hispanic or Latino, and 2.5 percent is Asian. Five percent of the City was identified by the Census as being of two or more races.

### *Baltimore's Commitment to Diversity, Equity, Inclusion, and Accessibility*

7. Baltimore's diversity is its strength, and the City has made significant efforts to embrace people from all backgrounds to strengthen itself economically and socially. Baltimore is committed to building a more equitable city for families to thrive.

8. Mayor Brandon Scott has said from the beginning of his tenure that equity is his guiding principle, imbued into all aspects of the City's work, from investing in the City's Black and Brown neighborhoods and businesses, to governance decisions and ensuring all residents get what they need.

9. As part of its commitment to equity, Baltimore works tirelessly to foster a community that welcomes and serves all residents, regardless of race, ethnicity, gender, sexual orientation, disability, religion, or immigration status.

10. Baltimore has an Office of Equity and Civil Rights ("OECR") devoted to activities to eliminate inequity, inequality, and discrimination. The OECR works to advance equity and uphold federal and local civil rights laws, including by enforcing the local living and prevailing wage laws, ensuring access and equal opportunities for persons with disabilities, and providing oversight of local law enforcement. The OECR's mission is to eliminate inequity, inequality, and discrimination.

11. The OECR consists of the Police Accountability Division, the Community Relations Commission, the Mayor's Commission on Disabilities, the Wage Commission, the

Women's Commission, and the Equity Office.

12. OECR's Equity Office ensures that Baltimore's policies, programs, and budget are fair and meet the needs of Baltimore's diverse communities, in part by offering diversity, equity, and inclusion trainings to City agencies. The Equity Office also administers an Equity Assistance Fund, which supports programs and activities that provide equity in housing and equitable access to education, assists in efforts to redress past inequities in City capital budget spending, and eliminates structural and institutional racism and other forms of discrimination based on immutable characteristics.

13. The Mayor's Commission on Disabilities is also part of OECR. The Commission works to remove barriers and promote equal rights and opportunities for individuals with disabilities by advising the City on accessibility and compliance with the Americans with Disabilities Act, running programs and services for those with disabilities, and helping provide information and education programs for government, business, and industries regarding reasonable accommodations for people with disabilities.

14. Each year, OECR hosts a celebratory Civil Rights Week. The celebration highlights OECR's work over the past year and pays tribute to people who have improved the quality of life in Baltimore over the past year.

15. Last year's Civil Rights Week included programs on "Women of Courage: Baltimore's Civil Rights Trailblazers" that honored the remarkable contributions of female trailblazers in Baltimore's Civil Rights Movement; "Immigration and Inclusion: A History of Struggle and Progress," a Spanish-language program that examined the struggle for and progress towards inclusion for immigrants in various sectors of Baltimore society, including housing, economic development, and healthcare; "From Protest to Progress: The History of the Prince

Hall Free Masons in Baltimore and Beyond," which explored the relationship between Prince

Hall Freemasonry and Historically Black Colleges and Universities, from early struggles to

provide educational opportunities for Black people to the ongoing cultural and economic support

of Masonry to Morgan State, to a reminder of the much-needed work to build a future of

achievement; "Inclusion at Every Stage and Every Age," which gave children with disabilities

and their families and caregivers a day of fun-filled programming; and "From Protest to

Progress: How the Birthplace of Redlining Turned into the Black Butterfly," which discussed the

history of redlining in Baltimore and the attempts by the City to reverse the effects in the

community.

16. Baltimore also runs a "Warm Welcome" program, a free diversity, equity,

inclusion, and accessibility training program for Baltimore businesses that encourages them to

embrace those values through tangible and meaningful actions that support colleagues,

neighbors, and visitors alike. The Warm Welcome program has been recognized in national

tourism publications and by countless visitors that have felt the impact from the participation of

over one hundred businesses.

### *Baltimore's Federal Contract and Grants*

17. Baltimore is both a federal government contractor and grantee. Federal funding is

crucial to serving Baltimore's residents in countless ways. This funding helps support a range of

Baltimore's services and programs, including public safety, housing, the environment, the local

economy, infrastructure, and accessibility for its citizens with disabilities. At the most

fundamental level, federal funds help provide Baltimore residents with food, infrastructure,

energy, and weather resilience.

18. All told, Baltimore currently receives around $270 million in active federal

grants, which includes funding for programs covered under the Justice40 Initiative intended to benefit disadvantaged communities. The Justice40-covered programs, which spanned across the government, were developed, in part, pursuant to Executive Order 14008, which President Trump rescinded on January 20, 2025, by Executive Order 14148. By design, many of the Justice40-covered grants provide targeted support for historically underserved groups. Many of Baltimore's Justice40-covered grants necessarily touch on themes of equity and inclusion.

19. Baltimore receives $500,000 from the Department Energy's Weatherization Assistance Program to improve energy efficiency in Baltimore homes. The Secretary of Energy is authorized to administer this grant program "for the purpose of providing financial assistance with regard to projects designed to provide for the weatherization of dwelling units, particularly those where elderly or handicapped low-income persons reside, occupied by low-income families." 42 U.S.C. § 6863(a).

20. Similarly, Baltimore has received at least $850,000 for its Y-SURGE project through the Department of Health and Human Services' Family Planning Service Delivery Improvement Research Grant program. Y-SURGE provides funding for youth (age 15-24) clinical services and addresses the special needs of lesbian, gay, bisexual, transgender, queer (or questioning), intersex, asexual, and disconnected youth. The project aims to increase these young people's use of services and decrease disparities of rates of teen birth, STI, and HIV across race, ethnicity, and sexual orientation.

21. Baltimore also receives funding through the CDC's Public Health Infrastructure Grant program, which aims to ensure state and local health departments have the resources to deliver basic services by supporting critical public health infrastructure needs. The Baltimore City Health Department uses PHIG funding to support its DEI Coordinator position. The DEI

Coordinator is an integral part of the BCHD's Equity Strategy. Because of the history of inequity across healthcare, BHCD considers addressing those disparities to be a core public health infrastructure need. As part of her role, the DEI Coordinator provides a range of equity-related services to the organization, including co-leading the Equity Committee, creating training material, and hosting feedback sessions for LGBT staff.

22. Without the BCHD's DEI Coordinator, the department, in the short term, would have to eliminate 12 upcoming staff trainings as well as equity content for all staff members and in-house guidance on LGBT-related concerns and the community. These trainings are critical, in the long term, to ensuring that agency staff are able to appropriately address the history of mistreatment of marginalized groups in the healthcare system and treat those that the Department serves with dignity and respect.

***Consequences of President Trump's Executive Order 14151 (Section 2)***

23. I understand that, on January 20, 2025, President Trump signed an executive order titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "J20 Order").

24. The J20 Order directs federal executive branch officials to "[a]s appropriate" to "terminate, to the maximum extent allowed by law . . . 'equity-related' grants or contracts" within sixty days of the order. The term "equity-related" is not defined in the J20 Order.

25. Baltimore has received federal grants that could be considered "equity-related."

26. For example, the Weatherization Assistance Program grant that Baltimore receives is intended to provide equitable access to weatherization for low-income elderly people or people with disabilities and their families.

27. And Baltimore's federally funded Y-SURGE project is intended to increase

equitable access to clinical services for young people and decrease health disparities across race, ethnicity, and sexual orientation.

28. Through Baltimore's PHIG funding, the BCHD maintains a DEI Coordinator, who works with BCHD staff to ensure constituents are treated with appropriate dignity and respect.

29. These are just a few examples of federal grants that Baltimore receives which could be considered "equity-related."

30. Baltimore, accountable for a wide range of services supported by federal funding that could be considered "equity-related," faces a quandary. The uncertainty of federal funding leaves the City wondering whether it needs to start reallocating resources—and likely reduce support for other programs or shutter some altogether—just to sustain certain critical municipal functions.

### Consequences of President Trump's Executive Order 14173 (Section 3)

31. I understand that, on January 21, 2025, President Trump signed an executive order titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "J21 Order").

