IN THE

# United States Court of Appeals for the Fourth Circuit

---

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS
IN HIGHER EDUCATION, ET AL.,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, ET AL.,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the District of Maryland
Case No. 25-cv-333

---

**BRIEF FOR APPELLEES**

---

Niyati Shah
Noah Baron
Alizeh Ahmad
ASIAN AMERICANS ADVANCING JUSTICE
 | AAJC
1620 L Street NW, Suite 1050
Washington, D.C. 20036
(202) 296-2300

Aleshadye Getachew
Cynthia Liao
J. Sterling Moore
Audrey Wiggins
Brooke Menschel
Skye Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
agetachew@democracyforward.org

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _25-1189_        Caption: _National Association of Diversity Officers in Higher Education, et al._

v. Donald J. Trump, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

_National Association of Diversity Officers in Higher Education_

(name of party/amicus)

_____

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.      Does party/amicus have any parent corporations?                ☐YES ☑NO
        If yes, identify all parent corporations, including all generations of parent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                  ☐YES ☑NO
        If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Aleshadye Getachew            Date: 05/09/2025

Counsel for: Appellees

Print to PDFfor Filing        Reset Form

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1189__     Caption: __National Association of Diversity Officers in Higher Education, et al.__

v. Donald J. Trump, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

__American Association of University Professors__
(name of party/amicus)

_____

 who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.     Does party/amicus have any parent corporations?                              ☐YES ☑NO
       If yes, identify all parent corporations, including all generations of parent corporations:




3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
       other publicly held entity?                                                  ☐YES ☑NO
       If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Aleshadye Getachew     Date: 05/09/2025

Counsel for: Appellees

[Print to PDF for Filing]     [Reset Form]

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>25-1189</u>        Caption: <u>National Association of Diversity Officers in Higher Education, et al.</u>

v. Donald J. Trump, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Mayor and City Council of Baltimore, Maryland</u>
(name of party/amicus)

_____

who is _____<u>Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Aleshadye Getachew          Date: 05/09/2025

Counsel for: Appellees

Print to PDF for Filing          Reset Form

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................................... 1

STATEMENT OF THE ISSUES ................................................................... 2

STATEMENT OF THE CASE ...................................................................... 4

   I.    Plaintiffs ........................................................................................ 4

   II.   The Executive Orders ................................................................... 7

   III.  Implementation of the Executive Orders and Impact on Plaintiffs ........ 9

   IV.  Procedural history ...................................................................... 11

STANDARD OF REVIEW ......................................................................... 13

SUMMARY OF ARGUMENT ................................................................... 14

ARGUMENT .............................................................................................. 16

   I.    Plaintiffs' Claims Are Justiciable ............................................. 16

        A.    Plaintiffs Have Demonstrated Standing. ..................... 16

         i.    Plaintiffs have standing to challenge the Certification Provision ................................................................ 18

         ii.   Plaintiffs have standing to challenge the Enforcement Threat Provision. ........................................... 20

         iii.  Plaintiffs have standing to challenge the Termination Provision. ................................................ 23

        B.    Plaintiffs' Claims Are Ripe. ........................................ 25

        C.    The Tucker Act Does Not Apply. ............................... 27

   II.   Plaintiffs Will Likely Succeed on their Constitutional Claims ............ 28

        A.    The Certification Provision Discriminates Based on Content and Viewpoint. ............................................. 29

     B.     The Termination Provision Is Unconstitutionally Vague. ..........35

     C.     The Enforcement Threat Provision Is Both Viewpoint Discriminatory and Unconstitutionally Vague. ..........................41

III.     The Irreparable Harm Factor Favors a Preliminary Injunction.............45

IV.     The Balance of the Equities and the Public Interest Factors Favor a Preliminary Injunction........................................................................47

V.     The Scope of Relief Was Necessary and Appropriate ..........................49

VI.     Alternatively, This Court Can Vacate and Remand ..............................55

CONCLUSION ..................................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) ..................................................................................55

*Edgar v. Coats*, 454 F. Supp. 3d 502 (D. Md. 2020), *aff'd sub nom. Edgar v. Haines*, 2 F.4th 298 (4th Cir.) ...................................................18

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) .......46

*Am. Fed'n of Gov't Emps. v. Office of Special Couns.*, 1 F.4th 180 (4th Cir. 2021) ..................................................................................18

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ........................................43, 44

*Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774 (C.D. Cal. 1991) ..................................................................................40

*Benham v. City of Charlotte*, 635 F.3d 129 (4th Cir. 2011) ...................................18

*Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) .......39, 40

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .......................................................28

*Bowsher v. Synar*, 478 U.S. 714 (1986) .................................................................23

*Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770 (4th Cir.)..................................................................................42

*CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025) ..................................................................................50, 51

*Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625 (4th Cir. 2016). ...................30, 31

*Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013).....................14

*Chi. Women in Trades v. Trump,* No. 25-cv-2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025).................................................................32, 34, 48

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).........39, 41

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)..............................................17

ix

*CNF Constructors, Inc. v. Donohoe Constr. Co.*, 57 F.3d 395 (4th Cir. 1995) ......28

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) .......................................17, 18, 25

*E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021)......................28

*Edgar v. Coats*, 454 F. Supp. 3d 502 (D. Md. 2020) .............................................17

*Eisenstadt v. Baird*, 405 U.S. 438 (1972)...............................................................17

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ...................................36

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)........................................17

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) ...............................38

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149
    (4th Cir. 2000).............................................................................................24

*Frisby v. Schultz*, 487 U.S. 474 (1988) ..................................................................31

*Gill v. Whitford*, 585 U.S. 48 (2018)................................................................52, 54

*Grayned v. City of Rockford*, 408 U.S. 104 (1972).........................................35, 45

*Haaland v. Brackeen*, 599 U.S. 255 (2023). ..........................................................53

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021)....................................38, 39, 50

*Hills v. Gautreaux*, 425 U.S. 284 (1976) ...............................................................50

*Honeyfund.com v. Desantis*, 622 F. Supp. 3d 1159 (N.D. Fla. 2022), *aff'd* 94
    F.4th 1272 (11th Cir. 2024) ........................................................................33

*Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133 (9th Cir.
    2009) .............................................................................................................36

*Hynes v. Mayor & Council of Oradell*, 425 U.S. 610 (1976) ................................36

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589 (1967) ....19, 29,
    34, 35

*Kolender v. Lawson*, 461 U.S. 352 (1983) .............................................................36

*Laird v. Tatum*, 408 U.S. 1 (1972) .........................................................................22

*Lance v. Coffman*, 549 U.S. 437 (2007) .................................................. 16

*Leaders of a Beautiful Struggle v Balt. Police Dept.*, 2 F.4th 330 (4th Cir. 2021) ...................................................................................................... 47

*Legend Night Club v. Miller*, 637 F.3d 291 (4th Cir. 2011) .................................. 46

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...................................................... 53

*Maine v. USDA*, No. 25-cv-131, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ........ 28

*Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006) .............................................. 25, 27

*Nat'l Educ. Ass'n v. Dep't of Educ.*, No. 25-cv-091, 2025 WL 1188160 (D.N.H. Apr. 24, 2025) .............................................................................. 33

*Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024) ........................................ 42, 44, 47

*Nat'l Urb. League v. Trump*, No. 25-cv-471, 2025 WL 1275613 (D.D.C. May 2, 2025) .............................................................................................. 18

*National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ......................... 37

*Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998) ..................................... 26

*Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671 (4th Cir. 2020) ... 17, 23

*Perry v. Sindermann*, 408 U.S. 593 (1972) ........................................................... 40

*PFLAG, Inc. v. Trump*, No. 25-cv-337, 2025 WL 685124 (D. Md. Mar. 4, 2025) .......................................................................................................... 26

*Powell v. McCormack*, 395 U.S. 486 (1969) ........................................................ 55

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......................................... 29, 31, 42

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ................................... 31

*Roe v. DOD*, 947 F.3d 207 (4th Cir. 2020) ................................................ 13, 49, 50

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ............... 29

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) .............................................................................................. 36

*Smith v. Goguen*, 415 U.S. 566 (1974)...................................................36

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)........................................17

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008).........17

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .....................20

*Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017) ...........50

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ..........................29

*United States v. Playboy Ent. Grp.*, 529 U.S. 803 (2000)......................30

*Virginia v. Black*, 538 U.S. 343 (2003) .................................................34

*Wild Va. v. Council on Env't Quality*, 56 F.4th 281 (4th Cir. 2022)......25

*Woonasquatucket River Watershed Council v. USDA*, No. 25-cv-097, 2025
     WL 1116157 (D.R.I. Apr. 15, 2025)..............................................28

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)............26

**Statutes**

18 U.S.C. § 287 ........................................................................................8

28 U.S.C. § 1491(a)(1) ............................................................................27

31 U.S.C. § 3729(a).................................................................................8

31 U.S.C. § 3730(d) ................................................................................8

**Other Authorities**

Exec. Order 14215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg.
     10447 (Feb. 18, 2025) ..................................................................53

Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI
     Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 29, 2025) .........*passim*

Exec. Order No. 14,173, *Ending Illegal Discrimination and Restoring Merit-
     Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 31, 2025).......................*passim*

**Rules**

Fed. R. Civ. Proc. 65(d). ...........................................................................53

## INTRODUCTION

Two Executive Orders issued by President Trump seek to eliminate principles and programs promoting diversity, equity, inclusion, and accessibility. For Plaintiffs-Appellees, higher education associations and the city of Baltimore, the targeted ideals and expression are integral to their existence, and the Orders' threat to their speech and the federal funds on which they rely was immediate. Plaintiffs brought this action to seek the swift relief necessary to protect Plaintiffs-Appellees and their members. The district court preliminarily enjoined enforcement of the Orders; however, a panel of this Court granted a stay.

