No. 25-1189

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION, et al.,

*Plaintiffs- Appellees*,

*v.*

DONALD J. TRUMP, et al.,

*Defendants-Appellants*.

On Interlocutory Appeal from the United States District Court for the District of Maryland

**BRIEF FOR AMICI CURIAE ILLINOIS, CALIFORNIA, MASSACHUSETTS, COLORADO, CONNECTICUT, DELAWARE, HAWAII, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE**

SARAH A. HUNGER
  *Deputy Solicitor General*
SAMANTHA SHERMAN
  *Assistant Attorney General*
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
Sarah.Hunger@ilag.gov

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

Attorneys for State of Illinois

(*Additional counsel on next page*)

ROB BONTA
Attorney General
State of California

JAMES RICHARDSON
  *Deputy Attorney General*
WILLIAM H. DOWNER
  *Supervising Deputy Attorney
  General*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney
  General*
300 South Spring Street
Los Angeles, California 90013
(213) 269-6698
William.Downer@doj.ca.gov
James.Richardson@doj.ca.gov
Michael.Newman@doj.ca.gov

Counsel for State of California

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

ELIZABETH MATOS
  *Chief, Civil Rights Division*
DAVID UREÑA
  *Assistant Attorney General*
Civil Rights Division
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2345
Elizabeth.Matos@mass.gov

Counsel for Commonwealth of
Massachusetts

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................... ii

INTERESTS OF AMICI CURIAE............................................................1

SUMMARY OF THE ARGUMENT ........................................................3

ARGUMENT ..............................................................................................6

**I.    Principles And Practices Related To Diversity, Equity, Inclusion, and Accessibility Are Grounded In Longstanding Antidiscrimination Laws And Confer Substantial Benefits To Amici States...................................................................................6**

    A.    Practices promoting diversity, equity, inclusion, and accessibility are grounded in, and integral to complying with, federal antidiscrimination laws. ...............................7

    B.    Diversity, equity, inclusion, and accessibility policies and programs provide important benefits to amici States, their residents, and their businesses. .........................................13

**II.    The Vague And Unclear Directives Set Forth In The Challenged Provisions Harm Amici States. ..........................18**

    A.    Notices purporting to implement the vague terms of the Executive Orders are placing amici States and their agencies in an untenable position. ....................................20

    B.    The Challenged Provisions are creating a chilling effect on private entities that provide critical benefits to amici States' residents. ...............................................................24

CONCLUSION.........................................................................................28

CERTIFICATE OF COMPLIANCE.....................................................31

CERTIFICATE OF SERVICE ...............................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chi. Women in Trades v. Trump*,
      No. 25-cv-2005, 2025 WL 1114466
      (N.D. Ill. Apr. 14, 2025) ..................................................... 23, 24, 25

*Groff v. DeJoy*,
      600 U.S. 447 (2023) ........................................................ 10

*Roberts v. U.S. Jaycees*,
      468 U.S. 609 (1984) ......................................................... 2

*S.F. Unified Sch. Dist. v. AmeriCorps,*
      No. 25-cv-02425, 2025 WL 974298
      (N.D. Cal. Mar. 31, 2025) ...................................................... 23, 24

*Tex. Dep't of House. & Cmty. Affs. v. Inclusive Cmtys. Proj.*,
      576 U.S. 2507 (2015) ...................................................... 11

*U.S. Airways, Inc. v. Barnett*,
      535 U.S. 391 (2002) ...................................................... 10

**Statutes, Orders, and Regulations**

Exec. Order No. 14,151,
      Ending Radical and Wasteful Government DEI Programs and
      Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025) ................. 1, 2, 4, 9

Exec. Order No. 14,173,
      Ending Illegal Discrimination and Restoring Merit-Based
      Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025) .................. 1, 2, 4, 9

34 C.F.R. § 106.8(a) (2020) ......................................................... 9

20 U.S.C.
    § 1092(a) ............................................................... 9
    § 1401(9) ............................................................... 9
    § 6311(b) ............................................................... 9

29 U.S.C. § 557b ................................................................ 11

42 U.S.C.
    § 3616a ............................................................... 12
    § 12112(b) ............................................................ 10

Equal Pay Act of 1963,
    Pub. L. No. 88-38, 77 Stat. 56 ...................................... 7

Civil Rights Act of 1964,
    Pub. L. No. 88-352, 78 Stat. 241 ................................. 7, 8

Age Discrimination in Employment Act of 1967,
    Pub. L. No. 90-202, 81 Stat. 602 .................................... 8

Fair Housing Act of 1968,
    Pub. L. No. 90-284, §§ 801-901, 82 Stat. 73, 81-90 ........ 8, 10, 11, 13

Education Amendments of 1972,
    Pub. L. No. 92-318, 86 Stat. 235, 373-75 ........................... 8

Rehabilitation Act of 1973,
    Pub. L. No. 93-112, 87 Stat. 355 .................................... 8

Individuals with Disabilities Education Act,
    Pub. L. No. 94-142, 89 Stat. 773 (1975), *as amended by* Pub. L. No.
    101-476, 104 Stat. 1103 (1990) ...................................... 8

