No. 25-1189

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

DONALD J. TRUMP, *et al.*,

*Defendants – Appellants,*

v.

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER
EDUCATION, *et al.*,

*Plaintiffs – Appellees.*

_____

On Appeal from the United States District Court
for the District of Maryland

_____

**UNOPPOSED *AMICUS CURIAE* BRIEF OF PRIVATE EMPLOYERS
WITH DIVERSITY, EQUITY, AND INCLUSION PROGRAMS, AND
ORGANIZATIONS THAT SUPPORT THEM, SUPPORTING APPELLEES**

_____

Victoria Slade, State Bar No. 44597
Ambika Kumar, State Bar No. 38237
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 622-3150 Phone
ambikakumar@dwt.com
vickyslade@dwt.com

Stacey Sprenkel, State Bar No. 241689
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, CA 94111
(415) 276-4847 Phone
staceysprenkel@dwt.com

Amanda Gómez, State Bar No. 5619481
DAVIS WRIGHT TREMAINE LLP
1250 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 603-6475 Phone
amandagomez@dwt.com

Adam Sieff, State Bar No. 302030
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071
(213) 633-6800 Phone
adamsieff@dwt.com

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1189__    Caption: __D. Trump, et al. v. Nat'l Assoc. of Div. Officers in Higher Ed, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

**Adasina Social Capital; andCo Hospitality, Inc.; Candide Group; Climate Positive Consulting; Color in Green; Current-C Energy Systems, Inc.; ImpactGC LLP; Keker, Van Nest & Peters LLP; Main Street Journal; Marketing Partners Inc.;**
(name of party/amicus)
**New Energy Partners Inc.; OBERLAND Inc.; Pure Strategies, Inc.; Seirus Innovative Accessories Inc.; Sustainability Associates LLC; The Burton Corporation; The Verna Myers Company; Upstate Steel; Working IDEAL**

who ~~is~~ are __Amici Curiae__, ~~makes~~ make the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?   ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO
   If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question) ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Victoria Slade       Date: May 15, 2025

Counsel for: Amici Curiae

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF IDENTIFICATION ........................................................1

II.   ARGUMENT.........................................................................................2

    A.    Employers have adopted DEI policies and practices to support important business objectives.................................................................3

    B.    DEI arose in response to documented barriers to equal employment opportunity and is necessary to reduce the risk of traditional discrimination. ................................................................7

        1.    Despite growing legal protections, discrimination against historically marginalized groups persists.....................................7

        2.    Forcing Amici and the employers they support to end DEI work would mean exposing them to additional litigation risk. ................................................................11

    C.    There is no conflict between DEI and "merit," and the way employers conduct this work is non-discriminatory. .........................15

    D.    The EO's mandate to end DEI is at odds with legal authority establishing that typical components of DEI practices are lawful.....................................................................................17

    E.    The EO violates the First Amendment and warrants preliminary injunctive relief.........................................................................22

        1.    Vague speech regulations require swift relief...........................22

        2.    The Order is unconstitutionally vague.....................................24

        3.    Failure to enjoin the Order would only invite more self-censorship.............................................................................26

III.  CONCLUSION....................................................................................28

CERTIFICATE OF COMPLIANCE..............................................................1

CERTIFICATE OF SERVICE .....................................................................2

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrego Garcia v. Noem*,
  2025 WL 1135112 (4th Cir. 2025) ................................................................25

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) ......................................................................................23

*Bernstein v. St. Paul Cos., Inc.*,
  134 F.Supp. 2d 730 (D. Md. 2001) ...............................................................19

*Coleman v. Quaker Oats Co.*,
  232 F.3d 1271 (9th Cir. 2000) ......................................................................18

*Counterman v. Colorado*,
  600 U.S. 66 (2023) ...................................................................................21, 23

*De Piero v. Pennsylvania State Univ.*
  711 F. Supp. 3d 410 (E.D. Pa. 2024) ............................................................20

*De Piero v. Pennsylvania State Univ.*,
  No. CV 23-2281, 2025 WL 723029 (E.D. Pa. Mar. 6, 2025) ........................21

*Diemert v. City of Seattle*,
  No. 2:22-CV-1640, 2025 WL 446753
  (W.D. Wash. Feb. 10, 2025) ....................................................................20, 21

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965) ...................................................................................22, 23

*Dothard v. Rawlinson*,
  97 S. Ct. 2720 (1977) ......................................................................................8

*Erznoznik v. City of Jacksonville*,
  422 U.S. 205 (1975) ......................................................................................22

*FEC v. Wisc. Right To Life, Inc.*,
  551 U.S. 449 (2007) ......................................................................................23

*Filozof v. Monroe Cmty. Coll.*,
   583 F. Supp. 2d 393 (W.D.N.Y. 2008),
   *aff'd*, 411 F. App'x 423 (2d Cir. 2011) ............................................................ 18

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................................................................ 25

*Griggs v. Duke Power*,
   91 S. Ct. 849 (1971) ............................................................................................. 8

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ................................................................................................ 23

*J.G.G. v. Trump*,
   No. CV 25-766 (JEB), 2025 WL 1119481
   (D.D.C. Apr. 16, 2025) ....................................................................................... 25

*Jones v. Bernanke*,
   493 F.Supp.2d 18 (D.D.C. 2007) ......................................................................... 19

*Lutes v. Goldin*,
   62 F. Supp. 2d 118 (D.D.C. 1999) ....................................................................... 19

*Meritor Savings Bank, FSB v. Vinson*,
   106 S. Ct. 2399 (1986) .......................................................................................... 8

*Moranski v. Gen. Motors Corp.*,
   433 F.3d 537 (7th Cir. 2005) ............................................................................... 20

*Nat'l Ass'n for Advancement of Colored People v. Button*,
   371 U.S. 415 (1963) ................................................................................. 23, 24, 25

*Norgren v. Minnesota Dep't of Hum. Servs.*,
   No. 22-489 ADM/TNL, 2023 WL 35903
   (D. Minn. Jan. 4, 2023), *aff'd*,
   96 F.4th 1048 (8th Cir. 2024) .............................................................................. 21

*Reed v. Agilent Techs., Inc.*,
   174 F.Supp.2d 176 (D. Del. 2001) ....................................................................... 19

