No. 25-1189

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER
EDUCATION, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Maryland

**REPLY BRIEF FOR APPELLANTS**

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

MARK R. FREEMAN
DANIEL TENNY
JACK STARCHER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................1

ARGUMENT.................................................................................................2

I.     Plaintiffs Have No Likelihood of Success on the Merits. ......................3

       A.     Plaintiffs' merits arguments disregard what the provisions
              they challenge actually say and do.................................................3

       B.     Plaintiffs are not likely to succeed on any of their challenges.....6

              1.  The Termination Provision ...............................................6

              2.  The Report Provision .................................................13

              3.  The Certification Provision ........................................21

II.    Plaintiffs Also Fail to Establish the Remaining Preliminary
       Injunction Factors. ....................................................................27

III.   At a Minimum, the Preliminary Injunction Is Overbroad. .................28

CONCLUSION ...........................................................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                              **Page(s)**

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) ............................................................................20

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...........................................................................14

*Cooksey v. Futrell*,
    721 F.3d 226 (4th Cir. 2013)......................................................... 17, 18

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ...........................................................................10

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021)......................................................... 13, 28

*Humanitarian Law Project v. U.S. Treasury Dep't*,
    578 F.3d 1133 (9th Cir. 2009)............................................................11

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ............................................................................29

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) ...........................................................................12

*Rice v. Paladin Enters., Inc.*,
    128 F.3d 233 (4th Cir. 1997)...............................................................19

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
    508 F. Supp. 3d 521 (N.D. Cal. 2020).................................................11

*United States v. Texas*,
    599 U.S. 670 (2023) ...........................................................................19

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................2

**Statute:**

42 U.S.C. § 2000d-1 ............................................................24

**Regulatory Materials:**

Exec. Order No. 14,151,
    90 Fed. Reg. 8339 (Jan. 29, 2025) ......................................6

Exec. Order No. 14,173,
    90 Fed. Reg. 8633 (Jan. 31, 2025) ..................................... 13, 16, 21

## INTRODUCTION

A motions panel of this Court has already held that the government is likely to succeed on the merits of this appeal because the Executive Order provisions that plaintiffs challenge are lawful directives that merely instruct federal officers to enforce preexisting federal laws, ensure compliance with those laws, and deploy preexisting authority to ensure that government funds are expended in ways that further Presidential policy priorities to the maximum extent possible.

In response, plaintiffs—like the district court—fail to grapple with what the provisions they challenge actually say. Instead, they spend the bulk of their response tilting at atextual hypotheticals that presuppose that some unknown government actors will, at some point in the undefined future, purport to act pursuant to the challenged provisions in ways that contravene both the text of those provisions and existing federal law. Putting aside the significant ripeness and standing problems plaintiffs' arguments present, none of plaintiffs' arguments support the injunction the district court entered—or, indeed, any injunction against the Executive Order itself. If plaintiffs think a particular action by a government actor is

unlawful, the proper remedy is to wait for that dispute to materialize, challenge that action, and seek relief from the allegedly unlawful conduct.

Plaintiffs' facial constitutional challenges are doomed to fail for numerous independent reasons and the district court's preliminary injunction therefore must be vacated.

## ARGUMENT

Because plaintiffs cannot establish that they are likely to prevail on any of the threshold and merits issues presented—let alone all of them— they fall far short of making a "clear showing" that they are likely to succeed on the merits of their case. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). As the motions panel found, it is the government, not plaintiffs, that is likely to succeed on appeal and therefore the district court's injunction cannot stand. Plaintiffs' response provides no reason to revisit the motions panel's conclusion.

Beyond their inability to show any likelihood of success on the merits of their claims, plaintiffs also fail to show that the Executive Orders themselves would cause them to suffer any cognizable harm, let alone that they would suffer the kind of irreparable injury necessary to justify a preliminary injunction. In contrast, the government suffers immediate and

significant harms from an injunction preventing the President from

providing lawful directives to subordinate executive officers.  For all of

those reasons, the preliminary injunction must be vacated in whole.