32. The J21 Order requires federal contractors and grantees to "certify that they do not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Section 3(b)(iv)(B) (the "Certification Requirement"). And another section suggests that Baltimore and other federal grantees may face civil enforcement and penalties under the False Claims Act. Section 3(b)(iv)(A).

33. The J21 Order does not define what "programs promoting DEI" are or why such programs might violate anti-discrimination laws.

34. The J21 Order does not otherwise clarify which DEI or DEIA practices, programs, or services are prohibited.

35. Because the Certification Requirement does not explain which "programs promoting DEI" President Trump purports to prohibit, Baltimore fears it may have to abandon its lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds that support the City's valuable programs.

36. As a result, Baltimore doesn't know whether, to continue receiving federal funding, it must refrain from expressing its values or offering crucial services to its residents and visitors alike.

37. For example, many of the events and panels from last year's Civil Rights Week celebration touched on topics related to diversity, equity, inclusion, and accessibility. Baltimore is uncertain whether, to comply with the Certification Provision, it would have to refrain from hosting such panels in the future, or perhaps even cancel Civil Rights Week altogether.

38. Similarly, Baltimore does not know whether it can continue its nationally recognized Warm Welcome program because it encourages local business to commit to embracing diversity, equity, and inclusion. Eliminating that program would threaten to make Baltimore less welcoming for those visiting the Charm City.

39. Baltimore is also uncertain whether, to comply with the Certification Provision, it would have to shutter other programs central to the City's values through which it expresses its commitment to diversity, equity, inclusion, and accessibility. For instance, the City does not know whether it must shut down the OECR Mayor's Commission on Disabilities, the OECR Equity Office's Equity Assistance Fund, the OECR Equity Office itself, and/or the OECR altogether.

40. Several of Baltimore's programs offer trainings to help City agencies, local business, and other citizens learn how they can best advance equity. Yet because of the lack of guidance in the J21 Order, Baltimore fears it may lose federal funding for speaking its values through these trainings.

41. And the City suffers further chilling of its speech and expression because the Certification Requirement includes no timetable for its implementation. Baltimore cannot know whether the agencies overseeing its grant programs will insert the required certifications into active grants that Baltimore has already been awarded.

42. The City *wants* to continue operating these programs and hosting these events, but doing so could present an existential threat under the J20 and J21 Orders: loss of all federal grants and contracts or even criminal investigation and prosecution.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed:        February 12, 2025

By: _____
        Faith Leach
        Chief Administrative Officer
        City of Baltimore

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| National Association of Diversity Officers in Higher Education, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:25-cv-333-ABA |
| Donald J. Trump, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**<u>SUPPLEMENTAL DECLARATION OF TODD WOLFSON</u>**

I, Todd Wolfson, declare as follows:

1.  I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2.  As a correction to my February 12, 2025, declaration, I have been the President of the American Association of University Professors ("AAUP") since June 2024, not October 2024, and have previously held various leadership roles in the Rutgers chapter of AAUP, AAUP-AFT, including as its President and Vice President.

3.  As I explained in my February 12, 2025, declaration, AAUP members have continued to experience harms flowing from the challenged executive orders, *Ending Radical and*

**SA56**

*Wasteful Government DEI Programs and Preferencing* (January 20, 2025) and *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (January 21, 2025).

4.  For example, one AAUP member is a professor at a university in Virginia with a National Science Foundation ADVANCE: Organizational Change for Gender Equity in STEM Academic Professions (NSF ADVANCE) grant to research potential disparities affecting women in science. After requesting accommodations for traveling to a conference as part of their grant work, the professor received an email on February 6, 2025, from their Program Officer with NSF notifying them that the NSF employee "cannot make the determination" regarding the travel until it is determined that "the activity is aligned with the administration's executive orders . . . ." The e-mail referred the professor to the NSF guidance, available online at https://new.nsf.gov/executive-orders, which was issued to implement recent executive orders, including the Orders at issue here.

5. The e-mail also quoted the NSF guidance, which provided, in part: "[A]ll NSF grantees must comply with these executive orders, and any other relevant executive orders issued, by ceasing all non-compliant grant and award activities . . . . [i]n particular, this may include, but is not limited to conferences, trainings, workshops, considerations for staffing and participant selection, and any other grant activity that uses or promotes the use of diversity, equity, inclusion and accessibility (DEIA) principles and frameworks or violates federal anti-discrimination laws." Because the professor was told NSF cannot approve their travel request, because of uncertainty about their grant, this AAUP member's travel and other grant-related activities that an enforcing entity could deem "non-compliant grant and award activities" are frozen indefinitely.

6. On February 18, 2025, I became aware of a stop work order issued to another AAUP member, which explicitly identified the Orders at issue here as the basis for decision. That

**SA57**

member is a professor at the University of Texas at Austin. This member informed me that, on January 29, 2025, the university's Office of Sponsored Projects received an e-mail "stop work order" about a subaward from the National Academy of Sciences (NAS). The member's project, which focused on equity of access to crucial services and goods, was funded by a National Academy of Sciences (NAS) grant that uses federal funds from the Department of Transportation. The letter states: "The National Academy of Sciences (NAS) is hereby issuing University of Texas at Austin this notice of Termination for Convenience effective as of the date of this letter for all work associated with the above referenced Subaward. This action is not a judgment of your work performance under the Subaward. However, NAS has determined to take certain actions with respect to federally funded contracts following the issuance of the Executive Order on *Ending Radical and Wasteful Government DEI Programs and Preferencing* (January 20, 2025) and *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (January 21, 2025)." The letter states that "[s]ubawardee is directed to immediately stop all work being performed under the referenced Subaward and must inform all lower-tier subcontractors that they too must stop all work and refrain from incurring any costs beyond the date of this letter."

7. On February 18, 2025, I became aware of an email sent to an AAUP member who is a professor at the University of Connecticut. The member works on a project to broaden diversity in the Science Technology Engineering and Mathematics (STEM) workforce. This project is conducted in partnership with Auburn University and is funded by NSF ADVANCE. On January 31, 2025, this member received an email from the Principal Investigator—the faculty member in charge—of that project "to pause project activities until we receive further guidance from NSF and Auburn."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

Executed on February 18, 2025

By: _Todd Wolfson_____
    Todd Wolfson (Feb 18, 2025 23:07 EST)
    _____
    Todd Wolfson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

National Association of Diversity Officers in
Higher Education, et. al.,

        Plaintiffs,

    v.

Donald J. Trump, in his official capacity as
President of the United States,

        Defendant.

Civil Action No. 1:25-cv-333-ABA

## SUPPLEMENTAL DECLARATION OF PRESIDENT AND CHIEF EXECUTIVE OFFICER OF THE NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION

I, Paulette Granberry Russell, hereby attest:

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2. As I explained in my February 12, 2025, declaration (Doc. 27-23), I am the current President and Chief Executive Officer of the National Association of Diversity Officers in Higher Education ("NADOHE"), the nation's leading association for chief diversity officers and professionals in postsecondary education.

3. As I previously discussed in my February 12 declaration, NADOHE, its institutional members, and its individual members have already suffered significant harms from the J20 and J21 Orders.

4. For instance, Institutional Member A, described in ¶ 22 of my February 12 declaration, cancelled its conference after learning that the Department of Labor had issued a

**SA60**

"stop work" instruction for the grant that would pay for the conference based on the Orders. Institutional Member A, which received a sub-award under a larger grant, was told by the primary grantee that DOL had provided that instruction and directed to stop all work under the award and cancel the conference.

5.    In the week since my declaration, additional harms have come to light.

6.    For example, Individual Member A, described in ¶ 33 of my February 12 declaration, lost her salary and any discretionary funds when all of her contracts "c[a]me to an abrupt halt and contracting for future work . . . evaporated." Those contracts were primarily funded directly or indirectly by the National Science Foundation. As a result, Individual Member A lost her ability to participate in professional conferences and was unable to cover the cost of her participation in NADOHE's annual conference. NADOHE covered Individual Member A's registration for our annual conference.