Cognizant of the stay panel's guidance that more information on implementation and enforcement of the Orders would be helpful in deciding the merits, Plaintiffs made the difficult decision to seek vacatur of the preliminary injunction to develop a more robust factual record in the district court in support of amended claims. The district court, however, denied the motion, noting that it "remains of the view that Plaintiffs have shown a strong likelihood of success on the merits" on their First and Fifth Amendment claims. SA93. On that point, Plaintiffs agree.

This Court can and should affirm the district court's preliminary injunction for the reasons set forth below. Without limitation, the Orders characterize diversity, equity, inclusion, and accessibility as "illegal" and "immoral" practices

that must be eliminated. Their broad sweep silences protected speech and expressive conduct promoting these principles and certain provisions are impermissibly vague. In contrast, if affirmed, the preliminary injunction would not constrain the government's ability to enforce antidiscrimination laws using long-existing, lawful means.

If, however, the Court believes additional evidence would aid its consideration, it should vacate the preliminary injunction and remand for further proceedings in the normal course of litigation. This would allow Plaintiffs to allege and prove how agencies' implementation and enforcement of the Orders violate the First and Fifth Amendments, and how the government improperly relies on the Orders' savings clause provisions. *See, e.g.*, Dkt. 29 (Stay Order) at 4 n.1 (Diaz, C.J., concurring); *id*. at 7-8 (Harris, J., concurring).

On the record before it, the Court can properly affirm or, in the alternative, in the interest of judicial economy, vacate and remand.

## STATEMENT OF THE ISSUES

Vilifying "DEI" as "illegal" and "discriminatory" without defining what speech or conduct constitutes "DEI," let alone "illegal" or "discriminatory" DEI, the Executive Orders (Orders) require: all federal grantees and contractors to certify that they do not operate *any* programs "promoting DEI," whether those programs are federally funded or not, under threat of False Claims Act prosecution

(Certification Provision); all "equity-related" grants and contracts to be terminated (Termination Provision); and all agencies to "deter DEI programs or principles" in the private sector by identifying investigation targets (Enforcement Threat Provision). The issues presented in this appeal are:

1. Did the district court correctly determine that Plaintiffs have standing and that their claims are ripe?

2. Did the district court correctly determine that the Certification and Enforcement Threat Provisions likely violate the First Amendment because they discriminate based on content and viewpoint and fail strict scrutiny?

3. Did the district court correctly determine that the Enforcement Threat and Termination Provisions likely violate the Fifth Amendment due to their vagueness?

4. Did the district court abuse its discretion in finding that the equitable preliminary injunction factors, including irreparable harm to Plaintiffs, weigh in favor of a preliminary injunction?

5. Did the district court abuse its discretion in finding that a broad preliminary injunction was necessary to provide complete relief to Plaintiffs and their members?

## STATEMENT OF THE CASE

### I.    Plaintiffs

Plaintiffs are the Mayor and City Council of Baltimore (Baltimore); the

American Association of University Professors (AAUP); and the National

Association of Diversity Officers in Higher Education (NADOHE).[1] JA26-27.

Plaintiffs and their members promote principles and participate in programs

related to diversity, equity, inclusion, and accessibility. Plaintiff NADOHE, for

instance, literally has the word "diversity" in its name. NADOHE's members

include diversity officers and higher education institutions, several of which have

endowments exceeding $1 billion in assets. SA19-20 ¶¶ 4-5; JA78. Its members

run programs supporting a diverse student body, including low-income students,

first-generation students, students from historically underrepresented groups,

international students, veterans, women, and students with disabilities. Its members

develop strategies to recruit students, staff, and faculty from diverse applicant

pools. Its members respond to and work to prevent incidents of bias,

discrimination, and harassment on campus. Its members also examine schools'

---

[1] Plaintiff Restaurant Opportunities Center (ROC) United has noticed dismissal of its claims in the district court. ROC United is not included in any references herein to "Plaintiffs" or "Plaintiffs-Appellees."

policies and practices to ensure that career services and other programs meet the needs of students with varied life experiences. SA21 ¶ 11.

Plaintiff AAUP is a membership association and labor union. Many of its members are employees of higher-education institutions with endowments exceeding $1 billion. SA34-35 ¶¶ 4-5; JA78; JA88. Members include faculty who teach courses related to racial, sexual, gender, or sexual orientation identities or study how race and ethnicity affect health outcomes. SA36 ¶ 13. Some members teach and mentor students in programs meant to encourage students from groups that are underrepresented in science, technology, engineering, or mathematics (such as low-income students or women) to go into those fields. SA38-40 ¶ 21. AAUP appoints standing committees such as the Committee on Historically Black Institutions and Scholars of Color and the Committee on Gender and Sexuality in the Academic Profession. SA41 ¶ 28; JA88.

Baltimore is a city of nearly 600,000 people. According to the 2020 Census, 60% of the population is Black, 27% is White, 8% is Hispanic or Latino, and 2.5% is Asian. SA48 ¶ 6. To serve its diverse residents, the city maintains an Office of Equity and Civil Rights (OECR) that seeks to eliminate inequity, inequality, and discrimination by enforcing local wage laws, ensure access for persons with disabilities, and provide oversight of local law enforcement. SA48 ¶ 10. OECR hosts an annual Civil Rights Week, which has included speakers who discuss the

history of redlining in Baltimore and the city's attempts to reverse its effects. SA49-50 ¶ 15. The Equity Office within OECR provides diversity, equity, and inclusion trainings to city agencies, and administers an Equity Assistance Fund, which supports equitable access to housing and education and other programs. SA49 ¶ 12. The Mayor's Commission on Disabilities promotes equal opportunities for individuals with disabilities by running services for those with disabilities and educating the city government, business, and industries on reasonable accommodations. SA49 ¶ 13.

NADOHE's and AAUP's members and Baltimore receive grants from numerous federal agencies. *E.g.*, JA78; JA84-87; JA 128; SA23 ¶¶ 16-17; SA36-40 ¶¶ 14-18, 21; SA50-52 ¶¶ 17-22. They have pending proposals for grants and plan to apply for grants in the future. SA23 ¶ 16; SA39 ¶ 21.d.ii. Many of their federal grants specifically support research or programs that promote diversity, equity, inclusion, or accessibility. SA23 ¶ 17 (grants cover "advancing [STEM] education," "pursuing more equitable health outcomes for underserved communities," "reducing disparities in juvenile justice," "improving public transit," and "promoting the development of clean energy technology"); SA38-40 ¶ 21 (grants encourage diversity in STEM fields); SA51 ¶ 20 (grant supports city program addressing needs of LGBTQIA youth and reducing disparities in rates of

teen birth and sexually-transmitted infections such as HIV across race, ethnicity, and sexual orientation).

## II.    The Executive Orders

On January 20 and 21, 2025, President Trump issued Executive Orders 14,151 and 14,173 ("J20 Order" and "J21 Order," respectively).[2] The J20 Order directs government officials, including agency Defendants, to eliminate "DEI," "DEIA," and "environmental justice" from the federal government, including through expenditure of public funds. J20 Order § 2(b)(i). The J21 Order targets the private sector, including major corporations, the medical industry, and institutions of higher education. J21 Order § 1.

Although the Orders repeatedly refer to DEI as "illegal," "immoral," and "discriminatory," "neither Order ever defines DEI or its component terms." Stay Order at 4 (Diaz, C.J., concurring). It is also unclear from the Orders whether everything labelled "DEI" or "DEIA" is considered illegal or, if only certain practices are "illegal DEI," and if so, which ones. *See id.* at 4 n.2 ("[I]t's unclear what types of programs—formal or informal—the administration seeks to eliminate."). Section 1 of the J21 Order, for example, refers to "immoral race and

---

[2] Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing,* 90 Fed. Reg. 8339 (Jan. 29, 2025); Exec. Order No. 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 31, 2025).

sex-based preferences under the guise of so-called [DEI] or [DEIA] that can violate the civil-rights laws of this Nation." But Section 2 directs agencies to "combat" not just allegedly unlawful "preferences," but also "illegal private-sector DEI preferences, mandates, policies, programs, and activities." Section 3 sweeps broader still, directing certain agencies to "immediately cease" "[p]romoting 'diversity'" and to "[t]erminate all 'diversity,' 'equity,' 'equitable decision-making,' 'equitable deployment of financial and technical assistance,' 'advancing equity,' and like mandates, requirements, programs, or activities." Section 4 seeks to deter not only "DEI programs" but "principles" too—and "under whatever name they may appear"—if they somehow "constitute illegal discrimination and preferences." Neither the J21 Order nor Defendants have explained what either "DEI programs" or "principles" are or which ones are illegal.

Plaintiffs challenge three provisions in the two Orders:

**Certification Provision**: The J21 Order requires agencies to "include in every contract or grant award" a "term requiring" the grantee or contractor "to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." J21 Order § 3(b)(iv)(B). A materially false certification may result in treble damages and civil penalties under the False Claims Act (FCA) and possible criminal liability. *Id.* § 3(b)(iv)(A); 31 U.S.C. §§ 3729(a), 3730(d); 18 U.S.C. § 287.

**Termination Provision**: The J20 Order requires agencies to "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts." J20 Order § 2(b)(i).

**Enforcement Threat Provision**: The J21 Order directs the Attorney General to develop "[a] plan . . . to deter [private sector] DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences," and to work with agencies to identify "potential civil compliance investigations" of "institutions of higher education with endowments of over 1 billion dollars," among others. J21 Order §§ 4(b), 4(b)(iii).