Americans with Disabilities Act of 1990,
    Pub. L. No. 101-336, 104 Stat. 327 ................................. 8

Women in Apprenticeship and Nontraditional Occupations Act,
    29 U.S.C. §§ 2501-2509 ............................................. 12

iii

**Other Authorities**

AmeriCorps, *Executive Order Compliance Instructions* (Feb. 13, 2025) .................................................................. 22

Anand, Rohini & Mary-Frances Winters, *A Retrospective View of Corporate Diversity Training From 1964 to the Present*, 7 Acad. Mgmt. Learning & Ed. 356 (2008) .................................... 7

Azevedo, Kate, *Corporate Diversity Goals Vanish in Wake of Workplace Diversity EO, in Executive Orders: Focus on DEI* Initiatives, Bloomberg Law (2025) ................................................. 27

Carter-Edwards, Lori, et al., *Diversity, Equity, Inclusion, and Access Are Necessary for Clinical Trial Site Readiness*, 7 J. Clinical & Translational Sci. 1 (2023) ............................................ 16

Charles, J. Brian, *The Evolution of DEI*, Chron. Higher Ed. (June 23, 2023), https://tinyurl.com/9e97z9ew ....................... 14, 15

Cohen, Sascha, *This Is What Breast Cancer Activism Looked Like Before the Pink Ribbon*, Time (Oct. 17, 2016), https://tinyurl.com/mpr5xvda ....................................... 16

Compl., *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025)................................... 20, 21, 22

Dep't of Labor Emp. & Training Admin., *Training and Employment Notice No. 21-24* (Jan. 22, 2025) ................................... 20

*Diversity Matters Even More: The Case for Holistic Impact*, McKinsey & Co. (Dec. 5, 2023), https://tinyurl.com/263af5h8 ........................... 15

*Executive Orders: Focus on DEI Initiatives*, Bloomberg Law (2025) .... 27

*Fair Housing Act Remedies*, Nat'l Ctr. for State Cts., https://tinyurl.com/yj2w6r2e ....................................... 13

iv

Ferguson Melhorn, Stephanie, & Makinizi Hoover, *Understanding America's Labor Shortage: The Most Impacted Industries*, U.S. Chamber of Com. (Apr. 18, 2025), https://tinyurl.com/dmv5p25t ........................................................ 15

Hernandez, Tanya Kateri, *Can CRT Save DEI?: Workplace Diversity, Equity & Inclusion in the Shadow of Anti-Affirmative Action*, 71 UCLA L. Rev. Discourse 282 (2024) ..................................... 7, 13, 14

Kelly, Harry J., *Fallout:  The Impact of Supreme Court's Disparate Impact Decision and HUD's AFFH Rule*, Nat'l Hous. & Rehab. Ass'n, https://tinyurl.com/4s3p5pm4 ............................................. 11

Kratz, Julie *The Little Known History of DEI and Why It's Critical to Its Survival*, Forbes (Dec. 29, 2024), https://tinyurl.com/3mundfcn........................................... 7, 8, 14, 15

Letter from Edward R. Martin, Interim U.S. Att'y for D.C. to William M. Treanor, Dean of Geo. L. Sch. (Feb. 17, 2025).......................... 22

*Lives at Risk:  Komen Calls on Congress to Restore Funding and Protect Lifesaving Breast Cancer Programs*, Susan G. Komen (Mar. 17, 2025), https://tinyurl.com/55x4xs3b................................................ 16

Loyola Univ. Chi. Inst. for Racial Just., *DEI in K-12: Case Study Profiles* (2022), https://tinyurl.com/bdfs4dt6 ................................. 17

Nat'l Sci. Found., *NSF Implementation of Recent Executive Orders* (Jan. 28, 2025) ...................................................................... 22

Park, Julie J. & Jonathan Feingold, *How Universities Can Build and Sustain Welcoming and Equitable Campus Environments*, Campaign for Coll. Opportunity (2024), https://tinyurl.com/354xew9v........................................................ 18

U.S. Dep't of Just. Civ. Rts. Div., *Know Your Rights: Title II of the Civil Rights Act of 1964* (Apr. 2024), https://tinyurl.com/48n768sa ...... 13

Veltman, Chloe, *PBS Shutters DEI Office*, NPR (Feb. 11, 2025),
https://tinyurl.com/2h3bjw6k ......................................................... 25

## INTERESTS OF AMICI CURIAE

The amici States of Illinois, California, Massachusetts, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington ("amici States") submit this brief in support of plaintiffs-appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2).

In January 2025, President Trump issued two Executive Orders that target "diversity, equity, inclusion, and accessibility" (referred to as "DEI" or "DEIA"), as well as "equity-related grants or contracts."[1] The Orders provide no definition for these and other key terms, but nonetheless direct (1) executive agencies to "terminate . . . 'equity-related' grants or contracts" ("Termination Provision"), (2) executive agencies to "include in every contract or grant award" a certification that the contractor or grantee "does not operate any programs promoting DEI that violate any applicable Federal antidiscrimination

---

[1] *See* Exec. Order No. 14,151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14,173, Ending Illegal Discrimination and Restoring Merit-Based Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025).

laws" ("Certification Provision"), and (3) the Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]" ("Enforcement Threat Provision") (collectively, the "Challenged Provisions").[2]  The district court entered a preliminary injunction upon concluding that plaintiffs were likely to succeed on the merits of their claims that the Challenged Provisions were unconstitutionally vague in violation of the Fifth Amendment and abridged plaintiffs' freedom of expression in violation of the First Amendment.