*United States v. Stevens*,
   559 U.S. 460 (2010) ....................................................................................... 24, 25

v

*United States v. Williams*,
   553 U.S. 285 (2008) ............................................................22

*Vavra v. Honeywell Int'l, Inc.*,
   2024 WL 645993 ...............................................................20

*Virginia v. Am. Booksellers Ass'n, Inc.*,
   484 U.S. 383 (1988) ......................................................23, 25

*W. Virginia State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ............................................................26

*Wash. Post v. McManus*,
   944 F.3d 506 (4th Cir. 2019) ..............................................27

**STATUTES**

29 U.S.C. § 621 *et seq* ...............................................................8

42 U.S.C. § 12101 *et seq* ...........................................................8

**RULES**

Fed. R. App. P. 29(a) ...............................................................2

**CONSTITUTIONAL PROVISIONS**

United States Constitution, First Amendment ....................passim

4912-3936-0576v.5 -

# I.    STATEMENT OF IDENTIFICATION

Amici are private employers and firms[1] that operate diversity, equity, and inclusion ("DEI") or similar types of programs and related practices and organizations that support them.  The private employer Amici, who collectively include firms in the hospitality, energy, financial, consumer products, manufacturing, legal, consulting, marketing and communications, and publishing sectors, among others, believe their DEI work is essential to their business interests and mission delivery—as well as to their ability to ensure a fair, inclusive and non-discriminatory workplace.  Other organizations, including trade associations and industry groups, advocate for and support this work on behalf of their members and other employers.  Amici have carefully crafted their programs and practices to ensure compliance with governing law, and they operate them in a manner that is intended to eliminate, not create discrimination.

The January 21, 2025 Executive Order, entitled, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" ("EO")[2] threatens the ability of Amici and the employers they support to combat discrimination in their workforces, preventing them from continuing lawful and important business

---

[1] A few Amici are solo practitioners who apply DEI principles in advancing their business partnerships and client engagement efforts.  The individual Amici are described in Appendix A.

[2] Executive Order 14173 of January 21, 2025, 90 FR 8633 (Jan. 31, 2025), *available at* https://www.govinfo.gov/content/pkg/FR-2025-01-31/pdf/2025-02097.pdf.

4912-3936-0576v.5 -

practices and subjecting them to additional litigation and enforcement risk, among other harms. The EO also restricts all Amici's First Amendment rights by requiring them to censor internal and external communications in order to align with the government's political position.

Amici file this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure and with the consent of all parties to the appeal. No party's counsel authored this brief in whole or in part. No party or its counsel contributed financial support intended to fund the preparation or submission of this brief.

## II.    ARGUMENT

The EO at issue broadly proclaims that undefined DEI efforts are unlawful and threatens significant consequences against employers that implement such anti-discrimination practices. As private sector employers and firms who engage in DEI work, and trade associations and other organizations that support them, Amici are in a position to educate the Court on what their DEI policies and practices entail, why they exist, and how they are carried out in compliance with the law. Additionally, Amici ask the Court to consider the impact on them and the employers they support from the EO's mandates, in terms of the additional risk they incur from ending these anti-discrimination efforts, and the burden on their First Amendment rights from the self-censorship the EO encourages.

### A.     Employers have adopted DEI policies and practices to support important business objectives.

Most American employers have implemented policies and practices that foster greater fairness and equal opportunities for all people under the umbrella of DEI.  Although nomenclature varies, these anti-discrimination efforts largely focus on (1) casting a wide net for talent from all backgrounds; (2) increasing the equity, or fairness, of employment decisions; and (3) strengthening inclusion, or a sense of belonging and welcomeness, in workplaces.  Many policies and practices also specifically address accessibility for individuals with disabilities.  Contrary to the EO's attempt to stereotype this longstanding work as exclusionary or involving improper racial or other preferences, DEI efforts open doors of opportunity, giving more people the chance to succeed based on their unique talents.

Employers and firms adopt DEI practices for many reasons, but a primary goal is to advance important and legitimate business and mission objectives.  For decades, corporate leaders have promoted diversity as "good for business."  Their experience has shown these anti-discrimination efforts will promote innovation, improve customer experiences, expand the reach of products and services, and strengthen their ability to recruit and retain talent.  For this reason, corporate and other organizational leaders who have recently reinforced their commitments to their work often speak of how their diversity, equity and inclusion commitments

4912-3936-0576v.5 -

advance market share,[3] improve the quality of talent acquisition,[4] and promote

financial growth and profitability,[5] while reducing discrimination.

This experience is backed by decades of research showing that companies

with more demographically diverse leadership are more successful.[6]  Diverse

teams boost innovation, reduce the dangers of "groupthink" and serve as a catalyst

for new ideas or viewing the same problem from a different lens.[7]  Hiring people

---

[3] *See Costco Defies Trump's DEI Order and Embraces Diversity as Other Companies Scale Back*, Fortune (Jan. 24, 2025), *available at* https://fortune.com/2025/01/24/costco-anti-dei-proposal/ (citing Costco Board of Directors' proxy filing assertion that DEI has increased the "creativity and innovation in the merchandise and services we offer" and increased customer satisfaction). *See also* Jack Kelly, *JPMorgan's Jamie Dimon Stands Firm Amid Conservative Pressure to Dismantle DEI Initiatives,* Forbes (Jan. 23, 2025) (describing positive impact of diversity initiative in expanding the bank's customer base)*, available at* https://www.forbes.com/sites/jackkelly/2025/01/23/jpmorgans-jamie-dimon-stands-firm-amid-conservative-pressure-to-dismantle-dei-initiatives/.

[4] Mark Maske, *NFL Reaffirms Diversity Hiring Efforts Despite Trump's Moves Against DEI*, Washington Post (Feb. 3, 2025), *available at* https://www.washingtonpost.com/sports/2025/02/03/nfls-diversity-efforts-focus-after-trumps-moves-against-dei/ (NFL diversity efforts are "fundamental" to hiring the best talent).

[5] *See, e.g.,* Joshua Nelken-Zitser, *DEI Is Good for Our Business, Coca-Cola Says,* Business Insider (Feb. 21, 2025), *available at* https://www.msn.com/en-ae/money/companies/dei-is-good-for-our-business-coca-cola-says/ar-AA1zvNFk.