## I.    Plaintiffs Have No Likelihood of Success on the Merits.

### A.    Plaintiffs' merits arguments disregard what the provisions they challenge actually say and do

All of plaintiffs' arguments addressing the likelihood of success on

the merits of their claims suffer from a common defect: They do not

meaningfully address or respond to what the Executive Order provisions

they challenge actually say.  Instead, despite raising purely facial

challenges to those provisions, plaintiffs insist that what really matters is

plaintiffs' fears and suspicions about how various government actors

might misinterpret or misapply the challenged provisions and preexisting

federal law referenced in those provisions.  Whether viewed through the

lens of threshold justiciability issues like ripeness and standing or on the

merits of plaintiffs' constitutional claims, that is wrong.

Plaintiffs show their misapprehension of the issues presented in this

case in the very first sentence of their brief, claiming that this is a challenge

to Executive Orders that "eliminate principles and programs promoting

3

diversity, equity, inclusion, and accessibility."  Resp. Br. 1.  As a
unanimous stay panel of this Court concluded, that is not what the
Executive Orders say or do.  "The Executive Orders do not purport to
establish the illegality of all efforts to advance diversity, equity or
inclusion, and they should not be so understood."  Order 7 (Harris, J.,
concurring).  Instead, they instruct federal officers to enforce existing
federal antidiscrimination law, direct federal officers to use existing lawful
authority to terminate government contracts and grants that the President
has decided no longer warrant federal funding, and require recipients of
federal funds to certify their compliance with federal law.  That all of these
directives come against a backdrop policy judgment that certain efforts to
promote diversity, equity, and inclusion (DEI) may be either unlawful or
unwise does not transform those directives into covert prohibitions against
otherwise lawful DEI programs or activities.

Plaintiffs are wrong to attribute to the stay panel the view that any
subsequent agency action could show otherwise.  Plaintiffs constructed this
case as a facial challenge to the provisions of the Executive Orders
themselves.  No amount of factual development will change the

4

fundamental defects with those challenges.[1]  The stay panel did not suggest

otherwise.  Instead, the panel indicated that agency action implementing

the challenged provisions could raise independent constitutional concerns

in the future.  *See* Order 4-5, 5 n.3 (Diaz, C.J., concurring); Order 7 (Harris,

J., concurring) ("Agency enforcement actions that go beyond the Orders'

narrow scope may well raise serious First Amendment and Due Process

concerns … ."); Order 9 (Rushing, J., concurring) ("[T]his case does not

challenge any particular agency action implementing the Executive

Orders.").  But, of course, the way for plaintiffs (or anyone else) to raise

those concerns would be to challenge the relevant agency action, not the

Executive Orders themselves.  And any relief in such a case would be

limited to the specific action challenged and would not somehow

---

[1] For the same reason, plaintiffs' suggestion that this Court should
simply vacate and remand this case to district court to allow for further
factual development on these questions is unavailing.  This Court does not
need any additional factual development to resolve these legal questions.
Furthermore, plaintiffs have now repeatedly indicated that they intend to
amend their complaint to add new allegations about agencies'
implementation of the challenged provisions and then seek another round
of preliminary injunctive relief mirroring the injunction at issue in this
appeal.  It would therefore be in the interest of judicial economy for this
Court to issue a precedential decision rejecting plaintiffs' constitutional
challenges in order to forestall that kind of seriatim litigation of these facial
constitutional challenges.

metastasize to the Executive Orders in a way that could justify an injunction against the Executive Orders themselves.

**B.    Plaintiffs are not likely to succeed on any of their challenges**

### 1. The Termination Provision

The Termination Provision directs agencies to "terminate, to the maximum extent allowed by law, all … 'equity-related' grants or contracts." Exec. Order No. 14,151 § 2(b)(i), 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025). Plaintiffs make clear in their response that—unsurprisingly—they have no basis to object to the termination of grants or contracts to the extent "allowed by law." Instead, plaintiffs are concerned that some government actors will disregard what the Termination Provision says and terminate grants or contracts without regard to their legality. Those indefinite concerns, however, are not justiciable at this time. And in any event, there is a fundamental disconnect between the as-applied concerns plaintiffs raise and the facial challenge they bring. *See* Resp. Br. 27 ("Plaintiffs' constitutional claims are not based on a particular contract or agreement."). Plaintiffs offer no reason to enjoin the Presidential directive itself, nor could

they given that the directive they challenge is expressly limited to the exercise of preexisting lawful authority.