7.    In addition, a number of registered participants have had to cancel their attendance at our annual conference as a result of the Executive Orders. Consistent with our policy, NADOHE has refunded nearly $7,500 in registration fees that those participants had already paid.

8.    NADOHE relies on revenue from our annual conference, membership dues, professional development, and our peer reviewed journal to maintain the organization. If Individual Member A and others like her are unable to attend or pay the annual conference fees, NADOHE will not be able to survive. Similarly, these registration refunds, combined with the increasing difficulty of holding the annual conference that focuses on diversity, equity, and inclusion in higher education, and retaining our membership, decrease our revenue. Cumulatively, these direct impacts of the Executive Orders harm NADOHE's ability to sustain

itself.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed:        February 18, 2025

By: _Paulette Mabry Russell_
Paulette Granberry Russell
President and Chief Executive Officer
NADOHE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| National Association of Diversity Officers in Higher Education, et. al., | Civil Action No. 1:25-cv-333-ABA |
| Plaintiffs, | |
| v. | |
| Donald J. Trump, in his official capacity as President of the United States, | |
| Defendant. | |

**DECLARATION OF FAITH LEACH**

I, Faith Leach, declare as follows:

1.  I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2.  As I explained in my February 12, 2025 declaration in this case (ECF No. 27-26), I am the Chief Administrative Officer of the City of Baltimore, which is both a federal government contractor and grantee.

3.  Since my February 12 declaration, Baltimore has suffered additional harms directly tied to the J20 and J21 Orders.

4.  For example, around 11:45 ET on February 14, 2025, Baltimore received emails from AmeriCorps informing us that three of our AmeriCorps grants had been flagged for review based on the Executive Orders.

5.  AmeriCorps is a federal agency that is intended to provide opportunities for Americans of all backgrounds to serve their country, address the most pressing challenges, and

**SA63**

improve lives and communities. To accomplish its mission, AmeriCorps administers a number of service programs including its Seniors program, its VISTA program, its National Civilian Community Corps, and more. AmeriCorps also provides grants to local and national organizations and agencies to carry out this work.

6.    With respect to Grant Number 24SCBMD002—intended to support 50 AmeriCorps Seniors volunteers who provide supportive services to home-bound seniors in Baltimore—our grant was flagged because the "strengthening communities narrative" section of our application included the terms "Diversity," "Equity," "Equity Action Plan," and "DEI."

7.    With respect to Grant Number 24SRBMD004—intended to support 200 AmeriCorps Seniors volunteers who participate in outreach services, distribution of community information, programs and services, and distribution of food in Baltimore communities—our grant was flagged because the "strengthening communities narrative" section of our application included the terms "Diversity," "Equity," and "Equity Action Plan," and the "other narrative" section included the term "DEI."

8.    With respect to Grant Number 18VSAMD002—intended to support the Baltimore City Department of Public Work's AmeriCorps VISTA program—our grant was flagged because several different narrative sections used the term "Environmental Justice," one section included the term "Climate Change," and sections about the "Baltimore DPW Education and Volunteerism VISTA" and the "DPW Education and Volunteerism VISTA," implicated "Diversity, Equity," and "DEI."

9.    According to AmeriCorps, the flagged language raised questions about whether Baltimore's program "is using Federal funds to promote or provide services out of compliance of the recent Executive Orders."

10. The letters instruct Baltimore to assess whether these three awards are compliant with executive orders by February 19, 2025.

11. According to the letters, Baltimore must take one of three courses of action before the February 19 deadline for each award: (1) Certify that the awards, using proscribed language, "compl[y] with all administration Executive Orders and do[] not include any activities that promote DEI activities"; (2) Stop providing noncompliant services by February 19, 2025; or (3) Forgo this AmeriCorps funding altogether.

12. The AmeriCorps letters only heighten Baltimore's fear and uncertainty about whether the City must censor and chill its own expression in order to continue relying on the federal funding to carry out critical municipal responsibilities. And the agency's lack of guidance for how to interpret the vague Executive Orders leaves the City guessing at how we can ensure we comply if we decide to censor ourselves in the first place.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed:        February 18, 2025

By: _Faith P. L_____

Faith Leach
Chief Administrative Officer
City of Baltimore

*Democracy Dies in Darkness*

# Here are the words putting science in the crosshairs of Trump's orders

National Science Foundation staff have been combing through thousands of active science research projects, alongside a list of keywords, to determine if they include activities that violate Trump's executive orders.

February 4, 2025

🎧 5 min　　↷　　🔖　　💬 548

By Carolyn Y. Johnson, Scott Dance and Joel Achenbach

"Women." "Diverse." "Institutional." "Historically."

At the National Science Foundation, staff have been combing through thousands of active science research projects, alongside a list of keywords, to determine if they include activities that violate executive orders President Donald Trump issued in his first week in office. Those include orders to recognize only two genders and roll back diversity, equity and inclusion initiatives. The search is driven by dozens of flagged words, according to an internal document reviewed by The Washington Post and two NSF employees with knowledge of the review process who spoke on the condition of anonymity because they were not authorized to speak.

The words triggering NSF reviews provide a picture of the sievelike net being cast over the typically politically independent scientific enterprise, including words like "trauma," "barriers," "equity" and "excluded."

**A sampling of keywords drawing scrutiny to science at NSF include:**

Advocacy

Antiracist

Barrier

Biases

Cultural relevance

Disability

Diverse backgrounds

**SA66**



Scientists who receive NSF funding were already put on notice last week to cease any activities that do not comply with the executive orders. "In particular, this may include, but is not limited to conferences, trainings, workshops, considerations for staffing and participant selection, and any other grant activity that uses or promotes the use of diversity, equity, inclusion and accessibility (DEIA) principles and frameworks or violates federal anti-discrimination laws," a message to investigators said.

Previously published health documents have been expunged from public-facing websites in the wake of a Jan. 29 memo from Charles Ezell, acting director of the Office of Personnel Management, that was sent to all agency leaders. The memo instructed agency forms to record only an individual's sex and not gender identity. It also called for websites and social media to be scrubbed of content that "inculcate or promote gender ideology," among other requirements.

In the wake of the memo, some published reports were removed from the Patient Safety Network website, an online resource produced by the Agency for Healthcare Research and Quality (AHRQ). In one instance, a case study of a patient with endometriosis was taken down because the final paragraph said "it is important to note that endometriosis can occur in trans and non-gender-conforming people and lack of understanding this fact could make diagnosis in these populations even more challenging," said Patrick Romano, a physician at the University of California at Davis and co-editor in chief of PSNet.

At the Centers for Disease Control and Prevention, staff were given a list of about 20 terms to guide decisions to remove or edit content on the website. Those words include: gender, transgender, pregnant person, pregnant people, LGBT, transsexual, nonbinary, assigned male at birth, biologically male, biologically female, he/she/they/them.

The White House did not immediately respond to a request for comment on the NSF's review. According to an internal document and people familiar with the review process, NSF staff must analyze the keywords within grants and determine whether they are in violation of an executive order, providing a justification if they determine they are not. For example, the word "accessibility" would be flagged if it is used in the context of DEI, but is not if it is about data accessibility, the document explains. An internal email sent as an update clarifies some "edge cases," including that the socioeconomic status of individuals is "implicated" in the executive order, but rural communities are part of geographic diversity and are not.

The NSF is a $9 billion agency that funds scientific research across the globe, including research stations in Antarctica and astronomy observatories. Grants also fund research into quantum technologies, biology and earthquake risk, and support training young scientists. NSF grants are awarded to projects that advance scientific discovery and have intellectual merit, but they are also required to have "broader impacts" on society. Those impacts encompass an array of goals, and many of them overlap with DEI, include broadening participation in science among underrepresented groups of people.

According to a series of communications, NSF grants that are flagged for "further action" because they don't comply with the executive orders could be subject to a range of additional steps, including modification to be in compliance or being terminated in part or whole. A foundation spokesperson said they did not "have anything else to add beyond what is available on our website," when asked about the process.

Morteza Dehghani, a professor of psychology and computer science at the University of Southern California, said he learned of the keyword screenings from a colleague at the NSF, who shared the list with him along with a flowchart used to evaluate whether a research project should be flagged for further review. Dehghani said he finds the keyword screenings to be antithetical to the established process for reviewing scientific endeavors.