## III. Implementation of the Executive Orders and Impact on Plaintiffs

Federal agencies swiftly implemented the Orders across the government. *E.g.*, JA73-77. The implementation actions make clear that the gravamen of the Orders was to conduct an ideological purge rather than to target unlawful conduct.

For instance, the Department of Labor instructed grantees to "cease *all* award activities related to [DEI or DEIA]," without limiting this order to "illegal" DEI or DEIA programs. SA2 (emphasis added); JA74. The Department of Education similarly terminated training grants for diversity, equity, and inclusion. SA8-9; JA76. The Attorney General instructed DOJ components to terminate all "equity-related" grants or contracts and to "pay particular attention to ending references to DEI and DEIA . . . including references to 'unconscious bias,'

'cultural sensitivity,' [and] 'inclusive leadership.'" JA75. The same day, the

Attorney General declared that DOJ would "investigate, eliminate and penalize

illegal DEI and DEIA." JA75. Days later, the Federal Communications

Commission announced it was investigating a major corporation because its

website promoted DEI as a "core value" and it had a "DEI infrastructure." SA69;

JA77.

　　　　Agencies' efforts to implement the Orders have affected Plaintiffs and their

members. The Department of Health and Human Services demanded that

Baltimore "immediately terminate all activities promoting diversity, equity, and

inclusion that are supported with funds from [a CDC] award in light of the

Orders." SA5; JA86. AmeriCorps instructed Baltimore to certify that its awards

"comply with all administration Executive Orders" and do not "promote DEI

activities." SA65 ¶ 11; JA87. The National Endowment for the Arts issued a

similar certification with added warnings about FCA liability and that "the United

States has the right to seek judicial or administrative enforcement of this

assurance." SA82, JA77.

　　　　Citing the Orders, the National Science Foundation refused to approve a

request from an AAUP member, a professor, to travel to a conference as part of

their NSF-funded project regarding gender disparities and diversity in the sciences.

*See* SA57 ¶¶ 4-5; JA85; *see also* SA66-68 (NSF conducted word searches for

"women" and "diversity," among other words, in researchers' projects to determine compliance). Another AAUP member was instructed to stop work on their project regarding equity of access to crucial services and goods when a Department of Transportation subaward was terminated. SA57-58 ¶ 6; JA85-86.

NADOHE Institutional Member A's conference on alternate models of education at Historically Black Colleges and Universities, funded by a subaward under a DOL grant, was cancelled after DOL issued a "stop work" instruction and directed the conference be canceled. SA60-61 ¶ 4; JA85. NADOHE's own annual conference has also been affected. NADOHE had to refund registration fees as attendees cancelled due to the Orders. SA61 ¶ 7. Further financial losses are likely, based on NADOHE's experience of losing nearly all its members in Florida and Texas following state-level attacks on DEI similar to the Orders. SA30-31 ¶ 45. Membership dues and conference fees are NADOHE's largest sources of revenue. SA30-31 ¶ 45.

## IV. Procedural history

On February 3, 2025, Plaintiffs brought this suit against Defendants President Trump, the Attorney General, several agencies, and the heads of those agencies in their official capacities. JA11, JA26-30. Plaintiffs alleged that the Certification and Enforcement Threat Provisions violated their First Amendment right to free speech. JA57-58 (Count 4), JA58-59 (Count 5). Plaintiffs also alleged

11

that the Enforcement Threat and Termination Provisions violated the Fifth
Amendment. JA54-55 (Count 2), JA55-57 (Count 3).[3]

On February 21, the district court found that Plaintiffs were likely to succeed
on their First and Fifth Amendment claims and had also established the other
equitable factors supporting a preliminary injunction. Thus, it preliminarily
enjoined "Defendants other than the President, and other persons who are in active
concert or participation with Defendants" from requiring any grantee or contractor
to make any certification pursuant to the Certification Provision. JA130. The
district court preliminarily enjoined terminations and other changes to awards or
contracts on the basis of the Termination Provision. JA130. The district court also
enjoined agencies from bringing any "enforcement action, pursuant to the
Enforcement Threat Provision, including but not limited to any False Claims Act
enforcement action premised on any certification made pursuant to the
Certification Provision," but it did not enjoin the Attorney General from preparing
a report or conducting investigations under that provision. JA126, JA130. On
March 10, the district court clarified that the preliminary injunction "applies to and
binds Defendants other than the President, as well as other federal executive

---

[3] Plaintiffs also alleged that the Certification Provision violated the
separation of powers and that the Termination Provision violated the Spending
Clause, but the district court did not reach those issues in its preliminary injunction
order. JA53-54 (Count 1), JA59-60 (Count 6), JA91, JA108 n.11, JA113 n.12.

branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions directed pursuant to the J20 and J21 Orders." JA154.

On March 14, a panel of this Court stayed the preliminary injunction pending appeal. Dkt. 29. The concurring opinions suggested that more information on implementation and enforcement of the Orders could be helpful in deciding the merits. *Id.* Thus, on March 21, Plaintiffs asked the district court to vacate the preliminary injunction. *See* Dkt. 33 (attaching motion to vacate). Consistent with the guidance from the panel of this Court, Plaintiffs intended to amend their complaint to add new claims and plead new facts regarding agencies' interpretation and implementation of the Orders. Dkt. 33 at 2. On May 1, the district court denied the motion under the standards of Federal Rule of Civil Procedure 59(e) but emphasized that it "remains of the view that Plaintiffs have shown a strong likelihood of success on the merits" on their First and Fifth Amendment claims. SA86, 93.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant a preliminary injunction for abuse of discretion. *Roe v. DOD*, 947 F.3d 207, 219 (4th Cir. 2020). "[T]he decision to issue or deny a preliminary injunction is committed to the sound discretion of the trial court. That decision will not be disturbed on appeal unless the record shows an abuse of that discretion, regardless of whether the appellate court

would, in the first instance, have decided the matter differently." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). Factual findings are reviewed for clear error and questions of law de novo. *Id.*

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in preliminarily enjoining the Certification, Termination, and Enforcement Threat Provisions. The Orders denigrate "DEI" and "DEIA" as "illegal," "immoral," and "discriminatory" but fail to define those terms or say "what programs—formal or informal—the administration seeks to eliminate." Stay Order at 4 n.2 (Diaz, C.J., concurring). As a result, scores of federal grantees and contractors cannot know what conduct or speech will cause them to lose federal funding or be exposed to hefty penalties including under the FCA. They will necessarily steer clear of anything related to "DEI" or "DEIA," including speech or conduct that is lawful and protected by the First Amendment. The district court thus correctly determined that these vague and speech-chilling provisions likely violate the First and Fifth Amendments.

As the district court correctly determined, Plaintiffs have standing to challenge these provisions. Plaintiffs and their members hold federal grants or contracts and promote diversity, equity, inclusion, and accessibility as part of their work. Due to the Certification Provision, they face losing choices: change their programming in order to certify that they do not promote DEI, certify without

changes and risk making a false certification subject to FCA penalties, or give up federal funding. NADOHE's members include institutions of higher education with endowments of over $1 billion, one of the specific private sector targets in the Enforcement Threat Provision. NADOHE's and AAUP's memberships also include faculty or diversity professionals at such institutions who fear their speech will subject their institutions to investigation and enforcement under the Enforcement Threat Provision. Plaintiffs and their members also have grants that are likely to be considered "equity-related" and thus subject to the Termination Provision.

Absent a preliminary injunction, Plaintiffs and their members will be irreparably harmed by the challenged Provisions, as will the public interest. The marketplace of ideas is diminished when the government abuses its power to restrict free and open debate about how race, gender, disability, and other lived experiences affect our lives and how we can correct inequitable social disparities. And, not only is the loss of First Amendment freedoms unquestionably an irreparable injury, Defendants do not contest the district court's finding that the challenged provisions threaten NADOHE's very existence and the livelihoods of numerous NADOHE and AAUP members who have devoted their professional lives to furthering diversity, equity, inclusion, and accessibility. The temporary restraint on the government is slight in comparison. Defendants claim that the

Orders are simply about preexisting antidiscrimination laws. Even with a preliminary injunction, the government would still be able to enforce preexisting laws using preexisting enforcement tools.

## ARGUMENT

### I.      Plaintiffs' Claims Are Justiciable

The district court correctly determined Plaintiffs have standing. Plaintiffs demonstrated two concrete, actual or imminent injuries caused by the challenged provisions: (1) the chilling of their First Amendment protected speech and (2) the loss of critical federal funds. Enjoining enforcement of the challenged provisions and declaring them unconstitutional would redress these harms. Plaintiffs have also shown that their claims are ripe, based on their injuries, and that the Tucker Act does not present a jurisdictional barrier as Plaintiffs seek only declaratory and injunctive relief for their constitutional claims.

### A.      Plaintiffs Have Demonstrated Standing.

The district court correctly concluded that Plaintiffs have standing. To establish standing, a plaintiff must "demonstrate the now-familiar elements of injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007).[4] An injury in fact must be "concrete, particularized, and actual or

---

[4] To assert associational standing, NADOHE and AAUP must demonstrate that at least "one of their identified members" have standing "in their own right,"

16

imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up). To be concrete, an injury "must actually exist," that is, it must be "'real,' and not 'abstract.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016). To be particularized, it "must affect the plaintiff in a personal and individual way." *Id.* Causation and redressability go hand in hand: "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380-81 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)).