Amici States have a fundamental interest in ensuring that all of their residents can reap "the benefits of wide participation in political, economic, and cultural life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984).  As such, amici States embrace diversity, equity, inclusion, accessibility, and related principles, and are deeply committed to enforcing civil rights laws to ensure a safe, welcoming environment for all.  As detailed below, *infra* Section I.B., abundant research shows that

---

[2]  *See* Exec. Order 14,151 § 1; Exec. Order 14,173 § 1.

DEIA-informed practices are key to advancing these interests. To that end, amici States rely on federal grant programs and contracts to fund activities incorporating diversity, equity, inclusion, and accessibility principles. Likewise, amici States are home to many recipients of federal grants and contracts that involve such activities. The Challenged Provisions, however, direct federal agencies to impose vague and unlawful burdens on funding recipients that could interfere with the provision of critical services to amici States' residents. Accordingly, amici States urge this Court to affirm the district court's preliminary injunction.

## SUMMARY OF THE ARGUMENT

As the district court rightly determined, plaintiffs are likely to prevail on their claims because "the Termination and Enforcement Threat Provisions are unconstitutionally vague on their face" and because the "Certification and Enforcement Threat Provisions squarely, unconstitutionally, abridge the freedom of speech." JA67 (cleaned up). In reaching this conclusion, the court explained that the Executive Orders were deficient in many respects, including that they contained no meaningful definitions or other guideposts for terms that are critical

to understanding and implementing the Challenged Provisions.  Indeed, the Orders fail to define or explain "DEI," "illegal DEI," "promoting DEI," or "equity-related grants or contracts," among other terms.  *See* Exec. Order 14,151; Exec. Order 14,173.  At the same time, the Orders condemn these undefined practices as "illegal, pernicious conduct" that "violates longstanding Federal civil rights laws" and results in "disastrous consequences."  Exec. Order 14,173 § 1; *see also* Exec. Order 14,151 § 1 (describing DEI as involving "illegal and immoral discrimination programs" and referring to "equity action plans" as "shameful").  Amici States agree with plaintiffs that they are likely to succeed on the merits of their claims because of these flaws in the Executive Orders.  Amici States write separately, however, to highlight two issues that are particularly germane to their interests.

First, amici States disagree with the underlying premise of the Challenged Provisions—that practices intended to further "DEIA," "DEI," or "equity" are "pernicious" and even "illegal."  On the contrary, DEIA-informed principles and practices are grounded in, and have played an essential role in, enforcing compliance with longstanding civil rights laws in a wide range of contexts, including education,

4

employment, and housing.  Indeed, many longstanding diversity, equity, inclusion, and accessibility practices are *required* under antidiscrimination laws.  And, even when unnecessary to comply with legal obligations, many entities have broadly adopted lawful DEIA-related principles and practices precisely because they produce robust benefits, not "disastrous consequences."

Second, as the district court rightly recognized, the lack of clear standards or terms in the Challenged Provisions has resulted in substantial confusion and uncertainty for amici States, as well as for their residents and businesses.  JA66-67.  Indeed, federal agencies are implementing the Challenged Provisions in a variety of contexts across the country without providing any meaningful additional instruction by, for example, publishing coherent guidance documents or promulgating comprehensive rules.  Instead, many federal agencies have sent amici States and their resident federal grantees and contractors a barrage of notices demanding certifications of compliance with the Executive Orders' inscrutably vague terms and instructing them to cease grant activities related to DEIA.  Given the impossibility of determining what activities the administration may consider to be "DEIA," these Orders

and agency implementing actions place amici States in an untenable position. They also have had a chilling effect on private entities, many of which have self-censored by eliminating any conceivably "DEIA-related" programming and references to avoid abrupt loss of their funding and other harsh consequences.

As a result, if not enjoined, the Challenged Provisions will harm residents in amici States by depriving them of the many valuable benefits associated with workplaces, schools, and communities that have adopted practices related to diversity, equity, inclusion, and accessibility. Amici States thus respectfully request that this Court affirm the district court's decision granting a preliminary injunction.

## ARGUMENT

### I.    Principles And Practices Related To Diversity, Equity, Inclusion, and Accessibility Are Grounded In Longstanding Antidiscrimination Laws And Confer Substantial Benefits To Amici States.

The Executive Orders begin from the mistaken premise that "DEIA" refers to an unlawful and harmful set of policies that should be eradicated. As amici States know from experience, this is simply incorrect. First, diversity, equity, inclusion, and accessibility practices are firmly rooted in longstanding civil rights legislation and the

6

programs that were instituted to ensure compliance with these
antidiscrimination laws.  In other words, while the term "DEIA" may be
relatively new, the principles underlying it are not.  Furthermore, the
Orders do not account for the fact that many practices related to
diversity, equity, inclusion, and accessibility are mandated by federal
law, and thus not illegal in any respect.  Second, empirical research
confirms that far from being harmful, DEIA is beneficial for society.