[6] McKinsey's analysis over ten years of global data found the companies with the most gender and ethnic diversity in executive leadership were nearly 40% more likely to financially outperform those with the lowest levels of diversity. McKinsey, *Diversity Matters Even More: The Case for Holistic Impact* (2023), available at https://www.mckinsey.com/featured-insights/diversity-and-inclusion/diversity-matters-even-more-the-case-for-holistic-impact#/.  *See also* Katherine W. Phillips, *How Diversity Makes Us Smarter*, Scientific American (2014), available at http://www.scientificamerican.com/article/how-diversity-makes-us-smarter/ (same).

[7] Alison Reynolds and David Lewis, *Teams Solve Problems Faster When They Are Cognitively Diverse*, Harvard Business Review (March 30, 2017), available at https://hbr.org/2017/03/teams-solve-problems-faster-when-theyre-more-cognitively-diverse.  *See* Sylvia Ann Hewlett, Melinda Marshall and Laura

4912-3936-0576v.5 -

with different backgrounds and experiences can also make it easier to reach different markets, customers and clients.

An important and oft-cited justification behind efforts to recruit and retain talent from all backgrounds has been the need to effectively market to a more interconnected world and a more ethnically and racially diverse U.S. population.[8] DEI encompasses far more than race, however, and includes efforts pertaining to all kinds of diversity, such as neurodiversity,[9] non-traditional educational and economic backgrounds,[10] family status, military service experience, age, and other traits—based on the belief that such diversity can provide a "culture add" that advances the mission more effectively.[11]

---

Sherbin, *How Diversity Can Drive Innovation,* Harvard Business Review (Dec. 2013), available at https://hbr.org/2013/12/how-diversity-can-drive-innovation.

[8] Jennifer Miller, *For younger job seekers, diversity and inclusion in the workplace aren't a preference. They're a requirement,* Washington Post (Feb. 18, 2021); https://www.washingtonpost.com/business/2021/02/18/millennial-genz-workplace-diversity-equity-inclusion/.

[9] Deloitte Center for Integrated Research, *The Neurodiversity Advantage: How Neuroinclusion can Unleash Innovation and Create Competitive Edge,* available at https://www2.deloitte.com/us/en/insights/topics/value-of-diversity-and-inclusion/unleashing-innovation-with-neuroinclusion.html; Alison Reynolds and David Lewis, *Teams Solve Problems Faster When They're More Cognitively Diverse*, Harvard Business Review (March 30, 2017), available at https://hbr.org/2017/03/teams-solve-problems-faster-when-theyre-more-cognitively-diverse.

[10] Opportunity@Work program case studies show how major employers remove degree requirements and tap new talent with different skills and perspectives. *See* https://www.opportunityatwork.org/stars.

[11] Louis Montgomery, Jr., *Culture Fit Versus Culture Add: Hiring for Growth,* Forbes (June 8, 2022), available at https://www.forbes.com/councils/forbeshumanresourcescouncil/2022/06/08/culture-fit-versus-culture-add-hiring-for-growth/.

4912-3936-0576v.5 -

DEI is also not just about hiring. To leverage talent from all backgrounds, workplaces need to ensure everyone has a fair opportunity to thrive. DEI practices support respectful communication across differences, increase engagement and support retention—which in turn saves money and advances management goals.[12] Shareholders have recently resoundingly rejected proposals to cut back on these programs, showing investors "believe DEI is good for business."[13]

Employers also implement DEI programs to better align their practices with their values and those of their communities. Indeed, a majority of Americans agree that DEI initiatives promote broadly-accepted norms of fairness and opportunity at work.[14] This public support makes these commitments a strong selling point for new hires and for companies' public brands.

---

[12] Francis X. Frei and Anne Morriss, *10 Reasons Why Inclusion Is a Competitive Advantage*, Harvard Business Review (2023), available at https://hbr.org/2023/10/10-reasons-why-inclusion-is-a-competitive-advantage; Catalyst, *Why Diversity and Inclusion Matter,* available at https://www.catalyst.org/insights/2020/why-diversity-and-inclusion-matter (summarizing research).

[13] Nathan Meyersohn, *DEI is Winning with Costco, Apple and Levi's Shareholders,* CNN (May 2, 2025), available at https://www.cnn.com/2025/05/02/business/costco-apple-levi-shareholders-dei.

[14] *Most Americans Approve of DEI, According to Post-Ipsos Poll*, Washington Post (June 18, 2024), available at https://www.washingtonpost.com/nation/2024/06/18/affirmative-action-dei-attiudes-poll/; Jessica Stillman, *Inc.* (March 12, 2025), available at https://www.inc.com/jessica-stillman/you-are-probably-wildly-underestimating-how-many-americans-support-dei-new-study-shows/91157848 (citing data from Univ. of Wisconsin at Madison).

It is essential that employers remain free to continue this work that promotes equal opportunity and benefits the economy, without the improper burdens the EO places on lawful and effective DEI work.

**B.    DEI arose in response to documented barriers to equal employment opportunity and is necessary to reduce the risk of traditional discrimination.**

DEI policies and practices are not only critical to advance business initiatives and create workplaces where all employees can thrive, they are also an integral and time-honored part of employers' efforts to combat discrimination. For decades, our nation's legal institutions have built a strong framework to address discrimination in hiring, promotion and pay, and unfair workplace practices like harassment.  But legal rules are insufficient—proactive efforts by employers to advance workplace equality are essential to carry out the promise of these laws. Moreover, abandoning them per the EO's instructions would expose Amici and the employers they support to significant risk of traditional discrimination claims.

**1.    Despite growing legal protections, discrimination against historically marginalized groups persists.**

The Civil Rights Act was passed in 1964, providing a clear Congressional mandate prohibiting discrimination in employment.  Covert and systemic discrimination continued to lead to unequal outcomes, like biased hiring practices that kept women and people of color from having the opportunity to compete for

better-paying jobs.[15]  The federal government took additional steps to combat

embedded discrimination, including requiring federal contractors to proactively

review their hiring and other practices for potential discrimination.[16]

In the years since, Congress, the courts, and the President have repeatedly

acted to strengthen laws intending to identify and eliminate unintentional or

systemic discrimination.  *See*, *e.g.*, *Griggs v. Duke Power*, 91 S. Ct. 849 (1971)

(holding unanimously that employers could be held liable not only for intentional

discrimination, but also for neutral practices that adversely affect different groups);

*Meritor Savings Bank, FSB v. Vinson*, 106 S. Ct. 2399 (1986) (establishing cause

of action for sexual harassment); Executive Order 13672 (amending EO 11246

requiring affirmative action to include sexual orientation and gender identity as

protected classes); the Americans with Disabilities Act,[17] and the Age

Discrimination in Employment Act.[18]  Countless states and local governments have

also enacted non-discrimination laws across the nation.