Justiciability: Plaintiffs argue that they have standing to challenge the Termination Provision either because they believe certain awards have been terminated "due to the [Executive] Orders" or because they fear certain federal funds will be lost "because of the Termination Provision" in the future. Resp. Br. 23. But as explained in the government's opening brief, neither of those theories of injury holds water upon examination. Gov't Br. 14-15. For contracts that have already been terminated, if plaintiffs think any particular termination was unlawful in any way, they can challenge that decision in an appropriate forum. But they have not done so here, and plaintiffs give no explanation of how an injunction against a Presidential directive contained in an Executive Order could do anything to bring already terminated contracts or grants back to life.

Any theory of standing based on contracts that may be terminated in the future faces numerous problems. First, plaintiffs disregard that the Termination Provision itself plainly does not authorize the termination of any grant or contract. Any such termination would, per the directive, have to be made pursuant to some preexisting termination authority, not

7

pursuant to the Termination Provision.  Plaintiffs assert that the

Termination Provision's reference to "the maximum extent permitted by

law" is "boilerplate language" that is inconsistent with "how the

[Executive] Orders have been enforced."  Resp. Br. 25.  Whatever plaintiffs

mean by "boilerplate language," the text of the Termination Provision is

clear that termination should only be pursued to "the maximum extent

permitted by law"; that is not some tangential savings clause but instead is

a clear limitation on the President's directive that means what it says.

Plaintiffs' insistence that some agencies have acted beyond the scope

of the Executive Order and terminated particular equity-related grants or

contracts in ways that are not "permitted by law," *see* Resp. Br. 25-26

(quotation marks omitted), only underscores the fundamental flaws in

plaintiffs' case.  Plaintiffs do not challenge whether any individual contract

termination has been accomplished in accordance with the law.  Instead,

they challenge the President's judgment that certain categories of contracts

should be terminated to the maximum extent permissible.  That may be a

judgment that plaintiffs disagree with, but it is a judgment that the

President is manifestly entitled to make.  None of this means that it is

impossible to argue that an Executive Order is unlawful, only that plaintiffs

8

cannot establish that any unlawful conduct by federal agencies will be premised on the Executive Orders at issue here.

Plaintiffs' response to the plain fact that any contract dispute would need to be brought in the Court of Federal Claims under the Tucker Act similarly misses the point. Plaintiffs are right that there is no live contract dispute for contracts or awards that plaintiffs fear will be terminated in the future. But that merely underscores that this lawsuit is premature insofar it is premised on a claim that plaintiffs fear "losing federal funds" in the form of contracts that they claim will be unlawfully terminated at some point in the future. Resp. Br. 23-24. As for any contracts or awards that have already been terminated, plaintiffs claim that they have a present injury in the form of "los[t] federal funds," Resp. Br. 23-24, but simultaneously concede in their response that their "constitutional claims are not based on a particular contract or agreement," Resp. Br. 27. The fact that plaintiffs seek only an injunction against a directive in an Executive Order and have not sought to recoup any allegedly unlawfully terminated federal funds only confirms the fundamental disconnect between the injuries plaintiffs claim, the challenges they bring, and the remedy they seek.

9

<u>Merits</u>:  On the merits, plaintiffs offer no real response to the government's discussion of the fundamental defects in the district court's analysis.  Plaintiffs instead largely repeat the same errors as the district court.

To start, as explained in the government's opening brief, Gov't Br. 17-19, plaintiffs' assertion that Executive Orders "can be" subject to the same void-for-vagueness analysis as criminal statutes, Resp. Br. 35-36, does not provide any basis for subjecting this Executive Order to such review. Plaintiffs fail, in particular, to provide any basis for treating an Executive Order that merely provides directives within the Executive Branch to the same scrutiny that would apply to a criminal statute regulating private conduct.

The purposes vindicated by the Fifth Amendment's prohibition against vague laws make clear why.  The doctrine ensures that regulated parties have adequate notice of what they must do to comply with the law and prohibits arbitrary enforcement of those requirements.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The Termination Provision is not a law, and it does not prohibit any private conduct.  It is merely a directive that articulates the President's policy priorities to his subordinates within

10

the Executive Branch.  That directive is not subject to judicial vagueness review under the Due Process Clause.