He is among a cadre of scientists who volunteer to serve on panels that assess the merits and rigor of research proposals to help determine if they are worthy of NSF grant funding. That peer-review process is considered to be fundamental to scientific integrity: For example, panel members cannot review funding proposals from colleagues or anyone with whom they share a personal connection. He called the process "among the biggest cultural products of essentially our time."

Dehghani called the keyword-based vetting "unprecedented within the history of the NSF."

*Lena H. Sun contributed to this report.*



FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, DC 20554

Brendan Carr
Chairman

February 11, 2025

Mr. Brian Roberts
CEO
Comcast Corporation
1701 John F. Kennedy Boulevard
Philadelphia, PA 19103

**RE: Comcast and NBCUniversal's Promotion of DEI**

Dear Mr. Roberts,

I am writing to inform you that I have asked the FCC's Enforcement Bureau to open an investigation into Comcast and NBCUniversal. In particular, I want to ensure that your companies are not promoting invidious forms of discrimination in violation of FCC regulations and civil rights laws.

As you know, the Communications Act and Commission rules prohibit regulated entities—like Comcast and NBCUniversal—from discriminating on the basis of race, color, religion, national origin, age, or gender.[1] Indeed, the FCC's longstanding Equal Employment Opportunity or EEO rules set forth specific requirements that both Comcast and NBCUniversal must adhere to.

Nonetheless, I am concerned that Comcast and NBCUniversal may be promoting invidious forms of DEI in a manner that does not comply with FCC regulations. For instance, Comcast states on its website that promoting DEI is "a core value of our business" and public reports state that Comcast has an entire "DEI infrastructure" that includes annual "DEI day[s]," "DEI training for company leaders," and similar initiatives. NBCUniversal has similar DEI initiatives, including executives specifically dedicated to promoting DEI across the TV and programming side of the business.

But promoting invidious forms of discrimination cannot be squared with any reasonable interpretation of federal law. It can only deprive Americans of their rights to fair and equal treatment under the law.

Despite the emergence of DEI initiatives in recent years, these forms of discrimination have long been condemned by America's civil rights laws. Indeed, the Supreme Court has stated that "'[d]istinctions between citizens solely because of their ancestry are by their very nature odious

---

[1] *See, e.g.*, 47 U.S.C. § 151; *see also* 47 CFR §§ 25.601, 90.168, 73.2080(a), 76.73.

**SA69**

to a free people whose institutions are founded upon the doctrine of equality.'"[2]  Likewise, the Supreme Court has written that racial classifications "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility."[3]  For this reason, the Supreme Court has stated that, in the government context, "action based on race—a group classification long recognized as in most circumstances irrelevant and therefore prohibited—should be subjected to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed."[4]

President Trump took quick and decisive action to root out the scourge of DEI.  In his first week in office, President Trump issued an Executive Order that will end the radical and wasteful DEI programs that have spread across the federal government.[5]  Likewise, President Trump issued an Executive Order to end illegal discrimination and restore merit-based opportunity across the private sector.[6]  In that latter Executive Order, President Trump wrote that illegal DEI policies "undermine our national unity, as they deny, discredit, and undermine the traditional American values of hard work, excellence, and individual achievement in favor of an unlawful, corrosive, and pernicious identity-based spoils system."  President Trump's Executive Order also tasked federal agencies with combatting illegal private-sector DEI preferences, mandates, policies, programs, and activities.

At my direction, the FCC has already taken action to end its own promotion of DEI.[7]  As a next step, the FCC will be taking fresh action to ensure that every entity the FCC regulates complies with the civil rights protections enshrined in the Communications Act and the agency's EEO rules, including by shutting down any programs that promote invidious forms of DEI discrimination.

I am starting this broader effort with Comcast and NBCUniversal for two reasons.  First, as noted above, there is substantial evidence that your companies are still engaging in the promotion of DEI.  Second, your companies cover a range of sectors regulated by the FCC—from cable to high-speed Internet and from broadcast TV stations to MVNO wireless offerings.  Therefore, I expect that this investigation into Comcast and its NBCUniversal operations will aid the Commission's broader efforts to root out invidious forms of DEI discrimination across all of the sectors the FCC regulates.

---

[2] *Rice v. Cayetano*, 528 U.S. 495, 517 (2000) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023).

[3] *Shaw v. Reno*, 509 U.S. 630, 643 (1993).

[4] *Adarand Constructors Inc. v. Pena*, 515 U.S. 200, 227 (1995) (cleaned up).

[5] Executive Order on Ending Radical and Wasteful Government DEI Programs and Preferencing (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-and-wasteful-government-dei-programs-and-preferencing/.

[6] Executive Order on Ending Illegal Discrimination and Restoring Merit-Based Opportunity (Jan 21, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/ending-illegal-discrimination-and-restoring-merit-based-opportunity/.

[7] *See, e.g.*, Statement of FCC Chairman Carr, *Chairman Carr Ends FCC's Promotion of DEI* (Jan. 21, 2025), https://docs.fcc.gov/public/attachments/DOC-409054A1.pdf.

As Chairman of the FCC, it is important to me that the entities the Commission regulates fully adhere to the FCC's rules and regulations.  In order to aid the FCC's investigation into these matters, please provide the FCC's Enforcement Bureau with an accounting of Comcast's and NBCUniversal's DEI initiatives, preferences, mandates, policies, programs, and activities—including DEI activities that are ongoing but may be operating today under different labels.  The FCC's Enforcement Bureau will be following up with more specifics.

Thank you in advance for your cooperation and attention to these important matters.

Sincerely,

Brendan Carr



Menu

# Legal Requirements and Assurance of Compliance

## Legal Requirements

**NOTE: This list highlights some of the significant legal requirements that may apply to an applicant or recipient; however, it is not exhaustive. More information regarding these and other legal requirements may be found at Appendix A of the** General Terms & Conditions </node/45296>**, which set forth the National Policy and Other Legal Requirements, Statutes, Regulations, and Executive Orders that Govern Your Award. There may be other applicable legal requirements that are not listed in this document. It is ultimately your responsibility to ensure that you are compliant with all legal, regulatory, and policy requirements applicable to your award.**

**SA72**

USCA4 Appeal: 25-1189     Doc: 46     Filed: 05/08/2025     Pg: 76 of 103

2/17/25, 8:04 PM                    Legal Requirements and Assurance of Compliance | National Endowment for the Arts
                      Case 1:25-cv-00333-ABA     Document 39-8     Filed 02/19/25     Page 2 of 14

1. By law, the National Endowment for the Arts may support only those organizations:

- **That are tax-exempt**. Organizations qualifying for this status must meet the following criteria:

  1. No part of net earnings may benefit a private stockholder or individual.
  2. Donations to the organization must be allowable as a charitable contribution under Section 170(c) of the Internal Revenue Code of 1954, as amended.

  For further information, go to the Internal Revenue Service's (IRS) website <http://www.irs.gov>.

- Who have not had their IRS status revoked. It is your responsibility to ensure that your status is current at the time of the application and throughout the life of your award.

- **That compensate all professional performers and related or supporting professional personnel on National Endowment for the Arts-supported projects at no less than the prevailing minimum compensation**. (This requirement is in accordance with regulations that have been issued by the Secretary of Labor in 29 CFR Part 505 <http://www.gpo.gov/fdsys/pkg/cfr-1998-title29-vol3/pdf/cfr-1998-title29-vol3-chap-id2.pdf>. This part does not provide information on specific compensation levels.)