In First Amendment cases, the rules for standing are "somewhat relaxed." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013); *see also Eisenstadt v. Baird*, 405 U.S. 438, 445–46 & n.5 (1972). That leniency, particularly as to injury in fact, exists because "a chilling of the exercise of First Amendment rights is, itself, a constitutionally sufficient injury." *Edgar v. Coats*, 454 F. Supp. 3d 502, 525 (D. Md. 2020), *aff'd sub nom. Edgar v. Haines*, 2 F.4th 298 (4th Cir. 2021) (cleaned up).

---

that "the interests at stake are germane" to their purpose, and that the claims or relief requested do not require individual members to participate. *See Outdoor Amusement Bus. Ass'n, Inc. v. DHS*, 983 F.3d 671, 683 (4th Cir. 2020) (cleaned up). As discussed below, they have met their burden as to the first element. In addition, the second and third elements are easily met and undisputed: there is no question that diversity and equity are "germane" to their purposes (*see* SA20-23 ¶¶ 6-15; SA35 ¶¶ 7-12; JA78), and the claims asserted here do not require individual members to participate.

"Injury-in-fact may be established" in at least two ways: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder," or (2) by a "sufficient showing of self-censorship which occurs when a claimant is chilled from exercising his right to free expression." *Am. Fed'n of Gov't Emps. v. Office of Special Couns.*, 1 F.4th 180, 187 (4th Cir. 2021) (citations omitted). As to the latter, "a claimant need not show [it] ceased those activities altogether to demonstrate an injury in fact." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011). Rather, "[g]overnment action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey*, 721 F.3d at 235–36 (citation omitted).

> ### i. Plaintiffs have standing to challenge the Certification Provision.

The Certification Provision chills speech. Baltimore and NADOHE's and AAUP's members "based on their previous and planned activity as federal grantees," have faced or will likely face a "lose-lose-lose" choice: "change their programming to enable them to make the certification; make the certification without changes and risk a false certification; or give up federal funds and contracts." *Nat'l Urb. League v. Trump*, No. 25-cv-471, 2025 WL 1275613, at *11 (D.D.C. May 2, 2025).

Plaintiffs' concerns are objectively reasonable. The J21 Order on its face leaves no discretion to the agencies—each agency head "shall" include the certification in "every" contract or grant award. J21 Order § 3(iv)(B). Thus, there is a high likelihood that Plaintiffs or their members, who have federal grants and contracts from many agencies, will be required to certify. Baltimore, for instance, has already been instructed by AmeriCorps to certify. SA65 ¶ 11; JA86-87. Baltimore "fears it may have to abandon its lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds that support the City's valuable programs." SA54 ¶ 35; JA89. NADOHE's and AAUP's members who hold federal grants and contracts, JA96, will likely be required to certify too. *See, e.g.*, JA76 (certification reportedly sent to federal contractors on or around February 7); SA81-82 (National Endowment for the Arts certification requirement); JA77 (same). Defendants concede, as they must, that "plaintiffs experience some direct effects from the Certification Provision." OB36. A "person of ordinary firmness" faced with this situation would steer clear of any speech or activities arguably promoting diversity, equity, and inclusion out of fear that she would lose all federal funding. *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967) ("When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone…'") (citation omitted).

Defendants claim that Plaintiffs lack standing because they have not "allege[d] that they wish to engage in DEI programs that are unlawful." OB34. But "a plaintiff who wishes to challenge the constitutionality of a law" is not required "to confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) (a plaintiff facing government administrative action under a statute making certain types of false statements illegal had standing to challenge the statute even though the plaintiff insisted its statements were true, i.e., not illegal). Rather, the focus is on the breadth of the certification and whether the government is likely to enforce it. Here, Baltimore has already been asked to certify. The same is highly likely for the other Plaintiffs' members, as the J21 Order appears to leave agencies no discretion to *not* require certifications.

> ii. **Plaintiffs have standing to challenge the Enforcement Threat Provision.**

The Enforcement Threat Provision also chills speech. The Enforcement Threat Provision targets the private sector, specifically "institutions of higher education with endowments over 1 billion dollars." J21 Order § 4(iii). Nationwide, a short list of about 120 institutions of higher education fall in that category, JA40 ¶ 89, and several of those institutions are members of NADOHE. SA20 ¶ 5; JA78. Likewise, AAUP has members who "are employees of institutions of higher learning with endowments exceeding $1 billion." SA35 ¶ 5; JA88.

The Enforcement Threat Provision reaches beyond unlawful conduct and silences broad swaths of protected speech. In addressing the chilling effect, Defendants ask this Court to view the Enforcement Threat Provision as an innocuous "Report Provision" aimed at "deter[ing] certain unlawful conduct." OB11. But Defendants' rose-colored interpretation ignores the vitriolic and overbroad language used throughout the Orders. *See, e.g.*, J20 Order § 1 (referring to all DEI as "illegal and immoral discrimination programs"); J21 Order § 1 (referring to all DEI and DEIA as "dangerous, demeaning, and immoral race- and sex-based preferences."). The Orders draw no distinction between lawful and unlawful DEI and DEIA programs. The Orders certainly do not explain how support of a DEI "principle," i.e., a belief, could violate existing antidiscrimination laws. Likewise, agencies' interpretation and implementation of the Orders contradict Defendants' reading. *See* JA77 (citing SA69-71) (agency's investigation of a large corporation, citing the Orders, because the company promoted DEI as a "core value" on its website and had a "DEI infrastructure"); *see also infra* 41-42.

As the defined targets of the Enforcement Threat Provision, the members of NADOHE and AAUP reasonably fear retribution, in the form of investigation and ensuing enforcement actions, if they continue their speech and conduct in support of diversity, equity, and inclusion. *See, e.g.*, SA26-28 ¶¶ 31, 32, 34; SA43 ¶ 40-42. Their activities include promoting racial and gender diversity in standing

committees established for that purpose (*see* SA41 ¶ 28; JA88); teaching or researching topics related to diversity or equity (*see* SA36 ¶ 13; SA43 ¶ 40; JA88); and advocating for targeted support and resources for a diverse student body including students from historically underrepresented groups, women, and persons with disabilities (*see* SA21 ¶ 11). Institutional Member H of NADOHE explained that, as an institution with a large endowment, it fears its protected speech will be penalized and that it "may be targeted for investigation but lack[s] clarity about how to avoid the financial, reputational, and organizational costs of such an investigation." JA88 (quoting SA26 ¶ 31).

The chilling effect Plaintiffs established is objectively reasonable: they set out both a "specific present objective harm" and "a threat of specific future harm" to their speech. *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). *Laird* is instructive when juxtaposed with the facts of this case. In contrast to the plaintiffs in *Laird*, the government is doing more than collecting data, which raised only the mere prospect of potential misuse one day in the future. *Id.* at 13. Rather, Plaintiffs object to a viewpoint discriminatory policy that fixes a target on them (or their members), as opposed to a general objection to the existence of a government program. And their claim does not rest on speculation, as Defendants have taken steps to interpret and implement the Enforcement Threat Provision in a viewpoint discriminatory way that chills speech. *See, e.g.*, JA115 (discussing White House

and Attorney General's interpretations); JA77 (investigation of business for its support of DEI as a core value).

### iii. Plaintiffs have standing to challenge the Termination Provision.

Plaintiffs have shown that they face actual or imminent injury—losing federal funds—because of the Termination Provision.[5] Baltimore is both a federal contractor and grantee. SA50 ¶ 17; *see also* JA79. The Department of Health and Human Services demanded that Plaintiff Baltimore "immediately terminate" all activities "promoting 'diversity, equity, and inclusion' (DEI)" supported with its federal award in light of the Orders. SA5; JA86.

NADOHE's and AAUP's members are universities and university faculty and staff, many of whom receive federal funds for their work. *See, e.g.*, SA23 ¶ 16; SA36 ¶¶ 14-15; SA57-58 ¶¶ 4-7; JA78; JA84-86. The National Science Foundation cited the Orders in refusing to approve a travel request from an AAUP member, a professor, to attend a conference as part of their NSF-funded project regarding gender disparities and diversity in the sciences. *See* SA57 ¶¶ 4-5; JA85. Another individual NADOHE member lost her contract, supported by funding from the NSF, due to the Orders. SA27 ¶ 33; SA61 ¶ 6; JA85.

---

[5] "[O]nly one plaintiff needs to have standing for [this] court to hear the case." *Outdoor Amusement Bus. Ass'n*, 983 F.3d at 681 (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)).

Agencies' efforts to eliminate "DEI" or "equity-related" grants and contracts pursuant to the Orders have been widely reported. *See, e.g.*, SA66-67 (NSF's keyword searches to determine compliance); SA8 (termination of training grants for diversity, equity, and inclusion). Based on this evidence, Plaintiffs adequately established actual harm, or at least "threats or increased risk" of harm. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000).

Defendants protest that Plaintiffs did not state with certainty which of their equity-related grants and contracts are at risk of termination. *See* OB14-15. But Plaintiffs *did* identify which of their awards would likely be subject to the anti-equity Termination Provision. *See, e.g.*, SA23 ¶ 17 (grants addressing health equity); SA38-40 ¶ 21 (grants promoting diversity in the sciences); SA51 ¶ 20 (grants addressing health disparities by race, gender, and sexual orientation). And the record shows that agencies have already stopped Plaintiffs and their members from performing grant-funded work based on the Orders. *See, e.g.*, SA5, SA57 ¶¶ 4-5, SA60-61 ¶ 4; JA85-87. Given the President's sweeping mandate for agencies to terminate "all" equity-related contracts "maximum[ally]," the likelihood that Plaintiffs' grants will be affected adversely is high.