### A.  Practices promoting diversity, equity, inclusion, and accessibility are grounded in, and integral to complying with, federal antidiscrimination laws.

Modern diversity, equity, inclusion, and accessibility practices
originated with the passage of landmark civil rights legislation in the
1960s,[3] including the Equal Pay Act of 1963,[4] the Civil Rights Act of

---

[3] *See, e.g.*, Tanya Kateri Hernandez, *Can CRT Save DEI?: Workplace Diversity, Equity & Inclusion in the Shadow of Anti-Affirmative Action*, 71 UCLA L. Rev. Discourse 282, 291 (2024) (explaining that, to promote compliance with these new civil rights laws, many businesses and organizations held "[e]arly iterations of DEI training," which primarily focused "on educating institutions about legal prohibitions and avoiding lawsuits"); *see also* Rohini Anand & Mary-Frances Winters, *A Retrospective View of Corporate Diversity Training from 1964 to the Present*, 7 Acad. Mgmt. Learning & Ed. 356, 357 (2008); Julie Kratz, *The Little Known History of DEI and Why It's Critical to Its Survival*, Forbes (Dec. 29, 2024), https://tinyurl.com/3mundfcn/.

[4] Pub. L. No. 88-38, 77 Stat. 56.

1964,[5] the Age Discrimination in Employment Act of 1967,[6] and the Fair Housing Act of 1968.[7] These statutes established a legal framework for recognizing, rectifying, and preventing discrimination on the basis of characteristics including race, color, religion, sex, national origin, and age.[8] Other key antidiscrimination laws subsequently built upon this foundation, such as Title IX of the Education Amendments of 1972,[9] which prohibited sex-based discrimination in educational institutions that receive federal funding, and the Rehabilitation Act of 1973,[10] the Individuals with Disabilities Education Act,[11] and the Americans with Disabilities Act of 1990,[12] which outlawed discrimination based on disability by federal funding recipients, in public schools, and in all areas of public life.

---

[5] Pub. L. No. 88-352, 78 Stat. 241.

[6] Pub. L. No. 90-202, 81 Stat. 602.

[7] Pub. L. No. 90-284, §§ 801-901, 82 Stat. 73, 81-90.

[8] *See, e.g.*, Kratz, *supra* note 3.

[9] Pub. L. No. 92-318, 86 Stat. 235, 373-75.

[10] Pub. L. No. 93-112, 87 Stat. 355.

[11] Pub. L. No. 94-142, 89 Stat. 773 (1975) (short title changed to Individuals with Disabilities Act by Pub. L. No. 101-476, 104 Stat. 1103 (1990)).

[12] Pub. L. No. 101-336, 104 Stat. 327.

Contrary to the Executive Orders' assertions that DEIA practices "violate the text and spirit of our longstanding Federal civil-rights laws" Exec. Order 14,173 § 1, and constitute "illegal and immoral discrimination," Exec. Order 14,151 § 1, many well-established practices designed to promote diversity, equity, inclusion, and accessibility are, in fact, *required* by these antidiscrimination laws and integral to ensuring they are adequately enforced.

In the education context, for instance, schools have many affirmative responsibilities under federal law that are directly related to diversity, equity, inclusion, and accessibility. These obligations include collecting and reporting information about "student body diversity at the institution," 20 U.S.C. § 1092(a)(1)(Q); designating a staff member as a "Title IX Coordinator" responsible for overseeing efforts to comply with Title IX's prohibition on sex discrimination, 34 C.F.R. § 106.8(a) (2020); working closely with parents of students with disabilities to develop Individualized Education Plans, 20 U.S.C. § 1401(9); and requiring inclusion of English language learners, 20 U.S.C. § 6311(b)(2)(B)(vii)(III).

9

Likewise, the federal laws requiring employers to ensure that employees and job applicants are not discriminated against on the basis of protected characteristics have long required employers to take active steps toward diversity, equity, inclusion, and accessibility. For example, employers must affirmatively make changes—even to neutral policies and requirements—in order to accommodate employees' religious beliefs or disabilities. *See Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (Title VII of the Civil Rights Act requires employers to accommodate an employee's sincere religious beliefs unless "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business"); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 395 (2002) (The Americans with Disabilities Act "says that an employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'" (quoting 42 U.S.C. § 12112(b)(5)(A))).

The Fair Housing Act, too, creates a responsibility for builders, lenders, real estate agents, landlords, and others in the housing

industry to employ basic practices related to diversity, equity, inclusion, and accessibility.  Because the Fair Housing Act prohibits neutral policies that have a disparate impact on protected classes without a sufficient business justification, *see Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Proj.*, 576 U.S. 2507 (2015), real estate industry professionals must assess whether policies like rental requirements and occupancy standards have disparate impacts on protected classes, and determine whether they could employ less discriminatory alternatives to such policies.[13]

Many entities, moreover, provide services related to diversity, equity, inclusion, and accessibility with federal funds that have been specifically appropriated for that purpose.  For example, in 2001, Congress enacted legislation establishing the Office of Disability Employment Policy within the Department of Labor to "provide leadership, develop policy and initiatives, and award grants furthering the objective of eliminating barriers to the training and employment of people with disabilities."  29 U.S.C. § 557b.  As another example,

---

[13] *See, e.g.*, Harry J. Kelly, *Fallout:  The Impact of Supreme Court's Disparate Impact Decision and HUD's AFFH Rule*, Nat'l Hous. & Rehab. Ass'n, https://tinyurl.com/4s3p5pm4.