---

[15] Juliet R. Aiken, Elizabeth D. Salmon and Paul J. Hanges, *The Origins and Legacy of the Civil Rights Act of 1964*, J. Bus. Psychol 28(4) 383-99 (2013) (the passage of the Civil Rights Act did not make immediate, dramatic change but did "paved the way for progress").  *See also Dothard v. Rawlinson*, 97 S. Ct. 2720, (1977) (height and weight requirements for guard positions that had no proven relation to job performance, but had a steeply disparate impact on women).
[16] *See Aiken et al. supra n.15; see also* Heather Timmons, *Why LBJ signed executive order 11246 that Trump rescinded*, Reuters (Jan. 23, 2025), available at https://www.reuters.com/world/us/why-president-johnson-signed-executive-order-1965-that-trump-rescinded-2025-01-23/
[17] 42 U.S.C. § 12101 *et seq*.
[18] 29 U.S.C. § 621 *et seq*.

Despite these legal efforts, however, significant demographic disparities persist. For example, data reveals that, despite making up 50.5% of the US population, women constituted only 29% of C-Suite executives as of 2024, which was up from 17% in 2015.[19] Women are underrepresented at every other step in the pipeline as well, from entry-level up to senior vice president roles. While this underrepresentation exists for women of all races, disparities are more significant for women of color.[20] Moreover, there are significant racial disparities. A 2021 Washington Post review of the top 50 companies in America uncovered that only 8 percent of C-suite executives are Black, despite this group making up 14% of the U.S. population.[21] Additionally, as with gender, racial disparities exist across organizations, with private employers consistently seeing the most diversity at the entry-level of their organization, with decreasing representation at each step up the corporate ladder.

---

[19] Women in the Workplace 2024: The 10th Anniversary Report, McKinsey & Company (Sept. 17, 2024), available at https://www.mckinsey.com/featured-insights/diversity-and-inclusion/women-in-the-workplace; *see also* Ruchika T. Malhotra, *How Work Has Changed for Women in Corporate America Over the Last 10 Years*, Harvard Business Review (Sept. 17, 2024), available at https://hbr.org/2024/09/work-has-changed-for-women-in-corporate-america-over-the-last-10-years.

[20] Catalyst, Women of color in the United States: Quick Take (February 1, 2023), available at https://www.catalyst.org/insights/2023/women-of-color-in-the-united-states.

[21] Tracy Jan, *The Striking Race Gap in Corporate America*, The Washington Post (December 15, 2021), available at https://www.washingtonpost.com/business/interactive/2021/black-executives-american-companies/.

4912-3936-0576v.5 -

Employees in minority groups also leave their roles in corporate America at a much higher rate. In addition to reduced opportunity for advancement, this may be because these groups experience higher incidents of discrimination and lower job satisfaction.[22] For example, a 2021 report found that over two in five Black workers (42 percent) felt they faced race- or ethnicity-based unfair treatment at work in the past five years. Over the same period, 26 percent of Asians, and 21 percent of Hispanics or Latinos, reported experiencing unfair treatment in the workplace due to their race or ethnicity.[23] Women and minorities also experience microaggressions, or expressions of bias that, while often unintentional or unconscious, create significant stress.[24] A 2023 McKinsey report showed women are twice as likely to be mistaken for someone junior and hear comments on their emotional state, for example, while Asian and Black women are seven times more likely than white women to be confused with someone of the same race and ethnicity.[25]

---

[22] SHRM Report: Racial Inequity Persists, Costs American Workplaces Billions Annually (May 24, 2021), available at https://www.shrm.org/about/press-room/shrm-report-racial-inequity-persists-costs-american-workplaces-billions-annually.

[23] SHRM, *supra* note 18.

[24] Women in the Workplace 2023, McKinsey & Company (October 5, 2023), available at https://www.mckinsey.com/featured-insights/diversity-and-inclusion/women-in-the-workplace-2023; *see also* McKinsey, *supra* note 17

[25] *Id.*

Data for LGBTQ employees is also stark.  A 2022 joint study by the Center for American Progress and NORC, a nonpartisan research group based at the University of Chicago, found that nearly half (46%) of surveyed LGBTQ+ employees reported experiencing unfairness or mistreatment at work.[26]  Of these reports, 36% of those who identify as both LGBTQ and People of Color report being verbally harassed while 26% of white LGBTQ staff report the same; and 34% have reported leaving a job due to mistreatment by their employer.[27]

It is clear that, despite changes in the law to eliminate discrimination, there is more work to be done.

### 2. Forcing Amici and the employers they support to end DEI work would mean exposing them to additional litigation risk.

In the face of these continuing disparities, DEI has emerged as a critical tool employers can use to create and maintain non-discriminatory workplaces. Amici's DEI policies and practices contain numerous features that serve as proactive risk management strategies.  These include, for example, reviewing internal data on

---

[26] Rae Barton, *The Challenges of Being LGBTQ in the Workplace*, Mental Health America (June 13, 2024), available at  https://mhanational.org/blog/challenges-being-lgbtq-workplace/#:~:text=Nearly%20half%20(46%25)%20of,with%20those%20who%20identify%20as (citing *Discrimination and Barriers to Well-Being: The State of the LGBTQI+ Community in 2022*, available at https://www.americanprogress.org/article/discrimination-and-barriers-to-well-being-the-state-of-the-lgbtqi-community-in-2022/.

[27] *Id.*

hiring practices, evaluating pay equity, and assessing employee engagement and workplace culture and climate.  These practices also involve training to help employees recognize when stereotypes or assumptions may be influencing their behavior, build skills to act with fairness and respect, and provide better feedback on workplace concerns.  Such DEI practices enable companies to identify potential inequalities or problematic behaviors and prevent them before discrimination occurs.