Plaintiffs offer no response to any of this and instead simply assert that the void-for-vagueness doctrine applies, citing a 2009 decision from the Ninth Circuit and a 2020 decision from the Northern District of California for the proposition that Executive Orders can be "subject to review under constitutional vagueness standards."  Resp. Br. 36.  The Ninth Circuit case they cite is the same authority cited by the district court.  As explained in the government's opening brief, the Ninth Circuit did not declare unlawful the Executive Order at issue there and the facts of that case are distinguishable from this case in any event.  Gov't Br. 18-19 (discussing *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133 (9th Cir. 2009)).  And whatever persuasive weight an out-of-circuit district-court decision might have, the district-court decision plaintiffs cite addressed an Executive Order that did not merely direct the exercise of discretion by federal agencies but required government contracts to include a provision that prohibited certain conduct on pain of termination of the contract and ineligibility for future contracts.  *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 530 (N.D. Cal. 2020).

11

All plaintiffs' discussion of the merits of the vagueness analysis is therefore irrelevant. Resp. Br. 37-40. As plaintiffs acknowledge, the terms that they regard as vague do not themselves terminate any contract or grant; that would have to be done by Executive Branch officials who would have to take some "implementation actions," Resp. Br. 38, to give the directive real-world effect. Plaintiffs' arguments thus boil down to an assertion that Executive Branch officials are subject to vague instructions. The uncertainty that plaintiffs themselves face is attributable not to the Termination Provision but rather to the possibility that they do not know whether government officials will elect to award them grants or to terminate existing grants that the government has the legal authority to terminate. But that type of uncertainty has never been thought to create a vagueness problem. *See National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998); Gov't Br. 19-21.

Plaintiffs fare no better in suggesting that the Termination Provision directs Executive Branch officials to violate the law. To the extent any agency terminates an award in a way that is unlawful, that can hardly be said to be "implement[ing]" the Termination Provision, which directs agencies only to terminate awards to the extent permitted by preexisting

12

law.  As noted above, *supra* p. 8, plaintiffs' characterization of this

limitation as "boilerplate," Resp. Br. 38, fails.  And plaintiffs' attempt, Resp.

Br. 38-39, to analogize the directive contained in the Termination Provision

to the "purely theoretical savings clause" this Court confronted in *HIAS,*

*Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021), is equally misguided for the

reasons explained in the government's opening brief (at 32), to which

plaintiffs offer no response.

### 2.    The Report Provision

The next challenged provision directs the Attorney General to submit

a report to "inform and advise" the President "so that [the] Administration

may formulate appropriate and effective civil-rights policy." Exec. Order

No. 14,173 § 4(b), 90 Fed. Reg. 8633, 8635 (Jan. 31, 2025) (EO 14,173).  That

report must include "recommendations for enforcing Federal civil-rights

laws and taking other appropriate measures to encourage the private sector

to end illegal discrimination and preferences, including DEI." *Id.*  For the

reasons given in the government's opening brief, plaintiffs do not have

standing to challenge a request from the President to his Attorney General

for a report recommending a plan for enforcing particular Federal laws.

Gov't Br. 24-29.  And even if they did, such a directive is entirely

unremarkable and plainly lawful.  *See* Gov't Br. 29-33.

Justiciability: Plaintiffs claim that their challenge to the Report

Provision is justiciable because it chills their speech.  Resp. Br. 20-22.  But in

doing so, they disregard what the Report Provision actually says in several

respects.  First, their claim that the provision "targets the private sector,"

Resp. Br. 20, disregards that the challenged provision only directs

subordinate officials to prepare a report and make recommendations to the

President.  Second, and relatedly, their claim that they fear "investigation

and ensuing enforcement actions" under the provision, Resp. Br. 21,

disregards that the provision itself does not regulate plaintiffs or their

members at all, much less subject them to a threat of enforcement if they

engage in particular protected activity.  Instead, it merely directs the

Attorney General to propose a strategy for enforcing preexisting federal

civil rights laws that plaintiffs do not challenge here.  It is well settled that

plaintiffs cannot demonstrate Article III standing "simply by claiming that

they experienced a 'chilling effect' that resulted from a governmental

policy that does not regulate, constrain, or compel any action on their

part."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 419 (2013).  And third,

14

plaintiffs' assertion that the provision "reaches beyond unlawful conduct and silences broad swaths of protected speech," Resp. Br. 21, finds no support in the text of the provision, which is plainly limited to dissuading "illegal" policies and practices.