**SA73**

- **That ensure that no part of any National Endowment for the Arts-supported project will be performed under or engaged in working conditions which are unsanitary, hazardous, or dangerous to the health and safety of the employees involved.**

USCA4 Appeal: 25-1189    Doc: 46    Filed: 05/08/2025    Pg: 78 of 103

2/17/25, 8:04 PM                     Legal Requirements and Assurance of Compliance | National Endowment for the Arts
          Case 1:25-cv-00333-ABA     Document 39-8     Filed 02/19/25     Page 4 of 14

2. **Some legal requirements apply to every applicant. For example:**

- **Compliance with the federal requirements** that are outlined in the Assurance of Compliance below

- **Debarment and Suspension procedures**. The applicant must comply with requirements set forth in Subpart C of 2 CFR 180, as adopted by the National Endowment for the Arts in 2 CFR Part 3254. Failure to comply may result in the debarment or suspension of the recipient, and the National Endowment for the Arts suspending, terminating, and/or recovering the funds. More information on Debarment and Suspension procedures can be found in the GTCs.

- **Federal Debt Status** (OMB Circular A-129

  <https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/circulars/a129/a-129.pdf>). Processing of applications will be suspended when applicants are delinquent on federal tax or non-tax debts, including judgment liens against property for a debt to the federal government. An organization's debt status is displayed in the System for Award Management (SAM). New awards will not be made if an applicant is still in debt status as of September 1 of the fiscal year listed on this funding opportunity.

**SA75**

- **Labor Standards** (29 CFR Part 505

  <https://www.govinfo.gov/app/details/cfr-2023-title29-vol3/cfr-2023-title29-vol3-part505>). Recipients must comply with the standards set out in Labor Standards on Projects or Productions Assisted by Grants from the National Endowments for the Arts.

- The Drug-Free Workplace Act of 1988

  <https://www.govinfo.gov/content/pkg/uscode-2020-title41/html/uscode-2020-title41-subtitleiv-chap81-sec8103.htm> (41 U.S.C. 8101 et seq. and 2 CFR Part 3256). The recipient is required to publish a statement regarding its drug-free workplace program as well as to comply with other requirements.

3. **Some legal requirements apply depending upon what activity the award is funding. For example:**

- If your project activities have the potential to impact any structure that is eligible for or on the National Register of Historic Places, adjacent to a structure that is eligible for or on the National Register of Historic Places, or located in an historic district, you will be asked to provide additional information about your project or take additional action so that the agency can review and comply with the National Historic Preservation Act <https://www.achp.gov/protecting-historic-properties> (NHPA). NHPA also applies to any planning activities that may affect historic properties or districts. The additional agency review must be completed prior to any agency funds being released.

- If your project activities have the potential to impact the environment or environmentally sensitive resources, you will be required to provide information in accordance with the National Environmental Policy Act <https://www.epa.gov/laws-regulations/summary-national-environmental-policy-act> (NEPA). The additional agency review must be completed prior to any agency funds being released.

**SA77**

- If your project activities include any contract over $2,000 involving the construction, alteration, or repair of public buildings or public works, the contract must contain a clause setting forth the minimum wages to be paid to laborers and mechanics employed under the contract in accordance with The Davis-Bacon and Related Acts (DBRA). More information on DBRA can be found in the GTCs </node/45296> under the "Other National Policies" heading.

- Projects or programs that are determined to be obscene are without artistic merit and shall not be funded. 20 USC 952(j)-(l); 20 USC 954(d),(l).

4. **Some legal requirements apply depending upon who the applicant is. For example:**

- The Native American Graves Protection and Repatriation Act of 1990 (25 U.S.C. 3001 et seq.) applies to any organization that controls or possesses Native American cultural items, such as human remains or associated funerary objects and receives Federal funding, even for a purpose unrelated to the Act.

**SA78**

5. **In addition, State Arts Agencies must meet the requirements in Section 954(g)(2) of the National Endowment for the Arts' authorizing legislation, which state:**

"In order to receive assistance under this subsection in any fiscal year, a State shall submit an application for such grants at such time as shall be specified by the Chairperson and accompany such applications with a plan which the Chairperson finds—

(A) designates or provides for the establishment of a State agency (hereinafter in this section referred to as the "State agency") as the sole agency for the administration of the State plan;

(B) provides that funds paid to the State under this subsection will be expended solely on projects and productions approved by the State agency which carry out one or more of the objectives of subsection (c);

(C) provides that the State agency will make such reports, in such form and containing such information, as the Chairperson may from time to time require, including a description of the progress made toward achieving the goals of the State plan;

(D) provides—

i. assurances that the State agency has held, after reasonable notice, public meetings in the State to allow all groups of artists, interested organizations, and the public to present views and make recommendations regarding the State plan; and

**SA79**

ii. a summary of such recommendations and the State agency's response to such recommendations; and

(E) contains--

i. a description of the level of participation during the most recent preceding year for which information is available by artists, artists' organizations, and arts organizations in projects and productions for which financial assistance is provided under this subsection;

ii. for the most recent preceding year for which information is available, a description of the extent projects and productions receiving financial assistance from the State arts agency are available to all people and communities in the State; and

iii. a description of projects and productions receiving financial assistance under this subsection that exist or are being developed to secure wider participation of artists, artists' organizations, and arts organizations identified under clause (i) of this subparagraph or that address the availability of the arts to all people or communities identified under clause (ii) of this subparagraph.

No application may be approved unless the accompanying plan satisfies the requirements specified in this subsection."

**SA80**

USCA4 Appeal: 25-1189    Doc: 46    Filed: 05/08/2025    Pg: 84 of 103

2/17/25, 8:04 PM                     Legal Requirements and Assurance of Compliance | National Endowment for the Arts
Case 1:25-cv-00333-ABA    Document 39-8    Filed 02/19/25    Page 10 of 14

# Assurance of Compliance

**By signing and submitting its application form on Grants.gov, the applicant certifies that it is in compliance with the statutes outlined below and all related National Endowment for the Arts regulations as well as all applicable executive orders, and that it will maintain records and submit the reports that are necessary to determine its compliance**.

We may conduct a review of your organization to ensure that the applicant is in compliance with these statutes, regulations, and executive orders. If the NEA determines that a recipient has failed to comply with any of these statutes, regulations, or executive orders, it may suspend or terminate the award, and/or recover the funds. The applicant's assurance of compliance is subject to judicial enforcement.

The applicant certifies that it does not discriminate:

- On the grounds of race, color, or national origin, in accordance with **Title VI of the Civil Rights Act of 1964**, as amended (42 U.S.C. 2000d et seq.), implemented by the National Endowment for the Arts at 45 CFR 1110.

- Solely on the grounds of disability, in accordance with **Section 504 of the Rehabilitation Act of 1973** (29 U.S.C. 794), as amended, implemented by the National Endowment for the Arts at 45 CFR 1151, and the **Americans with Disabilities Act of 1990** ("ADA"), as amended, (42 U.S.C. 12101 et seq.).

**SA81**

- On the basis of age, in accordance with the **Age Discrimination Act of 1975,** as amended (42 U.S.C. 6101 et seq.), implemented by the National Endowment for the Arts at 45 CFR 1156.

- On the basis of sex, in any education program or activity, in accordance with **Title IX of the Education Amendments of 1972,** as amended (20 U.S.C. 1681 et seq.).

In addition, the applicant agrees that, if the applicant is selected and becomes a NEA grant recipient:

- The applicant will comply with all applicable Executive Orders while the award is being administered.  Executive orders are posted at whitehouse.gov/presidential-actions.

- The applicant's compliance in all respects with all applicable Federal anti-discrimination laws is material to the U.S. Government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code, pursuant to Executive Order No. 14173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, dated January 21, 2025.

- The applicant will not operate any programs promoting "diversity, equity, and inclusion" (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with Executive Order No. 14173.

- The applicant understands that federal funds shall not be used to promote gender ideology, pursuant to Executive Order No. 14168, Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government.

**SA82**

USCA4 Appeal: 25-1189     Doc: 46     Filed: 05/08/2025     Pg: 86 of 103

2/17/25, 8:04 PM                    Legal Requirements and Assurance of Compliance | National Endowment for the Arts
Case 1:25-cv-00333-ABA     Document 39-8     Filed 02/19/25     Page 12 of 14

The applicant will inform the public that persons who believe they have been discriminated against on the basis of race, color, national origin, disability, sex, or age may file a complaint with the Director of Civil Rights at the National Endowment for the Arts.