## B.    Plaintiffs' Claims Are Ripe.

The district court correctly determined that Plaintiffs' claims are ripe. The question of ripeness goes to when a party may sue. *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022). "Ripeness requirements are also relaxed in First Amendment cases" given the need for "immediate protection" and the "special need to protect against any inhibiting chill." *Cooksey*, 721 F.3d at 240 (citation omitted). To determine justiciability, courts "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (cleaned up). Judicial review is appropriate when "the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.*

Defendants insist that Plaintiffs' claims rely on future uncertainties, *see* OB28-29, but Plaintiffs' harm is far from speculative given the reality of enforcement. The Termination Provision mandates that agencies terminate "*all*" equity-related grants and contracts within 60 days. J20 Order § 2(b)(i) (emphasis added). As discussed above, *supra* 23-24, agencies have already implemented the Termination Provision. Defendants' reliance on the boilerplate language, "to the maximum extent permitted by law," cannot withstand the reality of how the Orders have been enforced. That is even truer here where agencies *have* enforced the Termination Provision, and Defendants incorrectly claim that the government has

unbridled authority to cancel grants and contracts. *See* OB22. Likewise, the Enforcement Threat Provision threatens enforcement based on protected speech, and Plaintiffs have demonstrated an objectively reasonable chill based on those threats and actions. *See supra* 20-23.

Nor can Defendants escape judicial review by attempting to frame the Orders as "intra-governmental directives." OB13. That proposition would render judicial review of virtually all executive orders almost impossible as the President necessarily acts by directing subordinate executive officers and agencies. It is with good reason, then, that courts have repeatedly entertained challenges to executive orders with "intra-governmental directives" and found them justiciable. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583 (1952) (executive order directing Secretary of Commerce to seize the steel mills); *PFLAG, Inc. v. Trump*, No. 25-cv-337, 2025 WL 685124, at *2 (D. Md. Mar. 4, 2025) (executive order directing agencies to "ensure grant funds do not promote gender ideology").

The Orders are not unique. Presidential directives are justiciable when they "create adverse effects of a strictly legal kind," such as when they "grant, withhold, or modify any formal legal license, power, or authority," "subject anyone to any civil or criminal liability," or otherwise affect "legal rights or obligations." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Plaintiffs have adequately

demonstrated legal harm caused by the challenged provisions in the Orders, i.e., the chilling of their speech and the high risk of losing federal funds.

Absent judicial review at this juncture, Plaintiffs will experience hardship. "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] . . . ." *Miller*, 462 F.3d at 319 (cleaned up) (brackets in original). "When considering hardship, [the court] may consider the cost to the parties of delaying judicial review." *Id.* (citation omitted). If the Court adopts Defendants' theory of ripeness, Plaintiffs and their members have no recourse other than to wait for an executive agency to bring an enforcement action or terminate their federal awards, seriously disrupting their ability to carry out their work and mission, before seeking relief. By then, the harm cannot be undone.

### C. The Tucker Act Does Not Apply.

The Court should reject Defendants' Tucker Act defense, 28 U.S.C. § 1491(a)(1), OB15-16 n.1, which applies only to suits against the United States that sound in contract. Far from implicating contract law, Plaintiffs do not even seek monetary damages; instead, they seek equitable declaratory and injunctive relief. JA60-61. Moreover, Plaintiffs' constitutional claims are not based on a particular

contract or agreement, nor do they seek relief that could be considered quasi-contractual.[6]

## II. Plaintiffs Will Likely Succeed on their Constitutional Claims

The district court correctly determined that Plaintiffs are likely to succeed on

the merits. The Certification and Enforcement Threat Provisions infringe on

Plaintiffs' First Amendment right to engage in speech and expressive conduct that

"promotes" diversity, equity, and inclusion. The Termination and Enforcement

Threat Provisions also violate Plaintiffs' due process rights, as they are

impermissibly vague under the Fifth Amendment.[7]

---

[6] Even if Plaintiffs were to seek relief as to specific awards, the District Court would still have jurisdiction. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988). Several district courts have awarded relief for the termination or freezing of federal awards even when monetary payment would result. *See, e.g.*, *Woonasquatucket River Watershed Council v. USDA*, No. 25-cv-097, 2025 WL 1116157, at *15 (D.R.I. Apr. 15, 2025) (rejecting Tucker Act jurisdictional defense in challenge to agencies' freezes of federal awards); *Maine v. USDA*, No. 25-cv-131, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) (deciding APA claims based on the termination of USDA grants even where the TRO would likely result in monetary payments).

[7] A motions panel of this Court, in deciding a request for a stay pending appeal, determined that the challenged provisions were unlikely to violate the First or Fifth Amendment, Stay Order at 7 (Harris, J., concurring), 9 (Rush, J., concurring); *see also id.* at 4 (Diaz, C.J., concurring), but given that "practical realities dictate that a preliminary motion . . . before a motion panel is often without the benefit of full briefing and oral argument," that determination is not binding on a merits panel. *CNF Constructors, Inc. v. Donohoe Constr. Co.*, 57 F.3d 395, 398 n.1 (4th Cir. 1995); *see also E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660 (9th Cir. 2021) ("In deciding whether the court should stay the grant or denial of a preliminary injunction pending appeal, the motions panel . . . is predicting rather than deciding what our merits panel will decide.").

## A. The Certification Provision Discriminates Based on Content and Viewpoint.

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). The government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (cleaned up). This principle applies even where the government sets rules for contractors or grantees, because "the liberties of religion and expression may [not] be infringed by the denial of or placing of conditions upon a benefit or privilege." *Keyishian*, 385 U.S. at 606.

When the government restricts the right to speak based on content, that restriction is presumptively unconstitutional. "Government discrimination among viewpoints—or the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'" is a "blatant" and "egregious form of content discrimination." *Reed*, 576 U.S. at 168 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). To survive strict scrutiny, the government must prove that the viewpoint discriminatory restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id*. at 171 (citations omitted). "If a less restrictive alternative would serve the Government's

purpose, the [government] must use that alternative." *United States v. Playboy Ent. Grp.,* 529 U.S. 803, 813 (2000).

Defendants do not dispute that the Certification Provision discriminates between viewpoints, as it plainly does. All federal grantees and contractors must certify as a condition of funding that they do not "operate any programs promoting DEI that violate any applicable Federal antidiscrimination laws," J21 Order § 3(iv)(B), yet no similar certification about *opposing* "DEI" is required.

Defendants fail to satisfy strict scrutiny, i.e., their burden to show that the Certification Provision is narrowly tailored to serve a compelling interest. *Playboy Ent. Grp.*, 529 U.S. at 813. To establish a compelling government interest, Defendants cannot simply conjure an interest from thin air; rather, Defendants must present evidence—"more than anecdote and supposition"—to prove the existence of "an actual problem." *Id*. at 822. Defendants have not done so.

Even if Defendants could establish a compelling government interest, the Certification Provision is both fatally overinclusive and underinclusive, and certainly not "narrowly tailored." *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016).

The Certification Provision is "fatally underinclusive" because it "leav[es] appreciable damage to [the government's] interest unprohibited." *Id.* at 633 (quoting *Reed*, 576 U.S. at 172). Notably, the Certification Provision singles out

30

for punishment "promoting DEI" in a way that violates "Federal anti-discrimination law," including FCA liability, yet it does not seek to punish other violations of "Federal anti-discrimination law" in the same way. Just as egregious, though the J21 Order asserts a goal of "end[ing] illegal preferences and discrimination," it revokes longstanding executive orders that *prohibited* discrimination, such as Executive Order 13672, which barred discrimination on the basis of sexual orientation and gender identity.

The Certification Provision is also "unconstitutionally overinclusive" because it "'unnecessarily circumscrib[es] protected expression.'" *Cent. Radio Co.*, 811 F.3d at 633 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002); *accord Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (regulation must "target[] and eliminate[] no more than the exact source of the 'evil' it seeks to remedy").

To begin, the provision is so vague as to chill a variety of protected speech. The Orders repeatedly refer to "DEI" as "illegal," *see, e.g.*, J21 Order § 2 (referring to "illegal private-sector DEI preferences, mandates, policies, programs, or activities"), but it is impossible to discern from the Orders what types of speech or activities constitute "DEI" or "promoting DEI," and when such actions violate federal antidiscrimination laws. Tellingly, after numerous rounds of briefing and after questioning by the district court, Defendants still have not been able to

articulate exactly what the Orders seek to eliminate. *Chi. Women in Trades v. Trump,* No. 25-cv-2005, 2025 WL 1114466, at *11 (N.D. Ill. Apr. 14, 2025) ("[A]lthough the government emphasized, both in its briefing and at oral argument, that the Certification Provision implicates only *illegal* DEI programs, it has studiously declined to shed any light on what this means."). It is unclear, for example, whether advocating for university leadership to provide more resources for former foster care youth (a population that is disproportionately non-white) to navigate college is considered "promoting DEI" in a way that violates some antidiscrimination law. *See* SA21 ¶ 11. Would encouraging businesses to participate in trainings on how to provide a more welcoming visitor experience for tourists with disabilities or LGBTQIA tourists be "illegal DEI"? *See* SA50 ¶ 16. Is discussing at a conference the barriers women face in entering the sciences "illegal DEI"? *See* SA47 ¶ 4 (NSF refusing to approve grantee's travel to a conference as part of the grantee's research into gender disparities in STEM); JA85 (same).

At the same time, the Certification Provision's reach is extremely broad. The provision requires *all* grantees and contractors to certify that they do not operate "*any*" programs "promoting DEI," which the government's counsel has confirmed includes programs outside the scope of the federal award. *Chi. Women in Trades*, 2025 WL 1114466, at *11 (quoting hearing transcript: "[W]e're not arguing that the Certification Provision doesn't apply outside of the grants or contracts. It does.