Congress for decades has appropriated funds under the Women in
Apprenticeship and Nontraditional Occupations Act, 29 U.S.C. §§ 2501-
2509, which provides grants to community-based organizations to help
women, employers, and trade unions overcome barriers to full and
effective participation in occupations where women make up less than
25% of the workforce.  And in the context of housing, Congress has
provided funds under the Fair Housing Initiative Program to private
nonprofit housing organizations that carry out investigatory,
enforcement, education, and outreach activities aimed at rooting out
discrimination in the provision of housing, including "new or
sophisticated forms of discrimination."  42 U.S.C. § 3616a(b)-(d).  All of
these programs reflect principles of diversity, equity, inclusion, and
accessibility—and all are designed to support the enforcement of civil
rights laws, not to undermine them.

Finally, activities associated with diversity, equity, inclusion, and
accessibility are often required by court order to remedy illegal
discrimination after it has been found to occur.  "[C]onsent decrees
resolving discrimination lawsuits often include mandatory training of
relevant stakeholders on matters of discrimination and require reforms

12

of exclusionary institutional policies and practices."[14]  The Equal

Employment Opportunity Commission, for example, frequently has

included such conditions in consent decrees in class action employment

discrimination cases.  Similarly, courts have required defendants who

have violated the Fair Housing Act or laws prohibiting discrimination

in public accommodations to undergo antidiscrimination trainings and

to adopt new antidiscrimination policies.[15]

> **B.    Diversity, equity, inclusion, and accessibility policies
> and programs provide important benefits to amici
> States, their residents, and their businesses.**

In addition to serving as a basis for compliance with longstanding

federal antidiscrimination laws, DEIA policies and practices are also

well-recognized, lawful methods of achieving critical social and

economic benefits for amici States, their residents, and their businesses.

They are not, as the Executive Orders suggest, pernicious activities that

cause harm.

---

[14]  Hernandez, *supra* note 3, at 290-91.

[15]  *Id.*; *Fair Housing Act Remedies*, Nat'l Ctr. for State Cts.,
https://tinyurl.com/yj2w6r2e; .S. Dep't of Just. Civ. Rts. Div., *Know Your
Rights: Title II of the Civil Rights Act of 1964* (Apr. 2024),
https://tinyurl.com/48n768sa.

After the civil rights laws of the 1960s and 1970s paved the way for more diverse educational institutions and workplaces, there was "a surge in social science research detailing how diversity enhances innovation and efficiency."[16]  This research, alongside "increased concern with remaining competitive in a globalized economy," led to a shift in "the perceived utility of DEI."[17]  Businesses and other entities began to incorporate trainings designed to help individuals improve their "cross-cultural understanding and interpersonal communications," "to increase awareness of one's own cultural lens," and "to increase one's skills in working effectively in a diverse team."[18]  By the 2000s, many universities, corporations, and other institutions had established "cabinet-level" or "C-Suite" positions dedicated to DEIA-related work, with titles such as "Chief Diversity Officer" or "Vice President of Diversity."[19]  These entities created these positions and programs—and continue to utilize them today—not because they are legally required to

---

[16]  Hernandez, *supra* note 3, at 293.

[17]  *Id.*

[18]  *Id.* at 293-94.

[19]  *See, e.g.*, Kratz, *supra* note 3; J. Brian Charles, *The Evolution of DEI*, Chron. Higher Ed. (June 23, 2023), https://tinyurl.com/9e97z9ew.

do so, but because they recognize that DEIA-focused strategies can bring significant value.[20]

For example, research shows that diversity drives economic growth in numerous ways. Companies with strong, diverse leadership teams overperform compared to companies that are more homogenous: diversity is associated with higher financial returns and higher social and environmental impact scores.[21] In addition, many employers that struggle with labor shortages, retention, or lack of competitive candidates have successfully mitigated these problems by adopting strategies based on principles of diversity, equity, inclusion, and accessibility, such as offering subsidized childcare benefits or by participating in second-chance programs for individuals with certain felony convictions.[22]

Principles and practices related to diversity, equity, inclusion, and accessibility have also proven critical to advances in healthcare.

---

[20] *See, e.g.*, Kratz, *supra* note 3; Charles, *supra* note 11.

[21] *Diversity Matters Even More: The Case for Holistic Impact*, McKinsey & Co. (Dec. 5, 2023), https://tinyurl.com/263af5h8.

[22] Stephanie Ferguson Melhorn & Makinizi Hoover, *Understanding America's Labor Shortage: The Most Impacted Industries*, U.S. Chamber of Com. (Apr. 18, 2025), https://tinyurl.com/dmv5p25t.