Because DEI policies and practices are critical for preventing unlawful discrimination, it follows that employers face additional risk if they dismantle those programs pursuant to the EO's directive.  After the 2023 *Students for Fair Admissions* decision, for example, Attorneys General from 20 states issued a letter to Fortune 100 companies to underscore the importance of continuing lawful DEI work.  They wrote that such efforts "to address historic inequities, increase workplace diversity, and create inclusive environments" were not only "ethically responsible, good for business, and good for building America's workforce[,]" but were also "fully compliant with state and federal law."[28]  Significantly, the officials advised employers not to retreat from DEI but instead to "double-down on

---

[28] Aaron D. Forde, et. al. Letter to Fortune 100 CEOs (July 19, 2023), available at https://illinoisattorneygeneral.gov/News-Room/Current-News/Fortune%20100%20Letter%20-%20FINAL.pdf.

diversity-focused programs because there is still much more work to be done."[29]

More recently, Attorneys General from 16 states released guidance intended to

ensure organizations operating in the identified states "understand the continued

viability and important role of [DEI practices] in creating and maintaining legally

compliant and thriving workplaces."[30]

Amici are also mindful that ending DEI work could increase the risk of

traditional discrimination claims. For example, the National Employment Lawyers

Association (NELA) and National Institute for Workers' Rights (NIWR) jointly

published a statement and letters they sent to employers that had ostensibly

curtailed their DEI practices in response to the EO.[31] They wrote that DEI

policies and practices are "not only consistent with the law but are often necessary

to ensure compliance with it," and they warned employers that "*[a]bandoning*

*these efforts increases your liability risk under federal and state law*."[32]

---

[29] *Id.*

[30] *See* Multistate Guidance Concerning Diversity, Equity, Inclusion, and Accessibility Employment Initiatives from the Commonwealth of Massachusetts and State of Illinois Offices of Attorney General and others (Feb. 13, 2025) (available at https://www.mass.gov/doc/multi-state-guidance-concerning-diversity-equity-inclusion-and-accessibility-employment-initiatives/download).

[31] NELA is the nation's largest professional membership organization for lawyers who represent workers in employment, labor, and civil rights disputes. NIWR is a nonprofit organization that advocates for non-unionized workers.

[32] Statement on DEI rollbacks: National Institute for Workers' Rights (NIWR), NIWR and NELA Warn Corporations Of Increased Liability Risk In Rolling Back Diversity, Equity And Inclusion Programs (April 8, 2025), available at https://niwr.org/2025/04/08/release-risk-eliminating-dei-programs; Karen Maoki and Jason Solomon. Letter to Amy Tu (April 8, 2025), available at: https://niwr.org/2025/04/08/letter-dei-target/.

This warning rings true. Over the last decade, employers are increasingly concerned about claims brought by minority group plaintiffs alleging unconscious or systemic racism, or other unintentional discrimination such as microaggressions, as well as increasing numbers of internal complaints and prelitigation agency charges tied to similar issues. Employers have also experienced an increase in pay equity[33] and class litigation,[34] areas where proactive efforts to ensure fair and nondiscriminatory workplaces are particularly important. Stripping employers of the means to identify and rectify systemic barriers within their organization means exposing them to heightened risk of these costly discrimination claims.

No entity should unlawfully discriminate against any groups. DEI policies and practices that are carefully constructed in compliance with the law are essential to employers' ability to mitigate risk and comply with the law. The direct conflict between the EO and the reality of the purpose and effect of DEI work leaves employers in a double-bind, as they wish to avoid punishment under the EO while at the same time meeting their responsibility to create legitimately merit-based and non-discriminatory workplaces.

---

[33] U.S. Equal Employment Opportunity Commission, *EEOC Launches "Level the Playing Field" Equal Pay Video Campaign*, (June 9, 2023), *available at* https://www.eeoc.gov/newsroom/eeoc-launches-level-paying-field-equal-pay-video-campaign (discussing increase in Equal Pay Act charges).

[34] U.S. Equal Employment Opportunity Commission, *2024 Annual Performance Report* (Jan. 17, 2025), *available at* https://www.eeoc.gov/2024-annual-performance-report (104% increase in systemic recoveries over prior year).

4912-3936-0576v.5 -

### C.  There is no conflict between DEI and "merit," and the way employers conduct this work is non-discriminatory.

Furthering the burden from the EO on Amici's interest in advancing their business and mission objectives and preventing discrimination is the fact that the EO misconstrues DEI work as contrary to the principles of merit.  In reality, this could not be further from the truth.  DEI programs are at their core intended to advance a truly merit-based workforce and to prevent discrimination.

DEI practices promote fair competition.  For example, more expansive recruitment and hiring programs open the workplace to a broader array of talent and backgrounds, increasing the chances an employer will find the best match for their role.  DEI work empowers hiring managers to choose from a wider set of skills and backgrounds when adding to their teams, including considering relevant experience as a substitute for an educational degree where appropriate, all in order to find the best candidate.  Such practices focus on excellence, and making decisions based on skills, qualifications, and business needs, as opposed to simply hiring based on perceived pedigree and name recognition.  Employers also use data to identify and reduce barriers that limit who gets to compete for certain roles and to make sure decisions around hiring, promotion, and pay are being made on job-related criteria and not identity.[35]

---

[35] Lynn Clements, David Cohen and Victoria Lipnic, Workforce Data Considerations After DEI Order, Law 360 (February 27, 2025), available at:

15

Many DEI best practices increase transparency, so all employees understand what it takes to succeed and can more easily access professional development, mentoring and promotion opportunities. This may include structured mentoring and professional development programs that invite participants of all backgrounds and serve the interests of a wide variety of employees, instead of relying on individual employees and managers to take the initiative. Such intentional inclusion of all employees is the antithesis of discrimination and operates to ensure that merit is at the forefront as employees progress. Indeed, the DEI framework evolved in response to discrimination that operates through informal, subjective, and secretive approaches to hiring and promotion, based on networks and cultural capital that not everyone can access equally.