Plaintiffs largely disregard what the Report Provision says and instead claim that the government's focus on the text of the provision somehow represents a "rose-colored interpretation" of it. Resp. Br. 21. In support of that confusing claim, plaintiffs point to other language "used throughout the Orders" that supposedly has some bearing on the meaning of the Report Provision. *Id.* That argument is wrong for several reasons. First, plaintiffs do not appear to contest that the provision they actually challenge directs the Attorney General to identify and investigate only "unlawful" activity. That express language makes plaintiffs' claim that the "Orders draw no distinction between lawful and unlawful DEI and DEIA programs" incomprehensible. *Id.* Plaintiffs' point seems to be that—despite the directive to investigate only unlawful activity—other sections of the Executive Orders discuss DEI in a way that expands the Report Provision to call for investigations into and enforcement against lawful programs and activities. But no matter how plaintiffs try to fight it, the

15

provision they challenge says what it says. And the possibility that the President or federal agencies might exercise existing authority to limit government funding of even lawful programs with which they disagree as a policy matter provides a natural explanation for why the President might sometimes refer to unlawful DEI programs and other times refer to DEI programs generally.

In any event, even the unchallenged provisions of the Executive Order on which plaintiffs rely do not suggest that the Executive Orders presuppose that all programs labeled as "DEI" violate federal law. Section 1 of Executive Order 14,151 says that the President has determined that the prior administration promoted "illegal and immoral discrimination programs" that went "by the name 'diversity, equity, and inclusion.'" That assertion does not necessarily assume that all programs that go "by the name" of DEI are unlawful. Section 1 of the Executive Order 14,173, similarly, says that programs that use "race- and sex-based preferences under the guise of so-called [DEI] can violate the civil-rights laws." EO 14,173, § 1, 90 Fed. Reg. at 8633. Far from suggesting that all programs labeled as DEI are unlawful, that statement makes the entirely

16

unremarkable observation that programs that treat people differently based on their race or sex "can violate" federal civil rights laws.

Because the Report Provision targets only unlawful conduct, and because plaintiffs assert no First Amendment right to engage in unlawful conduct, plaintiffs fail to establish that any chilling effect they claim is objectively reasonable. That is fatal to their theory of standing. *Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013), which plaintiffs invoke in support of their chill-based standing theory, Resp. Br. 18, 25, only underscores that plaintiffs' claims are not justiciable. There, this Court confronted a First Amendment challenge to a statute prohibiting unlicensed people from engaging in the "practice of dietetics/nutrition." 721 F.3d at 230 (quotation marks omitted). A state board charged with enforcing the statute informed the plaintiff that it had reviewed his website, concluded it was not in compliance with the statute, and directed him to make "necessary changes" to remedy the problem. *Id.* at 231 (emphasis and quotation marks omitted). Even though no enforcement action had been initiated, this Court held that the plaintiff's challenge was ripe because "[n]o further action from the Board [wa]s needed" as it had already "manifested its views that the [statute] applie[d] to [the plaintiff's] website, and that he

17

was required to change it in accordance with the red-pen review or face

penalties." *Id.* at 241. In other words, the case was ripe because the state's

interpretation of the challenged statute was clear, the plaintiff's fear of

enforcement was objectively and subjectively reasonable, and no further

factual or legal development was required to evaluate the plaintiff's claim.

None of those features is present here. And that case in any event involved

an as-applied challenge to a statute that imposed criminal penalties, not a

facial challenge to an Executive Order directing Executive Branch agencies

to prepare a report.

Merits: As explained in the government's opening brief, plaintiffs are

unlikely to succeed in showing that the Report Provision is

unconstitutional under either the First or Fifth Amendment even if those

claims are justiciable. Gov't Br. 29-33. On Fifth Amendment vagueness, as

discussed above, *supra* pp. 10-12, plaintiffs offer no response to the fact that

a Presidential directive to subordinates contained in an Executive Order—

like a directive issued to subordinates at a cabinet meeting or on a phone

call—is not subject to vagueness review under the Due Process Clause.