The applicant will forward all complaints for investigation and any finding issued by a Federal or state court or by a Federal or state administrative agency to:

Director, NEA Office of Civil Rights
Email: civilrights@arts.gov

The applicant shall maintain records of its compliance and submission for three (3) years. The applicant will compile, maintain and permit access to records as required by applicable regulations, guidelines or other directives.

The applicant must also certify that it will obtain assurances of compliance from all subrecipients and will require all subrecipients of National Endowment for the Arts funds to comply with these requirements.

The United States has the right to seek judicial or administrative enforcement of this assurance.

# Stay Connected to the National Endowment for the

**SA83**

# Arts

Sign up for our newsletters and magazine

**Newsletter Signup** </sign-up-for-updates>

**Magazine Signup** </form/sign-up-for-american-artscape-magazine>

**About** </about>

## Contact Us

</about/leadership-staff/all-staff>

**Civil Rights**

</about/civil-rights-office>

## No Fear Act

</about/civil-rights-office/applicants-for-employment-and-employees/no-fear-act>

FOIA </about/freedom-of-information-act-foia-guide>

**Inspector General**

</about/inspector-general>

Accessibility

</impact/accessibility>

Privacy Policy

</privacy>

**Disclaimers**

</about/website-disclaimers>

Open Government

</about/open-government>

USA.gov

<http://www.usa.gov/>

Section 508 Accessibility </section-508-accessibility>

**SA84**

Scam Regarding NEA Grants </about/national-endowment-arts-warns-public-about-grant-scam>

---

400 7th Street, SW, Washington, DC 20506

202.682.5400

**SA85**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION OF
DIVERSITY OFFICERS IN HIGHER
EDUCATION, *et al.*,

    *Plaintiffs*,

  v.

DONALD J. TRUMP, *et al.*,

    *Defendants*

Case No. 25-cv-0333-ABA

## MEMORANDUM OPINION AND ORDER

This Court entered a preliminary injunction on February 21, 2025, enjoining the enforcement of specific provisions of three executive orders. ECF Nos. 44-45 & 66-67. Defendants filed a notice of appeal on February 24, 2025. ECF No. 47. On March 14, the Fourth Circuit stayed the injunction. ECF No. 73. On March 21, Plaintiffs filed a motion pursuant to Federal Rule of Civil Procedure 59(e) to vacate this Court's preliminary injunction in light of what Plaintiffs described as new factual developments. ECF No. 77. Plaintiffs state that those factual developments merit vacating the injunction and permitting Plaintiffs to file an amended complaint and a renewed motion for a preliminary injunction. *See* ECF No. 81 at 7. Defendants responded in opposition, ECF No. 78, and Plaintiffs replied, ECF No. 81. The Court held argument on April 10, 2025.

Contrary to Defendants' arguments, this Court has jurisdiction to rule on Plaintiffs' Rule 59 motion. In considering the motion, however, the Court concludes that Plaintiffs have not met their burden under Rule 59(e) to show that vacatur of the preliminary injunction is appropriate.

## DISCUSSION

### I.    Jurisdiction

Generally, the timely filing of a notice of appeal "divests the district court of its control over those aspects of the case involved in the appeal" because "a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982); *Doe v. Pub. Citizen*, 749 F.3d 246, 258 (4th Cir. 2014). But certain motions filed in a district court have the effect of (1) extending the deadline for filing a notice of appeal, such that "the time to file an appeal runs for all parties from the entry of the order disposing of [that] motion," Fed. R. App. P. 4(a)(4)(A), or (2) suspending a previously filed notice of appeal, such that a previously filed notice "becomes effective . . . when the order disposing of the last such remaining motion is entered," Fed. R. App. P. 4(a)(4)(B)(i). One such motion is a timely motion "to alter or amend the judgment under Rule 59." Fed. R. App. P. 4(a)(4)(A).

The way the Federal Rules of Appellate Procedure ("FRAP") approach the effect of such motions on appellate and district court jurisdiction has evolved through several revisions of FRAP 4. As the Supreme Court explained in *Griggs*, under the 1979 version of FRAP 4(a)(4)(A), the "effect of a Rule 59 motion on a previously filed notice of appeal" was that the appeal "self-destruct[ed]." 459 U.S. at 61 (internal citations omitted). But deeming a previously filed notice of appeal to be a nullity had several unproductive consequences, including that an appellant had to file a *new* notice of appeal after disposition of the Rule 59 motion, which some appellants might not have realized, leaving them having waived appeal rights. *Id*. at 60.

2

In 1993, FRAP 4 was amended to remove the requirement of filing a new notice of appeal in that situation. Under the revised rule, the filing of a Rule 59 motion has the effect of "*suspend[ing]*" the notice of appeal "until the motion is disposed of, whereupon, the previously filed notice effectively places jurisdiction in the court of appeals." Fed. R. App. P. 4, 1993 Advisory Committee Note to Paragraph (a)(4) (emphasis added); *see also In re Rains*, 428 F.3d 893, 904 n.9 (9th Cir. 2005) (discussing the effects of the post-*Griggs* changes to FRAP 4). Thus, after the 1993 amendments, the notice of appeal no longer "self-destructs" when a Rule 59 motion is filed; instead, the filing of the motion suspends the notice until the Rule 59 motion is adjudicated. The current FRAP 4 is substantially similar in this regard.

Defendants argue that even though FRAP 4 expressly envisions the filing—and disposition—of Rule 59 motions before a notice of appeal is due, district courts do not have jurisdiction to adjudicate Rule 59 motions filed after a notice of appeal has been filed. ECF No. 78 at 3-4. Defendants are correct that in *Griggs*, the Rule 59 motion was filed before the notice of appeal. 459 U.S. at 57. But the *Griggs* Court's reasoning was not limited to that sequence. *See* 459 U.S. at 61 (providing that the "effect of a Rule 59 motion on a *previously* filed notice of appeal" was that "[t]he appeal simply self-destruct[ed]" and also noting that "a *subsequent* notice of appeal [was] ineffective if it [was] filed while a timely Rule 59 motion [was] still pending") (internal citation omitted) (emphases added). Moreover, the 1993 comments to FRAP 4 make clear that the Advisory Committee was intending to account for Rule 59 motions (or other specified district court motions) that are filed either before or after a notice of appeal. *See* Fed. R. App. P. 4, 1993 Advisory Committee Note to Paragraph (a)(4) (providing that "[a] notice filed *before* the filing of [a Rule 59 motion] or *after* the filing of a motion

but before disposition of the motion" "suspended [the notice of appeal] until the motion is disposed of") (emphasis added).

Moreover, the Supreme Court has expressly held—following *Griggs* and following the 1993 FRAP amendments—that FRAP 4, as "interpreted in *Griggs* . . . provides in express terms that [Rule 59] motions also serve to divest the appellate court of jurisdiction where the motions are filed after appeal is taken" and that "[t]he majority of post-trial motions, such as Rule 59 [motions], render the underlying judgment nonfinal both when filed before an appeal is taken (thus tolling the time for taking an appeal), and when filed after the notice of appeal (thus divesting the appellate court of jurisdiction)." *Stone v. I.N.S.*, 514 U.S. 386, 402-03 (1995). The Fourth Circuit has also recognized the effect of the timely filing of a motion listed in FRAP 4(a)(4)(A) after a notice of appeal has been filed. In *Carpenter Insulation & Coatings v. Statewide Sheet Metal & Roofing*, an unpublished opinion, after a notice of appeal was filed, a party filed a Rule 59 motion to reconsider the order granting summary judgment. 937 F.2d 602 (4th Cir. 1991) (table). The court concluded that the district court had "subject matter jurisdiction over the Rule 59 motion, notwithstanding the fact that a notice of appeal had already been filed." *Id.* at 602 n.*[1]; *see also* § 2821 Motions While Appeal Pending, 11 Fed. Prac. & Proc. Civ. § 2821 (3d ed.) ("The district court . . . retain[s] jurisdiction over motions for alteration or amendment of a judgment filed after a notice of appeal is given."). Finally, the fact that the order at issue is interlocutory rather than final does not change the analysis. *Gelin v. Balt. Cnty., Md.*, 122 F.4th 531, 537 n.3 (4th Cir. 2024)

---

[1] The *Carpenter* footnote refers to the "previously filed notice of appeal" "self-destuct[ing]" but that was because *Carpenter* was issued in 1991, before the 1993 amendments discussed above.