It plainly does."). And the stakes are high. If the government (or a private-party relator) believes that the recipient made a false certification, the recipient can be subject to costly and reputationally harmful FCA litigation. *See, e.g.*, *Nat'l Educ. Ass'n v. Dep't of Educ.*, No. 25-cv-091, 2025 WL 1188160, at *12 (D.N.H. Apr. 24, 2025) (enjoining implementation of Department of Education's certification requirement, recognizing "serious threats" posed by FCA and other enforcement).

To avoid the perception that they are "promoting DEI" in some undefined but illegal way—and to avoid loss of funding and FCA liability—Plaintiffs and their members will be forced to self-censor a broad range of speech, including diversity, equity, inclusion, and accessibility topics that the public should be able to freely debate.

Defendants' assertion that the Certification Provision only furthers "compliance with existing legal obligations," OB38, merely confirms its overinclusivity. If the Provision only covers violations of "applicable Federal anti-discrimination laws," then it "sweeps up an enormous amount of protected speech" while covering conduct *already* prohibited under "[l]ongstanding Federal civil-rights laws." J21 Order § 1; *Honeyfund.com v. Desantis*, 622 F. Supp. 3d 1159, 1179 (N.D. Fla. 2022), *aff'd* 94 F.4th 1272 (11th Cir. 2024) (finding law not narrowly tailored because it prohibited conduct "[t]hat is already illegal").

Defendants also suggest that, to the extent Plaintiffs engage in unlawful DEI programs, that conduct is not protected under the First Amendment and thus the Certification Provision does not chill First Amendment protected speech. *See* OB34-35. But the Certification Provision targets programs "promoting" DEI. Even if all "DEI" (whatever the government thinks "DEI" is) were per se illegal (it isn't), there would still be situations where the First Amendment protects the right to discuss DEI and even to "promote" it. "[I]t is a bedrock First Amendment principle that advocating for violation of the law cannot be proscribed unless it rises to incitement" of violence, for example, which "promoting DEI" does not. *Chi. Women in Trades*, 2025 WL 1114466, at *12 (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)).[8]

In other words, the legality of conduct is not dispositive of whether speech about it is protected. In *Keyishian*, for example, a lecturer at a state university was required to answer whether he had "advised or taught" or was a member of a group that "taught or advocated" for the government to "be overthrown or overturned by

_____

[8] Section 7(c) of the J21 Order seems to recognize this principle, as it states that the "[t]his order does not prohibit persons teaching at a Federally funded institution of higher education as part of a larger course of academic instruction from advocating for, endorsing, or *promoting* the unlawful employment or contracting practices prohibited by this order" (emphasis added). But even with this carve-out, the Certification Provision is still not narrowly tailored. The carve-out only applies to those teaching "as part of a larger course," meaning those promoting purportedly "illegal DEI" in any other context would still be subject to the Certification Provision.

force, violence or any unlawful means" based on a state law that required removal for "seditious" words or acts. 385 U.S. at 592. While the Court recognized the state's legitimate interest in "protecting its education system from subversion," the Court struck down the statute on First Amendment grounds because the statute did not sufficiently specify what conduct was seditious. *Id.* at 599. It was unclear, for example, whether "a teacher who carries a copy of the Communist Manifesto on a public street thereby advocate[s] criminal anarchy[.]" *Id.* Just as the legality of the actions being advocated or taught (overthrowing the government by force) was not dispositive in the First Amendment analysis in *Keyishian*, the legality of the activities being promoted (DEI) is not dispositive here. In *Keyishian*, "[t]he crucial consideration [was] that no teacher can know just where the line is drawn between 'seditious' and nonseditious utterances and acts." *Id.* Here, similarly, the crucial consideration is that no person can tell what speech or conduct constitutes "DEI," "promoting DEI," or "illegal DEI" under the J21 Order. And this results in chilling of protected speech.[9]

### B. The Termination Provision Is Unconstitutionally Vague.

Vague laws offend the Due Process Clause of the Fifth Amendment. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Executive orders can be—

---

[9] Thus, the Certification Provision does not "apply only to conduct that violates existing federal anti-discrimination law." Stay Order at 7 (Harris, J., concurring).

and have been—subject to review under constitutional vagueness standards. *See Humanitarian L. Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146 (9th Cir. 2009) (evaluating executive order for vagueness); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 529 (N.D. Cal. 2020) (holding unconstitutional an executive order that prohibited certain "divisive concepts" including the belief that "the United States is fundamentally racist or sexist").

A law is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (cleaned up). When a law lacks "minimal guidelines," enforcement decisions are left to the "personal predilections" of the person or entity tasked with enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)). Vagueness principles "appl[y] with particular force in review of laws dealing with speech." *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 781 (4th Cir. 2023) (quoting *Hynes v. Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976)).

The Termination Provision is impermissibly vague as it is standardless and susceptible to discriminatory enforcement. It mandates that agencies "shall" "terminate . . . all . . . 'equity-related' grants or contracts." J20 Order §2(b)(i). But

what does "equity-related" mean? Neither Order speaks to this, but several dictionaries do. *See*, *e.g.*, Oxford English Dictionary Online (defining "equity" as "the quality of being equal or fair"); Merriam-Webster Online Dictionary (defining "equity" as "a fairness or justice in the way people are treated"). These broad definitions simply do not provide any guidance as to which grants or contracts must be terminated. And because the J20 Order leaves the term "equity-related" undefined while simultaneously calling for termination of federal awards and the decimation of "immoral" diversity, equity, and inclusion programs, J20 Order §§ 1, 2(b)(i), agencies are free to terminate grants and contracts as they please, even based on protected speech. *National Endowment for the Arts v. Finley*, 524 U.S. 569, 588-89 (1998) (recognizing vague standards promote arbitrary and discriminatory enforcement that could compel speakers to "steer far too clear" from protected conduct). In *Finley*, the Court expressed that the constitutional concerns with the NEA's vague grant selection criteria would be more severe if it involved a criminal statute or regulatory scheme rather than "in the context of [NEA] grants of this nature." *Id.* at 588. But the Court did not foreclose all claims of unconstitutional vagueness for already-awarded grants, especially when the danger of coercion and suppression is clear.

The agencies' implementation actions[10] confirm the arbitrary and discriminatory enforcement of the Termination Provision. Within days of the J20 Order, the Department of Labor ordered federal award recipients to "cease all activities related to diversity, equity, and inclusion (DEI) or [DEIA] under their federal awards, consistent with the requirements of the EOs." SA3 (internal quotation marks omitted); JA74 (internal quotation marks omitted). The Centers for Disease Control, directed that any "vestige, remnant, or renamed piece of any DEI programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." SA5; JA74. And scientists who received NSF funding were instructed to cease "any other grant activity," including conferences, trainings, and workshops, that "uses or promotes the use of [DEIA] principles and frameworks or violates anti-discrimination laws." SA67.

Defendants claim that "it is by definition lawful to terminate grants or contracts 'to the maximum extent allowed by law.'" OB12. But the boilerplate clause, "to the maximum extent allowed by law," is no cure-all. *See HIAS, Inc. v. Trump*, 985 F.3d 309, 319 (4th Cir. 2021). In *HIAS*, the executive order theoretically allowed the Secretary of State to reject the order's key directive if it

_____

[10] In evaluating a facial challenge, the Court can consider Defendants' "authoritative constructions" of the directive, including their "implementation and interpretation of it." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992).

would be "inconsistent with the policies and strategies established under [the Refugee Act] or other applicable law." *Id.* at 324. But this Court refused to "immunize the order from review" because crediting the savings clause would effectively "nullify the 'clear and specific' substantive provisions of the Order." *Id.* at 325 (quoting *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018)). Here too, the so-called savings clause would nullify the President's clear and substantive directive to terminate *all* "equity-related" grants and contracts based on the theory that agencies retain some general authority to *not* terminate equity-related grants. The so-called "savings clause" does not immunize the Termination Provision from review.

Defendants also claim that "a directive to agencies cannot be unlawful when 'the Executive Order itself instructs the agency to follow the law.'" OB23 (citing *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002)). But whether the Termination Provision is unconstitutionally vague does not turn on whether "the Executive Order itself instructs the agency to follow the law." The facts of the instant case are readily distinguishable. *Allbaugh* did not address the void for vagueness doctrine. There, the D.C. Circuit upheld an executive order's instruction not to require or prohibit certain labor agreements, to be implemented "to the extent permitted by law," against plaintiffs' claim that it was beyond the President's Article II authority. The court dismissed the plaintiffs' concern that an

agency might implement the executive order in a way that was inconsistent with the funding statute because the plaintiffs were relying on "[t]he mere possibility that some agency might make a legally suspect decision." *Allbaugh*, 295 F.3d at 33. Here, the issue before the Court is whether the President's order to terminate all "equity-related" grants itself is unconstitutionally vague, which would make discriminatory and unlawful enforcement likely, not a mere possibility.