Greater equity in research funding for diseases that disproportionately affect women, for example, has led to medical advances that have dramatically increased survival rates for diseases like breast cancer.[23] Similarly, in the context of clinical trials, it is crucial that the development of new treatments be based on DEIA-informed practices to ensure researchers are selecting participants (and acting on behalf of future patients) who represent a fair cross-section of the American public with respect to race, ethnicity, sex, and other demographic factors.[24] Understanding and implementing DEIA-informed best practices helps researchers to successfully recruit and retain the participants necessary to successfully execute their studies.[25]

---

[23] *See, e.g.*, *Lives at Risk:  Komen Calls on Congress to Restore Funding and Protect Lifesaving Breast Cancer Programs*, Susan G. Komen (Mar. 17, 2025), https://tinyurl.com/55x4xs3b (investment in breast cancer research contributed to the over 44% drop in breast cancer mortality over past 3.5 decades); *see also* Sascha Cohen, *This Is What Breast Cancer Activism Looked Like Before the Pink Ribbon*, Time (Oct. 17, 2016), https://tinyurl.com/mpr5xvda (describing "decades of committed activism" to secure resources to combat breast cancer).

[24] *See*, *e.g.*, Lori Carter-Edwards et al., *Diversity, Equity, Inclusion, and Access Are Necessary for Clinical Trial Site Readiness*, 7 J. Clinical & Translational Sci. 1, 1 (2023) ("The lack of representation in clinical trials has impeded innovation, compromised generalizability of evidence, and may undermine trust in the clinical trials enterprise.").

[25] *Id.*

16

Education, too, benefits from the work of organizations applying principles and practices related to diversity, equity, inclusion, and accessibility.  In K-12 settings, these principles have fostered initiatives to provide meals to students living with food insecurity, ensure that teachers sufficiently understand students' backgrounds to provide effective instruction, integrate students with disabilities among their peers, and ensure that subjects like sex education achieve their goals of advancing the health and safety of all students.[26]  Likewise, in higher education programs, DEIA-informed practices help ensure that all students have the same opportunities to learn, and that their performance is evaluated without regard to factors like race and gender. Such practices include "equipping personnel and offices with the skills and expertise necessary to design an inclusive campus community and to conduct professional and impartial investigations when discrimination complaints arise"; "supporting students' needs, like food security, emergency financial support, consideration if they work full

---

[26]  Loyola Univ. Chi. Inst. for Racial Just., *DEI in K-12: Case Study Profiles* (2022), https://tinyurl.com/bdfs4dt6.

17

time, and childcare"; and providing adequate funding to cultural

centers, student groups, and ethnic studies programs.[27]

Although these examples are far from exhaustive, they

demonstrate the wide variety of practices that promote diversity,

equity, inclusion, and accessibility that are both lawful and beneficial

for amici States, their businesses, and their residents.

## II.    The Vague And Unclear Directives Set Forth In The Challenged Provisions Harm Amici States.

In addition to inaccurately characterizing diversity, equity,

inclusion, and accessibility policies and practices as illegal and harmful,

the Challenged Provisions direct agencies to implement vague and

unclear standards to the detriment of amici States, their residents, and

their businesses.  As noted, *supra* pp. 1-3, the Executive Orders do not

provide any workable definition of key terms such as "DEI," "DEIA,"

"diversity," "equity," "inclusion," or "accessibility."  Likewise, they do

not explain what aspects of DEIA or related terms the executive branch

now considers to be "illegal" or "in violation of antidiscrimination law."

---

[27]  Julie J. Park & Jonathan Feingold, *How Universities Can Build and Sustain Welcoming and Equitable Campus Environments*, Campaign for Coll. Opportunity 10-16 (2024), https://tinyurl.com/354xew9v.

18

Indeed, as the district court here explained, the Orders "leave[ ] [federal contractors] and their employees, plus any other recipients of federal grants, with no idea whether the administration will deem their contracts or grants, or work they are doing, or speech they are engaged in to be 'equity-related,'" and thus within the scope of the Challenged Provisions. JA66. Likewise, these Orders "leave[ ] the private sector at a loss for whether the administration will deem a particular policy, program, discussion, announcement, etc. . . . to be among the [actions] the administration now deems 'illegal.'" JA66-67.

Amici States are harmed in at least two ways by the vague and uncertain terms of the Challenged Provisions. First, as federal contractors and grantees, many agencies in amici States have received notices from federal agencies that purport to implement the Executive Orders by delaying, freezing, and threatening termination of critical funding. Second, amici States are home to many private entities that are also subject to the Challenged Provisions and that must decide whether, in the face of these vague terms and threats, to continue to provide services that amici States' residents rely on. Any disruption in services—whether because of a loss of funding to state or private

19

entities or because of the chilling effect of the Challenged Provisions on private entities—causes serious harm.

A. **Notices purporting to implement the vague terms of the Executive Orders are placing amici States and their agencies in an untenable position.**

Since the Executive Orders were issued—and, in particular, since the preliminary injunction in this case was stayed—amici States have received numerous notices from federal agencies that threaten billions of dollars in federal funding for essential services like basic K-12 education, highway infrastructure, public health, workforce development, and environmental protection. Many of these notices require amici States to certify that they do not engage in "DEI" or "DEIA" that the executive branch might view as "illegal" and/or to "immediately cease all award activities related to DEI or DEIA."[28]

But as explained, the Orders do not provide any workable definition of key terms like "DEI," "DEIA, "diversity," "equity,"

---

[28] *See, e.g.*, Compl., *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025) (describing demands from Department of Education); FY2025 DHS Standard Terms & Conditions (Mar. 27, 2025) (recipients must certify that "[t]hey do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws"); Dep't of Labor Emp. & Training

"inclusion," and "accessibility." And the federal agencies implementing the Challenged Provisions have not provided any clarity. Instead, the agency communications merely repeat, without any meaningful elaboration, the vague and undefined phrases used in the Orders.