DEI programs and practices also focus on reducing barriers so that all employees have the ability to be successful, regardless of protected class. This can be as varied as ensuring employees have time and a private space to express breastmilk, providing employees with disabilities with reasonable accommodations, creating cultural competence so no employees are subjected to microaggressions that interfere with their performance, supporting employees with caregiving responsibilities so they have the flexibility to meet their care needs

---

https://www.law360.com/articles/2300749/workforce-data-collection-considerations-after-dei-order (detailing considerations for continuing to collect workforce data).

while succeeding at work, and preventing older employees from being sidelined. Finally, DEI work includes ensuring performance management is carried out fairly and consistently, so that strong performance is equally rewarded, and misconduct equally addressed, regardless of one's background.

Ultimately, employers design DEI policies and practices to serve all employees, both to meet legal requirements and foster engagement, while recognizing that all employees have different goals and needs. To the extent employers' DEI efforts focus attention on race, gender, disability, LGBTQ+ status, veterans' status or any other identity, it is simply to ask the question: Do the members of this group receive the same fair and respectful treatment as everyone else in our workplace? Where the answer is unclear or the experiences inconsistent, structured DEI initiatives help orient the process toward opportunity for all.

### D. The EO's mandate to end DEI is at odds with legal authority establishing that typical components of DEI practices are lawful.

In addition to being categorically inconsistent with the reality of what these policies and practices look like and how they operate, the EO's blanket assertion that all DEI efforts are inherently discriminatory is also contrary to governing law.

There is no question that the law favors proactive work to identify and remove barriers to equal opportunity. Indeed, the EEOC itself has expressed strong support for proactive DEI measures, stating that such initiatives "open the

17

American workplace to historically excluded groups" and may "also help to avoid discrimination."[36]  The EEOC has also expressly condoned efforts to diversify the workforce, releasing guidance encouraging employers to "recruit, hire, and promote with EEO in mind, by implementing practices designed to widen and diversify the pool of candidates considered for employment openings, including openings in upper-level management."[37]  Employers have relied on this longstanding invitation from the nation's lead enforcement agency to develop and implement their programs.

Consistent with the EEOC's support for this work, courts evaluating discrimination claims tied to DEI programs have frequently ruled that the programs are lawful as applied to the plaintiff in question.  In the context of diversity hiring practices, for example, courts have refused to find such programs inherently discriminatory.  *See, e.g., Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1295–96 (9th Cir. 2000) (existence of program with goal of "increasing diversity in management" and fact that reduction in force "was monitored to determine whether it had any impact on women or minorities" did not constitute evidence that white male plaintiff was terminated due to race); *Filozof v. Monroe Cmty. Coll.,*

---

[36] Guidance: Section 15: Race and Color Discrimination, EEOC (April 19, 2006) (available at https://www.eeoc.gov/laws/guidance/section-15-race-and-color-discrimination).

[37] *Id.*  The guidance further suggests employers "promote an inclusive culture in the workplace."

583 F. Supp. 2d 393, 402 (W.D.N.Y. 2008), *aff'd*, 411 F. App'x 423 (2d Cir. 2011) (leadership statements "emphasiz[ing] the need to increase diversity among faculty and staff" did not support discrimination claim); *Bernstein v. St. Paul Cos., Inc.,* 134 F.Supp. 2d 730, 739 (D. Md. 2001) ("A company's (or its CEO's) commitment to 'diversity,' if expressed in terms of creating opportunities for employees of different races and both genders . . . is not proof of discriminatory motive with respect to any specific hiring decision.'"); *Lutes v. Goldin,* 62 F. Supp. 2d 118, 131 (D.D.C. 1999) (interest in advancing diversity did not equate to proof of motive to discriminate against plaintiff); *Reed v. Agilent Techs., Inc.,* 174 F.Supp.2d 176, 185 (D. Del. 2001) ("[T]he mere existence of a policy promoting diversity awareness is not evidence of discrimination[.]"); *Jones v. Bernanke,* 493 F.Supp.2d 18, 29 (D.D.C. 2007) (testimony regarding objective of increasing diversity in the workplace did not support discrimination claim).

Amici and other employers have carefully followed and applied the requirements courts have placed upon DEI work to ensure it carries out its EEO mandate, advances merit, and does not operate to disfavor any group or any individual based on their identity.  In addition to lawful hiring initiatives, employers have widely adopted Employee Resource Groups, sometimes known as affinity groups, where employees with shared identities and interests can find connection and community.  ERGs are typically open to all and exist for the

purpose of creating community and advancing inclusion for all employees.  As such, they help prevent workplace discrimination and do not constitute unlawful discrimination under any interpretation of the law.  *See Diemert v. City of Seattle*, No. 2:22-CV-1640, 2025 WL 446753, at *17 (W.D. Wash. Feb. 10, 2025) ("When properly structured, [ERGs] are voluntary and open to all who share the group's goals, and can foster a sense of belonging and respect that advances equity in the workplace and improves the bottom-line.") (citing *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 539-542 (7th Cir. 2005) (approving of guidelines stating that membership in affinity groups was "voluntary and must be open to all current, salaried, full-time employees who share a group's goals.")).

Similarly, DEI trainings are instrumental for ensuring non-discrimination and preventing harassment in the workplace, and plaintiffs are rarely successful in showing that these trainings are discriminatory.  Again, the EEOC has endorsed this practice: "[Diversity] trainings can serve as vital measures to prevent or remediate workplace discrimination."  Brief for EEOC as Amici Curiae Supporting Neither Party, *Vavra v. Honeywell Int'l, Inc.,* , 2024 WL 645993, at *13. *See Id.* at *17 (identifying orders and consent decrees requiring employers to adopt training programs to redress discrimination, including implicit bias training).  The Courts have as well. *See De Piero v. Pennsylvania State Univ.* 711 F. Supp. 3d 410, 424 (E.D. Pa. 2024) ("Training on concepts such as 'white privilege,' 'white fragility,'

implicit bias, or critical race theory can contribute positively to nuanced, important conversations about how to form a healthy and inclusive working environment."); *De Piero v. Pennsylvania State Univ.*, No. CV 23-2281, 2025 WL 723029, at *15 (E.D. Pa. Mar. 6, 2025) (no rational trier of fact could view training including "being invited to review scholarly materials and engage in conversations about antiracist approaches to teaching and learning" as unlawful harassment); *Diemert,* 2025 WL 446753 at *10, (in rejecting claim related to DEI training, stating such "programs are needed because racial discrimination and inequality are present-day problems, not problems of the distant past.") (citing *Students for Fair Admissions*, 600 U.S. at 317 (Kavanaugh, J., concurring) ("[R]acial discrimination still occurs and the effects of past racial discrimination still persist."); *Id.* at 393 (Jackson, J. dissenting) ("The race-based gaps that first developed centuries ago are echoes from the past that still exist today.").[38]