That alone is fatal to any Fifth Amendment claim plaintiffs raise against the

Report Provision.

18

As for the First Amendment, plaintiffs are wrong to claim that the Report Provision amounts to "unconstitutional viewpoint discrimination" or a "content-based restriction" on speech." Resp. Br. 42. Like the district court, plaintiffs hinge their entire First Amendment argument on the assertion that the Report Provision targets protected speech in the form of "disfavored 'principles,' *i.e.*, those that support diversity, equity, and inclusion." Resp. Br. 41. As explained in the government's opening brief, that assertion has no support in the text of the Report Provision. Gov't Br. 30-31. The Report Provision is about developing a strategy for the enforcement of existing federal law—a strategy that will be reflected in a report, which in turn might lead to subsequent actions enforcing federal antidiscrimination laws. Unsurprisingly given that focus on enforcing federal law, the provision only directs the Attorney General to deter "*illegal* discrimination." Plaintiffs have no First Amendment right to engage in illegal conduct. *See Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 243-44 (4th Cir. 1997). As explained in the government's opening brief, Gov't Br. 31-32, the President's decision to focus enforcement efforts on particular categories of illegal conduct is not a viewpoint or content-based restriction on speech. *See United States v. Texas*, 599 U.S. 670, 678 (2023).

Plaintiffs once again fail to meaningfully engage with any of this. As noted in the government's opening brief, Gov't Br. 31, the President can determine that illegal discrimination against a certain group is particularly prevalent and direct federal agencies to focus on curtailing that discrimination without engaging in viewpoint discrimination. Plaintiffs neither dispute that point nor try to distinguish that scenario from the directive contained in the Report Provision. And unable to respond to the plain text of the provision that they chose to challenge, plaintiffs instead try to dismiss the text of the Report Provision as "[d]efendants' representation that the Orders simply enforce antidiscrimination laws." Resp. Br. 43. But that is not a "representation" about the Report Provision; it is what the provision says.

Plaintiffs alternatively try to analogize their claim to the challenge to an obscenity law at issue in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). Resp. Br. 43-44. But that case involved an actual threat issued to a bookseller to commence enforcement action if the bookseller did not cease distributing certain identified books. *See* 372 U.S. at 61 ("The Commission's practice has been to notify a distributor on official Commission stationery that certain designated books or magazines

20

distributed by him had been reviewed by the Commission and had been
declared by a majority of its members to be objectionable for sale,
distribution or display to youths under 18 years of age.").  It has no evident
relevance to an instruction within the Executive Branch to identify
unlawful practices and prepare a report about how to combat them.

### 3.    The Certification Provision

The final challenged provision provides that agencies must include in
"every contract or grant award" (1) a "term requiring [the contractor] or
recipient to certify that it does not operate any programs promoting DEI
that violate any applicable Federal anti-discrimination laws," and (2) a
"term requiring the [contractor or] recipient to agree that its compliance in
all respects with all applicable Federal anti-discrimination laws is material
to the government's payment decisions for purposes of [the False Claims
Act]." EO 14,173 § 3(b)(iv)(A)-(B), 90 Fed. Reg. at 8634.  Once again,
plaintiffs' arguments—both on justiciability and on the merits—are
irreconcilable with what the provision they challenge actually says.  That is
fatal to their facial challenge, and the district court erred in concluding
otherwise.

<u>Justiciability</u>:  As with the Report Provision, plaintiffs' theory of standing to challenge the Certification Provision rests entirely on their assertion that protected speech is reasonably chilled by the provision. Resp. Br. 18-20.  But as explained in the government's opening brief, Gov't Br. 34-36, plaintiffs' theory of self-censorship is not objectively reasonable because it turns solely on an assumption that the government will either do something different from what the Certification Provision says or misinterpret federal law.  For example, plaintiffs say that Baltimore "fears it may have to abandon its lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds that support the City's valuable programs."  Resp. Br. 19 (SA54).  But "lawful efforts" related to DEI are not covered by the Certification Provision.  To the extent plaintiffs fear that some agency will in the future misinterpret federal law and assert that some lawful program is actually unlawful, they can challenge that action when a concrete dispute arises—presumably by defending a False Claims Act dispute on the merits.  But again, here plaintiffs challenge—and the district court enjoined—the Presidential directive contained in the Executive Order itself.