(explaining that "[n]either Appellate Rule 4(a)(4)(A) nor the Civil Rules . . . requires a 'final' judgment" to trigger the Rule 4(a)(4) analysis).

In arguing that, notwithstanding FRAP 4, this Court lacks jurisdiction to consider Plaintiffs' Rule 59(e) motion, Defendants rely on *Haefner v. Cnty. of Lancaster*, which is a five-sentence unpublished opinion. 116 F.3d 1473 (4th Cir. 1997) (table). In that case, the Fourth Circuit held that because the *pro se* plaintiff "had previously filed a notice of appeal to this Court of the underlying order, the magistrate judge was divested of jurisdiction to consider any subsequent motion to amend or vacate the appealed order." *Id.* (citing *Lewis v. Tobacco Workers' Int'l Union*, 577 F.2d 1135, 1139 (4th Cir. 1978)). But the unreported *Haefner* opinion (1) relies on *Lewis*, which predates the 1979 rule amendments and *Griggs*, (2) lacks any significant reasoning, and (3) does not discuss FRAP 4. Defendants also rely on *In re Murphy-Brown, LLC*, which dealt with a writ of mandamus in connection with a "gag" order. 907 F.3d 788 (4th Cir. 2018). The court in *Murphy-Brown* noted that "a district court loses jurisdiction to amend or vacate its order after the notice of appeal has been filed." *Id.* at 792 (quoting *Lewis*, 577 F.2d at 1139). But the motion filed after the notice of appeal in *Murphy-Brown* was to "rescind its initial gag order in favor of an option to request a new or modified gag order," *id.* at 794; that motion was not one listed in FRAP 4(a)(4)(A) (such as a Rule 59 motion), and so did not "suspend" the notice of appeal as Plaintiffs' motion here has done. The two other cases Defendants cite involve whether a district court, following a notice of appeal, retained jurisdiction to entertain a motion to intervene—also a motion

5

**SA90**

not listed in FRAP 4(a)(4)(A). *See FTC v. Lin*, 66 F.4th 164 (4th Cir. 2023); *Doe*, 749
F.3d 246.[2]

For these reasons, this Court has jurisdiction to rule on Plaintiffs' Rule 59
motion—and indeed must do so, to end the period in which the notice of appeal has
been "suspended" by Plaintiffs' filing of their Rule 59 motion.

## II.    Whether to Vacate the Preliminary Injunction

Having concluded that this Court can, and must, adjudicate the pending Rule
59(e) motion, the Court now turns to its merits. "A Rule 59(e) motion may only be
granted in three situations: '(1) to accommodate an intervening change in controlling
law; (2) to account for new evidence not available at trial; or (3) to correct a clear error
of law or prevent manifest injustice.'" *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing,
Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (quoting *Zinkand v. Brown*, 478 F.3d 634, 637
(4th Cir. 2007)). Here, Plaintiffs do not contend there has been any intervening change
in controlling law, and also do not invoke the "error of law" or "manifest injustice"
prongs. Instead, Plaintiffs contend that this Court should vacate its preliminary
injunction because of "multiple factual developments that have taken place since the
Court issued its Preliminary Injunction." ECF No. 77 at 3.

In their written motion and reply, Plaintiffs point (1) in general to "factual
evidence of the Government's own interpretation and implementation of the Executive

---

[2] A similar analysis applies to motions to vacate a judgment filed under Rule 60(b). *See
Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 890-91 (4th Cir. 1999) (holding that "when
a Rule 60(b) motion is filed while a judgment is on appeal, the district court has
jurisdiction to entertain the motion, and should do so promptly," and explaining the
procedure depending on whether the district court determines to deny the motion or is
"inclined to grant" it).

SA91

Orders," ECF No. 81 at 9, and (2) specifically to "letters from the Department of Housing and Urban Development that implement the [J21 Order's] Certification Requirement," *id.* at 3 (referring to HUD correspondence to the City of San Francisco, ECF No. 68-4). Plaintiffs state that, based on those developments, they "seek to amend their complaint and pursue additional preliminary relief to prevent ongoing irreparable harm against a more developed factual backdrop." ECF No. 81 at 9. Plaintiffs state that they expect they would continue to assert facial claims only. ECF No. 86 at 26:16-19, 9:20-10:2, 25:6-20. But they believe that "evidence related to agencies' interpretation and implementation of the Executive Orders" would further support the likelihood of success on the merits of their already-asserted claims, and further that they "could amend their complaint to add *new* facial claims" challenging the executive order provisions at issue. ECF No. 81 at 7. The new "facial claims" Plaintiffs state they may add in an amended complaint would be claims under the Administrative Procedures Act. ECF No. 86 at 13:21-23.

Plaintiffs argue that the new evidence would specifically address the concerns expressed by two of the Circuit Judges on the panel that granted Defendants' motion to stay pending appeal. Plaintiffs put it this way:

> The concurrences emphasized that their opinions spoke only to the record so far and that future developments might alter the outcome. In his concurrence, for example, Chief Judge Diaz noted he was satisfied "for now" that Defendants had met their stay burden, but explicitly "reserve[d] judgment on the extent to which the government relies on the Orders' savings clause provisions as it enforces the Orders' directives . . . ." Stay Order, No. 73 at 4, 4 n.1. In doing so, with respect to the savings-clause issue, he cited to a successful facial challenge to an executive order and characterized the case as "declining to give effect to savings clause where that clause 'in [] context'

would 'override clear and specific language,' and render 'judicial review a meaningless exercise . . . .'" *Id.* at 4 n.1 (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239-40 (9th Cir. 2018)). Similarly, in her concurrence, Judge Harris concluded "for now" that Defendants had met their burden, but offered the "caveat" that "[a]gency enforcement actions that go beyond the Orders' narrow scope may well raise serious First Amendment and Due Process concerns, for the reasons cogently explained by" this Court. *Id.* at 7.

ECF No. 81 at 7-8.

This Court remains of the view that Plaintiffs have shown a strong likelihood of success on the merits of their facial free speech and vagueness claims, as this Court previously explained. ECF No. 44 at 28-55; ECF No. 61 at 1-3; ECF No. 66 at 5-6. The Challenged Provisions forbid government contractors and grantees from engaging in "equity-related" work and from "promoting DEI" in ways the administration may consider to violate antidiscrimination laws; they demand that the "private sector" "end . . . DEI" and threaten "strategic enforcement" to effectuate the "end[ing]" of "DEI"; and they threaten contractors and grantees with enforcement actions with the explicit purpose of "deter[ring]" such "programs or principles." J20 Order § 2(b)(i); J21 Order § 3(b)(iv)(B); J21 Order § 4(b). This Court remains deeply troubled that the Challenged Provisions, which constitute content-based, viewpoint-discriminatory restrictions on speech (in addition to conduct), have the inherent and ineluctable effect of silencing speech that has long been, and remains, protected by the First Amendment. And they do so through impermissibly vague directives that exacerbate the speech-chilling aspects of the Challenged Provisions.

Historically, the metaphor used to describe the effect of laws that restrict speech is "chill." The more apt metaphor here is "extinguish." Part of the explicit purpose and

effect of the Challenged Provisions is to stifle debate—to silence *selected* viewpoints, *selected* discourse—on matters of public concern. They forbid government contractors and grantees from engaging in discourse—including speech such as teaching, conferences, writing, speaking, etc.—if that discourse is "related" to "equity." And they direct the "private sector" to "end" diversity, to "end" equity, and to "end" inclusion. *See* J21 Order § 4(b) (directing agencies to "encourage the private sector to end . . . DEI"). "End" is not a mere "chill." "Deter[rence]" is not a side-effect of the Challenged Provisions; their *explicit* goal is to "deter" not only "programs" but "principles"—*i.e.* ideas, concepts, values. After all, the opposite of inclusion is exclusion; the opposite of equity is inequity; and, at least in some forms, the opposite of diversity is segregation.