Defendants also claim the Termination Provision does not create any vagueness problem because, even absent the Executive Order, agencies purportedly could terminate grants or contracts based on policy preferences with no concrete standard at all. OB22-23. This argument is problematic in multiple ways. First, the issue before the Court is whether the Termination Provision is vague as measured against the Due Process Clause, not whether the Termination Provision is more or less vague than the standard that agencies would rely on if, hypothetically, there were no Termination Provision. Second, agencies' ability to terminate grants or contracts based on policy preferences is not boundless. For example, even when a person has no entitlement to a government benefit, the government "may not deny [that] benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 598 (1972); *see also Bella Lewitzky Dance Found. v. Frohnmayer*, 754 F. Supp. 774, 784 (C.D. Cal. 1991) ("once the

government moves to subsidize, it cannot do so in a manner that carries with it a level of vagueness that violates the First and Fifth Amendments."). Moreover, Defendants' expansive reading of agency authority would make it impossible to determine if termination was "based only on the nature of the grant-funded activity itself," Stay Order at 7 (Harris, J.), rendering "judicial review a meaningless exercise[.]" *See City & Cnty. of San Francisco*, 897 F.3d at 1240.

### C. The Enforcement Threat Provision Is Both Viewpoint Discriminatory and Unconstitutionally Vague.

The Enforcement Threat Provision instructs the Attorney General, in consultation with "the heads of relevant agencies," to develop a plan "to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences," with each agency to identify "up to nine civil compliance investigations" of various sectors, including "institutions of higher education with endowments over 1 billion dollars." J21 Order § 4(b).

The Enforcement Threat Provision leverages the government's enormous control over federal funds and enforcement actions to "deter" disfavored "principles," i.e., those that support diversity, equity, and inclusion. The government's interpretation and implementation of the J21 Order reveals its intent to target and suppress the views it disfavors. A White House fact sheet, issued soon after the J21 Order, made several statements vilifying "DEI", asserting that: "radical DEI has dangerously tainted" institutions; "DEI's foundational rhetoric

and ideas foster intergroup hostility and authoritarianism"; and "DEI creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict." SA16. (The "fact sheet" does not explain what the White House believes "DEI" to be. *Id*.) And the government openly acknowledged its goal to end "deeply demeaning 'equity' mandates" and to "terminat[e] DEI." *Id.* The Attorney General followed suit. In a memorandum addressing the J21 Order's directives, the Attorney General instructed the Civil Rights Division and the Office of Legal Policy to advise on "specific steps to deter the use of DEI and DEIA programs or principles that constitute illegal discrimination or preferences." JA76.

That is unconstitutional viewpoint discrimination. *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024) ("A government official can share her views freely and criticize particular beliefs . . . . What she cannot do, however, is use the power of the State to punish or suppress disfavored expression."). At the very least, it is a presumptively unconstitutional content-based restriction subject to strict scrutiny. *Reed*, 576 U.S. at 163 (explaining that "content-based laws—those that target speech based on its communicative content . . . may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.") (citations omitted). As in *Reed*, here, "the speech being regulated is determined based on the message the speaker conveys, *i.e.*, whether the speech promotes principles of inclusion, equity, and diversity." JA116 (cleaned up).

To satisfy strict scrutiny, it is Defendants' burden to show that the Enforcement Threat Provision is narrowly tailored to serve a compelling interest. Defendants have not met their burden.

The Provision is not narrowly tailored. Because of its vagueness, it impinges on a wide range of protected speech. It is impossible to tell from the J21 Order what constitutes "DEI" or what DEI programs or principles "constitute illegal discrimination or preferences." Are only some DEI programs or principles illegal and, if so, which ones? Or, as Section 4(b) of the J21 Order suggests, are the Orders premised on the understanding that all such programs or principles are illegal? J21 Order § 4(b) ("end illegal discrimination and preferences, *including* DEI") (emphasis added). The Enforcement Threat Provision's targeting of not just DEI programs but also DEI "principles" also causes vagueness and First Amendment problems. How can a belief in the *principles* of diversity, equity, and inclusion be illegal? To avoid the threat of enforcement, a person of ordinary firmness would broadly self-censor speech related to these principles.

Even if the Court credits Defendants' representation that the Orders simply enforce antidiscrimination laws, the Enforcement Threat Provision's coercive tactics would still violate the First Amendment. In *Bantam Books, Inc. v. Sullivan*, the Supreme Court held that a state commission's actions to threaten booksellers for distributing books it classified as obscene were unconstitutional even though

"obscenity is not within the area of constitutionally protected speech." 372 U.S. 58, 65 (1963). The Court explained that the line between obscenity and protected speech was "dim and uncertain," *id.* at 66, and the targeted booksellers would likely self-censor to avoid the commission's broad threats of legal sanctions and other consequences. *Id.* at 69-71; *see also Vullo*, 602 U.S. at 197 (the "First Amendment prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech.") (cleaned up). So too here. Even if Defendants intend to deter "illegal DEI," leveraging the threat of civil compliance investigations and enforcement actions broadly to reach that goal is unconstitutional "informal censorship." *Sullivan*, 372 U.S. at 71.

The Enforcement Threat Provision, particularly coupled with its First Amendment infirmities, is unconstitutionally vague. The provision is intended to "deter DEI programs or principles" in the private sector, including institutions of higher education, by using civil compliance investigations, J21 Order § 4(b)(iii), and "other strategies." *Id.* § 4(b)(iv).

Diversity, equity, and inclusion, or "DEI," covers a broad swath of ideas, concepts, beliefs, and programs. Nevertheless, the Enforcement Threat Provision, like the Orders, does not attempt to define material terms like DEI, DEIA, "equity," or "illegal discrimination and preferences."

Defendants insist that "all plaintiffs must do is comply with federal law itself." OB29; *see also* OB30 ("the order directs the Attorney General to deter only "illegal discrimination") (emphasis in original). But that narrow interpretation is inconsistent with the language in the J21 Order and Defendants' interpretation and implementation of the Orders. Without any explanation as to which DEI programs or principles run afoul of existing civil rights laws, Defendants' stated desire to target only "illegal" DEI provides no comfort. With no clarity as to what unprotected speech the Enforcement Threat Provision prohibits, NADOHE's and AAUP's members have to self-censor to avoid the provision's broad and undefined sweep. *Grayned*, 408 U.S. at 109 (explaining that vague laws cause "cause citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.") (quotation omitted). The district court did not abuse its discretion in enjoining the Enforcement Threat Provision without preventing the government from writing a report or investigating. JA126, JA130 (preliminary injunction order).

## III.   The Irreparable Harm Factor Favors a Preliminary Injunction

The district court acted well within its discretion in finding that, absent a preliminary injunction, Plaintiffs would suffer irreparable harm in the form of chilled speech and unrecoverable monetary harm. It is well established that the "loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) (cleaned up). Defendants' sole argument—that Plaintiffs lack a "cognizable interest in receiving or retaining funds in violation of the antidiscrimination laws or in avoiding investigation for illegal practices," OB45—merely begs the question, for it relies wholly on an assumption that Plaintiffs' speech is unprotected. After all, Plaintiffs *do* have a "cognizable interest" in being free from viewpoint discrimination in "receiving or retaining funds" from the government, *e.g.*, *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013).

Beyond constitutional injury, the challenged provisions pose irreparable injury because they "threaten the livelihoods of numerous of Plaintiffs' members and NADOHE's existence." JA121. For example, NADOHE's revenue comes mainly from membership dues and its annual conference. In the past, when states like Florida and Texas launched similar attacks on DEI, NADOHE lost nearly all of its members and revenue from those states. NADOHE is likely to experience even greater loss of membership and loss of participation in its conferences and events as a result of the federal government's targeting of entities that have "equity-related" grants or operate programs that "promote DEI." SA25–26 ¶ 29, SA30–31 ¶¶ 44-46. NADOHE members have experienced job disruption as a result of the Orders, and NADOHE has already started to see a drop in membership

and conference attendance. SA25–26 ¶ 29; SA27 ¶ 33; SA61 ¶¶ 6–7. As the district court found, NADOHE's monetary injuries are unlikely to be recovered from the government, in light of the doctrine of sovereign immunity. JA121-122. Defendants have not challenged these findings.

### IV. The Balance of the Equities and the Public Interest Factors Favor a Preliminary Injunction

The district court did not abuse its discretion in finding that the balance of the equities and the public interest factor favored a preliminary injunction.

"[I]t is well-established that the public interest favors protecting constitutional rights." *Leaders of a Beautiful Struggle v Balt. Police Dept.*, 2 F.4th 330, 346 (4th Cir. 2021). Absent the preliminary injunction, Plaintiffs and their members will be irreparably harmed by unconstitutional infringements on their First Amendment rights and by severe losses that threaten their operations and existence. The public will be harmed because the marketplace of ideas will be diminished by the loss of free and open discussion about the best ways to "acknowledge[] and respect[]" people's "social identity" and to "open[] opportunity and ensure[] a level playing field for all." Stay Order at 5 (Diaz, C.J., concurring). While Defendant Trump and his allies can express their own views on this topic, they cannot wield the government's incredible power to squelch others' speech or ideas. *Nat'l Rifle Ass'n*, 602 U.S. at 188.

Defendants contend that a preliminary injunction restrains the government from enforcing civil rights law. OB42. But under Defendants' own theory of the case, any such restraint would be slight. Numerous civil rights laws exist and would continue to be readily enforceable even with the preliminary injunction in place. Defendants implicitly recognize this by their claim that all the Orders do is require Plaintiffs to follow existing law such as Title VI, which would apply even if there was no Certification Provision. OB37-39. Under Defendants' own logic, then, the government would still have its preexisting enforcement tools to pursue Title VI violations, including the FCA, even absent the Certification Provision. *Chi. Women in Trades*, 2025 WL 1114466, at *19 (noting that "issuance of a preliminary injunction will not prevent the government from enforcing existing anti-discrimination laws" and that unchallenged provisions of the Orders would remain in effect). A certification provides an additional piece of evidence of materiality in a future FCA case, but Defendants concede that "an express certification is not required to establish False Claims Act liability." OB39. The inconvenience to Defendants of having to prove materiality another way is outweighed by the harm to the public when Plaintiffs and the public are deterred from freely discussing important ideas like diversity, equity, inclusion, and accessibility.