For example, the Department of Education has demanded that state and local educational authorities certify, under penalty of sanctions, that they do not and will not engage in unspecified "DEI practices" in order to receive federal financial assistance totaling over $18.7 billion.[29] But the Department of Education did not define the words "certain" or "illegal DEI practices," much less explain how these practices purportedly violate federal law. This certification demand thus forces amici States to make an untenable choice: deprive their students of a wide range of services and programs that the Department of Education may conceivably view as "illegal DEI" in order to complete the vague certification; make the certification without changes to

Admin., *Training and Employment Notice No. 21-24*, 2 (Jan. 22, 2025) (notifying all state workforce agencies, state workforce development boards, and state apprenticeship agencies that they "must immediately cease all award activities related to DEI or DEIA").

[29] Compl. ¶¶ 35-39, 86, *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025); Compl., Ex. A at 4, *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025).

existing operations and risk a false certification or harsh penalties for alleged failure to comply with the certification's undefined standards; or give up significant federal funding and contracts for essential services that their residents rely upon.[30]

Worse still, actions by some federal agencies have added to the confusion by stating that amici States (and other, similarly situated recipients) must cease *all* DEIA activities in order to avoid funding termination or other punishments, without expressly cabining such requirements to only "illegal" DEIA or DEIA "in violation of federal antidiscrimination law."[31] Thus, to the extent that the terms of the

---

[30] Compl. ¶¶ 80-81, *New York v. Dep't of Ed.*, No. 25-cv-11116 (D. Mass. Apr. 25, 2025).

[31] *See, e.g.*, AmeriCorps, *Executive Order Compliance Instructions* (Feb. 13, 2025) (instructing grantees to certify that their programs "compl[y] with all administration Executive Orders and do[ ] not include any activities that promote DEI activities"); Nat'l Sci. Found., *NSF Implementation of Recent Executive Orders* (Jan. 28, 2025) (instructing NSF grantees to cease "conferences, trainings, workshops, considerations for staffing and participant selection, and any other grant activity that uses or promotes the use of diversity, equity, inclusion, and accessibility (DEIA) principles and frameworks or violates federal anti-discrimination laws"); Letter from Edward R. Martin, Interim U.S. Att'y for D.C. to William M. Treanor, Dean of Geo. L. Sch. (Feb. 17, 2025) (stating that the U.S. Attorney had "begun an inquiry" into whether "Georgetown Law School continues to teach and promote DEI" and requesting a response to whether the law school has "eliminated all DEI from your school and its curriculum").

Executive Orders are limited to "illegal DEI" (whatever that may mean), many federal agencies have gone beyond the scope of the Orders to "requir[e] cessation of DEI activities *without* reference to the requirement that the activity violate any applicable Federal anti-discrimination laws." *S.F. Unified Sch. Dist. v. AmeriCorps,* No. 25-cv-02425, 2025 WL 974298, at *2 (N.D. Cal. Mar. 31, 2025) ("*SFUSD*").

Unsurprisingly given these circumstances, multiple courts have found that the meaning of "DEI," "illegal DEI," "DEI program [that] violate[s] Federal anti-discrimination laws," and other key terms used by the Orders and agencies is vague and uncertain. *See Chi. Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1114466, at *11 (N.D. Ill. Apr. 14, 2025) ("*CWIT*") (meaning of these terms "is left entirely to the [recipients'] imagination"); *SFUSD*, 2025 WL 974298, at *5 (finding that "the ambiguity of the conditions" imposed by AmeriCorps, "particularly regarding which activities . . . 'promote DEI' . . . leaves Plaintiffs operating in the dark"). And despite numerous lawsuits and calls for clarification, the executive branch "has studiously declined to shed any light on what [these terms] mean." *CWIT*, 2025 WL 1114466, at *11. Amici States and other recipients of federal funds should not be

23

required to engage in guesswork over the meaning of these ambiguous terms to receive essential funds or avoid harsh penalties.