Along the same lines, courts have rejected retaliation claims by employees who claim they were punished for opposing DEI training, on the basis that such trainings do not violate Title VII.  *See, e.g. Norgren v. Minnesota Dep't of Hum. Servs.,* No. 22-489 ADM/TNL, 2023 WL 35903, at *7 (D. Minn. Jan. 4, 2023),

---

[38] Respectful workplace and anti-harassment programs that promote an inclusive culture and reduce harmful behavior are not only consistent with legal requirements, they are also more likely to successfully lead to positive outcomes. Frank Dobbin and Sandra Kalev, Getting to Diversity: What Works and What Doesn't (2022) (on benefits of cultural inclusion training).

*aff'd*, 96 F.4th 1048 (8th Cir. 2024) ("being required to attend across-the-board diversity training is not a discriminatory practice under Title VII").

The EO's statement that DEI is, as a whole, "illegal," is demonstrably false. Whether any particular DEI policy or initiative in fact operates to preference or exclude is a determination for a court to make based upon a full record, not a blanket assumption that the Administration can make—without any due process— and then enforce through an unlawful EO.

**E. The EO violates the First Amendment and warrants preliminary injunctive relief.**

The EO's vague terms chill speech and should be swiftly enjoined. *See Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). Those chilling effects are "both real and substantial," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 217 (1975), as myriad organizations—from businesses to law firms to charitable foundations— have changed their speech or are considering doing so to avoid the threatened penalties. The Court should reinstate the injunction and affirm.

**1. Vague speech regulations require swift relief.**

A law is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Vague laws regulating speech face an even more stringent test because they lead ordinary citizens "to steer far wider of the unlawful

zone" by censoring their own expression. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *Counterman v. Colorado*, 600 U.S. 66, 78 (2023) (even threat of legal fees to defend speech causes speakers to self-censor). To prevent shuttering whole areas of human thought, regulations in areas "so closely touching our most precious freedoms" must be clear. *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 432, 438 (1963); *see also Holder v. Humanitarian L. Project*, 561 U.S. 1, 19 (2010) (heightened scrutiny applies to vague laws burdening speech and association) (quotation omitted).

It does not matter that a regulation *could* be enforced lawfully. Courts "cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights." *Button*, 371 U.S. at 438. The risk of enforcement stifles free expression "even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 384 (1988). *Id.* at 393 (rejecting argument that it was premature to consider pre-enforcement challenge to vague and overbroad speech regulation). The "vindication of freedom of expression" thus cannot be made to "await the outcome of protracted litigation," *Dombrowski*, 380 U.S. at 487 (citing cases), which only compounds the chilling effects on protected speech. *See FEC v. Wisc. Right To Life, Inc.*, 551 U.S. 449, 469 (2007) (First Amendment requires prompt adjudication).

A vague regulation of speech does not pass muster "merely because the Government promise[s] to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Id.*

## 2. The Order is unconstitutionally vague.

The EO fails this test, threatening to punish private organizations that engage in undefined "illegal DEI discrimination and preferences." The government has not acknowledged any material constraints on its discretion to punish protected activities. In fact, it has already done the opposite. *See* Press Release, *In EEOC Settlement, Four 'BigLaw' Firms Disavow DEI and Affirm Their Commitment to Merit-Based Employment Practices*, EEOC (Apr. 11, 2025) (extracting law firms' concession not to "categorize" any "lawful employment activities" as DEI).

The vagueness doctrine exists to prevent this kind of censorship. *See Button*, 371 U.S. at 432, 435. Without a definition of "illegal DEI discrimination and preferences," organizations must guess what otherwise protected speech could subject them to penalties. Is a private foundation allowed to host a speaker highlighting our nation's history of discrimination? Can a company organize trainings to help retain and advance women executives? May a law firm take on pro bono work supporting transgender rights? No one can know—the EO

delegates plenary censorship authority "on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

The motions panel turned these fundamental First Amendment principles upside down, concluding it was premature to enjoin the EO since the government *could* apply it only to illegal conduct (and not speech). But again, a regulation threatening protected speech cannot stand based on the possibility—or even a promise—of responsible enforcement. *See Button*, 371 U.S. at 438; *United States*, 559 U.S. at 480; *Virginia*, 484 U.S. at 393. Nor has the government provided any reason to suggest it will enforce the EO responsibly. While Amici share Judge Wilkinson's "hope that it is not naïve to believe our good brethren in the Executive Branch perceive the rule of law as vital to the American ethos," *Abrego Garcia v. Noem*, 2025 WL 1135112, at *3 (4th Cir. 2025), the administration continues to push boundaries. *See e.g.*, *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 1119481, at *7 (D.D.C. Apr. 16, 2025) (government's "willful and knowing actions here constitute probable cause for a finding of contempt").

The EO vests an unrestrained executive branch with seemingly unfettered discretion to punish a range of speech promoting ideas that the President opposes, notwithstanding the established legality of DEI practices. But "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can

prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion[.]" *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). The First Amendment does not abide such sweeping censorship.

### 3. Failure to enjoin the Order would only invite more self-censorship.

The EO will continue to chill speech unless this Court restores the district court's injunction.