Plaintiffs say that someone "'who wishes to challenge the constitutionality of a law' is not required 'to confess that he will in fact violate that law.'" Resp. Br. 20. But that observation is irrelevant to the question presented here several times over. First, plaintiffs do not challenge the constitutionality of any law; they challenge the constitutionality of a provision of an Executive Order directing agencies to require certification of compliance with existing federal law. The federal laws implicated here are the civil rights laws, and whether plaintiffs could challenge the constitutionality of those—which they have not done— without first admitting that they plan to violate them is neither here nor there. Second, the problem with plaintiffs' theory of standing is not that plaintiffs have failed to "confess that [they] will in fact violate the law." The defect in plaintiffs' theory is that all plaintiffs are being asked to do is to certify that they intend to comply with the law—the sort of certification that, as the government explained in its opening brief, is commonplace, *see* Gov't Br. 38.

Plaintiffs confusingly claim that "the focus is on the breadth of the certification and whether the government is likely to enforce it." Resp. Br. 20. But again, the certification required is not broad; it is plainly limited to

23

certifying that the recipient is not engaged in unlawful activity.  To the extent plaintiffs mean to suggest that they fear that the government will misinterpret existing federal law at some point in the future and conclude that some unspecified lawful conduct is actually unlawful, that theory of injury suffers from numerous deficiencies.  It turns on multiple layers of speculation and asks this Court to prejudge now an indefinite universe of hypothetical future disagreements about the meaning and application of various federal laws.  That theory is neither sufficiently definite to state an Article III injury nor sufficiently ripe for present adjudication.

Merits: Plaintiffs' assertion that "[d]efendants do not dispute that the Certification Provision discriminates between viewpoints" is manifestly wrong.  Resp. Br. 30.  Illegal conduct is not a viewpoint, and the fact that the Certification Provision chooses to focus on illegal activity in a particular area is not viewpoint discrimination.  Like the other provisions at issue in this case, the certification requirement imposes no new requirements on primary conduct.  Rather, it simply requires recipients to certify their compliance with existing legal obligations under the "applicable" federal civil rights laws such as Title VI of the Civil Rights Act of 1964, which applies to all recipients of federal assistance, 42 U.S.C. § 2000d-1 — rules

24

that are already binding independent of any certification requirements. The Executive Order merely instructs agencies to require a certification that these obligations are being honored.

Plaintiffs' assertion that "the provision is so vague as to chill a variety of protected speech," Resp. Br. 31, is both wrong and telling. As plaintiffs acknowledge in the very next sentence of their brief, the provision is not broad—it requires only that entities certify that they are not engaged in illegal activities. *Id.* What plaintiffs seem to mean is that the Executive Orders do not themselves define what kinds of DEI related activity would violate federal antidiscrimination laws. That is a feature, not a bug. The Orders do not create or modify the universe of federal antidiscrimination laws or the robust body of case law interpreting those laws. Put another way, the day before these Executive Orders issued, a grantee deciding whether a contemplated program or action might violate federal antidiscrimination law would look to the text of relevant antidiscrimination laws and judicial opinions interpreting the parameters of those laws to evaluate if they could certify their compliance with federal law. As plaintiffs acknowledge, the Executive Orders do not change that. If plaintiffs harbor some uncertainty about what federal antidiscrimination

25

laws require or whether any given DEI program might be unlawful, that is
a problem unrelated to the provisions they challenge and not likely to be
redressed by the injunction they have obtained.  And as noted in our
opening brief, any good-faith uncertainty about the meaning of federal
antidiscrimination laws would be a complete defense to any False Claims
Act action.  *See* Gov't Br. 41.  So, plaintiffs have no need to fear filing an
inadvertently false certification.

Plaintiffs complain that the certification is overbroad because it
prohibits them from operating any program that promotes DEI.  *See* Resp.
Br. 34.  But again, plaintiffs' complaints are impossible to square with what
the provision actually says.  Plaintiffs again suggest—with no
explanation—that the Certification Provision somehow turns on an
assertion that "all 'DEI' … [is] per se illegal."  *Id.*  That simply cannot be
squared with the text of the provision, which requires certification only
that the entity "does not operate any programs promoting DEI that violate
any applicable Federal anti-discrimination laws."  If a program "promoting
DEI" does not "violate any applicable Federal anti-discrimination laws," it
plainly falls outside the scope of that certification.