The government has apparently concluded, and takes the position, that particular employment practices, for example related to hiring or promotion, constitute discrimination in ways that violate Title VI or Title VII. But the Challenged Provisions do far, far more than announce a change in enforcement priorities within the bounds of existing law. For as vague as the Challenged Provisions are about some matters, *see* ECF No. 44 at 36-44, 53-55, there can be no serious question that the direct and necessary impact of those provisions—and purposeful, to the extent that matters—is to extinguish discourse throughout civil society on what makes our society diverse, the different perspectives we each bring to bear based our respective upbringing, family history, community, economic circumstances, race, national origin, gender, ability, sexual orientation, or the like. These executive directives seek to extinguish discourse about our shared history. They seek to extinguish discourse about how to strive toward greater inclusivity, or even what that means, or whether that is a worthy goal.

The fact that the Challenged Provisions also target conduct, in addition to speech (and ideas), does not diminish the Challenged Provisions' unmistakable edict that persons working for government contractors or grantees, or any person working in the private sector for that matter, must not express certain viewpoints on a swath of topics related to inclusion, equity and diversity. And they do all of that on their face. While a "government official can share her views freely and criticize particular beliefs," and seek to "persuade" others (even "forcefully") of the merits of a particular view, officials may not "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188, 191 (2024).

Other courts have agreed. For example, in *Chicago Women in Trades v. Trump*, -- F. Supp. 3d --, Case No. 25 C 2005, 2025 WL 1114466 (N.D. Ill. April 14, 2025), the court held that the Certification Provision *undisputedly* "attempts to regulate grantees' speech outside of their federally-funded programs," and further restricts speech on the basis of content and viewpoint, for example prohibiting "programmatic activity [that] 'promote[s] DEI' (whatever that is deemed to mean)." *Id.* at *11 (second alteration in original); *see also id.* at *20 (granting a preliminary injunction with respect to the Certification Provision because "rather than spend their resources to challenge their patron in court or risk False Claims Act litigation, it is more likely that grantees and contractors will take the safer route, keep their heads down, and choose to simply stop speaking on anything remotely related to what the government might consider as promoting DEI or equity").[3]

---

[3] The *Chicago Women in Trades* court held that the plaintiffs there had not shown a likelihood of success on those plaintiffs' claim challenging the Termination Provision on First Amendment grounds, 2025 WL 1114466 at *12-*14; Plaintiffs here did not assert a

In the education context, the U.S. District Court for the District of New Hampshire explained in detail why prohibiting "DEI," requiring certification, and threatening enforcement actions for violations combine to threaten "the 'supremely precious' yet 'delicate and vulnerable' nature of the right to free speech in our country," *Nat'l Educ. Ass'n v. U. S. Dep't of Educ.*, -- F. Supp. 3d --, No. 25-cv-091-LM, 2025 WL 1188160, at *18 (D.N.H. Apr. 24, 2025) ("*NEA*") (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)), particularly given that they "sweep in a wide swath of conduct while leaving individual enforcement decisions to the subjective determinations of enforcement authorities." *Id.* at *19 (citing *Kolender v. Lawson*, 461 U.S. 352, 353-54 (1983)); *see also United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is."). As the *NEA* court explained, a prospective prohibition on speech, based on the content of such speech or the viewpoint of the speaker, constitutes nothing short of "censorship." 2025 WL 1188160, at *13-*14. And as Judge Gallagher explained in a similar case in this district, although the government is "entitled to its own views, including on how court cases and laws should be interpreted," and to "develop and pursue its own enforcement priorities within the law," it may not "blur the lines between viewpoint and law" in ways that prohibit (or could be reasonably perceived to prohibit) "conduct, speech, perspectives, lessons, programs, activities or

---

First Amendment claim with respect to the Termination Provision. As to the *Chicago Women in Trades* court's holding with respect to those plaintiffs' due process vagueness claim challenge to the Termination Provision, *id.* at *14-*16, this Court disagrees with that analysis, for the reasons explained previously. *See* ECF No. 44 at 38-44.

meetings" on the basis of content or viewpoint. *Am. Fed'n of Teachers v. Dep't of Educ.*, -- F. Supp. 3d ---, No. SAG-25-cv-628, 2025 WL 1191844, at *10-*11, *20 (D. Md. Apr. 24, 2025).

But that all goes to the merits of Plaintiffs' request for a preliminary injunction. Which side is likely to prevail on appeal is not the question presented by Plaintiffs' motion to vacate. The question is whether Plaintiffs have satisfied the Rule 59 "new evidence" standard. The problem for Plaintiffs is that although they have pointed to new evidence and claims they state they would present in an amended complaint and renewed motion for a preliminary injunction, they have not shown that any of it would materially alter the analysis of whether they are entitled to a preliminary injunction.

Plaintiffs explained at the hearing on their motion to vacate that the new evidence would show how Defendants and other agencies have interpreted and implemented the executive orders since the preliminary injunction was entered. But this Court already had ample evidence before it at the time the Court issued its preliminary injunction showing the ways the government was implementing each of the Challenged Provisions. *See, e.g.*, ECF No. 27-1 at 9-10, 17-18 (citing examples from five agencies of implementation of the Termination Provision); ECF Nos. 27-10 to 27-18 (exhibits illustrating implementation of the Termination Provision); ECF No. 27-1 at 10 (citing implementation of the Certification Provision); ECF Nos. 27-20 (exhibit illustrating implementation of the Certification Provision); ECF No. 27-1 at 10-11 (citing implementation of the Enforcement Threat Provision); ECF No. 27-21 (exhibit illustrating implementation of the Enforcement Threat Provision); ECF Nos. 39-8, 39-9, 39-13 (guidance documents from multiple agencies regarding implementation of the

Challenged Orders); ECF Nos. 39-10 to 39-12, ECF No. 43-5 (letters to grant recipients regarding implementation of the Challenged Orders).

Plaintiffs request an opportunity file an amended complaint that may contain one or more additional causes of action under the Administrative Procedures Act. But the causes of action at issue in Plaintiffs' anticipated amended complaint and renewed motion for a preliminary injunction would be largely the same as those currently asserted. Plaintiffs confirmed that if the Court were to vacate the preliminary injunction and allow them to file an amended complaint, they would continue to allege facial challenges to the Challenged Provisions of these executive orders. Plaintiffs have not shown that adding an Administrative Procedures Act would materially alter the preliminary injunction analysis. And with respect to the relief Plaintiffs seek, they state that such renewed motion for a preliminary injunction would continue to seek the "broadest relief possible," ECF No. 86 at 3:20, and the preliminary injunction Plaintiffs envision seeking would be subject to only "small changes" as compared to the current preliminary injunction. *Id.* at 13:19.

The Court of Appeals will soon be deciding whether Plaintiffs are entitled to a preliminary injunction based on Plaintiffs' facial claims challenging the executive orders at issue, as this Court held they are. Plaintiffs have not come forward with the type of new evidence or new claims that would justify vacatur of the preliminary injunction under Rule 59(e). For these same reasons, Plaintiffs have not shown that judicial resources (or the parties' resources) would be conserved by vacating the preliminary injunction, only to consider a renewed motion for a similar injunction based on similar facial challenges. While the record may be more developed in that circumstance, Plaintiffs have not shown that a new injunction (and its likely appeal) would place the

**SA98**

courts and parties in a significantly different posture than the present one. The appropriate course is to deny the Rule 59(e) motion and allow the parties to brief the issues before the Fourth Circuit.

## CONCLUSION AND ORDER

Upon consideration of the motion to vacate the preliminary injunction, ECF No. 77, and the response and reply thereto, and after oral argument on April 10, 2025, and for the reasons provided above, it is ORDERED that the motion is DENIED.

Date: May 1, 2025                    _____/s/_____
                                     Adam B. Abelson
                                     United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 8, 2025        _/s/ Aleshadye Getachew_

                        Aleshadye Getachew