With regard to the Enforcement Threat Provision, the district court did "not enjoin the Attorney General from preparing the report pursuant to the J21 Order, or engaging in investigation." JA126. The government simply must temporarily hold off on bringing enforcement actions pursuant to the Enforcement Threat Provision until the provision's legality has been finally resolved in this lawsuit. *See* JA130. Likewise, the government is temporarily barred from terminating and changing funds only "on the basis of the Termination Provision." *Id.* It remains free to use its existing authorities to terminate grants lawfully for other reasons.

Defendants also claim that the preliminary injunction "prevents the President from directing and controlling executive officers in their exercise of lawful authority." OB44. Again, this turns on a conclusion of the merits of the case. The lawfulness of the Orders has yet to be finally decided in this case. In the meantime, the Court should err on the side of allowing more free speech, not less.

## V.     The Scope of Relief Was Necessary and Appropriate

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Roe*, 947 F.3d at 231 (cleaned up). A district court has "broad discretion to craft remedies based on the circumstances of a case," and should "mold[] its decree to meet the exigencies of the particular case." *HIAS*, 985 F.3d at 326–27 (internal quotation marks omitted) (quoting *Roe*, 947 F.3d at 232).

And, "[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293–94 (1976) (citations and internal quotation marks omitted).

Considering the constitutional violations, the district court's preliminary injunction appropriately extended to Plaintiffs and "similarly situated" non-parties. *HIAS*, 985 F.3d at 326–27; *see also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 582 (2017) (leaving in place nationwide injunctions to the extent they covered "parties similarly situated to" the plaintiffs). Like *HIAS*, the injunction here covers a "categorical policy" where "the facts would not require different relief for others similarly situated to the plaintiffs." *HIAS*, 985 F.3d at 326; *see also* JA125 (recognizing challenged provisions apply to all contractors and grantees and "chill speech as to anyone the government might conceivably choose to accuse of engaging in [disfavored DEI-related] speech").

Nor did the district court abuse its discretion by extending relief beyond the parties where "an injunction limited to the parties" would "fail to provide complete relief to the plaintiffs." *CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *1 (4th Cir. Feb. 28, 2025). For one, NADOHE and AAUP, who have numerous members, would not be afforded complete relief because "an injunction limited to the parties would be unworkable in practice." *Id.* at *1; SA4 ¶ 19 (over 2,200

NADOHE members). It would have required NADOHE and AAUP to identify their many individual and institutional members that Defendants would need to track and manage in deciding who should be spared from enforcement of the Orders. Next, Plaintiffs and their members would have been impacted by the secondary effects caused by enforcement of the Orders as to non-parties. For example, even if NADOHE's members are themselves protected from enforcement, non-parties would be afraid to attend conferences on DEI-related topics organized by NADOHE members. *See* SA24 ¶ 22. Members could lose contracts with non-member partners who fear enforcement of the Orders based on their continued partnership. *See* SA27 ¶ 33 (describing a university's decision to terminate NADOHE Individual Member A's contract because the J20 Order threatened the NSF grant that funded the contract); JA85 (same). And non-member institutions of higher education that employ NADOHE's individual members may seek to terminate those individual members or prevent them from participating in NADOHE to avoid enforcement of the Orders. *See* SA28 ¶ 34 (explaining NADOHE individual members' fear of this kind of harm); JA85 (same).

Similarly, the district court's clarified preliminary injunction that covered non-named executive agencies, JA152-155, was necessary to afford complete relief to Plaintiffs. Without the district court's clarification, Plaintiffs' ability to get relief would artificially turn on "which federal executive agency the grantee or contractor

relies on" despite the same directives from the President to implement the Orders. JA150. As a result, Plaintiffs would have been "at risk of their speech being chilled by many non-named federal executive agencies." JA150.

While Defendants are correct that "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury,'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (alteration omitted), Defendants make the same mistake the *Gill* plaintiffs did by failing "to distinguish injury from remedy." *Id.* at 67. The *Gill* plaintiffs were barred from seeking statewide relief where their vote-dilution claims required "revising only such districts as [we]re necessary to reshape the voter's district." *Id.* But here, alleviating Plaintiffs' individualized injuries—chilling chief among them—requires injunctive relief against all federal agencies. As the district court explained, limiting the injunction to named agencies "and ignoring the fact that the President (who issued the challenged provisions) is a named defendant, would fail to provide complete relief to Plaintiffs and their members." JA150.

Nor are the *Lujan* plurality opinion or *Haaland* decision highlighted by Defendants on point. In *Lujan*, the plaintiffs sued only the Secretary of the Interior, seeking an injunction requiring the Secretary to issue a regulation requiring federal agencies to consult with the Secretary regarding the environmental implications of actions they took in foreign nations. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 558–59 (1992). A plurality of the court concluded that the plaintiffs' claims lacked

redressability because the non-party agencies who would make the decisions plaintiffs objected to denied the Secretary's authority to bind them, and because, even if a court concluded those agencies were mistaken, there was "no reason they should be obliged to honor an incidental legal determination the suit produced." *Id.* at 569–70 (plurality opinion). And the full Court pointed to this statement from the plurality in a later case, holding that an injunction forbidding federal parties from enforcing the Indian Child Welfare Act (ICWA) would not protect petitioners from the imminent harm that plaintiffs alleged they would suffer at the hands of the non-party "state officials who implement ICWA." *Haaland v. Brackeen*, 599 U.S. 255, 292–93 (2023). Unlike in *Lujan* or *Haaland*, there is every reason to expect that all federal agencies "should be obliged to honor" the district court's determinations of the constitutional questions in this case.

At a minimum, unnamed federal agencies are properly enjoined as parties in "active concert or participation" with the named Defendants. *See* Fed. R. Civ. Proc. 65(d). According to a recent Executive Order, the President and DOJ—both named Defendants—are alone the source of "authoritative interpretations of law for the executive branch" whose "opinions on questions of law are controlling on all employees in the conduct of their official duties." Exec. Order 14215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447 (Feb. 18, 2025) §§ 1, 7, https://tinyurl.com/56cmbwmt. In other words, the President and the Attorney

General speak for the federal government as to what the law is. And the terms of the Orders themselves direct all agencies to act in concert with DOJ, the Attorney General, the Office of Management and Budget, and the Director of the OMB—all named Defendants and all enjoined parties. *See* J20 Order § 2(b); J21 Order §§ 3(c), 4(b)(3). Thus, to the extent any agency implements the Orders, it would do so "in active concert or participation with" named Defendants.

Contrary to Defendants' protests, the preliminary injunction here "interfere[s] with core executive functions," OB46–47, no more than any other injunction barring the federal executive from acting unconstitutionally. Defendants truly take issue with degree, not kind. But it was Defendant Trump—not Plaintiffs—who decided to issue government-wide directives of such shocking breadth and vagueness that they were found to likely violate the constitutional rights of Plaintiffs and others similarly situated. The remedy must meet "the inadequacy that produced [Plaintiffs'] injur[ies]." *Gill*, 585 U.S. at 66. And "just as it is the province of the Executive to undertake its Constitutional duties within the bounds of its legitimate authority, so too" must the judicial department "determine in cases regularly brought before them, whether the powers of any branch of the government . . . have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void." *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *3 (4th Cir. Apr. 7, 2025) (Thacker, J., concurring)

(cleaned up) (quoting *Powell v. McCormack*, 395 U.S. 486, 506 (1969)). That is what the district court did here, and this Court should affirm its preliminary injunction as clarified. At a minimum, the preliminary injunction as to the named Defendants should be affirmed.

## VI.  Alternatively, This Court Can Vacate and Remand

Although Plaintiffs agree with the district court that they "have shown a strong likelihood of success on the merits" of their First and Fifth Amendment claims. SA93, both parties before the Court have asked that the preliminary injunction here be vacated. *See* OB48 (Defendants arguing for preliminary injunction to be "vacated in its entirety"); Dkt. 33 (Plaintiffs notifying this Court of then-anticipated motion before the district court to "vacate its preliminary injunction").

Given Plaintiffs' intent to amend their complaint to add new claims and acts regarding agencies' implementation of the Orders, if the Court is of the view that additional information would aid the Court in its analysis of the merits of Plaintiffs' claims, or promote judicial economy, then the Court could vacate the preliminary injunction and remand for further proceedings in the normal course of litigation.

# CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court affirm the district court's preliminary injunction and lift its stay of that injunction pending appeal. Alternatively, Plaintiffs respectfully request that the Court vacate the preliminary injunction and remand for further proceedings.

Date: May 8, 2025

Respectfully submitted,

Niyati Shah
Noah Baron
Alizeh Ahmad
ASIAN AMERICANS ADVANCING JUSTICE
  | AAJC
1620 L Street NW, Suite 1050
Washington, D.C. 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

*/s/ Aleshadye Getachew*
Aleshadye Getachew
Cynthia Liao
J. Sterling Moore
Audrey Wiggins
Brooke Menschel
Skye Perryman
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
agetachew@democracyforward.org
cliao@democracyforward.org
smoore@democracyforward.org
awiggins@democracyforward.org
bmenschel@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,583 words. This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font, a proportionally spaced typeface.

Dated: May 8, 2025                    */s/ Aleshadye Getachew*

                                          Aleshadye Getachew

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: May 8, 2025               _/s/ Aleshadye Getachew_

                                       Aleshadye Getachew