**B.    The Challenged Provisions are creating a chilling effect on private entities that provide critical benefits to amici States' residents.**

Furthermore, as multiple lower courts, including the district court below, have recognized, the "muddied language" of the Executive Orders has "spurred a chilling effect" for a wide range of private businesses, institutions, and organizations.  *See SFUSD*, 2025 WL 974298, at *5; JA125 (the Orders "chill speech as to anyone the government might conceivably choose to accuse of engaging in speech about 'equity' or 'diversity' or 'DEI'"); *CWIT*, 2025 WL 1114466, at *20 (certification provision chills speech by requiring "every federal grant recipient to certify that it does not engage in *any* programs involving 'illegal DEI' . . . without knowing which programs fall under that umbrella") (emphasis in original).  As one court recently noted, few recipients of federal funds are in a position to weather the abrupt termination of their federal funding, to "put their organizations at risk by suing the government," or to "risk False Claims Act litigation." *CWIT,* 2025 WL 1114466, at *45.  As a result, when faced with the

24

Challenged Provisions, "grantees and contractors will take the safer route, keep their heads down, and choose to simply stop speaking on anything remotely related to what the government might consider as promoting DEI or equity." *Id.*

Indeed, some recipients of federal funds have already begun removing references that even arguably invoke DEIA from their activities and cutting related offices and programs.[32]  For example, "organizations that support victims of domestic and intimate partner violence have been editing or deleting websites and other public resources to eliminate language the Trump administration might find objectionable."[33]  These examples "are more than isolated incidents," as observers have noted that "[e]vidence of widespread self-censorship has been mounting."[34]

---

[32] *See, e.g.*, Chloe Veltman, *PBS Shutters DEI Office*, NPR (Feb. 11, 2025), https://tinyurl.com/2h3bjw6k (quoting PBS's president as stating that it closed its DEI office and eliminated all staff members serving in that office "to best ensure we are in compliance with the President's executive order around Diversity, Equity, and Inclusion").

[33] Lauren Girardin, *Nonprofits Self-Censoring in Wake of Trump Actions*, Nonprofit Quarterly (Feb. 14, 2025), https://tinyurl.com/53t526v8.

[34] *Id.*

This chilling effect harms even those entities that continue their activities because they believe in good faith that they are compliant with the Executive Orders and federal antidiscrimination laws. These entities must confront the trepidation of *other* organizations, which fear that by engaging with an entity incorporating "DEIA," they put at risk their own federal funds and contracts. For instance, Chicago Women in Trades, which provides "training programs, best practices guides, employer resources, and advocacy to attract and retain women in skilled trades," has been pressured by other organizations it works with to eliminate "any references to 'DEI' and 'DEIA'" from upcoming technical assistance trainings and materials as a result of the Orders. *CWIT*, 2025 WL 1114466, at *1, *7.

The gravity of the chilling effect is further illustrated by the fact that the Orders have caused many private-sector companies to "erase their diversity programs"—including businesses that do not receive federal grants or contracts and thus are not subject to the certification requirements or the prospect of imminent termination of their funding.[35] A Bloomberg Law report analyzing corporate filings with the

---

[35] *Executive Orders: Focus on DEI Initiatives*, Bloomberg Law 3 (2025).

Securities and Exchange Commission concluded that the "anti-DEI order and rhetoric has had a marked impact on corporate behavior," causing companies "to proactively remove corporate diversity programs . . . before any major federal investigation or litigation occurs."[36]  Based on the "swift and significant" reaction to the Orders, the Bloomberg report forecasts "deeper cuts to corporate programs in the months to come."[37]

* * *

At bottom, allowing defendants to continue to act on the Executive Orders' vague and amorphous prohibitions on diversity, equity, inclusion, and accessibility will not only give the federal government a vehicle to attempt to coerce amici States and other federal grantees and contractors to halt virtually any activity that the current administration disfavors, but it will also chill nonprofits, businesses, schools, and other entities from undertaking important DEIA-related work.  This will cause immeasurable harm to amici States and their

---

[36]  Kate Azevedo, *Corporate Diversity Goals Vanish in Wake of Workplace Diversity EO*, *in Executive Orders:  Focus on DEI Initiatives*, Bloomberg Law 8-9 (2025).

[37]  *Id.* at 9.

residents who rely on practices and programs that advance and support diversity, equity, inclusion, and accessibility to combat discrimination and to secure extensive economic, social, and educational benefits.

## CONCLUSION

This Court should affirm the district court's order granting plaintiffs' motion for a preliminary injunction.

May 15, 2025

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Sarah A. Hunger
SARAH A. HUNGER
  *Deputy Solicitor General*
SAMANTHA SHERMAN
  *Assistant Attorney General*
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
Sarah.Hunger@ilag.gov

ROB BONTA
Attorney General
State of California

JAMES RICHARDSON
*Deputy Attorney General*
WILLIAM H. DOWNER
*Supervising Deputy Attorney General*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
300 South Spring Street
Los Angeles, California 90013
(213) 269-6698
William.Downer@doj.ca.gov
James.Richardson@doj.ca.gov
Michael.Newman@doj.ca.gov

Counsel for State of California

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

ELIZABETH MATOS
*Chief, Civil Rights Division*
DAVID UREÑA
*Assistant Attorney General*
Civil Rights Division
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2345
Elizabeth.Matos@mass.gov

Counsel for Commonwealth of Massachusetts

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

29

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909


AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701


LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005


PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, RI 02903


NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. MLK Jr. Blvd.
St. Paul, MN 55155


MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625


DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301


CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,179 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirement of Rules 32(a)(4), 32(a)(5), and 32(a)(6) because the brief is double-spaced and has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ Sarah A. Hunger
SARAH A. HUNGER

May 15, 2025

31

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2025, I electronically filed the foregoing Brief of Amicus Curiae State of Illinois, et al. with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
SARAH A. HUNGER