From major law firms[39] to Fortune 50 companies,[40] entities now speak differently (or not at all) now about DEI. Many of America's largest and most important enterprises have effectively erased the term "diversity" from their vocabulary. PepsiCo retroactively removed nearly all references to diversity in its 2024 investor report less than a year after describing DEI as a "competitive advantage" in the marketplace.[41] Similarly, in 2023, Intel told investors in that year's annual report that "[d]iversity and inclusion are core elements of Intel's

---

[39] Kathryn Rubino, *Biglaw Is Under Attack. Here's What The Firms Are Doing About It*, ABOVE THE LAW, (Apr. 4, 2025), https://abovethelaw.com/2025/04/biglaw-is-under-attack-heres-what-the-firms-are-doing-about-it/ (tracking law firm DEI statements, or lack thereof).
[40] Jeff Green, *How Trump Reshaped Corporate DEI*, BLOOMBERG (Apr. 30, 2025), https://www.bloomberg.com/news/articles/2025-04-30/how-trump-has-reshaped-dei-in-corporate-america (including timeline of evolving DEI policies in relation to Trump Administration's Executive Orders).
[41] Conor Murray and Molly Bohannon, *IBM Reportedly Walks Back Diversity Policies, Citing 'Inherent Tensions': Here Are All The Companies Rolling Back DEI Programs*, FORBES (Apr. 11, 2025), https://www.forbes.com/sites/conormurray/2025/04/11/ibm-reportedly-walks-back-diversity-policies-citing-inherent-tensions-here-are-all-the-companies-rolling-back-dei-programs/.

4912-3936-0576v.5 -

values."  But the 2024 investor report states: "~~Diversity and~~ inclusion ~~are~~ <u>is</u> <u>a</u> core elements of Intel's values."[42]  The breadth and timing of these changes underscore that this is no coincidence.[43]

And can you blame these organizations?  When the government celebrates settlements that compel universities and law firms to change their and their members' speech and association and turns its attention to corporations and charities, the pressure to conform is immense.  *See* Carol Rose, *Game Stories*, 22 YALE J.L. & HUMAN. 369, 375 (2010) (describing rational behavior within this "stag hunt" scenario).  Standing on constitutional rights carries a cost not every organization is able to bear.  *Cf. Wash. Post v. McManus*, 944 F.3d 506, 516 (4th Cir. 2019) (Wilkinson, J.) (businesses will choose self-censorship to avoid government penalties).  Amici can attest that they are themselves significantly concerned about the risk of improper government enforcement and facing serious pressure to alter how the engage in and communicate publicly about DEI—and that they are in frequent communication with other organizations about this concern.

---

[42] Maria Aspan, *Exclusive: GM, Pepsi, Disney, others scrub some DEI references from investor reports*, NAT'L PUB. RADIO (Feb. 7, 2025), https://www.npr.org/2025/02/07/nx-s1-5288947/trump-dei-disney-pepsi-diversity.

[43] Murray & Bohannon, *supra* note 39.

## III.  CONCLUSION

Employers around the country are doing the difficult but important work of creating workplaces where all employees have the opportunity to thrive, consistent with governing law and their valid business objectives.  DEI policies and practices represent employers' best efforts to not only prevent traditional forms of discrimination, but to create workplaces where ***all*** are welcome and have the opportunity to succeed.  Amici and the employers they support truly believe that this work is crucial to their missions, their workplaces, and their effectiveness in business.  Yet, through an EO that is entirely inconsistent with applicable law, the current administration seeks to make such programs too risky to continue in the short-term.  As business leaders and supporters, Amici must operate both for the short- and long-term, outside of politics and consistent with governing law.  To meet our fiduciary obligations and succeed in business, abandoning our principles and approaches to creating non-discriminatory workplaces in the face of unlawful intimidation tactics is untenable.

In our republic founded on the separation of powers, it is the duty of the federal judiciary to defend liberty and protect our most fundamental freedoms whenever the government attempts to undermine them. The Court should exercise its authority to safeguard these freedoms in this case.

Dated:  May 15, 2025

Respectfully submitted,

*Counsel for* Amici Curiae

By: _____
Victoria Slade, State Bar No. 44597

By: _____
Ambika Kumar, State Bar No. 38237

DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 622-3150 Phone
ambikakumar@dwt.com
vickyslade@dwt.com

By: _____
Amanda Gómez, State Bar No. 5619481
DAVIS WRIGHT TREMAINE LLP
1250 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 603-6475 Phone
amandagomez@dwt.com

By: _____
Stacey Sprenkel, State Bar No. 241689
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, CA 94111
(415) 276-4847 Phone
staceysprenkel@dwt.com

By: _____
Adam Sieff, State Bar No. 302030
DAVIS WRIGHT TREMAINE LLP
350 South Grand Avenue, 27th Floor
Los Angeles, CA 90071
(213) 633-6800 Phone
adamsieff@dwt.com

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App.

P. 32(a)(7)(B) because it contains 6,342 words, excluding the parts of the brief

exempted by Circuit Rule 32(a)(1), as determined by the word-counting feature of

Microsoft Word.

2.      This brief complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it

has been prepared in a proportionally spaced typeface using Microsoft Word in 14-

point Times New Roman.

Dated:  May 15, 2025

By:     _____
        Victoria Slade, State Bar No. 44597
        DAVIS WRIGHT TREMAINE LLP
        920 Fifth Avenue, Suite 3300
        Seattle, WA 98104-1610
        (206) 622-3150 Phone
        vickyslade@dwt.com

## CERTIFICATE OF SERVICE

I hereby certify under Circuit Rule 25(c), that on this 15th day of May, 2025, I caused to be electronically filed the foregoing **UNOPPOSED AMICUS CURIAE BRIEF OF PRIVATE EMPLOYERS WITH DIVERSITY, EQUITY, AND INCLUSION PROGRAMS, AND ORGANIZATIONS THAT SUPPORT THEM, SUPPORTING APPELLEES** with the Court using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: May 15, 2025

By: _____
Victoria Slade, State Bar No. 44597
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
(206) 622-3150 Phone
vickyslade@dwt.com

4912-3936-0576v.5 -

# APPENDIX A

### LIST OF AMICI CURIAE

Adasina Social Capital
American Sustainable Business Council
andCo Hospitality, Inc.
Candide Group
Climate Positive Consulting
Color in Green
Current-C Energy Systems, Inc.
ImpactGC LLP
Interfaith Center on Corporate Responsibility
Investor Advocates for Social Justice
Keker, Van Nest & Peters LLP
Main Street Journal
Manufacturing Renaissance
Marketing Partners Inc.
New Energy Partners Inc.
New Jersey Sustainable Business Council
OBERLAND Inc.
Pure Strategies, Inc.
SC Small Business Chamber of Commerce
Seirus Innovative Accessories, Inc.
Sustainability Associates LLC
The Burton Corporation
The Verna Myers Company
Upstate Steel
Urban Justice Center
Vera Institute of Justice, Inc.
WA LEAD
Working IDEAL