## II.    Plaintiffs Also Fail to Establish the Remaining Preliminary Injunction Factors.

Because plaintiffs cannot establish a likelihood of success on the merits, the injunction should be reversed for that reason alone.  But in any event, the remaining factors—irreparable harm, the balance of harms, and the public interest—likewise favor the government and fail to support the district court's injunction.  Unsurprisingly, plaintiffs' arguments on each of those factors merely restate their arguments on the merits.  *See* Resp. Br. 50-56.

And even if plaintiffs were likely to prevail on the merits, the remaining factors still would not support a preliminary injunction.  The district court's injunction thwarts the government's implementation of a vital Presidential initiative.  Conversely, plaintiffs experience no harm, let alone irreparable harm, from the mere fact that the President has directed his subordinates to enforce and deploy existing federal law and authority in order to further policy priorities.  The balance of the equities and the public interest thus strongly favor allowing the challenged Presidential directives to remain in effect.

27

### III.    At a Minimum, the Preliminary Injunction Is Overbroad.

As explained in the government's opening brief, the preliminary injunction the district court issued here is shockingly broad in two different respects.  First, it is not limited in any way to redressing plaintiffs' injuries and instead enjoins the challenged provisions universally.  And second, as clarified by the district court, the injunction runs against not just the defendant agencies that plaintiffs named in their complaint, but non-defendant federal actors as well.

On the nationwide scope of the relief, plaintiffs respond that this Court has allowed nationwide injunctions to remain in place in limited circumstances.  Resp. Br. 50.  But in the very case that plaintiffs cite for that proposition, this Court confirmed that a court "must ensure that a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quotation marks omitted).  Plaintiffs do not explain why it would be burdensome for members of the organizational plaintiffs to inform defendants that they are covered by an injunction.  Resp. Br. 50-51.  Nor does their speculation about indirect effects on the plaintiffs of potential enforcement against nonparties satisfy

28

the requirements for Article III standing, much less irreparable harm.  *See Murthy v. Missouri*, 603 U.S. 43, 75 (2024) (rejecting "startlingly broad" theory of standing that would provide "right to sue over *someone else's* censorship—at least so long as they claim an interest in that person's speech").

Plaintiffs' defense of the injunction's application to the entire Executive Branch is similarly unavailing.  Plaintiffs assert that extending relief to non-defendant agencies was "necessary to afford complete relief" to plaintiffs.  Resp. Br. 51.  But that response suffers from numerous problems.  First, even assuming plaintiffs have established standing at all, *but see supra* pp. 7-9, 14-18, they certainly have not established standing to bind all Executive Branch agencies because they have not established that they have contracts or grants with every agency.  Second, plaintiffs' suggestion that binding the entire Executive is necessary to provide them with complete relief disregards that plaintiffs are the ones who decided which agencies to name as defendants in this lawsuit.  In choosing to name many but not all federal agencies as defendants in this action, plaintiffs chose which agencies they thought they needed to enjoin in order to remedy the harms they allege.  Any "artificial[ity]," Resp. Br. 51, arising

from the fact that plaintiffs would receive relief only against the parties they named in their complaint is the result of plaintiffs' own litigation decisions and provides no reason to take the extraordinary step of enjoining non-parties. As noted in the government's opening brief, Gov't Br. 47-48, the district court's decision to extend the reach of its injunction to bind non-parties is unheard of, inconsistent with precedent, and cannot be allowed to stand. And plaintiffs' argument that all agencies are acting in concert because they are all supervised by the President would eliminate any need to identify the proper defendants in any lawsuit against the government, much less any need to identify particular actions that threaten to cause injury.

30

## CONCLUSION

For the foregoing reasons and those given in our opening brief, this

Court should vacate the preliminary injunction.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

MARK R. FREEMAN
DANIEL TENNY
 *s/ Jack Starcher*
JACK STARCHER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*
  *john.e.starcher@usdoj.gov*

May 2025

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,955 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2025, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Service will be accomplished by the appellate CM/ECF system.

*s/ Jack Starcher*

Jack Starcher